William Reeves
State Bar No. 8235
MORALES FIERRO & REEVES
600 S. Tonopah Drive, Suite 300
Las Vegas, NV 89106
Telephone: 702/699-7822
Facsimile: 702/699-9455
Email: wreeves@mfrlegal.com

Attorneys for Plaintiff/Defendant/Cross-Claimant
Steadfast Insurance Company

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CAPITOL SPECIALTY INS. CORP., | Case No.: 2:20-CV-01382-JCM-VCF |
| Plaintiff, | Consolidated with Case No. 22-CV-00335-MMD-CLB |
| vs. | APPENDIX OF EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| STEADFAST INS. CO., et al., | |
| Defendants. | <u>Accompanying Documents</u>: Motion, Request for Judicial Notice, Declaration of W. Reeves |
| and related crossclaims | |

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Defendant Steadfast Insurance Company hereby offers the following exhibits in support of its Motion for Summary Judgment:

Exhibit A - Excerpts of Deposition of Christopher Ford

        Ex. A, exhibit 1- Steadfast policy

        Ex. A, exhibit 7 - Steadfast denial of Milan claim

        Ex. A, exhibit 13 - Steadfast reservation of rights re Virginia claim

        Ex. A, exhibit 25 - Capitol letter challenging denial of Military claim

Exhibit B - Excerpts of Deposition of Brad Breach

        Ex. B, exhibit 34 - Email from United to Milan owner re Milan claim

        Ex. B, exhibit 37 - Email from Sherie Cloutier to Danielle Hill and Breach re Virginia and Milan claims

Ex. B, exhibit 43 - Email from United to L/P re Military claim

Ex. B, exhibit 44 - Email thread re Military claim

Ex. B, exhibit 50 - Steadfast denial of Military claim

Exhibit C - Excerpts of Deposition of Richard Bullard

Ex. C, exhibit 46 - Email thread re Military claim

Exhibit D - Excerpts of Deposition of William Roy

Ex. D, exhibit 73 - Capitol policy

Exhibit E - Excerpts of Deposition of Lori Sebransky

Ex. E., exhibit 59 - Email from Sebransky to L/P and Capitol re Military claim

Ex. E, exhibit 80 - Email from Sebransky to Capitol re Release Agreement

Ex. E, exhibit 109 - Email thread re United settling with Steadfast

Ex. E, exhibit 130 - Email thread re United providing information to Capitol

Exhibit F - Excerpts of Deposition of Craig Willcut

Ex. F, exhibit 55 - Email from Willcut to L/P re Military claim

Ex. F, exhibit 57 - Release Agreement

Exhibit G - Excerpts of Deposition Danielle Hill

Ex. G, exhibit 44 - Email thread re Military claim

Ex. G, exhibit 46 - Email thread re Military claim

Exhibit H - Excerpts of Deposition of Mike Clements

Ex. H, exhibit 31 - Narrative re Milan claim

Exhibit I - United Complaint

Exhibit J - LP Cross-Complaint

Exhibit K - Settlement Agreement

Exhibit L - Assignment And Cooperation Agreement

Exhibit M - Excerpts of Supplemental Disclosures

///

///

///

2

Exhibit N - Excerpts of Responses to Interrogatories

Dated: April 7, 2023

MORALES FIERRO & REEVES

By     /s/ William C. Reeves
          William C. Reeves
          600 S. Tonopah Dr., Suite 300
          Las Vegas, NV  89106
          Attorneys for Steadfast

# EXHIBIT A

# EXHIBIT A

```
 1                  UNITED STATES DISTRICT COURT
 2                     DISTRICT OF NEVADA
 3
 4
 5     CAPITOL SPECIALTY INSURANCE     )
       CORPORATION, a Wisconsin        )
 6     corporation, as assignee of     )
       UNITED CONSTRUCTION COMPANY,    )
 7                                      )
                                        )
 8                                      )
                  Plaintiff,            )
 9                                      )
          VS.                           ) CASE NO. 20-CV-1382
10                                      )
                                        )
11     STEADFAST INSURANCE COMPANY, a   )
       Delaware corporation; RHP        )
12     MECHANICAL SYSTEMS, a Nevada     )
       corporation; STATE NATIONAL      )
13     INSURANCE COMPANY, INC.,         )
       a Texas corporation; and AXIS    )
14     SURPLUS INSURANCE COMPANY, an    )
       Illinois corporation,           )
15                                      )
                  Defendant.            )
16     _____
17
18
                  VIDEO DEPOSITION OF CHRISTOPHER H. FORD
19
                         JUNE 2, 2022
20
21
22
23
       Reported by:  Anne Kielwasser, RPR No. 50901, CSR, CRR
24
25
                                              Page 1
```

```
 1                              A P P E A R A N C E S
 2
 3     FOR THE PLAINTIFF:
 4
       Sarah J. Odia
 5     PAYNE & FEARS LLP
       6385 S. Rainbow Blvd., Suite 220
 6     Las Vegas, Nevada 89118
       Telephone: (702) 851-0300
 7     Facsimile: (702) 851-0315
       Sjo@paynefears.com
 8
       Counsel for Plaintiff
 9     Capitol Specialty Insurance Corporation
10
11
12     FOR THE DEFENDANT:
13
       William Reeves
14     MORALES FIERRO & REEVES
       600 Tonopah Drive, Suite 300
15     Las Vegas, North Virginia 89106
       rmorales@mfrlegal.com
16
       Counsel for Steadfast Insurance Company
17
18
19
       Sarah Hartig
20     TYSON & MENDES LLP
       3960 Howard Hughes Pkwy., Ste. 600
21     Las Vegas, North Virginia 89169
       JWest@TysonMendes.com
22
       Counsel for RHP Mechanical Systems
23
24
25     The Legal Videographer: Steven Henry
```

Page 2

```
1                          INDEX
2        WITNESS:                                    PAGE:
3
          CHRISTOPHER H. FORD                             6
4         DIRECT EXAMINATION BY MS. ODIA                  7
          CROSS-EXAMINATION BY MS. HARTIG               204
5
                             * * * * *
6
                           EXHIBITS
7
          Exhibit No. 1, Zurich policy Contractor's      14
8         Protective Professional Indemnity and Liability
          Insurance Policy, marked for identification
9         Exhibit No. 2, a tender August 6, 2016,        18
          Steadfast Insurance Company from United
10        Construction Company, marked for identification
          Exhibit No. 3, Steadfast claim notes for the   19
11        385 Milan claim, marked for identification
          Exhibit No. 4, an e-mail chain dated August 12, 23
12        2016, marked for identification
          Exhibit No. 5, e-mail dated 8-26-16, marked for 28
13        identification
          Exhibit No. 6, July 14th, 2016 letter to United 31
14        Construction Company, marked for identification
          Exhibit No. 7, November 16th, 2016 letter,      47
15        marked for identification
          Exhibit No. 8, Steadfast's claim notes for the  64
16        Virginia Street claims, marked for
          identification
17        Exhibit No. 9, a report dated August 26, 2016,  68
          marked for identification
18        Exhibit No. 10, e-mails and documents dated     90
          April 20, 2016, marked for identification
19        Exhibit No. 11, a report by Tom Wise, dated     95
          June 7, 2017, marked for identification
20        Exhibit No. 12, Zurich Early Warning Memo,     114
          dated September 13, 2016, marked for
21        identification
          Exhibit No. 13, October 20th, 2016 letter,     122
22        marked for identification
          Exhibit No. 14, June 19th, 2018 letter to Chris 137
23        Ford from Lori Sebransky, marked for
          identification
24        Exhibit No. 15, response to United Construction 144
          Company's subpoena, marked for identification
25        Exhibit No. 16 marked for identification        149
          Exhibit No. 17, e-mails between Lori Sebransky  149
                      UNITED STATES DISTRICT COURT


                                                    Page  3
```

```
 1        and Chris Ford, marked for identification
          Exhibit No. 18, letter dated June 3rd, 2019,      160
 2        marked for identification
          Exhibit No. 19, group of e-mails, marked for      164
 3        identification
          Exhibit No. 20, e-mail dated July 22nd, 2019       169
 4        from Lori Sebransky to Ramie Morales, marked
          for identification
 5        Exhibit No. 21, claim notes for the Military      171
          Road claim, marked for identification
 6        Exhibit No. 22, set of e-mails between Chris       172
          Ford and Danielle Hill, marked for
 7        identification
          Exhibit No. 23, July 26, 2017 e-mail from Chris    176
 8        Ford Denise Hezner marked for identification
          Exhibit No. 24, July 27, 2017 letter, marked       179
 9        for identification
          Exhibit No. 25, e-mail from Jennifer Mathis to     186
10        Chris Ford, dated December 27, 2018, marked for
          identification
11        Exhibit No. 26, January 8, 2016 letter to          199
          Jennifer Mathis, marked for identification
12
                              * * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                        Page  4
```

```
 1          Q.    Okay.  And what types of documents would be in

 2     your claim file at Zurich?

 3          A.    It could have been something from counsel.

 4     We're a paperless company.  So everything came through like

 5     the call center and was imaged to the file.

 6          Q.    Okay.  So, every e-mail, every letter, every

 7     memorandum, that should all be in your claim file within

 8     Zurich.

 9          A.    Correct.

10          Q.    At Zurich.

11          MR. REEVES:  Belated, vague and ambiguous.

12               Go ahead.

13     BY MS. ODIA:

14          Q.    Okay.  So, just to give you some background.

15     I'm sure you know this case involves several claims made by

16     United Construction Company under a Contractors'

17     Prospective Indemnity Policy that was issued by Zurich, and

18     it appears that you handled those claims.  So, I'm going to

19     mark as Exhibit 1.

20               (Exhibit No. 1, Zurich policy Contractor's

21     Protective Professional Indemnity and Liability Insurance

22     Policy, marked for identification.)

23     BY MS. ODIA:

24          Q.    Okay, Mr. Ford, we just marked as Exhibit 1, a

25     Zurich policy Contractor's Protective Professional
```

```
1        Indemnity and Liability Insurance Policy.
2                      Can you take a look at that document and
3        let me know if you recognize it?
4                      MR. REEVES:  And I'll just state it's vague and
5        ambiguous in terms of recognizing.
6                      MS. ODIA:  Okay.
7                      MR. REEVES:  It's also a policy.
8        BY MS. ODIA:
9            Q.     Okay.  So, it appears this -- the named insured
10       under this policy is United Construction Company.  Is that
11       accurate?
12           A.     You want a specific page you want me to turn
13       to?
14           Q.     If you'll look at page 1 of the policy.
15                      MR. REEVES:  Again, the record will reflect we
16       produced this document.  He's not a party to this case.
17       You can obviously ask him about it, but ask him the name of
18       the --
19       BY MS. ODIA:
20           Q.     Have you --
21                      Do you recognize this document?
22           A.     This page?
23           Q.     Just the document as a whole.  Have you seen
24       this policy before?
25           A.     Yes.
```

Page 15

1          Q.       Okay.  And in what context have you seen this
2     document?
3          A.       Handling professional liability claims.
4          Q.       For United Construction Company?
5          A.       Yes.
6          Q.       Okay.  So as part of handling the claim, you
7     would have reviewed this policy; is that accurate?
8          A.       Yes.
9          Q.       Okay.  And can you tell me what kind of
10    coverage this policy provides to United Construction
11    Company?
12               MR. REEVES:  Vague and ambiguous, legal
13    conclusion.  Document speaks for itself.
14    BY MS. ODIA:
15         Q.       You can tell me your understanding of this
16    document and the coverage it provides to United
17    Construction Company?
18               MR. REEVES:  Same objections.
19               THE WITNESS:  It's a professional liability
20    policy.
21    BY MS. ODIA:
22         Q.       Okay, and what is professional --
23                  What does the policy cover?
24               MR. REEVES:  Legal conclusion, vague and
25    ambiguous.

                                        Page 16

1     found the mold?"

2          Q.     Yes.

3          A.     This is a --

4                 I've asked the questions that are -- No.

5     1, 2, 3, 4, and then below them is their responses.  So, I

6     would have taken their responses based on information that

7     they would have sent previously.  So, the factual

8     background would have been theirs.

9          Q.     Okay.  So, Steadfast didn't have any

10    information that conflicted with what the insured was

11    saying in this claim note, as far as you remember?

12                MR. REEVES:  Vague and ambiguous.

13                THE WITNESS:  I can't even understand the

14    context of that question.

15    BY MS. ODIA:

16         Q.     Okay.  Did Steadfast have any evidence that

17    would have contradicted the statements made by the insured

18    that are set forth in this November 3rd, 2016 claim note?

19                MR. REEVES:  Vague and ambiguous.

20                Also, he doesn't speak for Steadfast.

21    He's percipient.  He speaks for himself.

22                THE WITNESS:  I wouldn't.

23    BY MS. ODIA:

24         Q.     Okay.  Okay, let's look at the -- Exhibit 7,

25    the November 16, 2016 denial of the Milan claim.

```
 1                    Do you recognize this document?

 2          A.     Only because my name is on the front of it.  I

 3     do.

 4          Q.     Do you believe you drafted this letter?

 5          A.     Again, because my name is on the front of it, I

 6     would have.

 7          Q.     Okay.  Did your manager, Daryl Batjer, approve

 8     this letter?

 9          A.     He would have.

10          Q.     Okay.  Let's look at the second page of the

11     letter, the third full paragraph, first sentence.  You say:

12     "Irrespective as to the exact dates the claim was first

13     presented, UCC elected to self-perform this mediation."

14          A.     "Remediation."

15          Q.     Oh, "remediation."

16                 What evidence did you have at that time

17     that United elected to self-perform the remediation to 385

18     Milan?

19          A.     I'm just going to go back in the letter and see

20     if it already says in the letter.

21          Q.     Okay.

22          A.     But it would have been information that they

23     would have sent to us.  So, if you go on just in the

24     sentence that you just read:  "Our records reflect UCC

25     first reported this claim to Zurich in writing."
```

Page 49

```
1        foundation.

2                    THE WITNESS:  No, just the final version.

3        BY MS. ODIA:

4            Q.    Where do the drafts go?

5            A.    When you say where do they go --

6            Q.    The drafts are not saved in the claim file?

7            A.    No.

8            Q.    Are they saved anywhere?

9            A.    I don't know.

10           Q.    Okay.

11                    We'll mark this Exhibit 13.

12                    (Exhibit No. 13, October 20th, 2016 letter,

13       marked for identification.)

14       BY MS. ODIA:

15           Q.    Okay, Exhibit 13 is an October 20th, 2016

16       letter, authored by Chris Ford to United Construction

17       Company regarding the Virginia Street claims.

18                    Mr. Ford, do you recognize this document

19       as a letter you wrote?

20           A.    Only because it's on my letterhead.

21           Q.    So, looking at the claim notes, if we go back

22       to 9-7-16, when you had that -- you had that conversation

23       with risk engineering where they talked about --

24           A.    Can you give me the Bates number?

25           Q.    Sure.  It is 2 -- 240?
```

Page 122

1          A.      That's what they thought.

2          Q.      Okay.  Had you considered -- had you considered

3     that position before this phone call on 12-18-2018?

4          A.      I had not.

5          Q.      Okay.  And then the next claim note on

6     1-3-2019.  It says:  You received the rebuttal request from

7     counsel for brokers E&O carrier.  Sent AK.  F the letter.

8     That may be a typo.

9          A.      I'm sure I didn't read it like it sounds, "F

10    the letter."

11         Q.      "And draft AK to file."  What is "AK"?

12         A.      "Acknowledge."  It's a great note.  F the

13    letter.

14         Q.      All right, let me mark Exhibit 25.

15                 (Exhibit No. 25, e-mail from Jennifer Mathis to

16    Chris Ford, dated December 27, 2018, marked for

17    identification.)

18    BY MS. ODIA:

19         Q.      Okay, the first two pages, it's an e-mail from

20    Jennifer Mathis to Chris Ford, dated December 27, 2018,

21    which attaches a letter from Jennifer Mathis to Chris Ford

22    dated December 27, 2018.

23                 Mr. Ford, you can review that letter and

24    let me know if you recognize that letter.

25         A.      I recognize the letter because it was sent to

Page 186

```
1      me.  But you want me to read every --

2            Q.     No.

3            A.     Okay.

4            Q.     Okay.  So, what did you do with this letter

5      when you received it?

6            A.     F the file.

7                   I'm sure I probably would have dropped it

8      to file, called my team manager and said:  Hey, they're

9      looking at a reconsideration, and I probably would have

10     started to draft a reconsideration response.  It probably

11     would have been reviewed, probably by our claim legal team.

12           Q.     Okay.  So, do you recall whether you read this

13     letter?

14           A.     I'm sure I read the letter.

15           Q.     Okay.  Did you consider CapSpecialty's

16     position?

17           A.     I considered it in the context that they wrote

18     the letter.  I still didn't believe that they were related.

19           Q.     Okay.  And you said you didn't believe that

20     they were related.  Can you tell me why that is?

21           A.     I just didn't consider them related.  You asked

22     me my opinion; I gave it to you.

23           Q.     Okay.

24           A.     They painted a picture like it was:  Oh, look

25     at -- these are two -- these are all mirrored cases, and I
```

Page 187

# Ex A, exhibit 1

# Ex A, exhibit 1





# Contractor's Protective Professional Indemnity And Liability Insurance Policy Jacket

**STEADFAST INSURANCE COMPANY**
Dover, Delaware
Administrative Offices – 1400 American Lane
Schaumburg, Illinois 60196-1056



# Important Notice

**Service of Suit and In Witness Clause**

## Service of Suit

In the event an action or proceeding arises under the contract, it is agreed that the Company, at your request, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver or limitation of the right to arbitration as set forth herein or to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or any state in the United States. It is further agreed that service of process in such suit may be made upon Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703. In any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, other officer specified for that purpose in the statute, or his successors in office as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured of any beneficiary hereunder arising out of this policy of insurance and hereby designates the above named Illinois Corporation Service Company as the entity to whom the said officer is authorized to mail such process or a true copy thereof.

## In Witness Clause

In return for the payment of premium, and subject to the terms of this policy, coverage is provided as stated in this policy.

IN WITNESS WHEREOF, this Company has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly Authorized Representative(s).

President

Corporate Secretary

---

**QUESTIONS ABOUT YOUR INSURANCE?** Your agent or broker is best equipped to provide information about your insurance. Should you require additional information or assistance in resolving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich in North America
Customer Inquiry Center
1400 American Lane
Schaumburg, Illinois 60196-1056
**1-800-382-2150** (Business Hours: 8am - 4pm [CT])
**Email:** info.source@zurichna.com



# Important Notice to Policyholders

The address for the headquarters of Zurich North America will change after August 1, 2016 due to a relocation of our office in the same city. The new address is:

Customer Inquiry Center
Zurich North America
1299 Zurich Way
Schaumburg, IL 60196
1-800-382-2150

For specific questions regarding your policy, please contact your agent or broker.  For other questions, you may contact the Customer Inquiry Center of Zurich North America.   Any references to post office boxes previously provided remain unchanged.



# Disclosure Statement

It is our pleasure to present the enclosed policy to you
for presentation to your customer.

**INSTRUCTION TO AGENT OR BROKER:**

WE REQUIRE THAT YOU TRANSMIT THE ATTACHED/ENCLOSED DISCLOSURE STATEMENT TO THE CUSTOMER
WITH THE POLICY.

Once again, thank you for your interest, and we look forward to meeting your needs and those of your customers.



# Disclosure Statement

**NOTICE OF DISCLOSURE FOR AGENT & BROKER COMPENSATION**

If you want to learn more about the compensation Zurich pays agents and brokers visit:

http://www.zurichnaproducercompensation.com

or call the following toll-free number:  (866) 903-1192.


This Notice is provided on behalf of Zurich American Insurance Company

and its underwriting subsidiaries.

# Contractor's Protective Professional Indemnity®and Liability Insurance Declarations


ZURICH®

**Steadfast Insurance Company**
Dover, Delaware
Administrative Offices - 1400 American Lane
Schaumburg, Illinois 60196-1056

**Policy Number:**    EOC 0193620-00        **Renewal of:**  - - - - -

**Producer Number:**  18616000

**Producer Name:**   PROFESSIONAL DESIGN INS.

**Item 1.   Named Insured:**    UNITED CONSTRUCTION COMPANY

**Address:**    5300 MILL STREET
RENO, NV  89502-2320

**Item 2.   Limits of Liability:**

| | | |
|---|---|---|
| **COVERAGE PART A:** | $5,000,000 | Each "Claim" |
| | $5,000,000 | Aggregate Limit of Liability |
| **COVERAGE PART B:** | $5,000,000 | Each "Claim" |
| | $5,000,000 | Aggregate Limit of Liability |
| **COVERAGE PART C:** | $5,000,000 | Each "Claim" |
| | $5,000,000 | Aggregate Limit of Liability |
| **Policy:** | $5,000,000 | Aggregate Limit of Liability |

**Item 3.   "Policy Period":**    Inception Date: 04/20/2016        Expiration Date:    04/20/2017
(12:01 a.m. local time at the address shown in Item 1.)

**Item 4.   Self Insured Retention:**

| | | |
|---|---|---|
| **COVERAGE PART A:** | $25,000 | Each "Claim" |
| **COVERAGE PART B:** | $25,000 | Each "Claim" |
| **COVERAGE PART C:** | $25,000 | Each "Claim" |

**Item 5.   "Retroactive Date":**  04/20/2011

**Item 6.   Premium:**        REDACTED

**Item 7.   Endorsement(s) Effective at Inception:**  "See Schedule of Forms and Endorsements"

**Item 8.   Policy Form:**    STF-CPP-100-B CW (11/09)

**THESE DECLARATIONS TOGETHER WITH THE APPLICATION(S), COVERAGE PART FORM(S), AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF. COMPLETE THE NUMBERED POLICY. THE INSURANCE AS PROVIDED HEREIN IS "CLAIMS MADE." PLEASE DISCUSS ANY QUESTIONS YOU MAY HAVE WITH YOUR AGENT OR BROKER.**

# Schedule Of Forms And Endorsements



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EOC 0193620-00 | 04/20/2016 | 04/20/2017 | 04/20/2016 | 18616000 | ---------- | ---------- |

**Named Insured and Mailing Address:**
UNITED CONSTRUCTION COMPANY
5300 MILL STREET
RENO, NV 89502-2320

**Producer:**
PROFESSIONAL DESIGN INS.
PO BOX 501130
INDIANAPOLIS, IN 46250-6130

This endorsement modifies insurance provided by the following:

| Form Number | Endorsement Number | Form Name |
|---|---|---|
| STF-CPP-128-A CW (05/09) | | Contractor's Protective Professional Indemnity and Liability Insurance Policy Jacket |
| STF-GU-199-B (01/09) | | Service of Suit and In Witness Clause |
| STF-CPP-100-B CW (11/09) | | Contractor's Protective Professional Indemnity and Liability Insurance |
| STF-CPP-132-C CW (11/10) | 01 | Contractor's Pollution Liability - Claims Made |
| STF-CPP-156-B CW (11/10) | 02 | Non-Owned Disposal Site - Offsite and Onsite Coverage |
| STF-CPP-172-A CW (05/11) | 03 | ADA, FHA, OSHA, State Licensing and Regulatory Board Legal Expense Reimbursement Endorsement |
| STF-CPP-173-B CW (08/11) | 04 | Pre-Claims Assistance Endorsement |
| STF-CPP-119-B CW (02/12) | 05 | Nuclear Energy Liability Exclusion - Broad Form |
| U-GU-1191-A CW (03/15) | 06 | Sanctions Exclusion Endorsement |

# Contractor's Protective Professional Indemnity and Liability Insurance



**THIS POLICY PROVIDES CLAIMS MADE COVERAGE. UNDER COVERAGE PART A, "PROFESSIONAL LIABILITY CLAIMS" MUST FIRST BE MADE AGAINST THE "INSURED" DURING THE "POLICY PERIOD" AND REPORTED IN WRITING TO US DURING THE "POLICY PERIOD" OR EXTENDED REPORTING PERIOD, IF APPLICABLE. UNDER COVERAGE PART B, "PROTECTIVE INDEMNITY CLAIMS" MUST FIRST BE MADE BY YOU AGAINST THE "DESIGN PROFESSIONAL" AND REPORTED IN WRITING BY YOU TO US DURING THE "POLICY PERIOD" OR EXTENDED REPORTING PERIOD, IF APPLICABLE.**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine your rights, duties and what is and is not covered. Throughout this policy the words "you" and "your" refer to the "Named Insured" shown in the Declarations. The words "we", "us", and "our" refer to the Company providing this insurance. This policy contains Coverage A - Contractor's Professional Liability Coverage and Coverage B - Contractor's Protective Professional Indemnity Coverage, including terms and conditions unique to those coverage parts, and Common Policy Sections applicable to both Coverage Part A and Coverage Part B.

Refer to the DEFINITIONS sections of this policy for the special meaning of words and phrases that appear in quotation marks. PLEASE READ THE ENTIRE POLICY CAREFULLY.

In consideration of the premium charged, your undertaking to pay the Self Insured Retention, if any, and in reliance upon the statements in the application made a part hereof, and subject to the Limit of Liability of this insurance as set forth in the Declarations, and the Exclusions, Conditions and other terms of this Policy, we agree with you as follows:

**I.    INSURING AGREEMENT**

**COVERAGE PART A - CONTRACTOR'S PROFESSIONAL LIABILITY COVERAGE**

**A.    COVERAGE**

We will pay on behalf of the "Insured" all sums in excess of the applicable Self Insured Retention noted in Item 4 of the Declarations that the "Insured" is legally obligated to pay as "Damages" because of a "Professional Liability Claim" first made against the "Insured" during the "Policy Period" and reported to us during the "Policy Period", the Automatic Extended Reporting Period or the Optional Extended Reporting Period if applicable, provided that:

1    the "Professional Liability Claim" arises out of an actual or alleged negligent act, error or omission with respect to the rendering of or failure to render "Professional Services" by the "Insured" or any entity for which the "Insured" is legally responsible;

2    the actual or alleged negligent act error, or omission took place during the "Policy Period" or on or after the "Retroactive Date" specified in the Declarations; and

3    prior to the effective date of the first policy issued to you and continuously renewed by us, none of your principals, partners, directors or officers had any knowledge of any circumstance that could reasonably be expected to result in a "Professional Liability Claim".

**B.    DEFENSE**

We have the right and duty to defend, with counsel of our choice, any "Professional Liability Claim" seeking "Damages" to which Coverage Part A of this insurance applies. "Professional Liability Claim Expenses" reduce the applicable Limit of Liability identified in the Declarations and as described in Section IV.A.2 SELF INSURED RETENTION. Our duty to defend all "Professional Liability Claims" or pay any "Damages" or "Professional Liability Claim Expenses" to which this insurance applies shall end when the applicable Limit of Liability has been exhausted by the payment of "Professional Liability Claim Expenses" or "Damages".

## C.  MEDIATION

If we and you agree to use "Mediation" to resolve a "Professional Liability Claim" and the "Professional Liability Claim" is resolved thereby, the Self Insured Retention set out in the Declarations shall be reduced by 50% for that "Professional Liability Claim", subject to maximum reduction of $20,000 each "Professional Liability Claim". Any Self Insured Retention payments above the reduced Self Insured Retention amount will be reimbursed within 30 days of the resolution of the "Professional Liability Claim".

## COVERAGE PART B - CONTRACTOR'S PROTECTIVE PROFESSIONAL INDEMNITY

### A.  COVERAGE

We shall indemnify you for "Loss" in excess of the "Design Professional's Insurance", subject to the provisions of the Self Insured Retention and Limit of Liability designated in Items 4 and 2 of the Declarations, respectively, provided that:

1.  a "Protective Indemnity Claim" is first made by you against the "Design Professional" under contract to you and reported in writing by you to us during the "Policy Period" or if exercised, the Optional Extended Reporting Period;

2.  such "Protective Indemnity Claim" arises out of a negligent act, error or omission of the "Design Professional" in the rendering of or failure to render "Professional Services", and the act, error or omission took place on or after the "Retroactive Date" specified in the Declarations; and

3.  prior to the effective date of the first policy issued to you and continuously renewed by us, none of your principals, partners, directors or officers had any knowledge of any circumstance that could reasonably be expected to result in a "Protective Indemnity Claim".

### B.  DEFENSE

We shall not defend any "Design Professional", even if the "Design Professional's Insurance" has been reduced, exhausted, or for any reason is unavailable.

## II.  DEFINITIONS

A.  "Bodily Injury" means physical injury, sickness, disease, death, mental anguish or emotional distress sustained by any person.

B.  "Claim" means "Professional Liability Claim" or as otherwise defined as by endorsement to this policy.

C.  "Claim Expenses" means:

1.  fees charged by an attorney designated by:

    (a)  us; or

    (b)  the "Insured" with our prior written consent.

2.  with the exception of Item 4. in this definition, all other fees, costs and expenses resulting from the investigation, adjustment, or defense of a "Claim", and the premiums for appeal, attachment or similar bonds;

3.  interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under this policy; and

4.  allowable expenses of $500 per day but no more than $10,000 for each "Claim" as compensation to your principals, directors, officers or employees for personally attending any legal or disciplinary proceeding at our request.  These allowable expenses shall not be applied towards reducing the applicable Self Insured Retention amount and are in addition to the Limit of Liability.

"Claim Expenses" do not include salaries of your principals, directors, officers or employees, or salaries or expenses of our regular employees or officials; or fees and expenses of independent or public adjusters retained by us or the "Insured".

D.  "Damages" means the monetary amounts for which the "Insured" may be held legally liable, including sums paid as judgments, awards, or settlements, and related "Professional Liability Claim Expenses" but do not include:

    1.  the restitution, return, withdrawal or reduction of fees, profits or charges for services rendered or offered or any other consideration or expenses paid to the "Insured" or by the "Insured" for services or products; or

    2.  judgments or awards deemed uninsurable by law.

E.  "Design Professional" means those persons or entities or successors professionally qualified to perform "Professional Services" either itself or through the services of a subcontractor or subconsultant at any tier.

F.  "Design Professional's Insurance" means all professional liability policies insuring the "Design Professionals" under contract to you.

G.  "Insured" means:

    1.  the "Named Insured";

    2.  your current or former principals, partners, executive officers, directors, stockholders, trustees or employees while acting on your behalf and within the scope of their duties as such;

    3.  your current or former employees including leased personnel under your supervision, but only for acts within the scope of their employment or lease agreement;

    4.  your heirs, executors, administrators, assigns and legal representatives in the event of death, incapacity or bankruptcy, but solely with respect to the liability of the Named Insured otherwise insured herein;

    5.  any "Predecessor in Interest";

    6.  any "Insured" with regard to its participation in a legal entity including a limited liability company or joint venture, but only to the extent of the Insured's legal liability resulting from its performance of Professional Services under the respective legal entity or joint venture.

    7.  Any entity that is newly formed or acquired by the Named Insured during the policy period where the Named Insured has greater than fifty percent ownership, control, or beneficial interest, provided however that:

        a.  Coverage shall be provided only for "Damages" arising out of "Professional Services" performed on or after the date of formation or acquisition, subject to the "Retroactive Date"; and

        b.  This coverage shall expire at the end of the Policy Period or within 90 days of such formation or acquisition of the entity, whichever is earlier, unless you submit written notice to the Company providing detailed information concerning the newly formed or acquired entity, and provided further that you pay any additional premium requested by the Company.

H.  "Loss" as respects Coverage Part B, means the amount you are legally entitled to recover from the "Design Professional(s)" either by adjudication by a court of competent jurisdiction, arbitration or settlement or any other method of dispute resolution to which we agree in writing.  Such "Loss" must be the result of a negligent act, error or omission on the part of the "Design Professional(s)" in the rendering of or failure to render "Professional Services".

I.  "Mediation" means non-binding intervention by a neutral third party.

J.  "Named Insured" means the partnership, firm or corporation named in Item 1 of the Declarations, and includes any and all affiliates, divisions, subsidiary corporations, or subsidiary limited liability companies thereof, and any other legal entity in which you have fifty percent or more ownership.

K.  "Policy Period" means the period set forth in the Declarations, or any shorter period resulting from a termination of this policy.

L.  "Predecessor in Interest" means any prior entity whose assets have been acquired by you or whose partners, principals or shareholders have joined you and whose name has been provided in the application and for whose insurance you are responsible by written agreement.

M.  "Professional Liability Claim" means any demand received by an "Insured" seeking "Damages" for "Professional Services" and alleging liability or responsibility on the "Insured's" part or on the part of any entity for whom the "Insured" is legally responsible.

N.  "Professional Liability Claim Expenses" means "Claim Expenses".

O.  "Professional Services" for purposes of Coverage Part A means those services that the "Insured", a "Design Professional", or an entity providing services under contract to a "Design Professional", are qualified to perform for others in their capacity as an architect, engineer, landscape architect, land surveyor or planner, construction manager, a LEED accredited professional, interior designer/space planner, or as specifically described by endorsement to this policy.  "Professional Services" includes "Technology Services" to the extent provided in conjunction with the aforementioned capacities.

P.  "Professional Services" for purposes of Coverage Part B means those services that the "Design Professional", or an entity providing services under contract to the "Design Professional", are qualified to perform for others in their capacity as an architect, engineer, landscape architect, land surveyor or planner, construction manager, a LEED accredited professional, interior designer/space planner, or as specifically described by endorsement to this policy.  "Professional Services" includes "Technology Services" to the extent provided in conjunction with the aforementioned capacities.

Q.  "Property Damage" means:

1.  Physical injury to or destruction of tangible property including the resulting loss of use thereof;

2.  Loss of use of tangible property that has not been physically injured or destroyed.

R.  "Protective Indemnity Claim" means a written demand by you against a "Design Professional(s)" under contract with you seeking a remedy from or alleging liability or responsibility on the part of such "Design Professional(s)" for "Loss" arising out of the "Design Professional's" rendering of or failure to render "Professional Services".

S.  "Retroactive Date" means the date on or after which any alleged or actual negligent act, error or omission giving rise to a "Protective Indemnity Claim", "Professional Liability Claim", "Loss" or "Damage" must have taken place in order to be considered for coverage under this policy, as stated in Item 5 of the Declarations.  If none is shown, the retroactive date will be the effective date of the first policy issued by us to you.

T.  "Technology Services" means the activities performed by or on behalf of the Insured including:

a.  website design or website programming;

b.  database design or database management, data warehousing, data application hosting;

c.  hosting, management or maintenance of websites designed or programmed;

d.  maintenance of computer programs, applications or systems designed or developed;

e.  design and development of computer software programs, applications or systems;

f.  creation, maintenance, use, modification, alteration, and input into any digital model or digital representation, including, for example, a Building Information Model (BIM) or other computer assisted design or drafting system or program; and

g.  electronic data transmission in conjunction with any of the above.

## III.  EXCLUSIONS

This insurance does not apply to "Damages" or "Losses" based upon or arising out of:

A.  any "Professional Liability Claim" or "Protective Indemnity Claim" made by any "Insured" against any other "Insured;"

B.  any "Professional Liability Claim" made by, or any "Protective Indemnity Claim" brought against, any individual or entity or its subrogees or assignees:

(1)  that wholly or partially owns or operates you; or

(2)  in which you have an ownership interest in excess of 20 percent; or

(3)  that is controlled or operated by you; or

(4)  in which the "Insured" is an officer or director;

C.   the refusal to employ, termination of employment, coercion, evaluation, reassignment, discipline, wrongful infliction of emotional distress or other employment-related torts, harassment, discrimination, wrongful deprivation of a career opportunity, breach of any oral, written or implied employment contract or quasi-employment contract, violation of any federal, state or local statute, regulation, ordinance, common law or public policy concerning employment or discrimination in employment;

D.   any obligation for which the "Insured" or any carrier as insurer shall be liable under any workers' compensation, unemployment compensation, employer's liability, disability benefits law or under any similar law;

E.   any conduct by an individual, corporation, limited liability company, partnership or joint venture of which the "Insured" is a partner, director, officer, member, participant or employee, that is not designated in the Declarations, policy form, or endorsement as a "Insured", except that this exclusion shall not apply to the "Insured's" legal liability resulting from performance of its responsibilities on behalf of the respective individual, corporation, limited liability company, partnership or joint venture;

F.   any express warranty or guarantee except to the extent such liability would have attached by law in the absence of such warranty or guarantee;

G.   liability of others assumed by an "Insured" or a "Design Professional" under any contract or agreement, unless such liability would have attached by law in the absence of such agreement because of a negligent act, error or omission of the "Design Professional" or "Insured" or any other person, entity or organization for whom the "Design Professional' or "Insured" is legally responsible, and the liability arises out of the rendering of or failure to render "Professional Services".

H.   any project that is insured under a project specific insurance policy, provided, however, that this exclusion shall not apply where your liability is found to be in excess of the limit of liability available under such project specific insurance policy which has been specifically included for excess coverage by endorsement to this policy;

I.   the design or manufacture of any goods or products which are sold or supplied by the "Insured", the "Design Professional," or by others under license from the "Insured" or the "Design Professional";

J.   fines, penalties, and the multiple portion of multiplied damages;

K.   cost estimates being exceeded.  This exclusion shall not apply to those "Damages" or "Losses" which arise out of a negligent act, error or omission in the rendering of or failure to render "Professional Services";

L.   any dishonest, fraudulent, criminal, intentional or malicious act, error or omission or those of a knowingly wrongful nature, except that this exclusion shall not apply to an "Insured" who did not commit, participate in, or have knowledge of such conduct;

M.   the cost to repair or replace faulty workmanship in any construction, erection, fabrication, installation, assembly or manufacturing process performed or provided by an "Insured" or anyone for whom any "Insured" is legally responsible, including materials, parts or equipment furnished in connection therewith, including any workmanship which is not in accordance with the drawings and specifications with respect to any construction, erection, fabrication, installation, assembly or manufacturing process.  This exclusion shall not apply to those "Damages" or "Losses" which result from a negligent act, error or omission in the rendering of or failure to render "Professional Services" by an "Insured" or others for whom the "Insured" is legally responsible;

N.   "Bodily Injury" and "Property Damage" arising out of job site safety, including the failure to protect any property or persons or the preparation or failure to prepare any safety precautions or procedures in connection with any project;

O.   attorney fees and related expenses incurred by you resulting from the investigation, adjustment, appeal or making of a "Protective Indemnity Claim" against a "Design Professional";

P.   with respect to a "Protective Indemnity Claim" only, any amount awarded by default judgment or other proceeding in which any "Design Professional" has failed to answer, plead and otherwise defend itself or indemnify you. However this exclusion shall not apply if the "Insured" cooperates with us to determine what the "Loss" would have been in the absence of such default judgment or other proceeding in which any "Design Professional" failed to answer, plead or otherwise defend itself;

Q.   a settlement which has been reached without our express written consent;

R. war, invasion, act of foreign enemy, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection or military or usurped power, strike, riot, civil commotion, or terrorism, including any act which is certified by the United States Secretary of the Treasury as an "act of terrorism", as defined by the Terrorism Risk Insurance Act of 2002 or any amendment thereto;

S. "Bodily Injury" or "Property Damage" arising out of construction means, methods, techniques, sequences and procedures; and

T. any failure to prevent unauthorized access to or use of an electronic system or program, unless such unauthorized access arises out of a negligent act, error or omission in the rendering of or failure to render "Professional Services" by you or by any entity for which you are legally responsible.

## IV. LIMITS OF LIABILITY

### A. COVERAGE PART A

1. EACH PROFESSIONAL LIABILITY CLAIM LIMIT OF LIABILITY

Our liability for each "Professional Liability Claim" including "Damages" and "Professional Liability Claim Expenses" shall not exceed the amount set out in the Declarations as Each "Professional Liability Claim" Limit of Liability - Coverage Part A. The available Each "Professional Liability Claim" Limit of Liability under the policy is reduced by the payment of "Damages" and "Professional Liability Claim Expenses". We shall not be obligated to pay any "Damages" or "Professional Liability Claim Expenses" or undertake or continue the defense of any "Professional Liability Claim" after the Each "Professional Liability Claim" Limit of Liability has been tendered into court or exhausted by payment of "Damages" or "Professional Liability Claim Expenses".

2. SELF INSURED RETENTION

Our liability and obligation to you for "Damages" and "Professional Liability Claim Expenses" under Coverage Part A for each "Professional Liability Claim" shall attach excess of the Self Insured Retention – Coverage Part A stated in the Declarations. The Self Insured Retention shall apply to each "Professional Liability Claim".

### B. COVERAGE PART B

1. EACH PROTECTIVE INDEMNITY CLAIM LIMIT OF LIABILITY

Our liability for each "Protective Indemnity Claim" for "Loss" shall not exceed the amount set out in the Declarations as the Each "Protective Indemnity Claim" Limit of Liability - Coverage Part B. The available Each "Protective Indemnity Claim" Limit of Liability under the policy is reduced by the payment of "Loss" by us under this policy. We shall not be obligated to pay any "Loss" after the Each "Protective Indemnity Claim" Limit of Liability has been tendered into court or exhausted by payment of "Loss".

2. SELF INSURED RETENTION

Our liability and obligation to indemnify you for "Loss" under Coverage Part B attaches upon full payment of the amount(s) of the "Design Professional's Insurance". In the event the "Design Professional's Insurance" is unavailable through either exhaustion of its limits or through the applicability of a valid exclusion under the "Design Professional's Insurance" then our liability and obligation to indemnify you shall attach excess of the Self Insured Retention - Coverage Part B stated in the Declarations. The Self Insured Retention shall apply to each "Protective Indemnity Claim".

### C. AGGREGATE LIMIT OF LIABILITY

Our total liability for all "Damages", "Losses" and "Claim Expenses" under Coverage Parts A, B and any endorsed coverage parts combined shall not exceed the amount set forth in the Declarations as the Aggregate Limit of Liability. The available Aggregate Limit of Liability under the policy is reduced by the payment of "Damages", "Losses" and "Claim Expenses". We shall not be obligated to pay any "Damages", "Losses", or "Professional Liability Claims Expenses" after the Aggregate Limit of Liability has been tendered into court or exhausted by payments for "Damages", "Losses" or "Claim Expenses".

### D. MULTIPLE INSUREDS, CLAIMS, CLAIMANTS AND POLICY PERIOD(S)

1. ONE LIMIT OF LIABILITY / SELF INSURED RETENTION

   The inclusion of more than one "Insured" in the making of a single "Claim" or "Protective Indemnity Claim", or the bringing of multiple suits regarding the same negligent act, error or omission shall not increase our Limit of Liability; neither shall the making of "Claims" or the bringing of suits by more than one person or organization. Two or more "Claims" or "Protective Indemnity Claims" under Coverage Parts A, B and any endorsed coverage parts or a combination of Coverage Parts A, B, and any endorsed coverage parts, arising out of the same, interrelated, associated, repeated or continuous negligent act, error or omission or a series of related negligent acts, errors or omissions shall be treated as a single "Claim" and shall be subject to the same Limit of Liability and only one Self Insured Retention (if a single coverage part only), or one Limit of Liability and one Self Insured Retention for each applicable Coverage Part if multiple coverage parts are involved. Any payments under one Coverage Part shall not be recoverable under another Coverage Part.

2. TWO OR MORE POLICY PERIODS

   Any "Claim" or "Protective Indemnity Claim" which takes place over two or more "Policy Periods" shall be subject to only one Limit of Liability and one Self Insured Retention (if a single coverage part only). Any such "Claim" or "Protective Indemnity Claim" involving more than one Coverage Part shall be subject to only one Limit of Liability, and one Self Insured Retention per applicable coverage part. All such "Claims" or "Protective Indemnity Claims", whenever made, shall be considered first made on the date on which the earliest "Claim" or "Protective Indemnity Claim" was first reported to us and the Limit of Liability and Self Insured Retention applicable to that "Policy Period" shall apply.

## V. CLAIM PROVISIONS

### A. PROFESSIONAL LIABILITY CLAIMS AND OTHER "CLAIMS"

1. NOTICE OF CLAIM

   A. In the event of a "Claim", prompt written notice containing particulars sufficient to identify you or any "Insured" involved and reasonably obtainable information with respect to time, place and circumstances, and the names and addresses of any injured parties and of available witnesses, shall be given by or for you to us. Written notice must be provided to us no later than 60 days after the expiration or termination of the policy or as provided under Optional Extended Reporting Period under Section VI of this policy, if purchased. Your knowledge of a "Claim" shall be deemed to have occurred when an individual acting in a capacity as legal counsel or risk manager, or a principal, partner, director, or executive officer first learned of the "Claim".

   B. No costs, charges or related "Claim Expenses" shall be incurred without our written consent, which shall not be unreasonably withheld.

      The "Insured" shall do nothing to prejudice our rights under this policy nor shall the "Insured" admit liability or settle any "Claim" without our written consent. If we recommend a reasonable settlement of a "Claim", the "Insured" shall have the opportunity to concur, such concurrence not to be unreasonably withheld. If we recommend a reasonable settlement of a "Claim":

      1. for an amount within the Self Insured Retention and an "Insured" refuses to concur with such reasonable settlement, then we shall not be liable for any "Damages" or "Claims Expenses" in excess of the Self Insured Retention; or

      2. for a total amount in excess of the balance of the Self Insured Retention and the "Insured" refuses to concur with such reasonable settlement acceptable to the claimant, then our liability for "Damages" and "Claim Expenses" shall be limited to that portion of the recommended settlement and the costs, charges and expenses incurred as of the date of an "Insured's" refusal, which exceed the Self Insured Retention and fall within the Limit of Liability.

   C. The "Insured" shall assist and cooperate with us in the investigation, settlement and defense of all "Claims" made against the "Insured" and upon our request shall authorize the release of records and other information, secure and give evidence, attend hearings and trials and obtain the location of and cooperation of witnesses.

D.  In the event that an "Insured" is entitled by law to select independent counsel to defend an "Insured" at our expense, the attorney's fees and all other litigation expenses we must pay to that counsel are limited to the rates we actually pay to counsel we retain in the ordinary course of business in the defense of similar "Claims" in the community where the "Claim" arose or is being defended.

Additionally, we may exercise the right to require that such counsel have certain minimum qualifications with respect to their legal competency including experience in defending "Claims" similar to the one pending against an "Insured" and to require such counsel to have errors and omissions insurance coverage.  The "Insured" agrees that such counsel will respond to our request for information regarding the "Claim" in a timely manner.  Furthermore, an "Insured" may at anytime, by its signed consent, waive its right to select independent counsel.

2.  NOTICE OF CIRCUMSTANCE

If during the "Policy Period", the "Insured" becomes aware of an actual or alleged negligent act, error or omission which may be expected to give rise to a "Professional Liability Claim" or "Claim" under the policy, and the "Insured" provides written notice to us, prior to the expiration of the policy period and containing particulars sufficient to identify the "Insured" and reasonably obtainable information with respect to:

A.  the time, place and explanation of the actual or alleged negligent act, error or omission including how the "Insured" first became aware of the actual or alleged negligent act, error or omission;

B.  the name and addresses of any injured parties and available witnesses and the "Damages" which have or may result from such actual or alleged negligent act, error or omission;

C.  any and all investigative or engineering reports, data or information about the actual or alleged negligent act, error or omission, or "Damages"; and

D.  copies of any relevant contracts between the "Insured" and its client for "Professional Services".

then any "Claim", for which coverage is provided by this policy, that may be made against the "Insured" shall be deemed for the purposes of this insurance to have been made on the date on which the notice was given to us.  In such event the "Insured" agrees to cooperate fully with us and do all things reasonably necessary to allow us to investigate such notice of circumstance and mitigate to the fullest extent possible the resultant "Damages", if any.  At our sole discretion, we may elect to investigate any circumstance which is reported to us. Any costs associated with the investigation of a circumstance prior to a "Claim" being made will not be considered "Claim Expenses".  These costs shall not be applied toward reducing the applicable Self Insured Retention and are in addition to the Limit of Liability and shall be borne by us.

B.  PROTECTIVE INDEMNITY CLAIM PROVISION

1.  NOTICE OF PROTECTIVE INDEMNITY CLAIM

A.  As a condition precedent to Coverage Part B of this policy, you shall provide us with notice in writing of a "Protective Indemnity Claim" at the same time that you make such "Protective Indemnity Claim" against a "Design Professional".

B.  We have the right but not the duty to participate in the investigation or settlement of a "Protective Indemnity Claim" covered under Coverage Part B of this policy.  Whether or not we choose to participate in the settlement of a "Protective Indemnity Claim," the "Insured" shall make every effort, within reason, to obtain from the "Design Professional(s)" party to such settlement an assignment of any rights said "Design Professional(s)" has against any other "Design Professional(s)" to pursue claims that are related to or arising from the negligent act(s), error(s) or omission(s) included in the "Professional Indemnity Claim" and settlement.

C.  You shall not enter negotiations or settlement of a "Protective Indemnity Claim" with the "Design Professional" or its representative involving any part of the Limit of Liability of this policy without our knowledge and consent to such negotiation and settlement. However, we may, in writing, and at our election, waive our participation and consent to such negotiation and settlement.

D.  If we elect to participate in the negotiation and settlement of a "Protective Indemnity Claim", you shall fully cooperate with our requests for information.  Your duty to cooperate with us is a condition precedent to coverage under this policy and your failure to cooperate shall relieve us of our obligations and liability under this policy.

2.   NOTICE OF CIRCUMSTANCE

Circumstance reporting is not afforded under this coverage part.

**C.  REPORTING PROVISIONS**

All notices of "Claims" or circumstances, and "Protective Indemnity Claims" are to be submitted to the following address:

<div align="center">

**Construction Professional Liability Claims Manager**
**Steadfast Insurance Company (or name of insurance company used)**
**P.O. Box 968041**
**Schaumburg, IL  60196**
**Fax number: (866) 255-2962**

New matters may also be reported via email at:
**USZ_Zurich_Construction_Professional_Claims@zurichna.com**

</div>

**VI.  EXTENDED REPORTING PERIOD**

**A.  AUTOMATIC EXTENDED REPORTING PERIOD**

If we or you terminate or non-renew this insurance for any reason, other than nonpayment of premium or your failure to comply with any term or condition, or your fraud or material misrepresentation, you shall be entitled to a period of sixty (60) days from the date of policy termination to report "Professional Liability Claims" or "Claims" which are made against you prior to such termination date. This Automatic Extended Reporting Period may not be canceled by us and does not require the payment of an additional premium.  This Automatic Extended Reporting Period shall be included within the Optional Extended Reporting Period if such is purchased.

**B.  OPTIONAL EXTENDED REPORTING PERIOD**

If we or you terminate or non-renew this insurance for any reason, other than nonpayment of premium or your failure to comply with any term or condition, or your fraud or material misrepresentation, upon the payment of an additional premium, you shall have the option to:

a)   extend the period by which a "Professional Liability Claim" or "Claim" can be made against you and reported to us; and

b)   extend the period by which a "Protective Indemnity Claim" can be brought by you against a "Design Professional" and reported to us.

Selection of the Optional Reporting Period will include the extension of both a) and b) noted above.

"Professional Liability Claims" or "Claims" must be made and reported within the "Policy Period" or the Optional Extended Reporting Period, provided that the negligent act, error or omission giving rise to the "Professional Liability Claims" or "Claims", occurred on or after the Retroactive Date, if any and before the end of the "Policy Period".

"Protective Indemnity Claims" first made by you against a "Design Professional" and reported in writing to us during the "Policy Period" or the Optional Extended Reporting Period; provided that the negligent act, error or omission arises out of "Professional Services" performed for you by the "Design Professional" and has occurred on or after the Retroactive Date, if any and before the end of the "Policy Period".

The premium for the Optional Extended Reporting Period shall be determined by charging (1) 100% of the annual premium for twelve (12) months, (2) 150% for twenty-four (24) months, or (3) 200% for thirty-six (36) months.  The purchase of an Optional Extended Reporting Period shall be endorsed herein.

Your right to purchase the Optional Extended Reporting Period must be exercised by notice in writing not later than thirty (30) days after the cancellation or termination date of this policy.  Effective notice must indicate the total Optional Extended Reporting Period desired and must include payment of premium for such period.  If such notice and the premium are not mailed to us within thirty (30) days, then you shall not at a later date be entitled to purchase an Optional Extended Reporting Period.

At the commencement of any Optional Extended Reporting Period, the entire premium shall be deemed fully earned, and in the event you terminate the Optional Extended Reporting Period before its term for any reason, we shall not be obligated to return to you any portion of the premium.

The fact that the period during which "Professional Liability Claims", "Claims", and "Protective Indemnity Claims" can be reported to us is extended by virtue of the Optional Extended Reporting Period shall not in any way increase the Limit of Liability of this policy.

## VII. CONDITIONS

### A. ACTION AGAINST US

1. As to Coverage A and any coverage parts otherwise defined by endorsement to this policy, no action shall lie against us unless, as a condition precedent thereto, there shall have been full compliance with all of the terms and conditions of this policy, and both your liability and the amount of your obligations to pay has been finally determined either by judgment against you after an actual trial or by your written agreement with the claimant or the claimant's legal representative with our prior approval.

   Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join us as a party to any action against you to determine your liability, nor shall we be impleaded by you or your legal representative.

2. As to Coverage B, no legal action may be brought against us until there has been full compliance with all the terms and conditions of this policy and both the "Design Professional's" liability and the amount of the "Design Professional's" obligations to pay have been finally determined either by judgment against the "Design Professional" after an actual trial, adjudication or arbitration or by your written agreement with the "Design Professional" with our prior approval.

   No person or organization has a right under this policy to bring us into any action to determine our liability or the "Design Professional's" liability.

### B. ASSIGNMENT

Assignment of interest under this policy shall not bind us without our express written consent.

### C. AUDIT AND INSPECTION

We shall be permitted upon reasonable prior notice to audit the "Insured's" final books and records at any time during the "Policy Period" and within three years after the final termination of this policy, as far as they relate to the subject matter of this policy. We shall also be permitted upon reasonable prior notice to inspect, sample and monitor on a continuing basis the "Insured's" operations. Neither our right to make inspections, sample and monitor nor the actual undertaking thereof nor any report thereon shall constitute an undertaking, on behalf of us or others, to determine or warrant that operations are safe, healthful or conform to acceptable engineering practice or are in compliance with any law, rule or regulation.

### D. BANKRUPTCY

The "Named Insured's" bankruptcy or insolvency shall not relieve us of our obligations under this policy. Your bankruptcy, insolvency, inability to pay, failure to pay, or refusal to pay the Self Insured Retention will not increase our obligations under this policy. In the event there is insurance, whether or not applicable to a "Professional Liability Claim" or "Protective Indemnity Claim" within a Self Insured Retention, you will continue to be responsible for the full amount of the applicable Self Insured Retention before limits of insurance under this policy apply. In no case will we be required to pay the Self Insured Retention or any portion thereof. Our obligations will attach only when the entire amount of the applicable Self Insured Retention has been paid and then only in excess of the Self Insured Retention and not in excess of the Limits of Insurance adjusted for any reduction in the aggregate limit of our liability.

### E. CANCELLATION

1. The policy may only be canceled by us for any of the following reasons:

   a. Non-payment of premium;

   b. A material misrepresentation or concealment of facts; or

   c. A material breach of any provision of the policy.

If this policy is canceled by us, notice of cancellation will be sent in writing to the "Named Insured", at the address indicated on the Declarations. We will provide such written notice at least thirty (30) days prior to the date such cancellation is to take effect.

The effective date and hour of cancellation will be stated in such notice. Cancellation by us also cancels the Extended Reporting Period. The "Policy Period", the Automatic Extended Reporting Period and the Optional Extended Reporting Period will end on that date. If we cancel for the reason specified in 1a, there shall be no return premium. If we cancel for reasons stated in 1b. or 1c., the earned premium shall be computed pro-rata of the policy term premium. Payment of any return premium shall not be a condition of cancellation.

2. You may cancel this policy by surrendering to us, or by mailing to us, written notice requesting cancellation and stating when thereafter such cancellation shall take effect. If canceled by you, we shall retain the customary short rate proportion of the premium.

3. It is agreed that this policy will automatically terminate upon your acquisition by another entity or your merger into another entity, such that the "Named Insured" is not the surviving entity, or your consolidation with another entity, or the acquisition of substantially all of your assets by another entity.

**F. CHANGES**

The terms and conditions of this policy may only be altered by an endorsement issued by us.

**G. CHOICE OF LAW AND JURISDICTION**

In the event an "Insured" and we dispute the meaning, interpretation or operation of any term, condition, definition or provision of this policy resulting in litigation, arbitration or other form of dispute resolution, the "Insured" agrees with us that the law of the State of New York shall apply without giving effect to any conflicts or choice of law principles. In the event an "Insured" and we agree to resolve any dispute by arbitration, any such arbitration shall be in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

**H. DESIGN PROFESSIONAL INSURANCE**

You shall require that each Design Professional with whom you have a written contract initially evidence professional liability insurance.

**I. LIMITATION OF LIABILITY**

As respects Coverage Part B, the Insured shall not, without our express written authorization, accept any limitation of liability clause in a contract between the "Insured" and a "Design Professional" other than to limit the Design Professional's liability to the amount of the insurance specified by contract.

**J. OTHER INSURANCE**

Where other insurance is available to the "Insured" in addition to the "Design Professional's Insurance" for "Damages" or "Losses" covered under this policy, our obligation to the "Insured" is as follows:

1. This insurance shall apply as excess over any other applicable insurance be it primary or excess.

2. Where this insurance is excess over any other valid and collectible insurance, we will pay only our share of the amount of "Damages" or "Losses" if any, that exceeds the total amount that all such other insurance would pay for the "Damages" or "Losses" in the absence of this insurance.

3. If other policies of insurance have been issued to the "Design Professional" which provide similar coverage for a "Claim" under this policy, in whole or in part, this policy shall apply in excess of those policies and this policy shall not contribute with such policies.

This provision shall not apply if other insurance is purchased by you specifically as excess of this insurance.

**K. REPRESENTATIONS**

By acceptance of this policy, you agree that the statements in the application and its attachments are your agreements and representations, that this policy is issued in reliance upon the truth of such representations, and that this policy, its Declarations and endorsements embody all agreements existing between you and us relating to this insurance.

**L.   SEVERABILITY**

Except with respect to the Limit of Liability, and any rights or duties specifically assigned to you, this insurance applies:

1.   as if each "Named Insured" were the only "Named Insured", and

2    separately to each "Insured" against whom a "Professional Liability Claim" is made.

Misrepresentation, concealment, breach of condition or violation of any duty under this policy by one "Insured" shall not prejudice the interest or coverage of another "Insured" under this policy.

**M.   SOLE AGENT**

If there is more than one "Insured" named in this policy, the first "Named Insured" shall act on behalf of all "Insureds" for all purposes, including but not limited to the payment or return of premium, payment of any self insured retention, receipt and acceptance of any endorsement issued to form a part of this policy, complying with all applicable claims provisions, giving and receiving notice of cancellation or nonrenewal, and the exercise of the rights provided in the Extended Reporting Period or Subrogation clause.

**N.   SUBROGATION AND TRANSFER OF RIGHTS OF RECOVERY**

If we make any payment under this policy, we shall be subrogated to all your rights against any person or organization, including the right to participate with the "Insured" in the exercise of all the "Insured's" rights of recovery.  You shall execute and deliver instruments and papers to us and do whatever else is necessary to secure such rights.  With respect to a "Protective Indemnity Claim," this includes a written transfer to us of any assignment(s) of rights obtained under section V. CLAIM PROVISIONS, B. PROTECTIVE INDEMNITY CLAIM PROVISIONS, paragraph 1.B. if the "Insured" has elected not to pursue same in furtherance of its "Protective Indemnity Claim".  An "Insured" shall do nothing to prejudice such rights as described in this paragraph.

We shall not exercise any such rights against any persons, firms or corporations included in the definition of an "Insured" or against your clients if, prior to a "Professional Liability Claim," a waiver of subrogation was so required and accepted under a specific contractual undertaking by you.

Any recovery obtained through subrogation, after expenses incurred in such subrogation are deducted by the party bearing the expense, reimbursement will be made in the following order:

1.   First, to any interest who has paid any amount in excess of the Limit of Liability provided under this policy;

2.   next, to us; and

3.   then to any interest as are entitled to claim the remainder, if any.

**O.   POLICY TERRITORY**

Coverage under this policy shall extend anywhere in the world, to the extent permitted by law.

Endorsement # 01

# Contractor's Protective Professional Indemnity and Liability Insurance – Amendments


**ZURICH**

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem |
|---|---|---|---|---|---|---|
| EOC 0193620-00 | 04/20/2016 | 04/20/2017 | 04/20/2016 | 18616000 | ---------- | ---------- |

**Named Insured and Mailing Address:**

UNITED CONSTRUCTION COMPANY
5300 MILL STREET
RENO, NV 89502-2320

**Producer:**

PROFESSIONAL DESIGN INS.
PO BOX 501130
INDIANAPOLIS, IN 46250-6130

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided by the following

**Contractor's Protective Professional Indemnity and Liability Insurance Policy**

**THIS ENDORSEMENT PROVIDES CLAIMS MADE COVERAGE. UNDER COVERAGE PART C, "CONTRACTOR'S POLLUTION LIABILITY CLAIMS" MUST FIRST BE MADE AGAINST THE "INSURED" DURING THE "POLICY PERIOD" AND REPORTED IN WRITING BY YOU TO US DURING THE "POLICY PERIOD" OR EXTENDED REPORTING PERIOD, IF APPLICABLE.**

In consideration of the premium charged, it is hereby agreed that the insurance provided under this policy is amended as follows

1. Section I. **INSURING AGREEMENT** is amended by adding the additional Coverage Part as follows:

   **COVERAGE PART C – CONTRACTOR'S POLLUTION LIABILITY**

   **A. COVERAGE**

   We will pay on behalf of an "Insured" any "Loss" an "Insured" is legally obligated to pay as a result of "Contractor's Pollution Liability Claim(s)" caused by:

   1. a "Pollution Event" resulting from "Technical Activities" performed by the "Named Insured" or anyone for whom the "Named Insured" is legally responsible; or

   2. a "Pollution Event" resulting from "Completed Operations" of the "Technical Activities"; provided that the "Technical Activities" must commence on or after the "Retroactive Date" and before the end of the "Policy Period" and the "Contractor's Pollution Liability Claim" is the first made against the "Insured" and reported to us during the "Policy Period", the automatic extended reporting period, or the extended reporting period, if applicable,

   **B. DEFENSE**

   We shall have the right and duty to assume the adjustment, defense and settlement of any "Contractor's Pollution Liability Claim" to which this insurance applies. "Contractor's Pollution Liability Claim Expense" reduces the applicable Limits of Liability set out in the Declarations as described in LIMITS OF LIABILITY section. Our duty to adjust, defend and settle all "Contractor's Pollution Liability Claims" to which this endorsement applies, pending and future, ends when the applicable Limits of Liability have been tendered into court or exhausted by payment of "Contractor's Pollution Liability Claim Expense(s)" or "Loss(es)".

2.  Section **II. DEFINITIONS** is amended as follows:

Solely with respect to **COVERAGE PART C**, the following definitions shall apply:

A.  "Automobile" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any machinery or apparatus attached thereto.

B.  "Bodily Injury" means physical injury, sickness, disease, death, mental anguish or emotional distress suffered by any person.

C.  "Claim" means "Contractor's Pollution Liability Claim".

D.  "Cleanup Costs" means the necessary expenses incurred in the investigation, removal, remediation, neutralization or immobilization of contaminated soil, surface water, groundwater, or other contamination resulting from a "Pollution Event".

    To the extent that real or personal property not owned by the "Insured(s)" is directly damaged during the investigation, removal, remediation, neutralization or immobilization of contaminated soil, surface water, groundwater, or other contamination resulting from a "Pollution Event", this policy will pay the expenses necessary to repair, replace, or restore such damaged real or personal property to substantially the same condition it was in prior to being so damaged provided that any such expenses shall, in no event, exceed the fair market value of such property prior to being damaged and further provided that such expenses shall not include expenses associated with improvements or betterments, including, but not limited to upgrades necessary to achieve building code compliance.

E.  "Contractor's Pollution Liability Claim" or "Contractor's Pollution Liability Claims " means any demand or notice received by an "Insured" alleging liability or responsibility on the part of an "Insured" for "Losses" because of a "Pollution Event" resulting from "Technical Activities" or "Completed Operations" of the "Technical Activities".

F.  "Contractor's Pollution Liability Claim Expense(s)" means "Claim Expenses" as defined in this policy.

G.  "Completed Operation(s)" coverage begins when the job is completed and includes all "Bodily Injury" and "Property Damage(s)" occurring away from the premises owned or rented by the "Insured" and arising out of "Technical Activities" that have been completed or "Technical Activities" that have not been abandoned. "Technical Activities" will be deemed completed at the earliest of the following times:

    1.  When all the "Technical Activities" called for in the contract have been completed; or

    2.  When all the "Technical Activities" to be done at one or more sites have been completed if the contract calls for "Technical Activities" at more than one site; or

    3.  When that part of the "Technical Activities" at any site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.  "Technical Activities" that may need service, maintenance, correction, repair or replacement, but which are otherwise complete, will be deemed complete.

H.  "Hazardous Materials" means any petroleum, petroleum products, polychlorinated biphenyls, explosives, reactive materials, ignitable materials, corrosive materials and any hazardous, toxic, radioactive and infectious materials, substances, chemicals or wastes, together with any other substances designated as hazardous substances or hazardous materials by federal, state or municipal laws, statutes or ordinances, including rules, administrative or judicial orders, directives or policies.

I.  "Hazardous Materials Facility" means any site, location or premises, or any part of any site, location or premises, on which "Hazardous Materials", wastes or pollutants are stored, treated, processed, recycled or disposed other than those sites at which "Technical Activities" are being performed.

J.  "Insured" has the meaning stated in the policy, and solely as to Coverage Part C shall also include the following:

    1.  your clients but only:

        a.  when required by written contract executed and effective before the "Technical Activities"; and

        b.  with respect to "Technical Activities" and "Completed Operation(s)" of the "Technical Activities"; and

        c.  for those amounts required by written contract not to exceed the Limits of Liability of this policy; or

    2.   any other person or entity endorsed on this policy as an "Insured".

K.   "Loss(es)" means:

    1.   compensatory damages or legal obligations arising from;

        a.   "Bodily Injury";

        b.   "Property Damage";

    2.   and related "Contractor's Pollution Liability Claim Expense".

L.   "Microbial Event" means any "Loss" caused directly or indirectly, by: 1. any "Fungus(i)" or "Spore(s)", or 2. any substance, vapor or gas produced by or arising out of any "Fungus(i)" or "Spore(s)".  For the purpose of this definition, the following definitions are added:

    1.   "Fungus(i)" includes, but is not limited to: a. any form or type of mold, mushroom or mildew; b. any other fungal structure; and c. any volatile organic compounds, mycotoxins, allergenic proteins or other substances or gases produced by or arising out of any mold, mushroom, mildew , fungal structure or "Spore(s)".

    2.   "Spore(s)" means any reproductive body produced by or arising out of any "Fungus(i)".

M.   "Named Insured" has the meaning stated in the policy at Section II. DEFINITIONS, J.

N.   "Natural Resource Damage" means physical injury to or destruction of, including the resulting loss of value of land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et. seq.)), any state or local government, any foreign government, any Native American tribe or, if such resources are subject to a trust restriction on alienation, any member of a Native American tribe.

O.   "Policy Period" means the period set forth in the Declaration, or any shorter period arising as a result of termination of the policy.

P.   "Pollution Event" means the discharge, dispersal, release, or escape of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.

Q.   "Property Damage" has the meaning stated in the policy, and solely as to Coverage Part C shall also include the following:

    1.   "Cleanup Costs"; and

    2.   "Natural Resource Damage".

R.   "Retroactive Date" means the date set forth in the Declarations or attached Endorsement, and the earliest date a "Technical Activity" can commence for coverage to be provided under this policy.

S.   "Technical Activities" means construction work and other non-professional services.

3.   Section **III. EXCLUSIONS** is amended by adding the following which are the only exclusions to apply to this Coverage Part:

Solely with respect to **COVERAGE PART C – CONTRACTOR'S POLLUTION LIABILITY**, this insurance does not apply to "Contractor's Pollution Liability Claim(s)" or "Loss(es)" based upon or arising out of:

A.   a "Pollution Event" existing prior to the "Retroactive Date" of the policy;

B.   any dishonest, fraudulent, or malicious act, error or omission, or those of a knowingly wrongful nature or the intentional, willful or deliberate non-compliance with any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, executive order, or instruction of any governmental agency or body by or at the direction of an "Insured" except that this exclusion will not apply to an "Insured" who did not commit, participate in, or have knowledge of any of the acts described;

C.   a "Contractor's Pollution Liability Claim" made by an "Insured" against any other "Insured", however, this exclusion does not apply to clients of the "Named Insured" who are considered "Insureds" under this policy;

D.  a "Contractor's Pollution Liability Claim" made by an entity or individual:

    1.  that wholly or partially owns, operates or manages an "Insured"; or

    2.  in which an "Insured" has an ownership interest in excess of 20%; or

    3.  that is controlled, operated or managed by an "Insured"; or

    4.  in which an "Insured" is an officer or director;

E.  any obligation of an "Insured" which could have been brought in whole or in part under a workers compensation, disability benefits or unemployment compensation law or any similar law;

F.  conduct by an individual, corporation, partnership or joint venture of which an "Insured" is a partner, director, officer, member, participant or employee, that is not designated in the Declarations or by Endorsement as a "Named Insured" however, this exclusion shall not apply to the "Named Insured" for "Contractor's Pollution Liability Claim(s)" alleging liability of the "Named Insured" arising out of the "Named Insured's" participation in the joint venture.  Such liability is limited exclusively to the "Loss" arising out of the "Named Insured's" performance of "Technical Activities";

G.  liability of others assumed by an "Insured" under any contract or agreement, however, this exclusion shall not apply to:

    1.  such written contracts or agreements, in effect prior to the performance of the "Technical Activities" between the "Named Insured " and its client provided that the liability for the "Loss(es)" arises from a "Pollution Event" resulting from "Technical Activities" or "Completed Operation(s)" of the "Technical Activities" performed by the "Named Insured" or any other person, entity or organization for whom the "Named Insured" is legally responsible and the liability does not arise due to the sole negligence of the client; or

    2.  liability for the "Loss(es)" would have attached to an "Insured" by operation of law in the absence of such contract or agreement;

H.  any project that is insured under a project specific insurance policy, provided, however, that this exclusion shall not apply where your liability is found to be in excess of the limit of liability available under such project specific insurance policy which has been specifically included for excess coverage by endorsement to this policy;

I.  goods or products designed, manufactured, sold, handled, distributed, or supplied by an "Insured" or by others trading under its name or under license from an "Insured";

J.  fines, penalties, and the multiple portion of multiplied damages;

K.  injury to any employee, contract employee or leased personnel of an "Insured" if such injury occurs during and in the course of said employment; or to the spouse, child, parent, brother or sister of any employee, contract employee or leased personnel of an "Insured" as a consequence of said employment; or to any obligation of an "Insured" for indemnity or contribution to another because of "Loss" arising out of such injury in the course of employment, except that this exclusion does not apply to liability assumed by the "Named Insured" under a written contract or agreement, in effect prior to the "Loss" between the "Named Insured" and its client provided that the "Loss" arises out of a "Pollution Event" and the "Loss" does not arise due to the sole negligence of the client;

L.  any consequence, whether direct or indirect, of war, invasion, act of foreign enemy, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection or military or usurped power, strike, riot or civil commotion;

M.  ownership, entrustment, maintenance, use, operation, loading or unloading of any "Automobile", aircraft, vessel or rolling stock beyond the boundaries of the site at which the "Technical Activities" are being conducted unless endorsed onto this policy.  However, this exclusion shall not apply to a "Pollution Event" arising from the ownership, entrustment, maintenance, use, operation, loading or unloading of any "Automobile" or arising from waste or materials transported by or on behalf of the "Named Insured" via "automobile" during the course of performing "Technical Activities";

N.  waste, contaminants, pollutants, or materials transported via "Automobile", aircraft, vessel, or rolling stock beyond the boundaries of the site at which the "Technical Activities" are being conducted once they have been finally delivered, disposed of or abandoned unless endorsed onto this policy;

O. any real property or personal property owned, leased, or rented by a "Named Insured";

P. any "Pollution Event(s)" or "Loss(es)" on, at, under or coming from any location to which an "Insured" arranges for, sends or has sent materials for treatment, recycling, reclamation, storage or disposal unless endorsed onto this policy;

Q. an "Insured's" operation or management of a "Hazardous Materials Facility" on behalf of, for the benefit of, or under contract with any other person, company or entity;

R. a "Microbial Event", whether caused directly or indirectly;

S. the refusal to employ, termination of employment, coercion, evaluation, reassignment, discipline, wrongful infliction of emotional distress or other employment-related torts, harassment, discrimination, wrongful deprivation of a career opportunity, breach of any oral, written or implied employment contract or quasi-employment contract, violation of any federal, state or local statute, regulation, ordinance, common law or public policy concerning employment or discrimination in employment;

4. Section **IV. LIMITS OF LIABILITY**, is amended as follows:

   a. The following new Coverage Part is added:

      **E. COVERAGE PART C**

         1. EACH CONTRACTOR'S POLLUTION LIABILITY CLAIM LIMIT OF LIABILITY

         Our liability for each "Contractor's Pollution Liability Claim" including "Claim Expenses" and "Cleanup Costs" shall not exceed the amount set out in the Declarations as Each "Contractor's Pollution Liability Claim" Limit of Liability – Coverage Part C. We shall not be obligated to pay any "Claim Expenses" or "Cleanup Costs" or undertake or continue the defense of an "Contractor's Pollution Liability Claim" after the Each "Contractor's Pollution Liability Claim" Limit of Liability has been tendered into court or exhausted by payment of "Claim Expenses" or "Cleanup Costs".

         2. SELF INSURED RETENTION

         Our liability and obligation to indemnify you for "Claims Expenses" and "Cleanup Costs" under Coverage Part C for each "Contractor's Pollution Liability Claim" shall attach excess of the Self Insured Retention – Coverage Part C stated in the Declarations. The Self Insured Retention shall apply to each "Contractor's Pollution Liability Claim".

   b. Paragraph **C. AGGREGATE LIMIT OF LIABILITY** is deleted in its entirety and replaced with the following:

      C. Subject to Sections A, B, and E, our total liability for all "Damages", "Losses", Professional Liability Claim Expenses", "Claim Expenses", and "Cleanup Costs " under Coverage Parts A, B, and C combined shall not exceed the amount set forth in the Declarations as the Aggregate Limit of Liability – Coverage Parts A, B, and C. We shall not be obligated to pay any "Damages", "Losses", Professional Liability Claim Expenses", "Claim Expenses", and "Cleanup Costs " after the Aggregate Limit of Liability has been tendered into court or exhausted by payments for "Damages", "Losses", Professional Liability Claim Expenses", "Claim Expenses", and "Cleanup Costs".

5. Section **VII. CONDITIONS, Item A., ACTION AGAINST US**, is amended by adding the following new subparagraph:

   3. As to Coverage C, no action shall lie against us unless, as a condition precedent thereto, there shall have been full compliance with all of the terms and conditions of this policy, and both your liability and the amount of your obligations to pay has been finally determined either by judgment against you after an actual trial or by your written agreement with the claimant or the claimant's legal representative with our approval.

   Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join us as a party to any action against you to determine your liability, nor shall we be impleaded by you or your legal representative.

All other provisions of this policy remain unchanged.

Endorsement #  02

# Non-Owned Disposal Site – Offsite and Onsite Coverage



ZURICH®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EOC 0193620-00 | 04/20/2016 | 04/20/2017 | 04/20/2016 | 18616000 | ---------- | ---------- |

**Named Insured and Mailing Address:**
UNITED CONSTRUCTION COMPANY
5300 MILL STREET
RENO, NV 89502-2320

**Producer:**
PROFESSIONAL DESIGN INS.
PO BOX 501130
INDIANAPOLIS, IN 46250-6130

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Contractor's Protective Professional Indemnity and Liability Insurance Policy**

In consideration of the payment of premium and the Self Insured Retention by you and in reliance upon the statements in the Application made a part hereof, we agree with you, subject to all the terms, exclusions and conditions of the policy and associated endorsements, that the coverage provided by this Endorsement shall apply to the NON-OWNED DISPOSAL SITE(S) set forth below and the following amendments shall apply with respect to coverage provided under this endorsement only:

**I.   NON OWNED DISPOSAL SITE(S)**

1   Any location that has accepted "Waste" generated by "Technical Activities" performed by the "Named Insured" or anyone for whom the "Named Insured" is legally responsible or "Completed Operations" of the "Technical Activities" and is licensed and/or certified by the respective controlling local, state and federal agency(s) and/or authorities to accept this "Waste"; or

2   Any location that has accepted the "Waste" generated by "Technical Activities" performed by the "Named Insured" or anyone for whom the "Named Insured" is legally responsible or "Completed Operations" of the "Technical Activities" and for which the "Named Insured" has by appropriate due diligence determined is licensed and/or certified by the respective controlling local, state and federal agency(s) and/or authorities to accept this "Waste" provided that the "Named Insured" retains such documentation confirming its due diligence about the location within its control and possession and presents such documentation to us at the time of a "Claim"; or

3   Any location that has accepted "Waste" generated by "Technical Activities" performed by the "Named Insured" or anyone for whom the "Named Insured" is legally responsible or "Completed Operations" of the "Technical Activities" from a "Carrier" that the "Named Insured" or anyone for whom the "Named Insured" is legally responsible has by appropriate due diligence determined is licensed and/or certified by the respective controlling local, state and federal agency(s) and/or authorities to accept, "Transport" and dispose of the "Waste" provided that the "Named Insured" retains such documentation confirming its due diligence about the "Carrier" within its control and possession and presents such documentation to us at the time of a "Claim".

**II.   The Limits of Liability for Coverage Part C on the policy Declarations shall be amended to add the following Non Owned Disposal Site (NODS) Sublimit of Liability.**

$5,000,000    NODS Each Claim Sublimit of Liability

$5,000,000    NODS Aggregate Sublimit of Liability

III. The NODS Each Claim Sublimit of Liability shown in this endorsement shall be a sublimit of the Each Claim Limit of Liability for Coverage Part C shown in the Declarations. The NODS Each Claim Sublimit of Liability shall not be in addition to the Each Claim Limit of Liability for Coverage Part C shown in the Declarations but shall erode the Each Claim Limit of Liability. The NODS Aggregate Sublimit of Liability shall be the most we shall pay for all "Claims" provided coverage under the terms of this endorsement. The NODS Aggregate Sublimit of Liability is a sublimit of the Aggregate Limits of Liability for all coverage parts as shown in the Declarations. The NODS Aggregate Sublimit of Liability shall not be in additions to the Aggregate Limits of Liability for all coverage parts as shown in the Declarations but shall erode the Aggregate Limits of Liability for all coverage parts. When the NODS Each Claims Sublimit of Liability or NODS Aggregate Sublimit of Liability is exhausted by any combinations of payment for "Claims" or "Losses" covered under this endorsement, or the Aggregate Limit of Liability for all coverage parts is exhausted, our obligations under this endorsement shall end.

IV. As an exception to Exclusions N. and P. in Section III. EXCLUSIONS of the Contractor's Pollution Liability endorsement, the location(s) defined in Section I. Non-Owned Locations above are covered under that endorsement.

V. A Retroactive Date of 04/20/2011 is the earliest date that a "Technical Activity" can commence for coverage to be provided under this endorsement.

VI. Section III. EXCLUSIONS of the Contractor's Pollution Liability endorsement is amended to add the following exclusions applicable to coverage provided under this endorsement only:

**Your Locations**

Any location that is owned or operated in whole or in part by an "Insured" or an employee of an "Insured" or any subsidiary or affiliated company of an "Insured."

**Closure Post Closure**

The implementation of any "Closure Plan" or "Post Closure Plan".

**NPL / CERCLIS Location**

Any location that appears on the proposed or final Federal National Priorities List ("NPL") and/or any local or state equivalent, and any amendments; and/or any location that appears on the CERCLA information system ("CERCLIS") as defined by the Code of Federal Regulations, 40 CFR Part 300.5 (revised as of July 1, 2000) or any local or state equivalent, and the amendments. However, this exclusion shall not apply to locations where the waste was treated, stored or disposed prior to the location's appearance on the above lists.

VII. Section II. DEFINITIONS of the Contractor's Pollution Liability endorsement shall be amended by adding the following for purposes of this endorsement only:

"Closure Plan" or "Post Closure Plan" means the written documents or actions required by the Code of Federal Regulations (CFR), Title 40, Protection of Environment, including any amendments, or by similar state laws and regulations, which require the partial or final closure or post closure of a unit, facility or location.

"Carrier" means any person or entity pursuant to written contract that "Transports" the "Insured's" "Waste" by "automobile," aircraft, watercraft or rolling stock.

"Waste" means oil, petroleum, and materials to be disposed of, recycled, reconditioned or reclaimed.

"Transport" means the movement of "Waste" in the physical possession of the "carrier".

VIII. Section VII. CONDITIONS, Item J Other Insurance of the policy shall be deleted and replaced by the following:

**J.  OTHER INSURANCE**

When other insurance is available to the "Insured" for "Claim" or "Loss" covered under the terms and conditions of this policy and this endorsement, our obligation to you shall be as follows:

1.  The coverage provided by this policy and this endorsement shall apply as excess insurance over any other valid and collectible insurance, be it primary or excess. This excess insurance shall operate as primary insurance as a result of the receivership, insolvency, or inability to pay of any insurer with respect to both the duty to indemnify and the duty to defend. However, this does not apply to the "Insured" while acting as self insured for any coverage.

Endorsement # 03

# ADA, FHA, OSHA, State Licensing and Regulatory Board Legal Expense Reimbursement Endorsement



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EOC 0193620-00 | 04/20/2016 | 04/20/2017 | 04/20/2016 | 18616000 | --------- | --------- |

**Named Insured and Mailing Address:**

UNITED CONSTRUCTION COMPANY
5300 MILL STREET
RENO, NV 89502-2320

**Producer:**

PROFESSIONAL DESIGN INS.
PO BOX 501130
INDIANAPOLIS, IN 46250-6130

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Contractor's Protective Professional Indemnity and Liability Insurance Policy**

The following **Section I.I. SUPPLEMENTAL PAYMENTS** shall be added to the policy following Section **I. INSURING AGREEMENT:**

**I.I. SUPPLEMENTAL PAYMENTS**

All payments made under this section are not subject to the Self Insured Retention and are in addition to the Limits of Liability for each Coverage Part set forth in Item 2 of the Declarations. However, the Company shall not be obligated to make any payments under this Section after the Aggregate Limit of Liability set forth in the Declarations has been exhausted by payments of "Damages" and/or "Professional Liability Claim Expenses" or tendered into court.

A. ADA, FHA, OSHA, State Licensing and Regulatory Board Legal Expense Reimbursement

The Company will reimburse the "Insured" for reasonable and necessary "Legal Expenses" incurred in responding to a proceeding initiated directly against the "Insured" by a:

1 governmental, quasi-governmental or administrative agency under the Americans with Disabilities Act of 1990 (ADA) as amended 42 USC §§ 12101-12213 (2005), the Fair Housing Act (FHA) as amended 42 USC §§ 3601-3631 (2003), or the Occupational Safety and Health Act (OSHA) as amended 29 USC §§ 651-678 (1999); or

2 by a state licensing or regulatory board;

up to a maximum of twenty-five thousand dollars ($25,000) per proceeding subject to a maximum of fifty thousand dollars ($50,000) per "Policy Period";

Provided always that any such proceeding results from "Professional Services" and is:

a first commenced against the "Insured" during the "Policy Period"; and

b. reported to the Company in writing during the "Policy Period" and before any legal expenses have been incurred; and

c. the "Professional Services" occurred on or after any applicable "Retroactive Date."

B. For purposes of this Insuring Agreement, the following definition is added to **Section II. DEFINITIONS**

U "Legal Expense" means the reasonable costs, charges, fees and expenses charged by an attorney appointed by us, (other than compensation of any "Insured") and incurred by the "Insured" solely in connection with such proceeding.

All other terms and conditions of this policy remain unchanged.

Endorsement #  04

# Pre-Claims Assistance Endorsement



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EOC 0193620-00 | 04/20/2016 | 04/20/2017 | 04/20/2016 | 18616000 | ---------- | ---------- |

**Named Insured and Mailing Address:**

UNITED CONSTRUCTION COMPANY
5300 MILL STREET
RENO, NV  89502-2320

**Producer:**

PROFESSIONAL DESIGN INS
PO BOX 501130
INDIANAPOLIS, IN  46250-6130

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Contractor's Protective Professional Indemnity and Liability Insurance Policy**

In consideration of the premium charged, it is hereby understood and agreed that the following **Section I.I. SUPPLEMENTAL PAYMENTS** shall be added to the policy following Section I. **INSURING AGREEMENT:**

**I.I.  SUPPLEMENTAL PAYMENTS**

All payments made under this section are not subject to the Self Insured Retention and are in addition to the Limits of Liability for each Coverage Part set forth in Item 2 of the Declarations. However, the Company shall not be obligated to make any payments under this Section after the Aggregate Limit of Liability set forth in the Declarations has been exhausted by payments of "Damages" and/or "Professional Liability Claim Expenses" or tendered into court.

A    Pre-Claims Assistance

If the "Insured" reports a circumstance during the "Policy Period," in accordance with Section **V. CLAIM PROVISIONS,** Item A.2. NOTICE OF CIRCUMSTANCE the Company may, in its sole discretion and at its expense, investigate or monitor such circumstance, and such costs or expenses will not be applied towards the Self Insured Retention or erode the applicable Limit of Liability until a "Claim" is made.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Endorsement #  05

# Nuclear Energy Liability Exclusion - Broad Form

**ZURICH**

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EOC 0193620-00 | 04/20/2016 | 04/20/2017 | 04/20/2016 | 18616000 | ----------- | ----------- |

**Named Insured and Mailing Address:**
UNITED CONSTRUCTION COMPANY
5300 MILL STREET
RENO, NV  89502-2320

**Producer:**
PROFESSIONAL DESIGN INS.
PO BOX 501130
INDIANAPOLIS, IN  46250-6130

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided by the following

**Contractor's Protective Professional Indemnity and Liability Insurance Policy**

In consideration of the premium charged, it is agreed that this policy does not apply:

A.  Under any liability coverage, to "bodily injury" or "property damage";

    1.  With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an "insured" under any such policy but for its termination upon exhaustion of its limit of liability; or

    2.  Resulting from the "hazardous properties" of "nuclear material" and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, with any person or organization.

B.  Under any medical payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

C.  Under any liability coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material" if:

    1.  The "nuclear material" (i) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or (ii) has been discharged or dispersed there from;

    2.  The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

    3.  The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility" but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such a "nuclear facility" and any property thereat.

D.  As used in this endorsement:

    "Hazardous properties" include radioactive, toxic or explosive properties;

    "Nuclear material" means "source material", "special nuclear material" or "by-product material";

    "Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

Endorsement #  06

# Sanctions Exclusion Endorsement



**Policyholder:**  UNITED CONSTRUCTION COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

The following exclusion is added to the policy to which it is attached and supersedes any existing sanctions language in the policy, whether included in an Exclusion Section or otherwise:

SANCTIONS EXCLUSION

Notwithstanding any other terms under this policy, we shall not provide coverage nor will we make any payments or provide any service or benefit to any insured, beneficiary, or third party who may have any rights under this policy to the extent that such cover, payment, service, benefit, or any business or activity of the insured would violate any applicable trade or economic sanctions law or regulation.

The term policy may be comprised of common policy terms and conditions, the declarations, notices, schedule, coverage parts, insuring agreement, application, enrollment form, and endorsements or riders, if any, for each coverage provided. Policy may also be referred to as contract or agreement.

We may be referred to as insurer, underwriter, we, us, and our, or as otherwise defined in the policy, and shall mean the company providing the coverage.

Insured may be referred to as policyholder, named insured, covered person, additional insured or claimant, or as otherwise defined in the policy, and shall mean the party, person or entity having defined rights under the policy.

These definitions may be found in various parts of the policy and any applicable riders or endorsements.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED**

# Ex A, exhibit 7

# Ex A, exhibit 7





# ZURICH

November 16, 2016

Brad Breach
United Construction Co
5300 Mill St
Reno, NV 89502

**RE: Prologis Building - 385 Milan McCarran Nevada**

Zurich
Claims
P.O. Box 66965
Chicago, IL
60666-0965

Telephone (805) 520-3641
Fax (805) 520-3647
Chris.ford@zurichna.com
http://www.zurichna.com

| | |
|---|---|
| File No.: | 9260150560 |
| Named Insured: | United Construction Company |
| Claimant: | Prologis — 385 Milan |
| Policy Type: | Contractor's Protective Professional Indemnity |
| Policy No.: | EOC 0193620-00 |
| Effective Dates: | April 20, 2016 to April 20, 2017 |
| Retroactive Date: | April 20, 2011 |

Dear Mr. Breach:

The purpose of this letter is to further respond to United Construction Company's (hereinafter "UCC") demand to Steadfast Insurance Company (hereinafter "Zurich") to reimburse UCC for amounts it incurred in connection to this claim. I have reviewed the information and materials received to date involving the above referenced matter. This will also follow-up our recent various teleconferences during which time we discussed the following claim. As set forth in more detail below, based upon the policy and information made available to Zurich we must regretfully advise UCC that we are unable to find any coverage under policy no. EOC 0193620-00 for the claim presented.

## I.    SUMMARY OF CLAIM

Zurich understands the facts of the claim to be as follows[1]:

On October 10, 2014 UCC entered in to a design build contract with KTR Capital Partners to build a 566,600 sq. ft. warehouse at 385 Milan Ave McCarran, NV (hereinafter the "Property"), Nevada. Prologis, (hereinafter "Prologis" or "Owner") purchased the Property from KTR Capital Partners and is the current owner of the Property. The Certificate of Occupancy was issued June 19, 2015.

---

[1]    Any reference to the allegations against UCC is not meant to endorse or refute those claims. Reference is made exclusively for evaluation of coverage under the above-referenced policy.

On April 5, 2016 Richard Dermody, a UCC employee, was removing roof insulation during tenant improvement and discovered/observed mold. UCC reported their observation to the Owner's Representative, Tom Marko (hereinafter "Owner's Representative") on April 13, 2016.

It is our understanding Prologis reported a claim related to the finding of mold at the Property to its own property insurer sometime subsequent to April 13, 2016 as we are in receipt of a letter from Prologis' insurer dated July 14, 2016 addressed to UCC advising they would be seeking reimbursement from UCC as their investigation indicated the loss occurred due to "faulty installation of the roof." Despite the July 14, 2016 subrogation demand or notification, we understand neither Prologis nor its insurer has yet to incur any costs related to the remediation of mold located at the Property.

Further, based upon our investigation it is our understanding neither Prologis nor the Owner's Representative ever made a written demand against UCC in connection to this matter. It is our understanding a claim, if not first brought earlier, was made verbally no later than on or about May 9, 2016 when the Owner's Representative demanded UCC remediate the mold in advance of expected occupation by a new tenant as barring such remediation this tenant could have canceled their lease. There is some indication that the Owner's Representative may have first presented a claim against UCC as early as on or about April 13, 2016 when he reportedly made representations to UCC to remediate the mold found at that time prior to an additional investigation performed by a professional hygienist that indicated a more wide-spread presence of mold at the Property.

Irrespective as to the exact date the claim was first presented UCC elected to self-perform this remediation ,and that that remediation commenced in late May or early June 2016 and was completed sometime in July 2016. Our records reflect UCC first reported this claim to Zurich in writing under the above-referenced policy through its broker on August 5, 2016 by an ACORD form dated August 8, 2016, and that UCC is now seeking Zurich to reimburse UCC for claimed amounts totaling $1,273,908.44 that it reports it incurred in the remediation of mold at the Property.

Zurich recognizes that the allegations against UCC are, as of yet, unsubstantiated, and nothing in this letter is intended to suggest whether the allegations have any legal or factual merit.

If our understanding of the facts is in any way incorrect, please advise us immediately.

## II.    THE POLICY

Zurich issued a Contractor's Protective Professional Indemnity and Liability Insurance Policy, EOC 0193620-00, to United Construction Company for the policy period April 20, 2016 to April 20, 2017 (the "Policy"). Coverage Part A of the Policy provides claims made and reported Contractors Professional Liability Coverage with limits of $5,000,000 each "Claim" and $5,000,000 Aggregate Limit of Liability. Coverage Part

CAP003941

C provides CONTRACTOR'S POLLUTION LIABILITY with limits of $5,000,000 each "Claim" and $5,000,000 Aggregate Limit of Liability. Further, the Policy provides a $5,000,000 Aggregate. Please be advised that the limits of liability may have been eroded through the payment of other claims.

## III.     REVIEW OF COVERAGE

Please refer to your copy of your Policy for reference regarding the following coverage discussion. If you no longer have a copy of your Policy, we will gladly supply you with a copy upon request.

Pursuant to the terms of the Policy, any obligation to UCC for "Damages" and "Professional Liability Expenses" under Coverage Parts A, B and C only attaches excess the applicable self-insured retention ("SIR"). There is $25,000 each "claim" SIR inclusive of claims expenses for Parts A, B and C.

In considering your request for coverage, we have reviewed Coverage Part A - CONTRACTOR'S PROFESSIONAL LIABILITY COVERAGE and Coverage Part C - COVERAGE PART C – CONTRACTOR'S POLLUTION LIABILITY. We have not reviewed COVERAGE PART B - CONTRACTOR'S PROTECTIVE PROFESSIONAL INDEMNITY as it is our understanding UCC did not retain any "Design Professional"(s) in conjunction to the Property, nor has UCC brought any claim against any "Design Professional." If this understanding is incorrect, please advise in writing. Zurich does not waive our rights to address coverage under Coverage Part B at a later date.

Review of Coverage under Coverage Part A:

As described above in Section I Summary of Claim, UCC elected to incur charges related to the remediation of the mold prior to providing written notice to Zurich of this claim on August 5, 2016. Accordingly, in the event UCC may have been legally obligated to pay "Damages" because of a "Professional Liability Claim," no such coverage is afforded as UCC failed to comply with the following Claim Provision, quoted in relevant part below:

V.     CLAIM PROVISIONS

A.     PROFESSIONAL LIABILITY CLAIMS AND OTHER "CLAIMS"

      B. No costs, charges or related "Claim Expenses" shall be incurred without our written consent, which shall not be unreasonably withheld.

      The "Insured" shall do nothing to prejudice our rights under the policy nor shall the "insured" admit liability or settle any "Claim" without our written consent...

As UCC elected to incur remediation costs prior to providing Zurich with written notice, UCC did not comply with Section V Claims Provisions Part B of the Policy and accordingly Zurich hereby disclaims coverage under Coverage Part A. As the remediation occurred prior to our notice, Zurich had no opportunity to investigate this matter for potential coverage or as to potentially liability on behalf of UCC. By electing to perform remediation UCC assumed complete liability for this matter and in doing so incurred amounts without our knowledge well in excess of the $25,000 SIR thus prejudicing our ability to resolve this claim within the policy proceeds above the applicable SIR in the event we were able to confirm any covered damages under the Policy were being presented.

Please be advised in the event UCC was found to have complied with the Claim Provisions which Zurich disputes for the reasons detailed above, it is unclear what coverage, if any, may have been afforded for this matter pursuant to the terms of the Insuring Agreement of Coverage Part A which states in part:

I.    **COVERAGE PART A - CONTRACTOR'S PROFESSIONAL LIABILITY COVERAGE**

We will pay on behalf of the "Insured" all sums in excess of the applicable Self Insured Retention noted in Item 4 of the Declarations that the "Insured" is legally obligated to pay as "Damages" because of a "Professional Liability Claim" first made against the "Insured" during the "Policy Period" and reported to us during the "Policy Period", the Automatic Extended Reporting Period or the Optional Extended Reporting Period if applicable, provided that:

1. the "Professional Liability Claim" arises out of an actual or alleged negligent act, error or omission with respect to the rendering of or failure to render "Professional Services" by the "Insured" or any entity for which the "Insured" is legally responsible;

2. the actual or alleged negligent act error, or omission took place during the "Policy Period" or on or after the "Retroactive Date" specified in the Declarations; and

3. prior to the effective date of the first policy issued to you and continuously renewed by us, none of your principals, partners, directors or officers had any knowledge of any circumstance that could reasonably be expected to result in a "Professional Liability Claim".

In addition to our declination based upon UCC failing to adhere to the Conditions of the Policy as it incurred amounts without our written consent, Zurich reserves the right to further disclaim coverage at a later date on the basis that the terms of the Insuring Agreement were not satisfied as it relates to this claim. These reservations include, but are not necessarily limited to the following:

In regards to the Insuring Agreement, it is unclear if the claims made and reported requirements were met. While we do not dispute the claim was reported to Zurich in writing during the policy period, it is unclear if the claim was first made to UCC during the policy period as required by the Insuring Agreement. As stated above in the Summary of Claim, there is an indication the claim may have first been brought against UCC on or about April 13, 2016 by the Owner's Representative, which predates the inception of the Policy on April 20, 2016. Zurich reserves the right to further disclaim coverage if it is ultimately determined the claim was not first made during the policy period as required by the Insuring Agreement.

Further, in regards to the Insuring Agreement if the claim was made and reported within the policy period it is unclear what portion, if any, constituted "Damages" UCC would be legally obligated to pay because of a 'Professional Liability Claim." As stated above, Zurich having no knowledge of this claim was unable to investigate causation prior to remediation efforts being made. It is unclear what portion, if any, of any damages arose out any "Professional Services" provided by UCC. In fact, Prologis' insurer in its July 14, 2016, subrogation notification letter to UCC states the mold was due to "faulty installation of the roof." Faulty installation does not constitute "Professional Services" as defined by the Policy. Zurich reserves the right to further disclaim coverage as the damages sought in whole or in in applicable part did not constitute "Damages" UCC was legally obligated to pay because of a "Professional Liability Claim" as required by the Insuring Agreement.

Zurich further reserves the right to further disclaim coverage for this loss under any potentially applicable Exclusion which may serve to preclude or limit coverage for this matter including, but not necessarily limited to, the following potentially applicable Exclusions:

We reserve the right to further disclaim coverage under Exclusion M which precludes coverage for "...the cost to repair or replace faulty workmanship in any construction, erection, fabrication, installation, assembly or manufacturing process performed or provided by an "Insured..." Again, Prologis' insurer in their July 14, 2016 letter attributed the mold problems to "faulty installation" on behalf of UCC. Accordingly, Zurich reserves the right to further disclaim coverage for this matter in whole or applicable part under Exclusion M which precludes coverage for costs associated with faulty workmanship including faulty workmanship concerning installation issues.

Moreover, we reserve the right to further disclaim coverage under Exclusion Q which precludes coverage for "a settlement which has been reached without our express written consent." It is unclear to us what agreement may have been in place between Prologis and UCC concerning these repairs, but to the extent any such agreement existed it was entered without our express written consent.

5

<u>Review Coverage under Coverage Part C:</u>

Zurich has further reviewed this claim under Coverage Part C – **CONTRACTOR'S POLLUTION LIABILITY** which contains the following Insuring Agreement:

### A. COVERAGE

We will pay on behalf of an "Insured" any "Loss" an "Insured" is legally obligated to pay as a result of "Contractor's Pollution Liability Claim(s)" caused by:
1. a "Pollution Event" resulting from "Technical Activities" performed by the "Named Insured" or anyone for whom the "Named Insured" is legally responsible; or
2. a "Pollution Event" resulting from "Completed Operations" of the "Technical Activities"; provided that the "Technical Activities" must commence on or after the "Retroactive Date" and before the end of the "Policy Period" and the "Contractor's Pollution Liability Claim" is the first made against the "Insured" and reported to us during the "Policy Period", the automatic extended reporting period, or the extended reporting period, if applicable.

Pursuant to Definition P. "Pollution Event" means the discharge, dispersal, release, or escape of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.

Pursuant to Definition S. "Technical Activities" means construction work and other non-professional services.

Zurich reserves the right to later further disclaim coverage under Coverage Part if we determine the terms of the Insuring Agreement have not been satisfied. However, we do disclaim coverage at this time under Coverage Part C based upon Exclusion R as follows:

R.      a "Microbial Event", whether caused directly or indirectly;

Pursuant to Exclusion R., Coverage Part C excludes from coverage "Contractor's Pollution Liability Claim(s)" or "Loss(es)" based upon or arising out of a "Microbial Event". "Microbial Event" means, in pertinent part, any "Loss" caused directly or indirectly by any "Fungus", which includes any form or type of mold. Consequently, this matter, which arises out of discovery of mold at the subject site, is excluded from coverage under Coverage Part C. As a result, Zurich respectfully declines coverage of this matter under Coverage Part C.

CAP003945

## IV.    CONCLUSION

Zurich regrets to advise you for the reasons described above that we were unable to find any coverage to UCC in this matter under either Coverage Part A or C of the Policy as it relates to UCC's demand for reimbursement totaling $1,273,908.44 that it reports it incurred in the remediation of mold at the Property.  In the event a subrogation claim from the Owner's carrier is later pursued we ask that you promptly advise us in writing so we may have the opportunity to review it for coverage.  We reserve our rights to further address coverage for any such claim at that time, including our right to later disclaim coverage for such a claim based upon any policy terms, conditions and/or exclusions that may be found to bar coverage.

Zurich's coverage position discussed in this letter is based upon the facts of this matter, as we now know them, as well as information provided to us by UCC. Zurich reserves its rights to alter its position, should any of the facts change. No actions undertaken by Zurich to further investigate or handle this claim should be construed as a waiver of any rights available to Zurich, and Zurich in no way intends to be estopped from asserting its rights under the Policy or the law.

Zurich reserves its right to assert such additional defenses that may be applicable and to rely upon the Policy terms and conditions and all exclusions. Please be advised that Zurich's failure to include in this letter any other defenses to coverage is not intended to be, and should not be viewed as, a waiver of any such other defenses, whether known or unknown. Instead, Zurich reserves its right to assert any other Policy defenses that may apply to the referenced matter.

In the event UCC disagrees with our coverage position we are more than happy to review and consider any written communication you provide in response to this letter in support of your position along with any additional information and/or documentation you may currently have or possess, and/or later develop in connection to this claim.

If you have any questions, or can provide any additional information, please feel free to contact me at 805-520-3641.

Sincerely,
Steadfast Insurance Company

*Chris Ford*

Chris Ford
Claims Specialist

cc:     Danielle Hill
        Claims Consultant
        LP Insurance Services Inc.
        300 East 2nd Street Suite 1300
        Reno, NV 89501
        ***danielle.hill@lpins.net***

# Ex A, exhibit 13

# Ex A, exhibit 13



EXHIBIT
_13_



ZURICH

October 20, 2016

Brad Breach
United Construction Co.
5300 Mill St
Reno, NV 89502
Brad@unitedconstruction.com

**RE: Logiscenter 395 Owner, LLC**

| | |
|---|---|
| Named Insured: | United Construction Company |
| Matter: | 8020 and 8040 N. Virginia Reno Nevada |
| Policy No.: | EOC 0193620-00 |
| Effective | April 20, 2016 to April 20, 2017 |
| File No.: | 9260150559 |
| Policy Type: | Contractor's Protective Professional Indemnity |

Zurich
Claims

P.O. Box 66965
Chicago, IL
60666-0965

Telephone (805) 520-3641
Fax (805) 520-3647
Chris.fordr@zurichna.com
http://www.zurichna.com

Dear Mr. Breach:

The purpose of this letter is to further respond to United Construction Company's (hereinafter "UCC") demand to Steadfast Insurance Company (hereinafter "Zurich") to provide a defense to UCC. I have reviewed the information and materials received to date involving the above referenced matter. This will also follow-up our recent various teleconferences during which time we discussed the following claim. For the reasons we discussed and detailed herein, Zurich hereby agrees to participate in the defense of UCC under Coverage Part A subject to a complete reservation of our rights under the above-referenced policy. Zurich's investigation is ongoing under Coverage Part A as to what indemnity obligation, if any, we may have in connection to this claim.

## I.    SUMMARY OF CLAIM

Zurich understands the facts of the claim to be as follows[1]:

On November 26, 2014 UCC entered into two separate design build contracts with Logicenter 395 Owner, LLC. (hereinafter "Logicenter" or "Owner") to build a 225,000 square foot warehouse type structure at 8020 N Virginia Ave Reno, Nevada ("Building A") that had a substantial completion date of September 28, 2015, and to build a similar 400,000 square foot structure at 8040 N. Virginia Ave Reno, NV ("Building C") which had a substantial completion date of September 18, 2015. About a year after the

---

[1]     Any reference to the allegations against UCC is not meant to endorse or refute those claims. Reference is made exclusively for evaluation of coverage under the above-referenced policy.

completion of these buildings, Logicenter advised UCC there was an accumulation of condensation on the ceiling of the buildings which in August 2016 UCC investigated with the assistance of Trinity ERD. It is our understanding the Trinity ERD report is the only investigative report and that Logicenter did not retain any expert(s) to conduct its own investigation. If this is incorrect, please advise. The Trinity ERD experts in their report dated August 26th conclude the moisture accumulation under the OSB roof deck was attributable to a number of factors, including some which appear may arise from the potential liability of other party(ies), including, but not necessarily limited to the Owner for not controlling the temperature of the buildings when vacant.

Logicenter eventually presented a claim against UCC on September 19, 2016, demanding that UCC, at its own expense, remove microbial growth from the buildings and take corrective actions as necessary and/or appropriate to ensure no further damage occurs to the buildings. It is our further understanding in response UCC has submitted a remediation plan estimating $905,000 in repairs costs for Building A and $525,000 for Building C to Logicenter that remains under review. We have not been provided with a copy this remediation plan. Moreover, for the rationale captured in your counsel's October 14th letter, it is our understanding that UCC is electing to self-perform remediation activities and/or repairs to address the microbial growth issues as opposed to asserting liability defenses and entering into settlement negotiations with Logicenter.

Zurich recognizes that the allegations against UCC are, as of yet, unsubstantiated, and nothing in this letter is intended to suggest whether the allegations have any legal or factual merit.

If our understanding of the facts is in any way incorrect, please advise us immediately.

## II.    THE POLICY

Zurich issued a Contractor's Protective Professional Indemnity and Liability Insurance Policy, EOC 0193620-00, to United Construction Company for the policy period April 20, 2016 to April 20, 2017 (the "Policy"). Coverage Part A of the Policy provides claims made and reported Contractors Professional Liability Coverage with limits of $5,000,000 each "Claim" and $5,000,000 Aggregate Limit of Liability. Coverage Part C provides CONTRACTOR'S POLLUTION LIABILITY with limits of $5,000,000 each "Claim" and $5,000,000 Aggregate Limit of Liability. Further, the Policy provides a $5,000,000 Aggregate. Please be advised that the limits of liability may have been eroded through the payment of other claims.

## III.    REVIEW OF COVERAGE

In considering your request for coverage, we have reviewed Coverage Part A - CONTRACTOR'S PROFESSIONAL LIABILITY COVERAGE and Coverage Part C - COVERAGE PART C – CONTRACTOR'S POLLUTION LIABILITY. We have not reviewed COVERAGE PART B - CONTRACTOR'S PROTECTIVE PROFESSIONAL INDEMNITY as

workmanship performed on or behalf UCC. Zurich further reserves the right to disclaim coverage in whole or in applicable part under Exclusion S. for any "Bodily Injury" or "Property Damage" arising out of construction means, methods, techniques, sequences and procedures."

- The Policy provides we have the right and duty to defend, with counsel of our choice, any "Professional Liability Claim" seeking "Damages" to which Coverage Part A of this insurance applies. Zurich reserves the right to later retain counsel of our choice as we may deem necessary. Zurich is not agreeable at this time to pay or reimburse you for any portion of any fees and/or costs incurred by any counsel of your choice, including any such expenses that may qualify as "Professional Liability Claim Expenses" above the applicable $25,000 SIR. We are more than happy to have a discussion with you concerning possible counsel selection.

- Zurich reserves our rights under the Other Insurance Provision located in Section VII Conditions J which states in potentially applicable part:

  Where other insurance is available to the "Insured" in addition to the "Design Professional's Insurance" for "Damages" or "Losses" covered under this policy, our obligation to the "Insured" is as follows:

  > 1. This insurance shall apply as excess over any other applicable insurance be it primary or excess.
  > 2. Where this insurance is excess over any other valid and collectible insurance, we will pay only our share of the amount of "Damages" or "Losses" if any, that exceeds the total amount that all such other insurance would pay for the "Damages" or "Losses" in the absence of this insurance.

  Based upon the above, Zurich reserves the right to take an excess position to other potential coverage afforded to UCC. We are aware you have at least tendered this loss to one other carrier (Philadelphia Insurance Companies), and we hereby renew our request a copy of their coverage position in connection to this claim. We further request copy(ies) of any other tender(s), if any, you may have made against additional policy(ies), as well as copies of their response(s).

- We note your counsel's letter dated October 14th states "United also has serious concerns about its ability to incur the costs necessary to carry out the expense repairs." Please be advised Zurich in accordance to the terms of the Policy is unable to front or advance any amount to UCC should UCC independently elect to make repairs as it has indicated it desires to perform. Further, the Policy does not require we reimburse UCC for all costs it elects to incur but rather the Policy provides indemnification for covered "Damages" above the applicable SIR absent any other available coverage which may be applicable on a primary basis. Zurich will review any indemnity request submitted by UCC to

4

determine what amount(s), if any, constitute covered damages under the Policy. UCC will need to substantiate and document all such costs in support of its claim.

- If UCC elects to make repairs as it has indicated to Zurich that it does, Zurich does not deem such an action to be in violation of Exclusion Q which precludes coverage for a settlement which has been reached without our express written consent. Zurich does not waive our rights to assert this exclusion for any settlement discussions or agreements entered with the Owner without our express written consent.

- Pursuant to Section VII Conditions N. If we make any payment under this policy, we shall be subrogated to all your rights against any person or organization, including the right to participate with the "Insured" in the exercise of all the "Insured's" rights of recovery. You shall execute and deliver instruments and papers to us and do whatever else is necessary to secure such rights.

- Pursuant to the terms of the Insuring Agreement and Limits of Liability, our duty to defend all covered "Claims" or pay "Professional Liability Claim Expenses" shall end when the applicable Limit of Liability has been exhausted by the payment of "Professional Liability Claim Expenses" or "Damages."

Zurich has further reviewed this claim under Coverage Part C – **CONTRACTOR'S POLLUTION LIABILITY** which contains the following Insuring Agreement:

**A. COVERAGE**
We will pay on behalf of an "Insured" any "Loss" an "Insured" is legally obligated to pay as a result of "Contractor's Pollution Liability Claim(s)" caused by:
1. a "Pollution Event" resulting from "Technical Activities" performed by the "Named Insured" or anyone for whom the "Named Insured" is legally responsible; or
2. a "Pollution Event" resulting from "Completed Operations" of the "Technical Activities"; provided that the "Technical Activities" must commence on or after the "Retroactive Date" and before the end of the "Policy Period" and the "Contractor's Pollution Liability Claim" is the first made against the "Insured" and reported to us during the "Policy Period", the automatic extended reporting period, or the extended reporting period, if applicable.

Pursuant to Definition P. "Pollution Event" means the discharge, dispersal, release, or escape of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.

Pursuant to Definition S. "Technical Activities" means construction work and other non-professional services.

5

SF000007

Zurich reserves the right to later further disclaim coverage under Coverage Part if we determine the terms of the Insuring Agreement have not been satisfied. However, we do disclaim coverage at this time under Coverage Part C based upon Exclusion R as follows:

> R.    a "Microbial Event", whether caused directly or indirectly;

Pursuant to Exclusion R., Coverage Part C excludes from coverage "Contractor's Pollution Liability Claim(s)" or "Loss(es)" based upon or arising out of a "Microbial Event". "Microbial Event" means, in pertinent part, any "Loss" caused directly or indirectly by any "Fungus", which includes any form or type of mold. Consequently, this matter, which arises out of discovery of mold at the subject site, is excluded from coverage under Coverage Part C. As a result, Zurich respectfully declines coverage of this matter under Coverage Part C.

Zurich reserves its right to assert any other additional terms, conditions and/or exclusions as a defense to coverage under the Policy.

## IV. CONCLUSION

For the reasons captured above, Zurich agrees to participate in the defense of UCC under Coverage Part A subject to a reservation of our rights under the Policy. We reserve the right to later retain counsel of our choice in connection to this defense. Zurich is unable to find any afforded coverage for this matter under Coverage Part C of the Policy due to the microbial event exclusion. What indemnity obligation, if any, we may owe UCC under Coverage Part A remains under investigation subject to a complete reservation of our rights under the Policy.

Zurich has made every attempt to evaluate this matter accurately. Notwithstanding our efforts, please do not construe this letter to be all-inclusive of every potential coverage issue. This correspondence does not constitute a waiver, alteration, or modification of the terms and conditions contained in the policy. Zurich retains the right to amend, modify and supplement its opinions.

We look forward to receiving the above-requested information in regards to other tender(s) and response(s) from those carrier(s) as part of our ongoing coverage investigation.

If you have any questions, or can provide any additional information, please feel free to contact me.

Sincerely,
Steadfast Insurance Company

*Chris Ford*

Chris Ford
Claims Specialist
805-520-3641

6

SF000008

CC:    Danielle Hill
       Claims Consultant
       LP Insurance Services Inc.
       300 East 2nd Street Suite 1300
       Reno, NV 89501
       *danielle.hill@lpins.net*

       Paul J. Georgeson
       MCDONALD CARANO WILSON LLP
       100 West Liberty Street, 10th Floor
       Reno, NV 89501
       *pgeorgeson@Mcdonaldcarano.com*

7

SF000009

# Ex A, exhibit 25

# Ex A, exhibit 25



| | |
|---|---|
| **To:** | Mathis, Jennifer; Lori Sebransky |
| **Cc:** | jkoonankeil@CapSpecialty.com; Huggins, Michael L.; Tim McCaffery; Matt Ennis |
| **Subject:** | RE: United Construction - 8730 Military Rd. remediation claim |
| | |
| **UserEmailCreateDate:** | 2019-01-03 10:44:47 |
| | |
| **From :** | chris.ford@zurichna.com |
| **Sent :** | 1/3/2019 10:44:50 AM |

Jennifer thank and I will be reviewing and responding within the next 30 days.



*Chris Ford*
*Claims Specialist IV*
**Steadfast Insurance Company**
**PO Box 968020**
**Schaumburg, IL 60196**
**Office:** 805-520-3641
**Fax:** 805-520-3641
chris.ford@zurichna.com

zurichna.com
  

**From:** Mathis, Jennifer [mailto:Jennifer.Mathis@troutman.com]
**Sent:** Thursday, December 27, 2018 9:31 AM
**To:** Christopher Ford; Lori Sebransky
**Cc:** jkoonankeil@CapSpecialty.com; Huggins, Michael L.; Tim McCaffery; Matt Ennis
**Subject:** [EXTERNAL] United Construction - 8730 Military Rd. remediation claim

Chris and Lori,

Following up on our conversation from last week, please see the attached correspondence.

Regards,

Jennifer

**Jennifer Mathis**
**troutman** sanders
Direct: 415.477.5706
jennifer.mathis@troutman.com

This e-mail message (and any attachments) from Troutman Sanders LLP may contain legally privileged and confidential information solely for the use of the intended recipient. If you received this message in error, please delete the message and notify the sender. Any unauthorized reading, distribution, copying, or other use of this message (and attachments) is strictly prohibited.

SF001381

Troutman Sanders LLP
580 California Street, Suite 1100
San Francisco, CA 94104

troutman.com

**troutman
sanders**

_____

**Jennifer Mathis**                                                      **Michael Huggins**
(415) 477-5706                                                           (415) 477-5752
jennifer.mathis@troutman.com                              michael.huggins@troutman.com

December 27, 2018

**BY EMAIL ONLY**

Chris Ford
Claims Specialist IV
Steadfast Insurance Company
P.O. Box 968020
Schaumburg, IL 60196

Lori Sebransky
McCaffery Hosking LLP
1777 Botelho Drive, Suite 360
Walnut Creek, CA 94596

**Re:    Zurich's Denial of Coverage for UCC's Military Road Claim (Claim No. 9260156182)**

Dear Mr. Ford and Ms. Sebransky:

As you are aware, we represent Capitol Specialty Insurance Corporation ("CapSpecialty") with respect to Insurance Agents and Brokers Professional Liability Policy, No. IA20151100-03, that was issued to L/P Insurance Services ("LP") for the Policy Period of September 1, 2017 to September 1, 2018 (the "CapSpecialty Policy").

CapSpecialty understands that United Construction Company ("UCC") alleges that LP failed to timely notify UCC's professional liability carriers, including Steadfast Insurance Company ("Zurich"), of mold and moisture damage because of a defective roof design at 8730 Military Road, Reno, Nevada ("Military Road Claim"). CapSpecialty also understands that Zurich denied the Military Road Claim based on untimely reporting. As a result of that denial, UCC has argued that the CapSpecialty Policy should respond to remediate the damage at Military Road, which UCC has indicated will cost $3.2 million to $4 million.

As we discussed on December 18, 2018, CapSpecialty has reviewed Zurich's denial of coverage and all information provided to LP and/or CapSpecialty by UCC and has concluded that there are strong grounds for Zurich to reconsider its denial and accept coverage for the Military Road Claim, even if under a reservation of rights. Per your request, we have provided an analysis below in support of such conclusion.

All factual and legal representations in this letter are subject to CapSpecialty's ongoing investigation of this matter. CapSpecialty reserves the right to supplement its position as stated

SF001382

Chris Ford
Lori Sebransky
December 27, 2018
Page 2



_____

in this letter subject to further investigation and developments, and without prejudice to or waiver of any claim or defense to which CapSpecialty may be legally entitled in the event of litigation involving these issues.  This letter shall not be construed to waive or limit in any way CapSpecialty's right to seek contribution or coverage from any other insurance to which UCC may be entitled regarding the claims discussed herein.

**I.    Zurich Policy**

Zurich issued Contractor's Protective Professional Indemnity and Liability Insurance Policy No. EOC 0193620-00 ("Zurich Policy"), as follows:

- Named Insured:        United Construction Company
- Policy Period:        April 20, 2016 to April 20, 2017
- ERP:                  60 days (June 20, 2017)
- Retroactive Date:     April 20, 2011
- Limits of Liability:  $5M per Claim; $5M aggregate
- Deductible:           $25K per Claim
- Choice of Law:        New York

<u>Insuring Agreement</u>

The Zurich Policy provides coverage for "all sums in excess of the applicable Self Insured Retention . . . that the Insured is legally obligated to pay as 'Damages' because of a 'Professional Liability Claim' first made against the 'Insured' during the 'Policy Period' and reported to [Zurich] during the 'Policy Period', the Automatic Extended Reporting Period or the Optional Extended Reporting Period if applicable, provided that:

1.    the Professional Liability Claim arises out of an actual or alleged negligent act, error or omission with respect to the rendering of or failure to render Professional Services by the Insured or any entity for which the Insured is legally responsible;

2.    the actual or alleged negligent act error, [sic] or omission took place during the Policy Period or on or after the Retroactive Date specified in the Declarations; and

3.    prior to the effective date of the first policy issued to you and continuously renewed by us, none of your principals, partners, directors or officers had any knowledge of any circumstance that could reasonably be expected to result in a Professional Liability Claim.

*Zurich Policy*, § I.A.

"Professional Services" that are covered under a "Professional Liability Claim" in the Zurich Policy means services that the insured is providing under contract to a "Design Professional" that the insured is qualified to perform for others in the capacity as an architect, engineer, landscape architect, land surveyor or planner, construction manager, a LEED accredited

37252354v1

SF001383

Chris Ford
Lori Sebransky
December 27, 2018
Page 3



_____

professional, interior designer/space planner, or as specifically described by endorsement to the policy. _Id._ at § II.O.

<u>Related Claims</u>

The Zurich Policy states that the inclusion of more than one insured in the making of a single Claim or the bringing of multiple suits regarding the same negligent act, error or omission shall not increase the policy's Limit of Liability.  Two or more Claims "arising out of the same, interrelated, associated, repeated or continuous negligent act, error or omission or a series of related negligent acts, errors or omissions ["Related Claims"] shall be treated as a single Claim and shall be subject to the same limit of Liability and only one Self Insured Retention" for each applicable Coverage Part ("Related Claims Provision"). _Zurich Policy_, § IV.D.1.  The Zurich Policy does not limit related Claims only to those Claims made and reported within the Policy Period.

<u>Notice of Claim</u>

In the event of a Claim, the insured must provide "prompt written notice," and no later than sixty days after the expiration or termination of the policy or as provided under the ERP, containing particulars sufficient to identify the insureds and reasonably obtainable information regarding time, place, and circumstances, and the names and addresses of any injured parties and available witnesses. _Id._ at § V.A.1.  The insured's knowledge of a Claim shall be deemed to have occurred when an individual acting in a capacity as legal counsel or risk manager, or a principal, partner, director, or executive officer first learned of the Claim. _Id._

<u>Notice of Circumstance</u>

If during the Policy Period, the Insured becomes aware of an actual or alleged negligent act, error or omission "which may be expected to give rise to" a Professional Liability Claim or Claim under the policy, the Insured may provide written notice before the Policy Period expires and containing particulars to identify the Insured and reasonably obtainable information regarding:

    i.    the time place and explanation of the actual or alleged negligent act, error or omission, including how the Insured first became aware of it;

    ii.    the name and addresses of any injured parties and available witnesses and the Damages that have or may result;

    iii.    any and all investigative or engineering reports, data or information about the actual or alleged negligent act, error or omission, or Damages; and

    iv.    copies of any relevant contracts between the Insured and its client for Professional Services

("NOC Provision"). _Id._ at § V.A.2.  To the extent such notice is provided, any Claim for which coverage is provided by the policy that may be made against the Insured "shall be deemed for the purposes of this insurance to have been made on the date on which the notice was given to [Zurich]." _Id._  As with the related Claims provision, the NOC Provision does not limit Claims that relate back to any NOC to Claims made and reported within the Policy Period.

SF001384

Chris Ford
Lori Sebransky
December 27, 2018
Page 4



---

## II.  UCC's Roof-Design Claims

Per its website, UCC is a firm that offers design-build and design-assist contractor services, including tailored general contracting, feasibility, due diligence, and construction management.

### A.  Milan Ave Claim

On April 5, 2016, a UCC employee discovered mold during the removal of roof insulation at a property at 385 Milan Ave, where UCC had designed the roof.  The owner of the property sought reimbursement from UCC to remediate the mold.  On August 5, 2016, UCC tendered the claim, Claim No. 9260150560, under its professional liability policy that was issued by Zurich, seeking reimbursement of $1,273,908.44 ("Milan Ave Claim").

By letter dated November 16, 2016, Zurich denied coverage for the Milan Ave Claim, asserting that UCC incurred remediation expenses without Zurich's prior approval and that the purported "faulty installation of the roof" that caused mold damage did not constitute "Professional Services" under the policy.  UCC did not challenge Zurich's denial of coverage.  The Milan Ave Claim is not at issue in connection with UCC's dispute with LP, and so we do not address Zurich's denial of coverage for that claim in this letter.

### B.  North Virginia Road Claims

On September 16, 2016, UCC tendered two additional claims under the Zurich Policy, regarding mold damage at 8020 and 8040 North Virginia Road ("North Virginia Road Claims").  UCC sought reimbursement for damages relating to remediation of the mold, in the amount of $1,927,435.  Construction on those properties had been completed in September 2015.  The claims were consolidated as one claim.  In October 2016, Zurich issued a reservation of rights letter regarding the North Virginia Road Claims.

### C.  Military Road Claim

On or about April 14, 2017, UCC retained Pete Fowler Construction Services Inc. ("Fowler") to conduct an inspection on a property at 8730 Military Road, where UCC had implemented the same roof design as at the prior properties that had developed mold and moisture damage.  In a report dated April 21, 2017, and marked "for mediation purposes only," Fowler stated that "microbial growth was observed during inspection" at 8730 Military Road ("Fowler Report").

On July 11, 2017, UCC emailed Zurich asking if it had received a claim for 8730 Military Road ("Military Road Claim").  Zurich confirmed receipt of a notice of claim as of that day.  On July 12, 2017, Zurich informed UCC that it did not have record of any such claim.  On July 18, 2017, Ms. Hill noted that she spoke with Zurich, and Zurich requested that LP obtain updates from the other insurers before tendering notice of the claim to Zurich.  On July 21, 2017, LP provided "formal notice" to Zurich of the Military Road Claim.

SF001385

Chris Ford
Lori Sebransky
December 27, 2018
Page 5



By letter dated July 27, 2017 ("Coverage Letter"), Zurich denied coverage to UCC regarding the 8730 Military Rd Claim, asserting that UCC's notice of claim on July 11, 2017 was untimely under the policy's extended reporting period, which ended on June 20, 2017.

On October 20, 2017, Arch Specialty Insurance Company ("Arch") (UCC's subsequent professional liability insurer, whose policy incepted on April 20, 2017) confirmed by email to UCC that they had spoken the prior evening regarding 8730 Military Rd, requested additional information, and summarized the discussion as follows:

> You advised that the mold issue at 8730 Military Road in Reno Nevada is based on a UCC design of the roof at the property. The roof has a vapor barrier which causes moisture issues resulting in mold growth. . . . You advised that the roof design used on the property was used on other buildings which also had moisture issues and mold growth. . . . You indicated that the costs associated with fixing the prior two buildings are approximately $1M each, and that the property at issue will likely have the same costs to repair and remediate as the other two.

On October 27, 2017, Arch requested information from UCC regarding, among other things, whether Zurich had considered the Military Road Claim to be related to the Virginia Road Claims. On November 10, 2017, Arch denied coverage to UCC for the Military Road Claim asserting that it is related to UCC's prior claims that predate the Arch Policy Period that incepted on April 20, 2017.[1]

## III.    Potential Grounds for Coverage of Military Road Claim

Although CapSpecialty appreciates that notice is something Zurich may have raised as a reservation in light of the expiration of the ERP, the two-paragraph coverage analysis in Zurich's Coverage Letter denying coverage for the Military Road Claim does not address the interplay between the Related Claims issue and the late-notice ground on which Zurich denied coverage. The Coverage Letter does not assess whether the Military Road Claim can be denied as untimely where it is "related" to the prior claims that were timely tendered, or to the extent that Zurich was provided sufficient notice of conditions during the Zurich Policy Period that could give rise to the Military Road Claim.

### A.   Related Claims

Zurich's Related Claims Provision states that Related Claims shall be treated as a single Claim. Such provision does not expressly impose any reporting requirements on Related Claims reported after the Policy Period. Zurich's coverage denial letter does not address whether Related Claims made and/or reported after the Policy expires relate back to Related Claims made during the Policy Period such that those Claims, whenever made, would be considered first made on the date on which the earliest Related Claim was first reported to Zurich. This is particularly relevant here, where the Related Claim was reported so soon after the expiration of

---

[1] CapSpecialty does not address Arch's coverage position in this letter, but reserves all rights in that regard.

Chris Ford
Lori Sebransky
December 27, 2018
Page 6



the Policy Period, and was denied by UCC's subsequent carrier due to its relation back to prior claims that fell within the Zurich Policy Period.  There is ample case law support for this proposition.[2]

For example, in a case applying New York law (*Cushman*), the insured real estate company had used a certain valuation method that purportedly overvalued the properties and caused financial losses to developers, owners, etc., who brought lawsuits against Cushman.[3]  Cushman tendered four claims in total to Illinois National, which had issued professional liability policies to Cushman for each year of 2009 to 2013.  The Illinois federal court, applying New York law, held that all four claims were "related" as one claim that was deemed to have been noticed in the 2009-10 policy period, and were therefore subject to that policy period's single limits of liability.  Because the policy did not define "related wrongful acts," the court applied New York's factual-nexus, under which claims are related if they "arise from common facts and [ ] the

---

[2] *Nobilis Health Corp. v. Great Am. Ins. Co.*, 2018 WL 4810840, at *7 (S.D. Tex. Oct. 4, 2018) (three class actions based on drop in insured's stock price related back as a single claim under D&O policy period); *Columbus Life Ins. Co. v. Arch Ins. Co.*, 2016 WL 2865952, at *7 (N.D. Ind. May 17, 2016) (actions in subsequent policy periods alleging insured accountant's E&O based on similar tax plan related back); *Liberty Ins. Underwriters, Inc. v. Davies Lemmis Raphaely Law Corp.*, 162 F.Supp.3d 1068, 1079 (C.D. Cal. 2016), aff'd, 708 F. App'x 374 (9th Cir. 2017) (seven lawsuits brought in successive policy periods alleging the insured law firm participated in fraudulent investment scheme related as a single claim under the same per claim limit); *Darwin Nat. Assur. Co. v. Westport Ins. Corp.*, 2015 WL 1475887, at *6 (E.D.N.Y. Mar. 31, 2015) (actions in subsequent policy periods against insured municipality re zoning ordinance related back); *Worthington Fed. Bank v. Everest Nat. Ins. Co.*, 110 F.Supp.3d 1211, 1228-30 (N.D. Ala. 2015) (D&O claims in subsequent policy periods were related as a "single claim" and therefore related back, and the insured gave timely notice of the earlier "anchor" claim); *Kilcher v. Cont'l Cas. Co.*, 747 F.3d 983, 989 (8th Cir. 2014) (four separate actions in different years against financial adviser related back to same policy year); *Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*, 715 F.3d 1231, 1238 (10th Cir. 2013) (arbitrations in subsequent policy periods similarly alleging that the insured broker churned the claimants' accounts related back); *XL Specialty Ins. Co. v. Perry*, 2012 WL 3095331, at *7-10 (C.D. Cal. June 27, 2012) (eleven separate claims by different parties related back to earlier class action because all involved the insured's alleged failure to follow its underwriting standards and the resulting issuance of high-risk mortgages); *WFS Fin., Inc. v. Progressive Cas. Ins. Co.*, 232 F. App'x 624, 625 (9th Cir. 2007) (discrimination class actions in subsequent policy periods were related as a "single claim" and therefore related back); *Zahler v. Twin City Fire Ins. Co.*, 2006 WL 846352, at *8 (S.D.N.Y. Mar. 31, 2006) (investors' class action alleging securities fraud related back to employees' ERISA class action because "the intent of the parties was to cover claims first made during the policy period and subsequent claims related to the same facts that were the subject of the initial claim or claims"); *Friedman Prof. Mgmt. Co. v. Norcal Mut. Ins. Co.*, 120 Cal.App.4th 17, 21–22 (Cal. App. 2004) (medical malpractice suit and subsequent sexual-battery/invasion-of-privacy suit in successive policy periods arising out of same operation related back).

[3] *Cushman & Wakefield, Inc. v. Illinois Nat'l Ins. Co.*, 2018 WL 1898339, at *17 (N.D. Ill. Apr. 20, 2018).

SF001387

Chris Ford
Lori Sebransky
December 27, 2018
Page 7



troutman
sanders

_____

logically connected facts and circumstances demonstrate a factual nexus among the Claims."[4] Under that test, Cushman's claims were related because – even though each appraisal was a different work product, providing a unique valuation analysis and conclusion by a different Cushman employee – the appraisals were produced using the same allegedly misleading method. *Id.* at *19.

Here, each of UCC's claims concerned the same defective roof design that resulted in moisture and mold damage. The claims therefore arguably arose out of the same, interrelated, associated, repeated or continuous negligent act, error or omission or series of related negligent acts, errors or omissions – i.e., the design of the roof. Thus, to the extent the Military Road Claim relates to the prior claims that UCC tendered to the Zurich Policy, it would be considered as one claim with such prior claim(s).

Additionally, LP provided Zurich reasonably prompt notice of the Military Road Claim on UCC's behalf. Zurich received such notice approximately three months after the date of loss, and less than one month after the extended reporting period. Zurich also had notice of prior claims with the same roof design defect and was on notice that the defect had resulted in multiple claims already.

Therefore, because the Military Road Claim appears to relate to UCC's prior Related Claims that were timely tendered under the Zurich Policy, and because Zurich had reasonably prompt notice of the Military Road Claim, there is at least a possibility of coverage, even if provided under a reservation of rights.

Further support for considering UCC's Related Claims to relate back would exist to the extent the Zurich Policy's provision regarding "Two or More Policy Periods" may be read together with the preceding provision regarding "One Limit of Liability / Self Insured Retention." *See* §§ IV.D.1, 2. To the extent UCC's Related Claims constitute a single "Claim," the Related Claims that were reported after the Policy expired, coupled together with the Related Claims that were reported within the Policy Period, might be considered as a single Claim that took place over two or more Policy Periods. To such effect, the Zurich Policy states that all such Claims, whenever made, shall be considered first made on the date on which the earliest Claim was first reported to Zurich. Such provision therefore provides additional ground for considering the Military Road Claim to relate back to the date on which the Virginia Road Claims were first reported to Zurich.

### B. Notice of Conditions

A similar but independent ground for coverage of the Military Road Claim would exist to the extent UCC's prior claims provided Zurich notice of the conditions under which the Military Road Claim arose. The Zurich Policy states that where an Insured provided Zurich with notice during

_____

[4] Though the factual-nexus test may not apply where the policy defines "related" claims, *see Nomura Holding Am., Inc. v. Fed. Ins. Co.*, 629 F. App'x 38, 40 (2d Cir. 2015), the test is similar to Zurich's definition here that related claims must arise out of "the same, interrelated, associated, repeated or continuous negligent act, error or omission or a series of related negligent acts, errors or omissions."

SF001388

Chris Ford
Lori Sebransky
December 27, 2018
Page 8



troutman
sanders

_____

the policy period of an actual or alleged negligent act, error or omission "which may be expected to give rise to" a Professional Liability Claim or Claim . . . any Claim, for which coverage is provided by this policy, that may be made against the Insured shall be deemed for the purposes of this insurance to have been made on the date on which the notice was given to [Zurich]."

Here, Zurich was provided notice during the Policy Period of the design defect that allegedly caused the mold and moisture damage and had already led to other claims. The design flaw that was reported under three prior claims during the Policy Period reasonably may have constituted a negligent act, error or omission "which may be expected to give rise to" subsequent related claims. Although CapSpecialty is not privy at this time to all of the communications UCC had with Zurich regarding the design defect, presumably UCC provided Zurich in the claims adjustment process with further detail regarding this design defect, the damage that could result, and the fact that it was used on more than just one building.

Accordingly, to the extent the Military Road Claim is a "single Claim" with UCC's prior Related Claims regarding the same roof design defect, and/or to the extent Zurich had notice of the conditions under which such claims arose, CapSpecialty urges that, as UCC's insurer (which CapSpecialty is not), Zurich consider amending its denial of coverage to provide coverage for the Military Road Claim subject to a reservation of rights.[5] Please understand that to the extent litigation is initiated against LP as a result of Zurich's denial and CapSpecialty provides a defense for that litigation, one of LP's defenses will necessarily be that the Military Road Claim is covered under the Zurich Policy, or any other applicable policy issued to UCC by any other insurer.

Thank you in advance for considering the points discussed in this letter. We are happy to continue this conversation to the extent you may have any questions or additional items you may wish to discuss.

Thank you,

Jennifer Mathis
Michael Huggins

cc:    Jeff Koonankeil, CapSpecialty
       Tim McCaffery
       Matt Ennis, LP Insurance

_____

[5] On the reservation of rights point, CapSpecialty notes that a very recent Nevada Supreme Court decision, the jurisdiction where any litigation regarding coverage for the Military Road Claim or alleged broker negligence would be litigated, held that an insurer may be liable for an excess-limits judgment as "consequential damages" from a breach of the duty to defend, even where the insurer's denial of coverage was in good faith. *Century Surety Company v. Andrew*, 134 Nev. Op. 100, No. 73756, at *2 (Nev. Dec. 13, 2018).

SF001389

**From:**       Mathis, Jennifer <Jennifer.Mathis@troutman.com>
**Sent:**       Thursday, December 27, 2018 9:31 AM
**To:**         Christopher Ford; Lori Sebransky
**Cc:**         jkoonankeil@CapSpecialty.com; Huggins, Michael L.; Tim
                McCaffery; Matt Ennis
**Subject:**    [EXTERNAL] United Construction - 8730 Military Rd. remediation
                claim
**Attachments:** 37252354_1.pdf

Chris and Lori,

Following up on our conversation from last week, please see the attached correspondence.

Regards,


Jennifer

**Jennifer Mathis**
**troutman sanders**
Direct: 415.477.5706
jennifer.mathis@troutman.com


This e-mail message (and any attachments) from Troutman Sanders LLP may contain legally privileged and confidential information solely for the use of the intended recipient. If you received this message in error, please delete the message and notify the sender. Any unauthorized reading, distribution, copying, or other use of this message (and attachments) is strictly prohibited.

# EXHIBIT B

# EXHIBIT B

Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEVADA

 3

 4  CAPITOL SPECIALTY INS. CORP.,

 5              Plaintiff,

 6  vs.                              Civil Action No.
                                     2:20-cv-01382-JCM-VCF
 7  STEADFAST INS. CO., et al.,

 8              Defendant.

 9  _____

10

11

12

13      REMOTE VIDEOCONFERENCE DEPOSITION OF

14                   BRAD BREACH

15      Taken on Thursday, September 8, 2022

16   By a Stenographic Certified Court Reporter

17                At 10:08 a.m.

18   Witness Appearing Remotely from Reno, Nevada

19

20

21

22

23

24  Reported by:  Becky J. Parker, RPR, CCR No. 934

25  Job No. 50656, Firm No. 061F
```

```
                                                                   Page 2
   1    REMOTE VIDEOCONFERENCE APPEARANCES:


   2


   3          For Plaintiff:

   4                  SCOTT S. THOMAS
                      PAYNE & FEARS
   5                  6385 South Rainbow Boulevard, Suite 220
                      Las Vegas, Nevada   89118
   6                  702.382.3574
                      sst@paynefears.com
   7


   8          For Steadfast Insurance Company:

   9                  WILLIAM C. REEVES
                      MORALES FIERRO REEVES
  10                  600 South Tonopah Drive, Suite 300
                      Las Vegas, Nevada   89106
  11                  702.699.7822
                      wreeves@mfrlegal.com
  12


  13          For RHP Mechanical:

  14                  JESSICA A. WEST
                      TYSON & MENDES LLP
  15                  2835 St. Rose Parkway, Suite 140
                      Henderson, Nevada   89052
  16                  702.724.2648
                      jwest@tysonmendes.com
  17


  18           For Brad Breach/United Construction Company:

  19                  MARK G. SIMONS
                      SIMONS HALL JOHNSTON PC
  20                  690 Sierra Rose Drive
                      Reno, Nevada   89511
  21                  775.785.0088
                      msimons@shjnevada.com
  22
                      LORI A. SEBRANSKY
  23                  McCAFFERY HOSKING LLP
                      1777 Botelho Drive, Suite 360
  24                  Walnut Creek, California   94596
                      510.610.7981
  25                  las@mhfirm.law
```

Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 3

1                    INDEX TO EXAMINATION

2

3                   WITNESS:   BRAD BREACH

4    EXAMINATION
                                                          PAGE
5
     By Mr. Reeves                                           6
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                          Page 4
 1                     INDEX TO EXHIBITS

 2   NUMBER              DESCRIPTION                    MARKED

 3   Exhibit 27  Google Map                               16

 4   Exhibit 28  Standard Design-Build Agreement and      18
                 General Conditions Between Owner and
 5               Design-Builder, Bates SF000618 - 000655

 6   Exhibit 29  Project Agreement Between Contractor      23
                 and Subcontractor,
 7               Bates SF000663 - 000665

 8   Exhibit 30  Application for Contractor's Protective   32
                 Professional Indemnity and Liability
 9               Insurance, Bates SSP000417 - 000428

10   Exhibit 31  4/5/16 through 5/23/16 Time Line,         42
                 Bates CAP003666 - 03669
11
     Exhibit 32  April 11, 2016 Email, Bates CAP003639     45
12
     Exhibit 33  April 29, 2016 Email,                     46
13               Bates CAP003637 - 003638

14   Exhibit 34  May 12, 2016 Email, Bates CAP003665       50

15   Exhibit 35  July 14, 2016 Email Chain,                91
                 Bates CAP002266 - 002267
16
     Exhibit 36  3 August 2016 Letter Report,              99
17               Bates SF000961 - 000973

18   Exhibit 37  8/5/2016 Email, Bates LP000001            99

19   Exhibit 38  8/12/2016 Email Chain, Bates SF000123    105

20   Exhibit 39  August 12, 2016 Notice of Claim,         109
                 Bates CAP004202 - 004203
21
     Exhibit 40  November 3, 2016 Email Chain,            113
22               Bates CAP002271 - 002273

23   Exhibit 41  November 16, 2016 Letter,                116
                 Bates CAP003940 - 003947
24
     Exhibit 42  February 15, 2017 Letter,                123
25               Bates CAP003662 - 003664
```

www.oasisreporting.com                                        702-476-4500

Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                              Page 5
 1                         INDEX TO EXHIBITS

 2     NUMBER                  DESCRIPTION              MARKED

 3     Exhibit 43  4/18/2017 Email, Bates CAP001105        124

 4     Exhibit 44  7/13/2017 Email Chain,                  129
                   Bates CAP003988 - 003991
 5
       Exhibit 45  July 17, 2017 Email, Bates UCC_0012     135
 6
       Exhibit 46  7/21/2017 Email Chain,                  137
 7                 Bates CAP001122 - 001123

 8     Exhibit 47  7/21/2017 General Liability Notice of   142
                   Occurrence/Claim,
 9                 Bates SF001414 - 001415

10     Exhibit 48  7/26/2017 Email Chain,                  142
                   Bates CAP001213 - 001215
11
       Exhibit 49  7/26/2017 Email Chain, Bates SF001816   144
12
       Exhibit 50  July 27, 2017 Letter,                   145
13                 Bates SF001399 - 001401

14     Exhibit 51  July 27, 2017 Letter,                   149
                   Bates ARCH000113 - 000114
15
       Exhibit 52  November 10, 2017 Letter,               150
16                 Bates ARCH000084 - 000089

17     Exhibit 53  June 19, 2018 Letter,                   152
                   Bates SF001670 - 001673
18
       Exhibit 54  July 11, 2018 Email Chain,              153
19                 Bates SF001631 - 001632

20     Exhibit 55  December 17, 2018 Email,                157
                   Bates CAP005708
21
       Exhibit 56  January 30, 2019 Email Chain,           160
22                 Bates CAP005712 - 005715

23     Exhibit 57  Release Agreement,                      161
                   Bates SSP000148 - 000150
24

25
```

Page 11

1            Make sense?

2     A.     Yes.

3     Q.     Okay.  Do you have my question in mind or do

4  you need it read back?

5     A.      Can you repeat it?

6            MR. REEVES:  Ms. Court Reporter, can you

7  repeat it?

8            (Record read.)

9            THE WITNESS:  I don't know.

10 BY MR. REEVES:

11    Q.     Okay.  Your United circa -- let's talk about

12 2016 time frame and -- if we're able to.

13            United was -- in 2016, was in the business of

14 constructing buildings.  Agreed?

15    A.     Yes.

16    Q.     In terms of its -- all of its business

17 interest in 2016, was its sole business to construct

18 buildings or did it have other interests at that time?

19    A.     Can you rephrase that?

20    Q.     Yeah.  What I'm trying to drive at, I'm

21 trying to get at what the -- what business United was

22 performing or doing circa 2016.  And so I know that it

23 was in the business of constructing what I characterize

24 as warehouses.  I'm trying to see did it do other types

25 of work.  Did it do residential work?  Did it do other

Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 12

1  commercial work?  Do we consider this industrial work?

2  So I'm trying to get a big picture sense of your company

3  circa 2016.

4      A.     We're general contractor for commercial and

5  industrial buildings.

6      Q.     When we talk about Virginia, Milan, and

7  Military, do you consider them commercial or something

8  different?

9      A.     I don't know what the intended use for each

10  building would be.

11      Q.     When you drew the distinction in your answer

12  before, how do you define each?

13      A.     I would say warehousing would be more

14  commercial unless an industrial client was going into

15  that building.

16      Q.     When you use the word "warehousing," are we

17  talking about storage as opposed to manufacture?

18      A.     In my mind, yes.

19      Q.     Okay.  And so -- and that's an -- let's use

20  that nomenclature.  And so buildings that United was

21  constructing or operating as a general contractor in

22  2016, some were used for storage, some were used for

23  manufacturing.

24             Any other uses you're aware of vis-a-vis

25  buildings constructed in the 2016 time frame?



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

                                                            Page 50
1  occurred on April 5, 2016.  Do you have a recollection
2  of that occurring?
3      A.    No.
4      Q.    It mentions here, RHP arrived on site to
5  mobilize.
6            Do you see that?
7      A.    Yes.
8      Q.    Okay.  Go ahead, and you may have read it
9  before, but read this to yourself because I want to
10 understand whether you have any familiarity with what is
11 being described here as of this date of April 5, 2016.
12     A.    I don't have familiarity of any of that that
13 was going on at that point in time.
14     Q.    Do you know when you did become familiar with
15 it?
16     A.    I don't recall the exact date.
17     Q.    Can you give me a general sense?  Was it near
18 this time frame?  I mean, within -- within 30 days of
19 it, so to speak?
20           Look, I'll -- I'll withdraw the question.
21 I'm going to show you an exhibit and, you know, we'll
22 see if you recall.  So bear with me.  This is going to
23 be 34.
24           (Exhibit 34 marked for identification.)
25 ///



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 51

1   BY MR. REEVES:

2        Q.      It's a one-pager.  I'll display it.  It is

3   Bates-stamped CAP 3665.  It's an email from

4   Mark Clements to a guy named Tom Marko.

5               Do you know Marko?

6        A.      No.

7        Q.      CC recipients, there's a guy named Brunkow,

8   B-R-U-N-K-O-W.  Do you know who that is?

9        A.      He was a project manager.

10       Q.      Okay.  So he's with your company?

11       A.      He was, yes.

12       Q.      Got it.  No longer?

13       A.      No longer.

14       Q.      And there's Willcut and there's you.  Agreed?

15       A.      Yes.

16       Q.      Okay.  So certainly by this date, you're

17  aware of what's going on at Milan.  Agreed?

18       A.      Agreed.

19       Q.      Can you -- does this provide you any context

20  relative to how much earlier than May 12 you're aware of

21  it?

22       A.      My first recollection was Prologis requesting

23  that we take care of it.

24       Q.      So let me show you this because the email

25  might provide context.  It says here, Based on our phone

Brad Breach                           Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 52

1  call of 5/10/16, Prologis has directed UCC to inspect

2  each joint.

3          Do you see that?

4    A.    Yes.

5    Q.    Okay.  So were you on this 5/10/16 phone

6  call?

7    A.    No.

8    Q.    The manner in which this email is written

9  suggests that Marko is with Prologis.  Does that refresh

10 your recollection?

11   A.    No.

12   Q.    Do you recall receiving this email?

13   A.    Yes.

14   Q.    Okay.  And the email reflects that you folks

15 are going to do some work out there to deal with some

16 mold?

17          MR. THOMAS:  Objection.  Foundation.  Best

18 evidence.

19          THE WITNESS:  I recall that we were going to

20 follow the direction at that point in time.

21 BY MR. REEVES:

22   Q.    And that when you say follow the direction,

23 you were going to follow the direction provided by the

24 customer, the owner?

25   A.    The customer requested us to fix it and we

Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 53

1    did not know what was causing it at that point in time,

2    whether it was caused by the owner or something else.

3        Q.    Okay.  And who -- at that point in time,

4    did -- did your company agree to bear the cost

5    associated with this work?

6              And what I could probably -- I could qualify

7    that question.  Did your company agree to initially bear

8    the cost associated with this work?

9        A.    I recall a letter that we would -- a letter

10   or email that we would undertake the repairs, but we

11   reserve the right, depending on what caused it, to go

12   back against the owner.

13       Q.    Okay.  And so by virtue -- and here, let me

14   show you.

15             So it says -- and it's a separate sentence,

16   but it says, Starting the remediation process is by no

17   way admitting responsibility for the existing

18   conditions.

19             Do you see that?

20       A.    Yes.

21       Q.    Okay.  And so my take is that your company

22   agreed to initially bear the cost of it but would

23   reserve the right to go back against the owner if your

24   company concluded the ownership bear it.  Do I have that

25   right?



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 54

1      A.     Yes.

2      Q.     And so as I understand it, your company

3  incurred somewhere north of a million bucks relative to

4  this -- this work?

5      A.     I don't remember the exact numbers.

6      Q.     Do you know whether it's over a million or

7  under a million?

8      A.     I would have to look at the numbers to

9  remember.

10     Q.     Regardless of the amount, you'd agree with me

11 that your company bore 100 percent of it initially.

12 Agreed?

13     A.     Yes.

14     Q.     And then your company presented a claim to

15 the owner, and as I understand it the owner reimbursed

16 your company a portion of it?

17     A.     Yes.

18     Q.     And then at a point in time I think after the

19 sums were incurred but before the owner had agreed to

20 reimburse a portion, you folks presented a claim to

21 Zurich; agreed?

22     A.     Yes.

23     Q.     And relative to this email, and I'll show it

24 to you again, May 12, 2016, on this date you did not

25 write to your broker and say present this to Zurich.

OASIS
REPORTING SERVICES

Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 55

1    Agreed?

2       A.      Agreed.

3       Q.      And ultimately the -- when this -- when the

4    from Milan was presented to Zurich, the money had

5    already been incurred and spent.  Agreed?

6       A.      Yes.

7       Q.      And was that a conscious decision on the part

8    of your company relative to not presenting a claim to

9    Zurich or was it an oversight?

10              MR. THOMAS:  Objection.  Foundation.

11              MR. SIMONS:  I'm also going to advise the

12   client that if your decision or company's decision was

13   based upon communication with counsel at the time, to

14   not answer that question.  I'm not familiar.  I wasn't

15   involved in that period of time.  I just want you to be

16   aware that the company holds a privilege for

17   communicating with attorneys to get legal advice.

18   BY MR. REEVES:

19      Q.      Yeah.  Counsel's point is well taken.  And I

20   didn't -- I neglected to go over that.

21              So you've got a lawyer there, Mr. Simons,

22   representing you.  And relative to this

23   question-and-answer process, I don't wish to invade

24   information or communications you had with counsel.

25   Now, if you had an understanding of things independent

Brad Breach                                Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 58

1  Zurich on notice of that decision.  Agreed?

2      A.     Yes.

3      Q.     Okay.  And you're indicating that the

4  decision to place Zurich on notice was based upon

5  realization of, quote/unquote, a potential claim as well

6  as identification of causation.  Do you recall that?

7      A.     Yes.

8      Q.     And so what is it -- relative to the

9  potential claim, when in your mind did this become a,

10 quote/unquote, potential claim?

11         MR. THOMAS:  Objection.  Lack of foundation.

12 Calls for an expert opinion and a legal conclusion.

13 Vague and ambiguous with respect to the term "claim" and

14 "potential claim."

15         You can answer.

16         THE WITNESS:  I don't remember what in the

17 world you were asking.

18         MR. REEVES:  Court Reporter, read it back.

19 You know the drill now.

20         (Record read.)

21         MR. THOMAS:  Same objections.

22         THE WITNESS:  When we filed with

23 LP Insurance.

24 BY MR. REEVES:

25     Q.     Yeah, but what led you to do that?  You said



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 61

1   to place LP on notice.  Agreed?

2       A.      It was Craig Willcut's and my decision.

3       Q.      Okay.  Why did you decide to place LP on

4   notice?

5       A.      There was indication of a design deficiency.

6       Q.      A design deficiency for which your company

7   may bear responsibility?

8       A.      Yes.

9       Q.      And up until that time, were you ignorant

10  that your company may bear responsibility?

11              MR. THOMAS:  Objection.  Vague and ambiguous.

12              Mr. Breach personally or the company?

13              Do you understand the question?

14              THE WITNESS:  Not totally, I don't.

15  BY MR. REEVES:

16      Q.      What is it about the question you don't

17  understand?  I'm asking you whether you recognize prior

18  to that design issue coming to light, whether you were

19  aware that there was a potential that your company might

20  bear responsibility?

21      A.      I wasn't.

22      Q.      And so when -- when you got a directive from

23  Prologis to do this work, you were unaware that your

24  company may bear responsibility?

25      A.      I don't know.

Brad Breach                                                Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 62

1      Q.      Well, you knew that you were bearing it

2    initially, agreed, your company was?

3      A.      We were paying.

4      Q.      And you had no commitment from Prologis --

5      A.      We thought we had recourse back.

6      Q.      But you had no commitment from Prologis to

7    bear any portion of it.  Agreed?

8      A.      No commitment.

9      Q.      And so your company was going to bear

10   100 percent of it initially.  Agreed?

11     A.      Yes.

12     Q.      And you recognize there's a substantial that

13   Prologis was not going to reimburse your company.

14   Agreed?

15            MR. THOMAS:  Could you restate the question?

16   I think --

17            MR. REEVES:  No.

18            MR. THOMAS:  -- you may have misspoken.  I'm

19   asking the court reporter to read the question back,

20   please.

21            (Record read.)

22            MR. REEVES:  Potential, not substantial.

23   I'll restate it.

24   BY MR. REEVES:

25     Q.      You recognize there was a potential that

Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 63

1   Prologis was not going to reimburse your company at the

2   point in time you were doing that work.  Agreed?

3       A.      Agreed.  But there was a potential they would

4   reimburse us.

5           MR. REEVES:  Understood.

6           All right, guys.  I got -- my call's moved

7   up.  We're at the lunch hour.  So let's go off the

8   record.

9           (Recess taken from 12:01 p.m. to 12:40 p.m.)

10  BY MR. REEVES:

11      Q.      So Mr. Breach, I see Mr. Thomas there with

12  you in the room.  What are you all talking about?

13      A.      We had a good discussion on Utah and BYU

14  football.

15      Q.      Good.  I suppose you talked about the case.

16  So tell me what you and Mr. Thomas have talked about,

17  about the case.

18          MR. THOMAS:  Well, objection.  To the extent

19  that we may have talked about anything, it would be

20  protected by the attorney-client privilege.  So I would

21  just caution the witness not to disclose anything that

22  would fall into that category, if there is anything.

23  BY MR. REEVES:

24      Q.      Mr. Thomas doesn't represent United.  Agreed?

25          MR. THOMAS:  Bill, I'm not going to engage in



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 90

```
 1     A.     Nothing further.

 2     Q.     Okay.  And so then today you guys are all in

 3 the same room there.  We've had a number of different

 4 breaks.  You mentioned BYU football, I understand.

 5 Any -- any substantive conversations today?

 6     A.     No.

 7     Q.     Have you withheld anything from me?

 8     A.     No.

 9     Q.     Okay.  All right.  On Milan -- well, maybe

10 I'll move on.

11            Let's see here.  We're up to 35, I think.

12 Oh, I know what I was going to ask you.

13            On Milan, by virtue of timing, you'd agree

14 with me that you never -- you personally never consulted

15 with Zurich regarding the incurring of any of those

16 expenses before they were incurred.  Agreed?

17     A.     Yes.

18     Q.     And by virtue of that, you never obtained

19 consent from Zurich or even a comment from Zurich

20 regarding any -- the incurring of any of those expenses.

21 Agreed?

22     A.     Yes.

23     Q.     And so to sum it up, in a sense, everything

24 was incurred and paid before Zurich was ever placed on

25 notice.  Agreed?
```

Brad Breach                                        Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 91

1    A.    Not totally.

2    Q.    And what -- when you say "not totally," what

3   falls outside of that?

4    A.    I believe there were still a few incidental

5   costs coming in, but not -- nothing significant.

6    Q.    Under 5,000?

7    A.    I believe so.

8    Q.    And relative to those 5,000, did you consult

9   with Zurich and inquire it was -- that you had their

10  consent to incur?

11   A.    No.

12   Q.    And so in a sense, you came to Zurich simply

13  seeking reimbursement for sums that your company had to

14  incur and paid.  Agreed?

15   A.    Yes.

16   Q.    This will be 35.

17         (Exhibit 35 marked for identification.)

18  BY MR. REEVES:

19   Q.    This is Exhibit 35.  It's one page -- is it

20  one page -- two pages, excuse me.  CAP prefix, it's

21  2266, 2267.  It says it's from a woman named

22  Danielle Hill.

23         Do you know her?

24   A.    Yes.

25   Q.    She's with LP; right?



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 99

1      Q.    Okay.  I'm going to show you another exhibit.

2  Mark it as 36.

3            (Exhibit 36 marked for identification.)

4  BY MR. REEVES:

5      Q.    This is a 13-page document.  It's from a

6  company, Larsen, and then whatever the name with a Z

7  there.

8            Do you recognize that company?

9      A.    No.

10     Q.    Okay.  There's Clements.  Have you ever seen

11 this document before?

12     A.    I don't recall it.

13     Q.    Let's see who the author is.  You see we got

14 a guy Larsen.  It looks like the principals.  And then

15 do you recognize this name?

16     A.    No.

17     Q.    Do you recognize Larsen?

18     A.    No.

19     Q.    Okay.  Show you what I'm going to mark as 37.

20           (Exhibit 37 marked for identification.)

21 BY MR. REEVES:

22     Q.    So you see the title of this thing is called

23 notice of claim?

24     A.    Yes.

25     Q.    Okay.  And there's the Sherie woman we were

OASIS
REPORTING SERVICES

Brad Breach                                  Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 100

1   talking about before?

2       A.      Right.

3       Q.      Got it.  There you are; right?

4       A.      Yes.

5       Q.      And there's Bullard; right?

6       A.      Yes.

7       Q.      Okay.  It says -- see here.  So it's Sherie

8   writing to Danielle, so -- and then copying you guys on

9   it.

10              It says, Brad called this morning to report a

11  possible design build claim which caused condensation

12  and building damage at the following three jobsites.

13              Do you see that?

14      A.      Yes.

15      Q.      Okay.  And so when we talked before about

16  Virginia project, it's comprised of two buildings there,

17  right, 8020 and 8040?

18      A.      Okay.

19      Q.      Agreed?

20      A.      Yes.

21      Q.      And then there's Milan; right?

22      A.      Yes.

23      Q.      Okay.  So do you recall this conversation you

24  had with Sherie regarding these three projects?

25      A.      Vaguely.

Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 101

1      Q.     Do you recollect why it is that Milan and

2    Virginia were being reported at the same time?

3      A.     No, I don't recall why they were reported at

4    the same time.

5      Q.     Do you recall why they're being reported

6    together?

7      A.     The Virginia Street, I understand.  I'm not

8    sure, I don't recall why the Milan was reported then on

9    that date again.

10     Q.     Is there a correlation between these projects

11   relative to a decision to report them all together?

12     A.     They all had mold.

13     Q.     Okay.  Is it -- had you concluded that the

14   mold was a product of a similar design issue or

15   correlation or is it just you got mold at different

16   locations?

17     A.     Well, I'm not able to conclude anything along

18   that line.

19     Q.     So the commonality is they all involved mold.

20   Agreed?

21     A.     Yes.

22     Q.     Any other commonality between them?

23            MR. THOMAS:  Objection.  Lack of foundation.

24   Asked and answered.

25            THE WITNESS:  Again, I'm not -- I'm not an

Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 121

```
 1      A.      The only other thing I recall is that it was
 2  filed untimely or late, which I don't have an argument
 3  or anything for.
 4      Q.      Zurich denied on Military; right?
 5      A.      Yes.
 6      Q.      Do you dispute that?
 7      A.      No.
 8      Q.      In Military, your company went out of pocket,
 9  rough numbers, 4 million bucks; right?
10      A.      Yes.
11      Q.      And your company received reimbursement from
12  LP and its insurer for, rough numbers, 4 million bucks.
13  Agreed?
14      A.      Yes.
15      Q.      So has United been fully reimbursed for the
16  sums it incurred vis-a-vis Military?
17      A.      Yes.
18      Q.      And so as we sit here right now, it's a net
19  zero to United relative to Military?  It's been
20  reimbursed the sums it incurred?
21      A.      Yes.
22      Q.      And so does United have any damages for which
23  it has not been reimbursed vis-a-vis Military?
24              MR. THOMAS:  Objection.  Calls for a legal
25  conclusion.  Expert opinion testimony.  Lack of
```



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 122

1  foundation.

2  BY MR. REEVES:

3      Q.    You need the question read back or do you

4  have it in mind?

5      A.    No.  I've -- I've heard the question.

6      Q.    Your answer, please?

7      A.    We were reimbursed for the hard costs on that

8  project.  There's obviously other costs incurred for all

9  the time and effort, everything else that goes into

10 something like this.

11     Q.    Have you quantified those damages or those

12 costs?

13     A.    I haven't.

14     Q.    Are you able to quantify them?

15     A.    I don't believe so.

16     Q.    Basically time and -- time and energy, so to

17 speak?

18     A.    Time and energy spent on this that could have

19 been spent on other things.

20     Q.    Did you keep time sheets relative hours

21 spent?

22     A.    No.

23     Q.    So for all intents and purposes, United has

24 been reimbursed in full save and except this time and

25 energy that's undocumented.  Agreed?



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 123

 1      A.      Yes.

 2      Q.      I'm going to show you what I'm going to mark

 3  as 42.

 4              (Exhibit 42 marked for identification.)

 5  BY MR. REEVES:

 6      Q.      I'll display.  Looks like produced by

 7  Capitol, 3662 through 3664.  It's a letter from

 8  Prologis, February 15, 2017, to a guy named

 9  Robert Dotson.

10              Do you see that?

11      A.      Yes.

12      Q.      Did Dotson represent your company?

13      A.      I don't believe so.

14      Q.      Okay.  You don't know -- do you know who

15  Dotson is, or no?

16      A.      No.

17      Q.      Okay.  Let me show you the letter again.

18  Three-page letter signed by this guy, or individual,

19  maybe it's a woman, last name Kneisel, K-N-E-I-S-E-L.

20  Do you know who that is?

21      A.      No.

22      Q.      It's referencing somebody at Hughes at

23  Prologis.  H-U-G-H-E-S.  Do you know who that is?

24      A.      No.

25      Q.      Have you ever seen this letter before?

Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 124

1     A.     I don't recall it.

2     Q.     Okay.  We'll mark what we call 43.

3            (Exhibit 43 marked for identification.)

4            MR. REEVES:  I'll display.  Let's see here.

5  Looks like, Scott, you produced it.  It's 1105.

6            MR. THOMAS:  Just the one page?

7            MR. REEVES:  Looks like just one page, yeah.

8  BY MR. REEVES:

9     Q.     Brad, it's an email from you to Hill.  And it

10 says, Please advise the appropriate carriers that we

11 have now found microbial growth on the building at

12 8730 Military Road.

13           Do you see that?

14    A.     Yes.

15    Q.     Okay.  So is this the first instance or

16 within, say, 24 hours of learning about a mold issue at

17 Military Road?

18    A.     Yes.

19    Q.     Okay.  And so, in a sense, you're running

20 directly to Hill, who you've dealt with before, and

21 you're basically telling them put -- put the carriers on

22 notice; right?

23    A.     Yes.

24    Q.     Okay.  And so you say the word "appropriate

25 carriers."  You see that?



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 125

1       A.      Uh-huh.

2       Q.      Was it your intent that Zurich be placed on

3  notice?

4       A.      Yes.

5       Q.      Okay.  And that didn't occur; right?

6       A.      Right.

7       Q.      Okay.  And that was contrary to your wishes;

8  right?

9       A.      Yes.

10      Q.      Okay.  Did -- did Danielle ever explain to

11 you why she didn't put Zurich on notice?

12      A.      No.

13      Q.      Have you ever been provided an explanation as

14 to why LP didn't put Zurich on notice?

15      A.      I just recall a conversation from Rich.  It

16 was an oversight and he apologized.

17      Q.      So the explanation is oversight, your -- your

18 understanding?

19      A.      Yes.  Yes.

20      Q.      And did Rich say -- did he elaborate on it

21 and say that I -- he had delegated it to Danielle and

22 thought she would take care of it or did he take

23 ownership for it and say, My bad, I erred?

24      A.      Their company took responsibility for it, but

25 he explained, again, it was an oversight on Danielle's

Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 129

1    recollection?

2        A.      Yeah.  Without having the dates in front of

3    me, I know it came after.

4        Q.      And I'm trying to -- because the dates are

5    important to me vis-a-vis trying to figure out when

6    Bullard said he was going to put his own E&O carrier on

7    notice.  Was it right out of the gate or did he hold on

8    telling you he was going to do that?

9        A.      I don't know that.

10       Q.      Okay.  Other than telling you that Danielle

11   had made a, quote/unquote, oversight, did Bullard

12   provide you any explanation as to why LP failed to place

13   Zurich on notice when he requested it in April 2017?

14       A.      No.

15       Q.      Do you have an understanding of what is meant

16   by oversight?

17       A.      I have my interpretation.

18       Q.      Is it speculative on your part or is it

19   rooted in an understanding of what occurred?

20       A.      No.  It's nothing under -- it's not

21   understanding what occurred.

22       Q.      All right.  I'll show you what I'm going to

23   mark as 44.

24               (Exhibit 44 marked for identification.)

25   ///



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 130

```
 1  BY MR. REEVES:

 2     Q.     It's an email trail.  It's produced by

 3  Capitol.  It's four pages.  Begins with 3988.

 4            See that?

 5            MR. THOMAS:  Through 91?

 6            MR. REEVES:  Yeah, through 91.

 7            MR. SIMONS:  Can you read that?

 8            THE WITNESS:  I can.  It would be nice if it

 9  was bigger.

10  BY MR. REEVES:

11     Q.     Yeah.  Fair enough.  I'm just trying to

12  figure out where to start here.

13            So July 11th email, you, Ford, Military.  See

14  that?

15     A.     Yes.

16     Q.     And you say, Can you tell me if you or Zurich

17  have received a claim for Military Road.  You see that?

18     A.     Yes.

19     Q.     And so what prompted you to send this email?

20     A.     Normally I would have heard something

21  requesting information.  And we had been working with

22  Chris on the Virginia Street projects.

23     Q.     Okay.  And so by virtue of not hearing

24  anything, you're posing the inquiry regarding Military.

25  Agreed?
```



Brad Breach                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 145

1  first-party and third-party coverage?

2     A.     No.

3     Q.     Do you know the difference between property

4  and liability coverage?

5     A.     Limited.

6     Q.     What's your understanding of property

7  coverage?

8     A.     I have property coverage on my home to cover

9  damages to my home.  Liability, if somebody gets

10 injured, then I do have liability coverage for that.

11    Q.     And that latter coverage, is it intended to

12 protect you from a claim being made by another?

13    A.     I believe so.

14    Q.     And is that the nature of the Zurich coverage

15 at issue in this case, to your knowledge?

16           MR. THOMAS:  Objection.

17           THE WITNESS:  I don't know.

18           MR. THOMAS:  Lack of foundation.  Expert

19 opinion.  Legal conclusion.

20           MR. REEVES:  I'm going to mark as 50.

21           (Exhibit 50 marked for identification.)

22           MR. REEVES:  By the way, does anybody need a

23 break?  We're at 3 o'clock here.

24           MR. SIMONS:  Are you getting close?

25           MR. REEVES:  I got -- I got a lot of stuff

Brad Breach                                Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 146

1  left to cover.

2          MR. SIMONS:  I think we're all good on our

3  end for a while.

4  BY MR. REEVES:

5      Q.    This is July 27, 2017 letter.  Looks like it

6  might have been -- 24 to Ford.  Involves Military.  It's

7  Bates-stamped SF, so we produced it, 1399, three-page

8  letter.

9          Do you recall receiving this letter?

10     A.    Yes.

11     Q.    It says, Steadfast regrets to advise you we

12  are unable to find any coverage for this matter.

13         Do you see that?

14     A.    Yes.

15     Q.    Okay.  Did you know this denial was coming or

16  is this the first instance you're learning of it?

17     A.    I don't recall if I knew before it got there.

18     Q.    Your first -- when you first learned that

19  Zurich was going to be denying this claim -- let me do

20  the foundational.

21         You're aware that Zurich denied the claim

22  because from its vantage point, late notice; right?

23  We've talked about it enough now, but you understand

24  that's the basis of their denial?

25     A.    Yes.



# Ex B, exhibit 34

# Ex B, exhibit 34

## Mike Clements

| | |
|---|---|
| **From:** | Mike Clements |
| **Sent:** | Thursday, May 12, 2016 8:44 AM |
| **To:** | 'Marko, Tom' |
| **Cc:** | Mike Brunkow; Craig Willcut; Brad Breach |
| **Subject:** | 385 Milan Mold Remediation Project |
| **Attachments:** | Milan Fungal Screen Report and Invoice; Milan Warehouse Inspection Results |

Good Morning Tom,

See attached emails with reports UCC has received to date from the consultant.

Based on our phone call 5/10/16, Prologis has directed UCC to inspect each joint of insulation and inspect for mold. We have been instructed to leave the insulation hanging down to allow mold remediation if mold is present. When the OSB is clean, sanitized and dry, we will re-install the insulation. If mold does not exist, we will secure the insulation as it was. A qualified contractor must use proper gear to comply with OSHA safety rules. UCC will begin to check for mold over the TI areas first.

Starting the remediation process is by no way admitting responsibility for the existing conditions.

United is in the process of locating a qualified third party consultant to determine the cause of the mold. We will seek reimbursement for all remediation costs from the party deemed responsible.

Thanks.

Mike Clements | Construction Manager, Tenant Improvements
**United Construction Company**
O: 775.858.8090 | D: 775.398.1715 | M: 775.742.9609 | MikeC@unitedconstruction.com
Licenses  NV #0015417 AZ: #163263 CA: #553339 NM: #85070 OR: #202096 UT: #95-311769-5501

BUILD UNITED · *United with our customers, team and communities providing best-in-class construction services since 1978.*



EXHIBIT

Breach 34    9/8/22

CAP003665

1

# Ex B, exhibit 37

# Ex B, exhibit 37

**Notice of Claim**

From:   Sherie Cloutier
Received:   8/5/2016 1:09:17 PM
To:     Danielle Hill;
        Brad Breach (brad@unitedconstruction.com); Rich Bullard;
Attachments: image001.jpg

___

Danielle,

Brad called this morning to report a possible Design-Build Claim which caused condensation and building damage @ the following 3 jobsites:

1 – 8020 N. Virginia St., Reno, NV (Work performed December 2014 – September 2015 (Damage discovered in May-June 2016)

2 – 8040 N. Virginia St., Reno, NV (Work performed December 2014 – September 2015 (Damage discovered in May-June 2016)

3 – 385 Milan, Reno, NV (Work performed November 2014 – June 2015 (Damage discovered in May-June 2016)

You will need to put the General Liability, Pollution Liability and Professional Liability carriers on Notice accordingly.

Thank you.

*Sherie Cloutier*

Senior Account Manager
LP Insurance Services

Direct Line: (775) 996-6022
     (775) 996-6082
Email: sherie.cloutier@lpins.net
**300 East 2nd Street Suite 1300**
**Reno, NV 89501**
www.lpins.net

 LPIS Logo

**CONFIDENTIALITY NOTICE: This email contains confidential and privileged material for the sole use of the intended recipient(s). If the reader of this e-mail is not the intended recipient or his/her authorized agent, the reader is hereby notified that any use, disclosure, dissemination, distribution, or copying of this e-mail, including attachments, is strictly prohibited. If you have received this e-mail in error, please IMMEDIATELY (1) Forward the email and all file attachments to** sherie.cloutier@lpins.net **AND (2) permanently delete the message and any file attachments. Questions may be directed to the L/P Insurance Services, Inc. office at (775)996-6000.**

**EXHIBIT**

Breach 37    9/8/22

LP000001

# Ex B, exhibit 43

# Ex B, exhibit 43

New Claim

From:   Danielle Hill
Received:   4/18/2017 10:59:53 AM
To:   'Brad Breach';
Cc:   Rich Bullard;
Attachments: image001.jpg

Thanks Brad. I will get this submitted to the appropriate carriers.

Thank You!

**Danielle Hill**
Claims Consultant
LP Insurance Services Inc.
Direct (775) 996-6033
Fax (775) 996-6093
*danielle.hill@lpins.net*
500 East 2nd Street Suite 1300
Reno, NV 89501
*www.lpins.net*

 LPIS Logo

CONFIDENTIALITY NOTICE: This email contains confidential and privileged material for the sole use of the intended recipient(s). If the reader of this e-mail is not th intended recipient or his/her authorized agent, the reader is hereby notified that any use, disclosure, dissemination, distribution, or copying of this e-mail, including attachments, is strictly prohibited. If you have received this e-mail in error, please IMMEDIATELY (1) Forward the email and all file attachments to your.email@lpins.net AND (2) permanently delete the message and any file attachments. Questions may be directed to LP Insurance Services, Inc. (775) 996-000.

**From:** Brad Breach [mailto:Brad@unitedconstruction.com]
**Sent:** Monday, April 17, 2017 2:46 PM
**To:** Danielle Hill
**Subject:** New Claim

Please advise the appropriate carriers that we have now found microbial growth on the building located at 8730 Military Road, Reno, NV.  This building started design in August of 2015 and started Construction in October 2015.  Construction was completed in July 2016.

I will wait for requests from providers prior to providing any further documentation.

Thanks.

Brandon F. Breach | Vice President / CFO
**United Construction Company**
O: 775.858.8090 | D: 775.398.1708 | brad@unitedconstruction.com
lic   NV #0015417 AZ: #163263 CA: #553339 NM: #85070 OR  #203096 UT: #95-311769-5501

BUILD UNITED - *United with our customers, team and communities providing best-in-class construction services since 1978.*



This email was scanned by Bitdefender

# Ex B, exhibit 44

# Ex B, exhibit 44

8730 Military Road, Reno, NV
From:   Danielle Hill
Received:   7/13/2017 2:53:06 PM
To:   'Brad Breach';
(   )
Attachments: image001.jpg; image002.jpg; image003.jpg; image004.jpg
image005.jpg

Brad-

The York Adjuster is: Davie Smith dave.smith@yorkrsg.com Claim Number: 6466891.

He should be contacting you to discuss the claim.

Thank You!

**Danielle Hill**
Claims Consultant
**LP Insurance Services Inc.**
300 East 2nd Street, Suite 1300 Reno, NV 89501
Direct (775) 996-6033/Fax (775) 996-6093
*danielle.hill@lpins.net/lpins.net*

 LPIS Logo

CONFIDENTIALITY NOTICE: This email contains confidential and privileged material for the sole use of the intended recipient(s). If the reader of this e-mail is not the intended recipient or his/her authorized agent, the reader is hereby notified that any use, disclosure, dissemination, distribution, or copying of this e-mail, including attachments, is strictly prohibited. If you have received this e-mail in error, please IMMEDIATELY (1) Forward the email and all file attachments to your.email@lpins.net AND (2) permanently delete the message and any file attachments. Questions may be directed to LP Insurance Services, Inc. (775) 996-6000.

**From:** Danielle Hill
**Sent:** Thursday, July 13, 2017 9:11 AM
**To:** 'Brad Breach'
**Subject:** RE: 8730 Military Road, Reno, NV

I also submitted the claim to York. I will e-mail the Claims Manager on this one & will follow back up with you shortly.

Thank You!

**Danielle Hill**
Claims Consultant
**LP Insurance Services Inc.**
300 East 2nd Street, Suite 1300 Reno, NV 89501
Direct (775) 996-6033/Fax (775) 996-6093
*danielle.hill@lpins.net/lpins.net*

LPIS Logo



EXHIBIT

Breach 44    9/8/22

CAP003988

CONFIDENTIALITY NOTICE: This email contains confidential and privileged material for the sole use of the intended recipient(s). If the reader of this e-mail is not the intended recipient or his/her authorized agent, the reader is hereby notified that any use, disclosure, dissemination, distribution, or copying of this e-mail, including attachments, is strictly prohibited. If you have received this e-mail in error, please IMMEDIATELY (1) Forward the email and all file attachments to your.email@lpins.net AND (2) permanently delete the message and any file attachments. Questions may be directed to LP Insurance Services, Inc. (775) 996-6000.

}

---

**From:** Brad Breach [mailto:Brad@unitedconstruction.com]
**Sent:** Wednesday, July 12, 2017 4:49 PM
**To:** Danielle Hill
**Subject:** FW: 8730 Military Road, Reno, NV

I have only received acknowledgement from Philadelphia for the claim listed above. What other carriers were notified of the claim??

Brandon F. Breach | Vice President / CFO
**United Construction Company**
O: 775.858.8090 | D: 775.398.1708 | brad@unitedconstruction.com
Licenses: NV #0015417 AZ: #163263 CA: #553339 NM: #85070 OR: #203096 UT: #95-311769-5501

**BUILD UNITED** - *United with our customers, team and communities providing best-in-class construction services since 1978.*

**From:** Daryl Batjer [mailto:daryl.batjer@zurichna.com]
**Sent:** Wednesday, July 12, 2017 5:59 AM
**To:** Brad Breach <Brad@unitedconstruction.com>
**Cc:** Christopher Ford <chris.ford@zurichna.com>
**Subject:** FW: 8730 Military Road, Reno, NV

Mr Breach:

Please note Chris is out on vacation until Friday, but forwarded me your below message. Unfortunately, I cannot locate a claim number in our system for this claim. Please kindly forward this email on to your agent and/or provide me with your agent's contact information so I can reach out directly to him or her. I'll partner with your agent to ensure we have the tender docs and that a claim number has been established and assigned to the proper Claims Specialist. I will also investigate if your agent has the current reporting address.

I look forward to hearing back from you so I can do everything on my end to expedite you receiving the claim number and contact information for your Claims Professional.

Thank you for bringing this to Chris' attention and my apologies you had not previously heard a response back in regards to this tender.

Best,

 Zurich_Signature_logo     **Daryl Batjer**
*Team Manager Latent & Environmental Claims*
Steadfast Insurance Company
PO Box 66965
Chicago, IL 60666-0965

**Office:** 214-866-1156

zurichna.com


CAP003989

From: Christopher Ford
Sent: Tuesday, July 11, 2017 5:59 PM
**To:** Daryl Batjer
**Subject:** Fwd: 8730 Military Road, Reno, NV

Forwarding to you as I do not have a claim for this. I can't access ez access to check.

Zurich_Sign
ature_logo

**Chris Ford**
*Claims Specialist IV Latent & Environmental*
*Claims*
Zurich North America
PO Box 66965
Chicago, IL 60666-0965
**Office:** 805-520-3641
**Fax:** 805-520-3647

chris.ford@zurichna.com

zurichna.com

Begin forwarded message:

**From:** Brad Breach <Brad@unitedconstruction.com>
**Date:** July 11, 2017 at 12:14:16 PM EDT
**To:** 'Christopher Ford' <chris.ford@zurichna.com>
**Subject:** 8730 Military Road, Reno, NV

Can you tell me if you or Zurich have received a claim for 8730 Military Road? Our agent submitted the claim some time ago but we have received no follow up from Zurich.

Brandon F. Breach | Vice President / CFO
**United Construction Company**
O: 775.858.8090 | D: 775.398.1708 | brad@unitedconstruction.com
Licenses: NV #0015417 AZ: #163263 CA: #553339 NM: #85070 OR: #203096 UT: #95-311769-5501

BUILD UNITED - *United with our customers, team and communities providing best-in-class construction services since 1978.*

This email was scanned by Bitdefender

****************** PLEASE NOTE ******************
This message, along with any attachments, is for the designated recipient(s) only and may contain privileged, proprietary, or otherwise confidential information. If this message has reached you in error, kindly destroy it without review and notify the sender immediately. Any other use of such misdirected e-mail by you is prohibited. Where allowed by local law, electronic communications with Zurich and its affiliates, including e-mail and instant messaging (including content), may be scanned for the purposes of information security and assessment of internal compliance with company policy.
****************** PLEASE NOTE ******************

CAP003990

This message, along with any attachments, is for the designated recipient(s) only and may contain privileged, proprietary, or otherwise confidential information. If this message has reached you in error, kindly destroy it without review and notify the sender immediately. Any other use of such misdirected e-mail by you is prohibited. Where allowed by local law, electronic communications with Zurich and its affiliates, including e-mail and instant messaging (including content), may be scanned for the purposes of information security and assessment of internal compliance with company policy.

This email was scanned by Bitdefender

# Ex B, exhibit 50

# Ex B, exhibit 50





**ZURICH**

July 27, 2017

Brad Breach
United Construction Co
5300 Mill St
Reno, NV 89502
Brad@unitedconstruction.com

RE: 8730 Military Road

Zurich
Claims
P.O. Box 66965
Chicago, IL
60666-0965

Telephone (805) 520-3641
Fax (805) 520-3647
Chris.ford@zurichna.com
http://www.zurichna.com

Named Insured: United Construction Company
Matter:          8730 Military Road Reno Nevada
Policy No.:      EOC 0193620-00
Effective        April 20, 2016 to April 20, 2017
File No.:        9260156182
Policy Type:     Contractor's Protective Professional Indemnity

The purpose of this correspondence to further clarify Steadfast Insurance Company's (hereinafter "Steadfast") receipt on July 11, 2017 notice of claim to Steadfast by United Construction Company (hereinafter "UCC") under the above-referenced Contractor's Protective Professional Indemnity and Liability Insurance Policy (hereinafter CPPI) and to follow-up to our telephone call of July 26, 2017. For the reasons discussed herein, please be advised Steadfast regrets to advise you we are unable to find any coverage for this matter and accordingly we will not be participating in the defense or indemnifying UCC in this matter under the above-referenced CPPI policy.

As set forth more fully below, we have determined that there is no coverage under the Policy for the claim presented. This means that we deny any obligation to pay for indemnity or defense of this asserted claim.

## I.    SUMMARY OF CLAIM

The claim involves microbial growth in the roof system at 8730 Military Rd. Reno, Nevada. We received notice of this claim on July 11, 2017 by E Mail from Brad Breach at UCC.

If our understanding of the facts is in any way incorrect, please advise immediately by written communication.

SF001399

EXHIBIT

Breach 52     3/10/22

August 1, 2017
Page 2

## II.    THE POLICY

Zurich issued a Contractor's Protective Professional Indemnity and
Liability Insurance Policy, EOC 0193620-00, to United Construction
Company for the policy period April 20, 2016 to April 20, 2017 (the
"Policy"). Coverage Part A of the Policy provides claims made and
reported Contractors Professional Liability Coverage with limits of
$5,000,000 each "Claim" and $5,000,000 Aggregate Limit of Liability.
The Self Insured Retention ("SIR") for Coverage Part A is $25,000 for
each "Claim." "Professional Liability Claim Expenses" serve to erode the
SIR and the Policy Limits. This is a Claims-Made and reported policy.
Claims must first be made against the insured and reported to the
Company during the policy period unless an extended reporting period
applies.

## III.    COVERAGE ISSUES

The Policy provides a retroactive date of April 20, 2011. Pursuant to the
policy, the "actual or alleged negligent act, error or omission" must take
place "during the Policy Period or on or after the Retroactive Date." The
claim must also be made and reported in the applicable policy period. The
last policy with UCC expired in April 20, 2017.

As Steadfast did not receive notice of this matter until at the earliest July
11, 2017 and the policy period is April 20, 2016 to April 20, 2017 there
was no claim made and reported in the Steadfast's policy period. **The
policy further states written notice must be provided to Steadfast no
later than 60 days after the expiration or termination of the policy
(June 20, 2017). Again Steadfast's earliest notice is July 11, 2017.**
Steadfast hereby specifically denies any obligation to defend or indemnify
in this matter under the above-referenced policy.

## CONCLUSION

We regret that our coverage determination could not be favorable in this
regard. Additional issues, other than those discussed above, may also be
presented by this claim. However, given the fact that the issue discussed
above is dispositive, any other potential issues will not be discussed at this
time and Steadfast specifically reserves the right to address such issues at
a later date.

August 1, 2017
Page 3

If you have any information that may cause Steadfast to reconsider this coverage position or have additional information that you believe will assist in our investigation of this matter, please forward it to my attention for further review.

If you have any questions regarding this correspondence or any other aspect of this matter, please feel free to contact me at (805) 520-3641.

Sincerely,
Steadfast Insurance Company

Chris Ford
Claims Specialist

cc:     Danielle Hill
        Claims Consultant
        LP Insurance Services Inc.
        300 East 2nd Street, Suite 1300 Reno, NV 89501
        danielle.hill@lpins.net

SF001401

# EXHIBIT C

# EXHIBIT C

Richard A. Bullard, Jr.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                          Page 1
 1                 UNITED STATES DISTRICT COURT

 2                      DISTRICT OF NEVADA

 3

 4
     CAPITOL SPECIALTY INS. CORP.,      )
 5                                      )
                        Plaintiff,      )
 6                                      )
          vs.                           )           Case No.
 7                                      )  2:20-cv-01382-JCM-VCF
     STEADFAST INS. CO., et al.,        )
 8                                      )
                        Defendants.     )
 9   _____)
     and related crossclaims.           )
10   _____)

11

12

13

14

15          DEPOSITION OF RICHARD A. BULLARD, JR.

16               [via web videoconference]

17

18          Taken on Wednesday, October 12, 2022
                by a Certified Court Reporter
19                    At 10:03 a.m.

20

21

22

23

24      Reported by:  Ellen A. Goldstein, CCR 829

25          Job No. 51086, Firm No. 061F
```

Richard A. Bullard, Jr.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                        Page 2
 1    A P P E A R A N C E S  (via web videoconference):

 2

            For CAPITOL SPECIALTY INSURANCE CORPORATION:
 3
                    SCOTT S. THOMAS, ESQ.
 4                  PAYNE & FEARS
                    6385 South Rainbow Boulevard
 5                  Suite 220
                    Las Vegas, Nevada  89118
 6                  (702)382-3574
                    sst@paynefears.com
 7
            For LP INSURANCE SERVICES, LLC and the witness
 8                  RICHARD BULLARD:

 9                  PAUL J. ANDERSON, ESQ.
                    MAUPIN COX & LEGOY
10                  4785 Caughlin Parkway
                    Reno, Nevada  89519
11                  (775)827-2000
                    panderson@mcllawfirm.com
12

13          For STEADFAST INSURANCE COMPANY:

14                  WILLIAM C. REEVES, ESQ.
                    MORALES FIERRO & REEVES
15                  600 South Tonopah Drive
                    Suite 300
16                  Las Vegas, Nevada  89106
                    (702)699-7822
17                  wreeves@mfrlegal.com

18          For RHP MECHANICAL:

19                  JESSICA A. WEST, ESQ.
                    TYSON & MENDES
20                  2835 St. Rose Parkway
                    Suite 140
21                  Henderson, Nevada  89052
                    (702)724-2648
22                  jwest@tysonmendes.com

23

24

25
```

Richard A. Bullard, Jr.                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                               Page  3
 1                    I N D E X

 2

 3    WITNESS                                                  PAGE

 4    RICHARD A. BULLARD, ESQ.

 5         Examination by MR. REEVES                          7, 99
           Examination by MS. WEST                               97
 6

 7

 8                  E X H I B I T S

 9

      NUMBER           DESCRIPTION                             PAGE
10
           (exhibits that were previously marked)
11
      Exhibit 2      8-5-16 General Liability                    49
12                   Notice of Occurrence/Claim
                     (CAP 003930 to 003931)
13
      Exhibit 4      8-12-16 email chain                         54
14                   (SF 000830 to 000832)

15    Exhibit 5      8-26-16 email from Chris Ford               56
                     (SF 000829)
16
      Exhibit 6      7-14-16 letter from Jeremy                  46
17                   Woolf  (SF 000828)

18    Exhibit 7      11-16-16 letter from Chris                  52
                     Ford  (CAP 003940 to 003947)
19
      Exhibit 13     10-20-16 letter from Chris                  57
20                   Ford  (SF 000003 to 000009)

21    Exhibit 24     7-27-17 letter from Chris                   77
                     Ford, 8-1-17 email from Chris
22                   Ford  (SF 001399 to 001402)

23    Exhibit 30     4-18-16 Application for                     35
                     Contractor's Protective
24                   Professional Indemnity and
                     Liability Insurance
25                   (SSP 000417 to 000428)
```

Richard A. Bullard, Jr.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                       Page 4
 1    I N D E X   (continued):

 2    NUMBER           DESCRIPTION                        PAGE

 3    Exhibit 31       Diary of construction               40
                       activity by dates
 4                     (CAP 003666 to 003669)

 5    Exhibit 35       7-14-16 email chain                 46
                       (CAP 002266 to 002267)
 6
      Exhibit 40       9-1-16 through 11-3-16 email         57
 7                     chain  (CAP 002271 to 2273)

 8    Exhibit 43       4-17-17 through 4-18-17 email        58
                       chain  (CAP 001105)
 9
      Exhibit 46       7-12-17 to 7-21-17 email chain       57
10                     (CAP 001122 to 001123)

11    Exhibit 47       4-17-17 General Liability            76
                       Notice of Occurrence/Claim
12                     (SF 001414 to 001415)

13    Exhibit 48       7-26-17 email from Danielle Hill     75
                       with attachment  (CAP 001213 to
14                     001215)

15    Exhibit 52       11-10-17 letter Sherri McMahon       78
                       (ARCH 000084 to 000089)
16
      Exhibit 55       12-17-18 email from Craig            80
17                     Willcut  (CAP 005708)

18    Exhibit 56       1-29-19 through 1-30-19 email        91
                       chain with attachment
19                     (CAP 005712 to 005715,
                       SSP 000148 to 000150)
20
      Exhibit 57       8-21-19 Release Agreement            99
21                     (SSP 000148 to SSP 000150)

22           (exhibits that were newly introduced)

23    Exhibit 58       Undated letter from Craig            84
                       Willcut to Rich Bullard
24                     (CAP 003987)

25
```

Richard A. Bullard, Jr.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 5

1    I N D E X   (continued):

2    NUMBER          DESCRIPTION                              PAGE

3    Exhibit 59      12-27-18 through 1-9-19 email              84
                     chain  (CAP 005710 to 005711)
4
     Exhibit 60      1-11-19 letter from Mark                   89
5                    Simons  (Bates number
                     illegible, SF 001374)
6
     Exhibit 61      Complaint in "United                       89
7                    Construction Company v.
                     L/P Insurance Services,
8                    LLC"

9    Exhibit 62      Answer to Complaint and                    90
                     Third-Party Complaint in
10                   "United Construction Company
                     v. L/P Insurance Services,
11                   LLC"

12   Exhibit 63      1-29-19 through 1-31-19                    92
                     email chain with attachment
13                   (CAP 005737 to 005741)

14   Exhibit 64      2-1-19 email from Matt Ennis               92
                     with attachment  (CAP 005744
15                   to 5746)

16   Exhibit 65      2-1-19 through 2-4-19 email                93
                     chain with attachment
17                   (CAP 005747 to 005751)

18   Exhibit 66      4-8-19 through 4-9-19 email                93
                     chain  (UCC_0073 to 0074)
19
     Exhibit 67      8-15-19 email from Paul                    94
20                   Anderson  (CAP 003604)

21   Exhibit 68      2-27-20 through 3-6-20 email               95
                     chain  (CAP 005659 to 5661)
22
     Exhibit 69      4-27-20 Settlement Agreement               96
23                   and Mutual Release  (no Bates
                     stamps)
24
     Exhibit 70      Undated Assignment and                     96
25                   Cooperation Agreement

Richard A. Bullard, Jr.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                          Page 6
 1    I N D E X  (continued):

 2    NUMBER           DESCRIPTION                         PAGE

 3    Exhibit 71       1-29-19 through 2-1-19 email          99
                       chain  (CAP 005716 to 5719)
 4

 5

 6

 7

 8        QUESTIONS THE WITNESS WAS INSTRUCTED NOT TO ANSWER

 9                          PAGE    LINE

10                           39       8
                             65      23
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Richard A. Bullard, Jr.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 70

1          MR. REEVES:  This is 46.

2          MR. ANDERSON:  Same exhibit?

3          MR. REEVES:  Same exhibit, yeah.

4          Q    So you see the email we just went through was

5    at 8:49 a.m. July 18?

6          A    Yep.

7          Q    So here we are July 20, two days later.  It

8    says, "Rich" -- this is Hill to you -- "just spoke with

9    PHLY and Zurich."  Then it says, "Zurich:  To date I have

10   not submitted this matter to Zurich/E&O but need to do

11   so."  I'll stop right there.

12         Do you recall her conveying that to you on

13   July 20?

14         A    I don't recall it, but obviously she did.

15         Q    Okay.  "Spoke to the Zurich adjustor and we

16   discussed the update that I got from the PHLY adjustor."

17   Do you see that?

18         A    Yes.

19         Q    And then it says, "I would like to speak with

20   you about this and some other things that were mentioned

21   during the call."  Do you see that?

22         A    Yes.

23         Q    Do you recall that conversation?

24         A    I don't.

25         Q    The comment before where Hill says, "I only put

Richard A. Bullard, Jr.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 71

1   GL (York) and pollution (PHLY) on notice," I can show it

2   to you again.  Do you recall that email she sent to you?

3        A    I do.

4        Q    It sounds like she acted unilaterally and not

5   at your direction relative to who to put on notice.  Do I

6   have that right?

7        A    You know, I don't recall, but yes, I guess you

8   could say that.

9        Q    So you didn't personally, to your recollection,

10  select who to put on notice for the Military claim?

11       A    To my recollection I do not.

12       Q    And had you trained Hill on the need to provide

13  timely notice under claims-made-and-reported policies?

14       A    I did not train Hill on that.

15       Q    Who at your company, if anyone at your company,

16  trained Hill on that?

17       A    We have a team of people and over the years

18  they've changed.  So I couldn't tell you.

19       Q    What training do you know that -- are you aware

20  of that Hill received relative to that issue?

21       A    I am not aware of any training.

22       Q    And so candidly, are you aware that she's ever

23  been trained on providing timely notice in

24  claims-made-and-reported policies?

25       A    I am not aware of it.

# Ex C, exhibit 46

# Ex C, exhibit 46

**8730 Military Road, Reno, NV**
From:   Danielle Hill
Received:   7/21/2017 9:18:38 AM
To:   Rich Bullard;

Attachments:

_____

Rich-

      I just spoke to Brad & have submitted this matter to Zurich. Brad mentioned that this is similar to the other two claims: 8020 & 8040. We will be e-mailing me some dates today as we may need to put additional carriers on notice.

      Thanks- D

**From:** Danielle Hill
**Sent:** Thursday, July 20, 2017 11:45 AM
**To:** Rich Bullard
**Subject:** RE: 8730 Military Road, Reno, NV

Rich-

      As a follow up to my voicemail message, I just spoke with PHLY & Zurich.

      PHLY stated that Brad sent her a report back in June. Mold was found on the roof base. The moisture levels are going down. Brad stated that they were reviewing their options & would follow back up with the Adjuster. The Adjuster will be sending out her coverage letter shortly.

      Zurich: To date, I have not submitted this matter to Zurich/E&O, but need to do so. I spoke to the Zurich Adjuster, Chris & we discussed the update that I got from the PHLY Adjuster. Chris suggested that we reach out to Brad to discuss this matter & review potential issues. He also suggested that I get Brad's approval to submit this to Zurich before tendering it. I would like to speak with you about this & some other things that were mentioned during the call.

      Thanks- D

**From:** Danielle Hill
**Sent:** Tuesday, July 18, 2017 8:49 AM
**To:** Rich Bullard
**Subject:** RE: 8730 Military Road, Reno, NV

Rich-

      I only put the GL (York) & Pollution (PHLY) on notice of this matter given the description that Brad provided.

      Please advise the appropriate carriers that we have now found microbial growth on the building located at 8730 Military Road, Reno, NV. This building started design in August of 2015 and started Construction in October 2015. Construction was completed in July 2016.

      I just got off the phone with the Zurich Adjuster to discuss this. He has requested that I get an update from York & PHLY before we decide if a tender to the E&O carrier is necessary.

      Thanks- D

**From:** Rich Bullard
**Sent:** Tuesday, July 18, 2017 3:57 AM
**To:** Danielle Hill
**Subject:** Fwd: 8730 Military Road, Reno, NV



EXHIBIT

Broach 45    9/8/22

CAP001122

Sent from my iPhone

Begin forwarded message:

**From:** Christopher Ford <chris.ford@zurichna.com>
**Date:** July 17, 2017 at 2:30:41 PM PDT
**To:** Daryl Batjer <daryl.batjer@zurichna.com>, "Brad@unitedconstruction.com" <Brad@unitedconstruction.com>
**Cc:** "Bullard, Richard (rich.bullard@lpins.net)" <rich.bullard@lpins.net>
**Subject:** RE: 8730 Military Road, Reno, NV

Brad I have still received nothing on this matter.

 Zurich_Sign
alure_logo

**Chris Ford**
*Claims Specialist IV Latent & Environmental Claims*
Zurich North America
PO Box 66965
Chicago, IL 60666-0965

Office: 805-520-3641
Fax: 805-520-3647

chris.ford@zurichna.com

zurichna.com



**From:** Daryl Batjer
**Sent:** Wednesday, July 12, 2017 5:59 AM
**To:** Brad@unitedconstruction.com
**Cc:** Christopher Ford
**Subject:** FW: 8730 Military Road, Reno, NV

Mr. Breach:

Please note Chris is out on vacation until Friday, but forwarded me your below message. Unfortunately, I cannot locate a claim number in our system for this claim. Please kindly forward this email on to your agent and/or provide me with your agent's contact information so I can reach out directly to him or her. I'll partner with your agent to ensure we have the tender docs and that a claim number has been established and assigned to the proper Claims Specialist. I will also investigate if your agent has the current reporting address.

I look forward to hearing back from you so I can do everything on my end to expedite you receiving the claim number and contact information for your Claims Professional.

Thank you for bringing this to Chris' attention and my apologies you had not previously heard a response back in regards to this tender.

Best,

 Zurich_Sign
alure_logo

**Daryl Batjer**
*Team Manager Latent & Environmental Claims*
Steadfast Insurance Company
PO Box 66965
Chicago, IL 60666-0965

# EXHIBIT D

# EXHIBIT D

30(b)(6) designee of Capitol Specialty Insurance Corporation

William Allen Roy                           Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 1

1                  UNITED STATES DISTRICT COURT

2                       DISTRICT OF NEVADA

3

4    CAPITOL SPECIALTY INS. CORP., ) Case No.:
                                   ) 2:20-cv-01382-JCM-VCF
5                  Plaintiff,      )
                                   )
6    vs.                           )
                                   )
7    STEADFAST INS. CO., et al.,   )
                                   )
8                  Defendants.     )
     _____)
9                                  )
     AND RELATED CROSS-CLAIMS.     )
10   _____)

11

12

13

14            REMOTE VIDEOCONFERENCE DEPOSITION

15                          OF

16                  WILLIAM ALLEN ROY
     AS FRCP 30(b)(6) PERSON MOST KNOWLEDGEABLE DESIGNEE OF
17         CAPITOL SPECIALTY INSURANCE CORPORATION

18   Taken on Wednesday, October 26, 2022, at 10:00 a.m. PDT

19             Appearing via videoconference from
                    Hartford, Connecticut
20

21

22             By a Certified Court Reporter
23

24   Reported by: Dawn Bratcher Gustin, CCR 253, RPR, CRR
                                      California CSR 7124
25   Job No. 51089, Firm Nos. 061F/116F

30(b)(6) designee of Capitol Specialty Insurance Corporation
William Allen Roy                              Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                      Page 2
 1   APPEARANCES:
     (All participants appearing remotely)
 2
     For the Plaintiff:
 3
             SARAH J. ODIA, ESQ.
 4           PAYNE & FEARS LLP
             6385 South Rainbow Boulevard
 5           Suite 220
             Las Vegas, Nevada 89118
 6           sjo@paynefears.com

 7

 8   For the Defendant/Cross-Claimant Steadfast Insurance
     Company:
 9
             WILLIAM C. REEVES, ESQ.
10           MORALES FIERRO & REEVES
             600 South Tonopah Drive
11           Suite 300
             Las Vegas, Nevada 89106
12           wreeves@mfrlegal.com

13

14   For RHP Mechanical Systems:

15           JESSICA A. WEST, ESQ.
             TYSON & MENDES LLP
16           2835 St. Rose Parkway
             Suite 140
17           Henderson, Nevada 89052
             jwest@tysonmendes.com
18

19                      * * * * * * * *

20

21

22

23

24

25
```

Case 2:20-cv-01382-JCM-MDC    Document 166-1    Filed 04/07/23    Page 138 of 301
30(b)(6) designee of Capitol Specialty Insurance Corporation
William Allen Roy                        Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 3

```
1                    I N D E X

2   WITNESS                                          PAGE

3   WILLIAM ALLEN ROY

4        Examination by Mr. Reeves                      5

5        Examination by Mr. Reeves Resumed           101

6        Examination by Ms. West                     137

7

8

9                    E X H I B I T S
                                             IDENTIFIED/
10  EXHIBIT      DESCRIPTION                     MARKED

11  Exhibit 72   Notice of Deposition (22 pages)   13/148

12  Exhibit 73   Capitol Specialty Insurance       19/148
                 Corporation policy issued to LP
13               Insurance
                 (CAP005628, 5607 to 5627)
14
    Exhibit 74   Claim notes beginning with        49/148
15               5/27/2020 (CAP004594 to 4608)

16  Exhibit 75   Application and Certificate for   82/148
                 Payment
17               (CAP000550, 565, 40, 12, 298,
                 492, 139, 4540, 4574, and 4582)
18
    Exhibit 76   Email chain, top email dated      85/148
19               12/12/18 from Sebransky to
                 Huggins, et al., re Call re
20               United Construction - 8730
                 Military Road Remediation
21               (CAP005629 to 5631)

22  Exhibit 77   Email chain, top email dated      87/148
                 1/14/19 from Mathis to Sebransky,
23               et al., re United Construction -
                 8730 Military Rd. remediation
24               claim (CAP005650 to 5652)

25
```

30(b)(6) designee of Capitol Specialty Insurance Corporation

William Allen Roy                                Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 4

| | EXHIBIT | DESCRIPTION | IDENTIFIED/ MARKED |
|---|---|---|---|
| 1 | | E X H I B I T S (Continued) | |
| 3 | Exhibit 78 | 8/15/19 email from Anderson to Simons, et al., re L/P Insurance and United Construction (CAP003604) | 102/148 |
| 6 | Exhibit 79 | Email chain, top email dated 8/15/19 from Anderson to Thomas and Odia re Military Road Repair Bills (CAP000543 to 549) | 104/148 |
| 8 | Exhibit 80 | 9/18/19 email from Sebransky to Payne Fears, et al., re United Construction v. LP - Military Road - Request #4 (4 pages) | 111/148 |
| 11 | Exhibit 81 | Email chain, top email dated 2/11/20 from Mathis to Thomas, et al., re United Construction v. L/P Insurance - Settlement Negotiations - NRS 48.105 (CAP000370 to 374) | 117/148 |
| 14 | Exhibit 83 | Email chain, top email dated 3/6/20 from Simons to Mathis, et al., re United Construction v. L/P Insurance (CAP005659 to 5668) | 128/148 |
| 17 | Exhibit 85 | Email chain, top email dated 5/7/20 from Simons to Mathis, et al., re United Construction v. L/P Insurance Services, LLC - Case No. CV09-00164 (CAP005681 to 5683) | 131/148 |
| 20 | Exhibit 87 | Email chain, top email dated 7/2/20 from Odia to Engstrom, re March 2020 and April 2020 Invoices (CAP000006 to 9) | 133/148 |
| 23 | Exhibit 91 | Email chain, top email dated 10/23/20 from Odia to Engstrom and Thomas, re #189005 L/P Insurance September 2020 Invoice Review (CAP000379 to 380) | 134/148 |

30(b)(6) designee of Capitol Specialty Insurance Corporation
William Allen Roy                              Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 19

1      Q.    That's fine.

2      A.    -- I guess.

3      Q.    Yeah.  You know, I mean, you're an attorney.

4  You know what I'm doing here.  I'm just trying to pin

5  down that you have no information one way or the other

6  on that issue; agreed?

7      A.    Correct.

8      Q.    Thank you.

9            I'm going to mark what we're going to call 73.

10  Screen share.

11            (Exhibit 73 was identified for the

12            record.)

13  BY MR. REEVES:

14      Q.    This is a policy.  Effective date, you see

15  that.  So this is a -- this is the policy issued to LP

16  pursuant to which the settlement was funded; agreed?

17            I mean, I can show you the entire policy if you

18  want.

19      A.    Right.  That is the LP Insurance policy issued

20  by CapSpecialty.

21      Q.    Yeah.  Do you want to -- do you want me to flip

22  through all of it, or do you think you're familiar with

23  it?  I got 22 pages here.

24      A.    I understand the policy.

25      Q.    Fair enough.



30(b)(6) designee of Capitol Specialty Insurance Corporation
William Allen Roy                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 22

1  BY MR. REEVES:

2      Q.   I mean, you, yourself, have handled claims

3  where you've issued denials based upon late notice;

4  agreed?

5           MS. ODIA:  Object to form.  Lacks foundation.

6           THE WITNESS:  Yeah.  We've denied things for --

7  for late notice.

8  BY MR. REEVES:

9      Q.   And so what makes the Zurich denial different

10  than the other claims where you've handled where you've

11  denied based on late notice?

12          MS. ODIA:  Object to form.  Lacks foundation.

13  Calls for a legal conclusion.

14          THE WITNESS:  Well, we have not denied claims

15  where we believe a matter that's reported may be related

16  to another claim for which we did have proper notice.

17  So if it's deemed a related claim or arises out of

18  related circumstances, then, no, we wouldn't deny the

19  claim.  We would relate it back to the claim for which

20  we had notice.

21  BY MR. REEVES:

22      Q.   Does -- I marked the policy 73.  Does it have a

23  provision dealing with relate- -- related claims?

24          MS. ODIA:  Object to form.

25          THE WITNESS:  There is related claim language



Page 27

1      A.    Yes.

2      Q.    All right.  Roman numeral III, Who is an

3   Insured, here on page 7 of this form; agreed?

4      A.    Correct.

5      Q.    Roman numeral IV, Limits of Insurance and

6   Deductible.

7            Do you see that?

8      A.    Yes.

9      Q.    All right.  And then Roman numeral V, Other

10  Conditions.

11           Do you see that?

12     A.    Yes.

13     Q.    Okay.  So let's see if we -- do you have a

14  sense of which section this related claim provision is

15  in?

16           Here we go.

17     A.    Multiple Claims, Related Wrongful Acts.

18     Q.    So let's look at subpart 5.  It says:

19           "All wrongful acts or offenses giving rise to

20           personal injury that:"  And then it's got (a)

21  and (b).

22           Do you see that?

23     A.    Yes.

24     Q.    And it says:

25           "Are committed after the retro date...



30(b)(6) designee of Capitol Specialty Insurance Corporation
William Allen Roy                           Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 28

1           "Are logically, causally connected by common

2           facts..."

3           Do you see that?

4    A.   Yes.

5    Q.   Okay.  And then it says:

6           "Will be treated under the policy as one

7           wrongful act...

8           "Deemed to have occurred on the date of the

9           first wrongful acts..."

10          Do you see that?

11   A.   Yes.

12   Q.   Okay.  Have you compared or contrasted this

13   provision and the Zurich provision?

14          MS. ODIA:  Objection to form.  Relevance.

15          THE WITNESS:  No, I have not compared our, in

16   this case, related wrongful acts language to that in the

17   Zurich/Steadfast policy.  This, of course, is an

18   insurance agent and broker's professional liability

19   policy and not a contractor's professional liability

20   policy.  And even amongst insurance agent and broker,

21   E&O policies, certainly the related claims, related

22   wrongful acts language, can differ in -- in wording.

23   BY MR. REEVES:

24   Q.   Yeah.  And I think that's -- that nails it on

25   head in a sense.  These related claims or related acts

# Ex D, exhibit 73

# Ex D, exhibit 73



## Capitol Specialty Insurance Corporation

A Stock Company
P. O. Box 5900
Madison, WI 53705-0900

# Declarations

## Insurance Agents and Brokers Professional Liability Policy

**NOTICE:** THIS IS A CLAIMS MADE AND REPORTED POLICY. THE COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST AN INSURED DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD.

CERTAIN PROVISIONS IN THE POLICY RESTRICT COVERAGE. PLEASE READ THE ENTIRE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

| Policy No.: | IA20151100-03 | Renewal of Policy No | IA20151100-02 |
|---|---|---|---|

| Item 1. | Named Insured and Mailing Address: | L/P Insurance Services, Inc. 300 East 2nd Street, Suite 1300 Reno, NV 89501 | |
|---|---|---|---|

| Issuing Company: | Capitol Specialty Insurance Corporation | |
|---|---|---|

| Item 2. Policy Period: | Effective Date | Expiration Date |
|---|---|---|
| | 09/01/2017 | 09/01/2018 |

12:01 a.m. standard time at the mailing address of the Named Insured first listed in Item 1. above.

| Item 3. Retroactive Date | 09/01/2010 |
|---|---|

| Item 4. Limit of Liability | |
|---|---|
| Coverage Form Per Claim Limit of Liability for Insuring Agreements I.A (INSURANCE AGENTS AND BROKERS E&O: | $5,000,000 |
| Coverage Form Aggregate Limit of Liability for Insuring Agreements I.A (INSURANCE AGENTS AND BROKERS E&O) and I.B (SUPPLEMENTARY PAYMENTS): | $5,000,000 |
| Insuring Agreement I.B.1 (GOVERNMENTAL CLAIM SUPPLEMENTARY PAYMENTS) | $25,000 |
| Insuring Agreement I.B.2 (SUBPOENA SUPPLEMENTARY PAYMENTS) | $10,000 |

| Item 5. Deductible | |
|---|---|
| Insuring Agreements I.A. (INSURANCE AGENTS AND BROKERS E&O) | $25,000 |
| Insuring Agreement I.B. (SUPPLEMENTARY PAYMENTS) | $0 |

| Item 6. | Claim Notices are required to be given to us & must be addressed to: | CapSpecialty Claim Department P.O. Box 5900 Madison, WI 53705-0900 | Phone: | (866) 599-6098 |
|---|---|---|---|---|
| | | | Fax: | (608) 829-7411 |
| | | | Email: | eoclaims@CapSpecialty.com |

| Item 7. Premium and Applicable Taxes / Fees: | |
|---|---|
| Policy Period Premium: | $90,210.00 |
| State Surcharge / Tax: | Not Applicable |
| Surplus Lines Tax: | |

Premium stated above does not include applicable surplus lines taxes or other taxes/ fees. Producing Agent is responsible for determination of such amounts, invoicing insured, collecting, and filing in accordance with NV surplus lines laws and/or insurance regulations.

| Item 8. Forms & Endorsements: |
|---|

CAP005628

# Capitol Specialty Insurance Corporation

A Stock Company
P. O. Box 5900
Madison, WI 53705-0900

## Declarations

| | | |
|---|---|---|
| | Insurance Agents and Brokers Professional Liability Declarations | PLP 003 (02/14) |
| | Insurance Agents and Brokers Professional Liability Policy | PLP 001 (02/14) |
| 1 | Service of Suit | E-9000 (02/17) |
| 2 | Aggregate Deductible Endorsement | PLP 004 (08/16) |
| 3 | Amend Cancellation Endorsement | PLP 005 (08/16) |
| 4 | Amend Contractual Liability Exclusion | PLP 006 (08/16) |
| 5 | Amend ERP Endorsement | PLP 008 (08/16) |
| 6 | Amend Insured v. Insured Exclusion | PLP 009 (08/16) |
| 7 | Loss of Earnings Supplementary Payments | PLP 012 (4/17) |

© 2014 CapSpecialty, Inc. All rights reserved.

CAP005607

## INSURANCE AGENTS AND BROKERS PROFESSIONAL LIABILITY POLICY

THIS POLICY PROVIDES COVERAGE ON A CLAIMS MADE AND REPORTED BASIS AND APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD, OR ANY APPLICABLE EXTENDED REPORTING PERIOD, AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD. THE POLICY DOES NOT COVER CLAIMS ARISING OUT OF WRONGFUL ACTS THAT OCCUR PRIOR TO THE RETROACTIVE DATE OF THE POLICY OR AFTER THE EXPIRATION DATE OF THE POLICY. EXCEPT WITH RESPECT TO PARAGRAPH 4 OF THE INSURING AGREEMENT THERE IS A DEDUCTIBLE FOR WHICH THE INSURED IS RESPONSIBLE. EXCEPT WITH RESPECT TO PARAGRAPH 4 OF THE INSURING AGREEMENT, CLAIM EXPENSES ARE PAID IN ADDITION TO THE LIMITS OF INSURANCE.

VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED. WORDS AND PHRASES, OTHER THAN TITLES AND CAPTIONS, APPEARING IN BOLD PRINT HAVE SPECIAL MEANING AND ARE DEFINED IN THE POLICY. IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM AND IN RELIANCE UPON ALL STATEMENTS MADE AND INFORMATION FURNISHED TO THE INSURER, INCLUDING THE STATEMENTS MADE IN THE APPLICATION, THE COMPANY AND THE FIRST NAMED INSURED, SUBJECT TO ALL OF THE TERMS, CONDITIONS AND LIMITATIONS OF THIS POLICY AND ANY ENDORSEMENTS THERETO, AGREE AS FOLLOWS:

## I. COVERAGE

### A. INSURING AGREEMENT

1   The **Company** will pay on behalf of an **Insured** those sums in excess of the Deductible and up to the applicable Limit of Insurance specified in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** or **Claim Expenses** in connection with a **Claim** resulting from a **Wrongful Act** arising out of **Professional Services** provided by any **Insured**. The **Wrongful Act** must take place on or after the **Retroactive Date** and before the end of the **Policy Period**. A **Claim** for a **Wrongful Act** must be first made against an **Insured** during the **Policy Period** or the extended reporting period, if applicable.

2   The **Company** will pay on behalf of an **Insured** those sums in excess of the Deductible and up to the applicable Limit of Insurance specified in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** or **Claim Expenses** in connection with a **Claim** for **Personal Injury** arising out of **Professional Services** provided by any **Insured**. The offense giving rise to **Personal Injury** must take place on or after the **Retroactive Date** and before the end of the **Policy Period**. A **Claim** for **Personal Injury** must be first made against an **Insured** during the **Policy Period** or the extended reporting period, if applicable.

**Professional Services** means services performed by any **Insured** for others, for a fee or commission or other consideration, including such services that are performed electronically using the **Internet** or a network of two or more computers. **Professional Services** includes:

   a   services rendered as an insurance general agent, insurance agent, insurance broker, insurance surplus lines broker, wholesale insurance broker, third-party insurance agent, managing general agent, managing general underwriter, insurance underwriting manager, insurance program administrator, insurance appraiser, insurance claims administrator, expert witness concerning any insurance-related subject or matter, formal insurance instructor, lecturer, speaker or teacher, and notary public;

   b   services rendered as an insurance consultant including risk management, loss control and anti-fraud consulting;

   c   services as a licensed registered representative rendered in connection with the sale and servicing of variable life products, variable annuity products, and mutual funds;

Copyright 2014, CapSpecialty, Inc.

CAP005608

    d.  insurance premium financing services; and

    e.  services as a countersigning agent for out-of-state insurance agencies on policies issued within the state of domicile of the **Insured.**

3  The **Company** has the right and duty to defend a covered **Claim** against an **Insured**, regardless of whether the allegations of the **Claim** are meritless, false or fraudulent. The **Company's** duty to defend shall cease after the applicable limits of the **Company's** liability have been exhausted by payment of **Damages** and in such event the **Company** shall have the right to withdraw from the further defense of any **Claim**. The **Company** has the right to select defense counsel to defend the **Insured**. The **Company** has the right to select arbitrators in the event of any arbitration proceedings.

Payment of **Claim Expenses** will not reduce the limits of insurance of this Policy.

## B.  SUPPLEMENTARY PAYMENTS

Supplementary Payments made pursuant to this Section shall be in addition to the Limits of Insurance that apply to Insuring Agreement I.(A)(1) as stated in the Declarations and shall not be subject to the deductible. The obligation of the **Company** to pay Supplementary Payments ends when the applicable Limits of Insurance stated in the Declarations are exhausted.

    a  Governmental Claim Supplementary Payments:

    The **Company** shall pay on behalf of an **Insured Claim Expenses** which the **Insured** incurs as a result of a **Governmental Claim** during the **Policy Period**. The amount the **Company** shall reimburse the **Insured** for each **Governmental Claim** shall not exceed the amount stated in the Declarations. The **Company** shall have no obligation to pay on behalf of or indemnify any **Insured** for any fine, penalty or other monetary amounts that an **Insured** may become obligated to pay as the result of such **Governmental Claim.**

    b  Subpoena Supplementary Payments:

    If, during the **Policy Period**, an **Insured** receives a subpoena for documents or testimony arising out of **Professional Services**, and the subpoena is not related to a **Claim** previously reported under this or any prior **Policy**, the **Company** shall, at the written request of the **Insured** and upon receipt of a copy of the subpoena, retain legal counsel to assist the **Insured** in responding to the subpoena or to represent the **Insured** during testimony. The **Company** shall pay on an **Insured's** behalf the expenses incurred for the retention of legal counsel to assist the **Insured** in responding to any such subpoena. The amount payable by the **Company** for each subpoena shall not exceed the each subpoena limit stated in the Declarations. The maximum amount the **Company** shall pay under this **Policy** for all subpoenas shall not exceed the Aggregate Limits of Insurance for subpoenas stated in the Declarations regardless of the number of subpoenas reported or the number of **Insureds** involved.

## C.  EXCLUSIONS

The **Company** is not liable for **Damages** or obligated to defend any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

1  Criminal, dishonest, fraudulent, malicious or knowingly wrongful acts or omissions committed by or at the direction of any **Insured**; provided however that this Exclusion shall not apply:

    a  Unless there is an admission or final adjudication in any proceeding establishing that such conduct occurred; or

Copyright 2014, CapSpecialty, Inc.

CAP005609

b    To any natural person who did not actually commit, or have prior knowledge of, or participate in a concealment of such criminal, fraudulent, dishonest, malicious wrongful acts or omission.

None of the aforementioned list of wrongful conduct or acts or omissions of any natural person **Insured** will be imputed to any other natural person **Insured**; however the aforementioned list of wrongful acts and omissions of an **Executive Officer** shall be imputed to the **First Named Insured** or any **Subsidiary** of the **First Named Insured**. If any **Insured** is found to have engaged in, or admits to engaging in, the conduct specified in this Exclusion, such **Insured** shall reimburse the Company for any **Claim Expenses** advanced to or paid on behalf of such **Insured**.

2    Any intentional failure to pay or delay in paying all or part of any benefit or payment due or alleged to be due under any insurance contract, bond or any benefit **plan**, **or** any actual or alleged lack of good faith or fair dealing in the handling of any claim or obligation due or alleged to be due under any insurance contract, bond or any benefit plan; provided however, that this Exclusion will not apply unless there is an admission, finding or a final adjudication in any proceeding establishing that such conduct occurred; provided however that this Exclusion shall not apply:

a    Unless there is an admission or final adjudication in any proceeding establishing that such conduct occurred; or

b    To any natural person who did not actually commit, or have prior knowledge of, or participate in a concealment of such act.

None of the aforementioned list of wrongful conduct or acts or omissions of any natural person **Insured** will be imputed to any other natural person **Insured**; however the aforementioned list of acts of an **Executive Officer** shall be imputed to the **First Named Insured** or any **Subsidiary** of the **First Named Insured**. If any **Insured** is found to have engaged in, or admits to engaging in, the conduct specified in this Exclusion, such **Insured** shall reimburse the Company for any **Claim Expenses** advanced to or paid on behalf of such **Insured**.

3.   Breach of contract and liability assumed under any contract or agreement, unless the **Insured** would have been liable in the absence of such contract.

4.   Any breach of underwriting or binding authority; provided, however, that this Exclusion shall not apply:

a    Unless there is an admission or final adjudication in any proceeding establishing that such conduct occurred; or

b    To any natural person who did not actually commit, or have prior knowledge of, or participate in a concealment of such act.

None of the aforementioned list of wrongful conduct or acts or omissions of any natural person **Insured** will be imputed to any other natural person **Insured**; however the aforementioned list of acts of an **Executive Officer** shall be imputed to the **First Named Insured** or any **Subsidiary** of the **First Named Insured**. If any **Insured** is found to have engaged in, or admits to engaging in, the conduct specified in this Exclusion, such **Insured** shall reimburse the Company for any **Claim Expenses** advanced to or paid on behalf of such **Insured**.

5.   Any actual or alleged guarantee of any future premium payment, of any investment result or return, of any interest rate or yield, or any tax consequence in connection with any insurance product, annuity, mutual fund or security.

6.   Any actual or alleged placement or failure to place reinsurance.

7    Any actual or alleged sale or failure to sell any securities, other than variable annuities, variable life insurance, or mutual funds.

Copyright 2014, CapSpecialty, Inc.

CAP005610

8   Failure to collect, pay or return any premium, commission, tax, or brokerage or Policy fee of any kind, if the **Insured** has in fact collected such premium, commission, tax, or brokerage or Policy fee.

9   For injunctive relief alleging any **Wrongful Act** for which insurance would have been granted under this **Policy** if **Damages** had been sought. However, the **Claims Expenses** arising therefrom shall be covered by this **Policy**.

10. Except for **Claims** resulting from any actual or alleged failure of the **Insured** to effect or maintain any insurance or bond, in whole or in part, or on any particular terms or with any particular limits, the **Company** is not liable for loss or obligated to defend **Claims** arising out of actual or alleged:

   a   Violation of:

   i   The Securities Act of 1933 as amended;

   ii.  The Securities Exchange Act of 1934 as amended;

   iii.  Any state blue sky or securities law;

   iv.  Any similar state or federal law; or

   v   Any order, ruling or regulation issued pursuant to the above laws;

   b   Unlawful discrimination or harassment, including that based upon race, creed, color, religion, national origin, age, disability, sex, marital status or sexual orientation;

   c   Employment related practices and policies of an **Insured**;

   d   Any actual or alleged infringement of copyright, patent, trademark or service mark or any other intellectual property violation;

   e   **Bodily Injury** or **Property Damage**;

   f   Acts by an **Insured** related to any pension, healthcare, welfare, profit sharing, mutual or investment plans, funds or trusts; or any violation of any provisions of the Employee Retirement Income Security Act of 1974 (the "Act"), or any amendment, regulation, ruling or order issued pursuant to the Act or any similar provisions of any federal, state or local law; or

   g   Actual or threatened discharge, dispersal or release of any **Pollutant**; or the creation of an injurious condition involving any **Pollutant**; or the existence of any **Pollutant** on any property; or the cleanup, removal, testing, monitoring, containment, treatment, detoxification or neutralization of any **Pollutant**. This exclusion is effective whether or not the pollution was sudden, accidental, gradual, intended, expected or preventable and whether or not an **Insured** caused or contributed to the pollution.

11. The **Company** is not liable for loss or obligated to defend **Claims** made by or on behalf of:

   a   Any entity which is a parent, affiliate, subsidiary, co-venturer or partner of an **Insured** or any other entity over which an **Insured**, by reason of ownership interest or otherwise, asserts influence or control;

   b   Any entity directly or indirectly controlled, operated or managed by an entity described in 11.(a) above; or

   c   Any **Insured**.

Copyright 2014, CapSpecialty, Inc.
CAP005611

## II    DEFINITIONS

Some bold-faced words may be defined in other parts of the **Policy**.

A   **Application** means:

1   All signed applications, supplemental applications, renewal applications, any attachments thereto, and all other information and materials submitted to the **Company** by or on behalf of the **Insured** for the purpose of applying for this **Policy**, and

2   All applications, supplemental applications, renewal applications, attachments and other information and materials that were attached to or deemed attached to and became part of any policy of insurance of which this **Policy** is a direct or indirect renewal or replacement.

All such applications, supplemental applications, renewal applications, attachments, information and materials shall be deemed attached to and incorporated into this **Policy**.

B.   **Bodily Injury** means physical injury, sickness, disease or death of any person, as well as mental anguish, mental injury, emotional distress, shock or fright resulting in or from physical injury, sickness, disease or death of any person.

C   **Claim** means:

1   Any written notice or demand for monetary or non-monetary relief;

2.   Any written request to toll or waive the statute of limitations;

3   Any civil proceeding in a court of law;

4   Any notice of any suit; or

5   Any arbitration or mediation proceeding

which seeks **Damages** against an **Insured** for a **Wrongful Act** or **Personal Injury**.  A **Claim** shall not include a **Governmental Claim**.

D   **Claim Expenses** means the following expenses incurred by the **Company** in the investigation, adjustment, negotiation, arbitration, mediation, settlement and defense of **Claims**:

1   Expenses the **Company** incurs, other than salary, wages or expenses of the **Company**'s regular employees;

2   Reasonable fees charged by attorneys selected by the **Company** to defend an **Insured**;

3   The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. The **Company** will not apply for or furnish these bonds; and

4   Reasonable expenses incurred by an **Insured** at the **Company**'s request.

**Claim Expenses** do not include:

a   Loss of earnings or profit by any **Insured**; or

b   Salaries, wages, fees, or other compensation payable to any **Insured**.

E   **Company** means the Insurance Company named in the Declarations.

F   **Damages** means:

Copyright 2014, CapSpecialty, Inc.

CAP005612

1.  Amounts which an **Insured** is legally obligated to pay as a result of a covered judgment, award or settlement;

2.  Costs assessed against an **Insured** in any suit or proceeding defended by the **Company** unless such costs are assessed as a sanction for an **Insured** s delay or misconduct in the litigation process;

3.  Pre-judgment interest and post-judgment interest assessed before the **Company** has paid, offered to pay or deposited in court the part of any judgment that is covered by this **Policy** and that is within the applicable Limits of Insurance; and

4.  Punitive, exemplary or multiple **Damages**, where insurable by law. The insurability of punitive, exemplary or multiple **Damages** shall be determined under the laws of the jurisdiction most favorable to the insurability of such **Damages**, provided that such jurisdiction is where either the **Company** or the First **Named Insured** is incorporated or has its principal place of business, where the act giving rise to such **Damages** occurred, the location of the court which awarded such **Damages**, or the jurisdiction in which the **Damages** are awarded.

**Damages** do not include:

1.  Taxes, criminal or civil fines or penalties imposed by law, or

2.  Fines, fees or penalties charged by a licensing organization; disgorgement of an **Insured**'s profits; costs of complying with an order granting injunctive relief; or disputed fees, charges, or commissions for goods or services.

G   **Executive Officer** means the President, Chief Executive Officer, Managing Partner, Chief Financial Officer, Chief Operating Officer, In-house General Counsel, Risk Manager or any person in a functionally equivalent position of the First **Named Insured**.

H.  **First Named Insured** means the person or organization named in Item 1. Of the DECLARATIONS.

I   **Governmental Claim** means a **Claim**, investigation or proceeding by an administrative, disciplinary, governmental, quasi-governmental or regulatory agency, board, body or official to investigate charges of professional misconduct by an **Insured** in their performance of or failure to perform **Professional Services**. However, **Governmental Claim** shall not include any criminal proceeding.

A **Governmental Claim** shall not include any **Claim** brought by a governmental entity solely in its capacity as a customer or client of the **Insured**, and seeking only remedies available to a similarly situated private claimant. Such **Claims** may be covered, however, under paragraph 1 of the Insuring Agreement of this **Policy** unless otherwise excluded under the terms, conditions and exclusions of this **Policy**.

J   **Insured** means any person or entity qualifying as an **Insured** in Section III of the Policy. The insurance applies separately to each **Insured** against whom a **Claim** is made except with respect to the Limits of Insurance as provided in Section IV of the **Policy**.

K   **Personal Injury** means injury arising out of one or more of the following offenses:

1.  False arrest, detention or imprisonment;

2.  Malicious prosecution;

3.  Wrongful entry or wrongful eviction;

4.  Invasion of right of private occupancy;

Copyright 2014, CapSpecialty, Inc.

CAP005613

5. Oral or written publication of material that slanders or libels a person or organization or defames or disparages a person or organization's goods, products or services; or

6. Oral or written publication of material that violates a person's right of privacy.

L. **Policy** means, collectively, the Declarations, the Application, this policy form and all written endorsements to this Policy.

M. **Policy Period** means the period of insurance specified in the Declarations or a shorter period resulting from cancellation of the Policy.

N. **Pollutant** means any solid, liquid, gaseous or thermal irritant or contaminant, including:

1. Smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed; or

2. Hazardous, toxic or radioactive matter or nuclear radiation.

O. **Property Damage** means physical injury to tangible property, including all resulting loss of use of that property. For the purposes of this Policy, electronic data is not tangible property.

P. **Professional Services** is defined in Section I.(A)(2).

Q. **Retroactive Date** means the date specified in the Declarations, or in any endorsement attached hereto.

R. **Subsidiary** means any entity during any time in which the First Named Insured owns, directly or through one or more Subsidiaries, more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors.

S. **Supplementary Payments** is defined in Section I.(B).

T. **Wrongful Act** means any negligent act, error, or omission of an Insured in rendering Professional Services for others.

## III. WHO IS AN INSURED

1. The First Named Insured;

2. A director, officer or manager of the First Named Insured, but only with respect to the performance of his or her duties as such on behalf of the First Named Insured;

3. An employee (including a part time or temporary employee) of the First Named Insured, but only for work done while acting within the scope of his or her employment and related to the conduct of the First Named Insured's business;

4. A principal if the First Named Insured is a sole proprietorship, or a partner if the First Named Insured is a partnership, but only with respect to the performance of his or her duties as such on behalf of the First Named Insured;

5. Any person who previously qualified as an insured under III.2., III.3. or III.4. above prior to the termination of the required relationship with the First Named Insured, but only with respect to the performance of his or her duties as such on behalf of the First Named Insured;

6. any solicitor, sub agent, broker or independent contractor of the Named Insured but only as respect insurance placed through the facilities of the Named Insured

Copyright 2014, CapSpecialty, Inc.

PLP 001 (02-14)

CAP005614

7.  The estate, heirs, executors, administrators, assigns and legal representatives of any Insured in the event of such Insured's death, incapacity, insolvency or bankruptcy, but only to the extent that such Insured would otherwise be provided coverage under this insurance;

8.  The lawful spouse, including any natural person qualifying as a domestic partner under the provisions of any applicable federal, state, or local law in the United States, of any Insured, but solely by reason of any act, error or omission of an Insured other than such spouse or domestic partner; and

9.  a **Subsidiary** that is formed during the **Policy Period**, but only if there is no other similar insurance available to the **Subsidiary**; however, coverage for the newly acquired **Subsidiary** applies only if the following conditions are met:

    (a) Coverage under this provision is afforded only until the 90th day after the acquisition or formation, or the end of the **Policy Period**, whichever is earlier; provided that within this period a **Named Insured**:

        i.   advises the **Company** of the acquisition or formation of the new organization;

        ii.  provides information as required by the **Company** for evaluation; and

        iii. pays any additional premium the **Company** assesses as a result of the change; or

    (b) the **Subsidiary** that is acquired or merged, at the time of such transaction, is less than 25% of the total revenues of the **First Named Insured** as reflected in the **First Named Insured's** most recent audited consolidated financial statement.

Coverage under Section III.(9) applies only to **Wrongful Acts** or offenses giving rise to **Personal Injury** committed on or after the date of creation, formation or acquisition of the new **Subsidiary**.

## IV.    LIMITS OF INSURANCE AND DEDUCTIBLE

### A.  LIMIT OF INSURANCE

1.  All Limits of Liability shall apply in excess of the Deductible.  All Claim Expenses shall be in addition to the applicable Per Claim Limit of Liability.

2.  The Company's limit of liability for the combined total of all Damages for a Claim shall not exceed the amount stated in Item 4 of the Declarations as the Per Claim Limit of Liability or the sublimit of liability as shown on the Declarations for Governmental Claim Supplementary Payments and Subpoena Supplementary Payments.

3.  The Company's limit of liability for the combined total of all Damages for all Claims shall not exceed the amount stated in Item 4 of the Declarations as the Aggregate Limit of Liability.

### B.  DEDUCTIBLE

The Deductible amount is the amount specified in the Declarations. The **Company's** obligation to pay **Damages** and **Claim Expenses** applies only to sums in excess of the Deductible.  The application of the Deductible will not erode the Aggregate Limit of Insurance or any applicable sublimit.

If the total of **Damages** and **Claim Expenses** for any **Claim** is within the Deductible, the **Company** will have no duty to pay **Damages** or **Claim Expenses** for the **Claim**.

If, at the **Company's** option, the **Company** has paid part or all of any Deductible, the **Insured** will be obligated to reimburse such amounts to the **Company** upon demand.

Page 8 of 13

Copyright 2014, CapSpecialty, Inc.

CAP005615

## V.  OTHER CONDITIONS

### A  BANKRUPTCY

The bankruptcy or insolvency of an Insured or an Insured's estate will not relieve the Company of its obligations under this Policy nor deprive the Company of its rights or defenses under this Policy.

### B  DUTIES IN THE EVENT OF A CLAIM

1  The Insured must notify the Company, in writing, as soon as practicable of a Claim or a circumstance or incident likely to result in a Claim, but in no event later than sixty (60) days after the expiration of the Policy or the Extended Reporting Period, if applicable.  The Insured must notify the Company by sending notice to:

> PRMS, Inc.
>
> Attn: Claims Manager
>
> 1401 Wilson Boulevard, Ste. 700
>
> Arlington, Virginia 22209

The notice must include all of the following information:

    a  The names of all persons and/or organizations involved in the Wrongful Act or offense giving rise to Personal Injury;

    b  The specific person or organization likely to make the Claim;

    c  A description of the time, place and nature of the Wrongful Act or offense giving rise to Personal Injury; and

    d  A description of the potential Damages.

2.  The Insured must send the Company copies of all demands, notices, settlement offers, summonses or legal papers received in connection with the Claim or potential Claim;

3  Upon the Company's request, the Insured must authorize the Company to obtain records and other information;

4  The Insured must cooperate with and assist the Company in the investigation, settlement and defense of the Claim;

5  The Insured must cooperate with and assist the Company, upon the Company's request, in enforcing any rights of contribution or indemnity against another party who may be liable to an Insured;

6  No Insured will, except at the Insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense without the Company's consent; and

7  The Company has the right to settle all Claims subject to the consent of the First Named Insured first listed in the Declarations. The Company will not settle any Claim without the consent of such First Named Insured. The failure of the First Named Insured first listed in the Declarations to express consent to a settlement recommended by the Company will be deemed refusal to consent to the settlement.

However, if such First Named Insured refuses to consent to any settlement recommended by the Company, then the Company's liability for the Claim will be limited to (i) the amount for which the Claim could have been settled,; and (ii) plus Claim Expenses incurred up to the date of such First Named Insured's refusal to consent to settlement minus the amount of the Deductible specified in the Declarations.  Moreover, if such First Named Insured refuses to consent to

Copyright 2014, CapSpecialty, Inc.

CAP005616

any settlement recommended by the **Company**, 50% of any **Damages** and/or **Claim Expenses** in excess of the **Settlement Amount** will be carried by the **First Named Insured** at its own risk and will be uninsured.

## C.  LEGAL ACTION AGAINST THE COMPANY

No person or organization has a right under this **Policy**:

1   To join the **Company** as a party or otherwise bring the **Company** into a suit seeking **Damages** from an **Insured**; or

2   To sue the **Company**, unless the **Insured** has fully complied with all terms and conditions of this **Policy**.

## D.  OTHER INSURANCE

The insurance afforded by this **Policy** is excess over any other valid and collectible insurance available to the **Insured**, except insurance specifically arranged by the **First Named Insured** to apply in excess of this insurance.

## E  WHEN COVERAGE APPLIES

1   Claims First Made

This **Policy** applies to **Claims** first made against an **Insured** during the **Policy Period**.  The **Company** will consider a **Claim** to be first made against an **Insured** when a written **Claim** is first received by an **Insured** during the **Policy Period** or any Extended Reporting Period.  All terms and conditions of this **Policy** in effect on the date the **Claim** is first made will apply to the **Claim**.

2   Wrongful Acts and Offenses Giving Rise to Personal Injury

This **Policy** applies to **Claims** or **Supplementary Payments** arising from a **Wrongful Act** or offense giving rise to **Personal Injury** that occurs after the **Retroactive Date** and before the Expiration Date of this **Policy**.  These will be covered:

   a.   Subject to all terms and conditions of the **Policy**; and

   b    Unless an **Insured** had actual or constructive knowledge of the circumstance(s) or incident(s) which led to the **Claim** or **Supplementary Payments** and reason to believe it would result in a **Claim**, prior to the **Effective Date** of the first Insurance Agents and Brokers E&O **Policy** issued to an **Insured** by the **Company** or any affiliate thereof.

3   Reported Wrongful Acts and Offenses Giving Rise to Personal Injury

This **Policy** applies to **Claims** first made against an **Insured** after the end of the **Policy Period**, but only if all of the following conditions are met:

   a    The **Wrongful Act** or offense giving rise to **Personal Injury** is committed after the **Retroactive Date** and before the Expiration Date specified in the Declarations;

   b    The **Company** receives written notice, including information as required in SECTION V – OTHER CONDITIONS B.1. of this **Policy**, from an **Insured** during the **Policy Period** of the **Wrongful Act** or offense giving rise to **Personal Injury**;

   c.   No **Insured** had actual or constructive knowledge, prior to the **Effective Date** of the first Insurance Agents and Brokers E&O **Policy** issued by the **Company** or any affiliate thereof to an **Insured**, of a circumstance or incident that could reasonably have been expected to lead to the **Claim**; and

   d.   There is no other valid and collectible insurance for the **Claim**.

Copyright 2014, CapSpecialty, Inc.

CAP005617

A **Claim** first made after the end of the **Policy Period** and meeting all of the above conditions will be deemed to have been made on the last day of the **Policy Period**. All terms and conditions of this **Policy** in effect on that day will apply to the **Claim**.

4    Multiple Claims

All **Claims** arising from the same **Wrongful Act** will be considered to have been made on the earlier of the following times:

    a    The date the first of those **Claims** is made against an **Insured**; or

    b    The date the **Company** first receives an **Insured**'s written notice of the **Wrongful Act**. Such notice must include information as required in SECTION V – OTHER CONDITIONS B. of this Policy.

The terms and conditions of this **Policy** in effect on that date will apply to all such **Claims**.

5    Related Wrongful Acts or Offenses Giving Rise to Personal Injury

All **Wrongful Acts** or Offenses Giving Rise to Personal Injury that:

    a    are committed after the **Retroactive Date** and before the Expiration Date of the last Insurance Agents and Broker E&O Policy issued to an **Insured** by the **Company** or any affiliate thereof; and

    b    are logically or causally connected by common facts, circumstances, transactions, events and/or decisions;

    will be:

    a    treated under this Policy as one **Wrongful Act** or Offense Giving Rise to Personal Injury; and

    b    deemed to have occurred on the date of the first of the **Wrongful Acts** or Offense Giving Rise to Personal Injury.

F    REPRESENTATIONS

1    By accepting this **Policy** the **Insured** agrees:

    a    The statements in the **Application**, along with any and all attachments submitted with the same, or in connection with the **Application** process and furnished to the **Company** are true, accurate and complete;

    b    Those statements furnished to the **Company** are representations the **First Named Insured** made on behalf of all **Insureds**;

    c    Those representations are a material inducement to the **Company** to issue this **Policy**;

    d    The **Company** has issued this **Policy** in reliance upon those representations; and

    e.    If this **Policy** is part of the renewal of a **Policy** issued by the **Company**, the **Insured**'s representations include the representations made in all previous **Applications** for previous **Policies** issued by the **Company**.

G. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS

If the **Insured** has rights to recover all or part of any payment the **Company** has made under this **Policy**, those rights are transferred to the **Company**. The **Insured** must do nothing to impair those rights and at the **Company**'s request, the **Insured** will transfer those rights to the **Company** and help the **Company** enforce them.

PLP 001 (02-14)

Copyright 2014, CapSpecialty, Inc.

CAP005618

## H.  NO OBLIGATION TO RENEW

**The Company** will not be obligated or required to renew this **Policy**.  Any offer of renewal terms involving a change of deductible, premium, Limit of Insurance, or other terms and conditions will not constitute, nor be construed as, a refusal by the **Company** to renew the **Policy**.  The **Company** may elect to non-renew this **Policy** by mailing to the **First Named Insured** at least thirty (30) days advance written notice or notice as otherwise specified by state law.  If notice is mailed, proof of mailing will be sufficient proof of notice.

## I    TERRITORY AND CURRENCY

The territory applicable to this **Policy** is universal. If **Damages** or **Claim Expenses** are paid in currency other than United States of America dollars, then the payment under this **Policy** will be considered to have been made in United States of America dollars at the conversion rate as published in *The Wall Street Journal* on the date of payment.

## J.   MERGERS OR CONSOLIDATIONS

If during the Policy Period the **First Named Insured** consolidates or merges with or is acquired by another entity, or sells substantially all of its assets to any other entity, then this policy shall remain in full force and effect, but only with respect to **Wrongful Acts** or **Personal Injury**, that occur prior to the date of the consolidation, merger or acquisition. There shall be no coverage provided by this policy for any other **Claim** or **Loss**.

## K   EXTENDED REPORTING PERIOD

1    In the event of cancellation or non-renewal of this **Policy** by the **Company**, for reasons other than non-payment of premium and/or deductible or non-compliance with the terms and conditions of this **Policy**, the **First Named Insured** will have the right to purchase an Extended Reporting Period as follows:

    a    The right to purchase the Extended Reporting Period will terminate unless written notice by the **First Named Insured** of the intention to purchase it, together with payment of the additional premium due, is received by the **Company** within thirty (30) days after the effective date of the cancellation or non-renewal.

    b    An additional premium, based upon the length of the Extended Reporting Period will apply.

    c    A **Claim** made during the Extended Reporting Period will be deemed to have been made on the last day of the **Policy Period**.  All terms and conditions of this **Policy** in effect on that day will apply to the **Claim**; and

    d    The Extended Reporting Period does not extend the **Policy Period** or change the scope of coverage provided nor does it provide an additional or renewed Aggregate **Limit** of Insurance.  It applies only to **Claims** made against an **Insured** during the Extended Reporting Period for **Wrongful Acts** that occur after the **Retroactive Date** and before the Expiration Date of the **Policy**.

2    In the event the **First Named Insured** elects to cancel or non-renew this **Policy**, the **Company** may offer an Extended Reporting Period at its discretion.

## L.  PREMIUMS AND DEDUCTIBLES

**The First Named Insured**:

1    Is responsible for the payment of all premiums and deductibles; and

2    Will be the payee for any return premiums the Company pays.

PLP 001 (02-14)

Copyright 2014, CapSpecialty, Inc.

CAP005619

## M. CANCELLATION

1   The **First Named Insured** may cancel this **Policy** by mailing or delivering to the **Company** advance written notice of cancellation.

2   The **Company** may cancel this **Policy** by mailing or delivering to the **First Named Insured** written notice of cancellation at least:

    a   Ten (10) days before the effective date of cancellation if the **Company** cancels for nonpayment of premium; or

    b   Thirty (30) days before the effective date of cancellation if the **Company** cancels for any other reason.

3   The **Company** will mail or deliver notice to the last known mailing address of the **First Named Insured**.

4   Notice of cancellation will state the effective date of cancellation. The **Policy Period** will end on that date.

5   If this **Policy** is cancelled, the **Company** will send any premium refund due to the **First Named Insured**. If the **Company** cancels, the refund will be pro rata. If the **First Named Insured** cancels, the refund will be calculated as 90% of the pro-rated return premium. The cancellation will be effective even if the **Company** has not made or offered a refund.

6   If notice is mailed, proof of mailing will be sufficient proof of notice.

## N. CHANGES

This **Policy** contains all the agreements between the **Company** and the **Insured** concerning the insurance afforded. The **First Named Insured** is authorized to make changes in the terms of this **Policy** with the **Company's** consent. This **Policy's** terms can be amended or waived only by endorsement issued by the **Company** and made a part of this **Policy**.

## O. TRANSFER OF RIGHTS AND DUTIES UNDER THIS POLICY

An **Insured's** rights and duties under this **Policy** may not be transferred without the **Company's** prior written consent except in the case of death of an individual **Named Insured**.

If the **Insured** dies, the **Insured's** rights and duties will be transferred to the **Insured's** legal representative but only while acting within the scope of duties as the **Insured's** legal representative.

Copyright 2014, CapSpecialty, Inc.

CAP005620

| Endorsement No.: | 1 |
| Endorsement Effective Date: | 09/01/2017 |
| | 12:01 a.m. standard time at the address of the Named Insured as shown in Item 1 of the Declarations. |
| Forms a part of Policy No.: | IA20151100-03 |
| Issued to: | L/P Insurance Services, Inc. |
| Issuing Company: | Capitol Specialty Insurance Corporation |

## Service of Suit

This endorsement modifies insurance provided under the following:

   Insurance Agents E&O Primary

It is hereby understood and agreed that:

Capitol Specialty Insurance Corporation ("CSIC") may be sued upon any cause of action arising under any insurance contract made by CSIC or evidence of insurance issued or delivered by the producer, in the courts for the county(s) where the insurance provides coverage or in the courts of Dane County, Wisconsin, where the insurer maintains its home office.

It is further agreed that service of process in such suit may be made upon the appropriate person at the state Department of Insurance, Secretary of State or other designee as provided for in specific state laws and/or regulations.

When service of process is made upon a statutory designee according to state law, such process should be provided via mail to:

   Vice President – Claims
   Capitol Specialty Insurance Corporation
   1600 Aspen Commons
   Middleton, Wisconsin 53562-4718

The above-named is authorized and directed to accept service of process on our behalf in any suit. It is further agreed that in any suit instituted against any insured under this policy or otherwise upon this policy, we will abide by the final decision of such court or of any appellate court in the event of an appeal.

If this endorsement is issued after the Policy has been issued, it is deemed to have been added to the list of forms and endorsements on the Declarations.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

CAP005621

| Endorsement No.: | 3 |
|---|---|
| Endorsement Effective Date: | 09/01/2017 |
| | 12:01 a.m. standard time at the address of the First Named Insured as shown in Item 1 of the Declarations. |
| Forms a part of Policy No.: | 1A20151100-03 |
| Issued to: | L/P Insurance Services, Inc. |
| Issuing Company: | Capitol Specialty Insurance Corporation |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## Aggregate Deductible Endorsement

This endorsement modifies insurance provided under the following
Insurance Agents and Brokers Professional Liability Policy

In consideration of the premium charged, it is hereby understood and agreed that Section IV.B. DEDUCTIBLE is deleted in its entirety and replaced by the following:

B. DEDUCTIBLE

The Deductible amount is the amount specified in the Declarations. The **Company's** obligation to pay **Damages** and **Claim Expenses** applies only to sums in excess of the Deductible. The application of the Deductible will not erode the Aggregate Limit of Liability or any applicable Sublimit. The Deductible shall apply to each and every **Claim until the Insured** has paid a total of $75,000 (The Aggregate Deductible) in **Damages** and/or **Claim Expenses** for **Claims**. After the Aggregate Deductible has been satisfied, no Deductible will apply.

If the total of **Damages** and **Claim Expenses** for any **Claim** is within the Deductible, and the Aggregate Deductible has not been satisfied, the Company will have no duty to pay **Damages** or **Claim Expenses** for the **Claim**.

If, at the **Company's** option, the **Company** has paid part or all of any Deductible, prior to the satisfaction of the Aggregate Deductible, the **Insured** will be obligated to reimburse such amounts to the **Company** upon demand.

If this endorsement is issued after the **Policy** has been issued, it is deemed to have been added to the list of forms and endorsements on the Declarations.

All other terms and conditions of **this Policy** remain unchanged.

CAP005622

| Endorsement No.: | |
|---|---|
| Endorsement Effective Date: | 09/01/2017 |
| | 12:01 a.m. standard time at the address of the First Named Insured as shown in Item 1 of the Declarations. |
| Forms a part of Policy No. | IA201S1100-03 |
| Issued to: | L/P Insurance Services, Inc. |
| Issuing Company: | Capitol Specialty Insurance Corporation |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## Amend Cancellation Endorsement

This endorsement modifies insurance provided under the following:
Insurance Agents and Brokers Professional Liability Policy

In consideration of the premium charged, it is hereby understood and agreed that Section V.M. CANCELLATION is deleted in its entirety and replaced by the following:

**M. CANCELLATION**

1. The First Named Insured may cancel this **Policy** by mailing or delivering to the **Company** advance written notice of cancellation.

2. The **Company** may cancel this **Policy** solely for the nonpayment of premium by mailing or delivering to the First Named Insured written notice of such cancellation at least ten (10) days before the effective date of cancellation.

3. The **Company** will mail or deliver notice to the last known mailing address of the First Named Insured.

4. Notice of cancellation will state the effective date of cancellation. The **Policy** Period will end on that date.

5. If this **Policy** is cancelled, the **Company** will send any premium refund due to the First Named Insured. If the **Company** cancels, the refund will be pro rata. If the First Named Insured cancels, the refund will be calculated as 90% of the pro-rated return premium. The cancellation will be effective even if the **Company** has not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

If this endorsement is issued after the **Policy** has been issued, it is deemed to have been added to the list of forms and endorsements on the Declarations.

All other terms and conditions of this **Policy** remain unchanged.

PLP 005 (8/16)    © 2016 CapSpecialty, Inc. All rights reserved.    Page 1 of 1

CAP005623

| Endorsement No. | 4 |
| Endorsement Effective Date: | 09/01/2017 |
| | 12:01 a.m. standard time at the address of the First Named Insured as shown in Item 1 of the Declarations. |
| Forms a part of Policy No.: | IA20151100-03 |
| Issued to: | L/P Insurance Services, Inc. |
| Issuing Company: | Capitol Specialty Insurance Corporation |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## Amend Contractual Liability Exclusion

This endorsement modifies insurance provided under the following:
   Insurance Agents and Brokers Professional Liability Policy

In consideration of the premium charged, it is hereby understood and agreed that in Section I.C. EXCLUSION, Paragraph 3. is deleted in its entirety and replaced by the following:

3   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged breach of contract and any liability assumed under any contract or agreement, unless:

   a   the Insured would have been liable for same in the absence of such contract; or

   b.   the Insured assumes any liability under any formal written standard agency or brokerage agreement to indemnify any insurance carrier whom the Insured represents for any Claim or Claims Expenses the insurance carrier incurs solely and exclusively due to Wrongful Acts committed by an Insured, or by any other person or entity for whom the Insured is legally liable.

If this endorsement is issued after the Policy has been issued, it is deemed to have been added to the list of forms and endorsements on the Declarations.

All other terms and conditions of this Policy remain unchanged.

PLP 006 (8/16)                          © 2016 CapSpecialty, Inc. All rights reserved.                          Page 1 of 1

CAP005624

| Endorsement No.: | 5 |
|---|---|
| Endorsement Effective Date: | 09/01/2017 |
| | 12:01 a.m. standard time at the address of the First Named Insured as shown in Item 1 of the Declarations. |
| Forms a part of Policy No.: | IA20151100-03 |
| Issued to: | L/P Insurance Services, Inc. |
| Issuing Company: | Capitol Specialty Insurance Corporation |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## Amend ERP Endorsement

This endorsement modifies insurance provided under the following:
Insurance Agents and Brokers Professional Liability Policy

In Section V.K. EXTENDED REPORTING PERIOD is deleted and replaced by:

In the event of cancellation or non-renewal of this **Policy** by the **Company** or the **First Named Insured**, for reasons other than non-payment of premium and/or deductible or non-compliance with the terms and conditions of this **Policy**, the **First Named Insured** will have the right to purchase an Extended Reporting Period as follows:

a    The right to purchase the Extended Reporting Period will terminate unless written notice by the **First Named Insured** of the intention to purchase it, together with payment of the additional premium due, is received by the **Company** within thirty (30) days after the effective date of the cancellation or non-renewal.

b    An additional premium, based upon the length of the Extended Reporting Period will apply as follows:

12 months at 100% of the annual premium

24 months at 150% of the annual premium

36 months at 200% of the annual premium

c    A **Claim** made during the Extended Reporting Period will be deemed to have been made on the last day of the **Policy Period**. All terms and conditions of this **Policy** in effect on that day will apply to the **Claim**; and

d    The Extended Reporting Period does not extend the **Policy Period** or change the scope of coverage provided nor does it provide an additional or renewed Aggregate Limit of Insurance. It applies only to **Claims** made against an **Insured** during the Extended Reporting Period for **Wrongful Acts that occur** after the **Retroactive Date** and before the Expiration Date of the **Policy**.

If this endorsement is issued after the **Policy** has been issued, it is deemed to have been added to the list of forms and endorsements on the Declarations.

All other terms and conditions of this **Policy** remain unchanged

CAP005625

| Endorsement No.: | 6 |
|---|---|
| Endorsement Effective Date: | 09/01/2017 |
| | 12:01 a.m. standard time at the address of the First Named Insured as shown in Item 1 of the Declarations. |
| Forms a part of Policy No.: | IA20151100-03 |
| Issued to: | L/P Insurance Services, Inc. |
| Issuing Company: | Capitol Specialty Insurance Corporation |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## Amend Insured v. Insured Exclusion

This endorsement modifies insurance provided under the following:
Insurance Agents and Brokers Professional Liability Policy

1. Section C. EXCLUSIONS sub-section 11. Is amended as follows:

11. The **Company** is not liable for loss or obligated to defend **Claims** made by or on behalf of:

a. Any entity which is a parent, affiliate, subsidiary, co-venturer or partner of an **Insured** or any other entity over which an **Insured**, by reason of ownership interest or otherwise, asserts influence or control;

b. Any entity directly or indirectly controlled, operated or managed by an entity described in 11 (a) above; or

c. Any **Insured**.

Unless the **Claim** is brought in the capacity of a customer or client of an **Insured**.

If this endorsement is issued after the **Policy** has been issued, it is deemed to have been added to the list of forms and endorsements on the Declarations.

All other terms and conditions of this **Policy** remain unchanged.

CAP005626

| Endorsement No.: | 7 |
|---|---|
| Endorsement Effective Date: | 09/01/2017 |
| | 12:01 a.m. standard time at the address of the Named Insured as shown in Item 1 of the Declarations. |
| Forms a part of Policy No.: | IA20151100-03 |
| Issued to: | L/P Insurance Services, Inc. |
| Issuing Company: | Capitol Specialty Insurance Corporation |

## Loss of Earnings Supplementary Payments

This endorsement modifies insurance provided under the following:

**Insurance Agents E&O Primary Policy**

It is hereby understood and agreed that:

| Schedule | | |
|---|---|---|
| Loss of Earnings Per Day: | $           350 | Per Day |
| Loss of Earnings Aggregate: | $        5,000 | in the Aggregate for all Insureds, all Claims |

1   SECTION I. COVERAGE, Subsection B. **SUPPLEMENTARY PAYMENTS**, is amended by addition of the following coverage:

Loss of Earnings Supplementary Payments:

**The Company** shall reimburse an **Insured**, up to the amount set forth in the Schedule above per day, for each **Insured**, for all reasonable expenses such **Insured** incurs at the **Company's** request to attend a hearing, trial or mediation in the course of defending a **Claim** under this **Policy**, including actual loss of earnings because of time off work, up to a maximum aggregate set forth in the Schedule above for all **Insureds**, all **Claims** for which coverage is provide under this **Policy**.

2   SECTION II. **DEFINITIONS**, Subsection D. **Claim Expenses**, Paragraph 4. thereof, is deleted in its entirety and replaced with the following:

4.   Reasonable expenses incurred by an **Insured** at the **Company's** request, other than Loss of Earnings Supplementary Payments as described in Section I.B. of the Policy.

If this endorsement is issued after the Policy has been issued, it is deemed to have been added to the list of forms and endorsements on the Declarations.

All other terms and conditions of this Policy remain unchanged

_____
Authorized Representative

CAP005627

# EXHIBIT E

# EXHIBIT E

Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 1

 1                UNITED STATES DISTRICT COURT

 2                    DISTRICT OF NEVADA

 3

 4

 5    CAPITOL SPECIALTY INS.
      CORP.,
 6
                 Plaintiff,
 7
                 vs.                 No. 2:20-cv-01382-JCM-VCF
 8
      STEADFAST INS. CO., et al.,
 9
                 Defendants.
10    _____/

11    and related crossclaims.
      _____/
12

13

14

15       WEB-BASED DEPOSITION OF LORI SEBRANSKY, ESQ.

16              Taken on November 1, 2022

17                   At 1:40 p.m.

18              Remotely in Las Vegas, Nevada

19

20

21

22

23

24    Reported by:  Linda Horton Sprague, CCR 466

25    Job No. 51306.B, Firm Nos. 061F/116F

Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                          Page 2
 1     APPEARANCES:

 2

 3    For the Plaintiff:

 4            Scott S. Thomas, Esq.
              Payne & Fears
 5            6385 South Rainbow Boulevard
              Suite 220
 6            Las Vegas, Nevada 89118
              (702) 851-0300
 7            sst@paynefears.com

 8

 9    For Steadfast Insurance Company:

10            William C. Reeves, Esq.
              Morales Fierro & Reeves
11            600 South Tonopah Drive
              Suite 300
12            Las Vegas, Nevada 89106
              (702) 699-7822
13            wreeves@mfrlegal.com

14

15    For RHP Mechanical Systems:

16            Jessica A. West, Esq.
              Tyson & Mendes
17            2835 St. Rose Parkway
              Suite 140
18            Henderson, Nevada 89052
              (725) 410-7684
19            jwest@tysonmendes.com

20

21

22

23

24

25
```

Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                        Page  3
 1   APPEARANCES:   (Continued)

 2

 3   For United Construction Company:

 4           Mark G. Simons, Esq.
             Simons, Hall, Johnston, PC
 5           690 Sierra Rose Drive
             Reno, Nevada 89511
 6           (775) 785-0088
             msimons@shjnevada.com
 7

 8

 9                 INDEX OF EXAMINATION

10

11   LORI SEBRANSKY, ESQ.

12                                              Page

13   EXAMINATION

14   By Mr. Reeves                                 7

15   By Mr. Thomas                                69

16

17                 INDEX TO EXHIBITS

18

19   Number      Description                     Page

20    97         Photocopy of e-mail chain         11

21    98         Photocopy of e-mail chain         13

22    99         Photocopy of e-mail chain         14

23    100        Photocopy of e-mail chain         21

24    101        Photocopy of e-mail chain         26

25
```

Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                        Page 4
  1                 INDEX TO EXHIBITS (Continued)

  2

  3    Number        Description                        Page

  4
       102    Photocopy of e-mail chain                 27
  5           with UCC VA Draft Release
              Edits attached
  6
       103    Photocopy of e-mail chain                 28
  7
       104    Photocopy of e-mail chain                 29
  8
       105    Photocopy of e-mail chain                 34
  9
       106    Photocopy of e-mail chain                 37
 10
       107    No Exhibit 107                            38
 11
       108    Photocopy of e-mail chain                 38
 12
       109    Photocopy of e-mail chain                 44
 13
       110    Photocopy of e-mail from Lori             44
 14           Sebransky to Ramie Morales,
              dated July 24, 2019, with
 15           United Construction Release
              attached
 16
       111    Photocopy of e-mail chain                 47
 17           with United Construction
              Release (Draft)
 18
       112    Photocopy of e-mail chain                 49
 19
       113    Photocopy of e-mail from Lori             50
 20           Sebransky to Ramie Morales,
              dated 7/30/2019, with United
 21           Construction Release (Draft)
              attached
 22
       114    No Exhibit 114                            51
 23
       115    Photocopy of e-mail chain                 51
 24

 25
```

Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                          Page 5
  1                    INDEX TO EXHIBITS (Continued)

  2

  3      Number       Description                          Page

  4
         116          Photocopy of e-mail from              52
  5                   Ramie Morales to Lori
                      Sebransky, dated 8/6/2019,
  6                   with United Construction
                      Release (Draft) - Changes by
  7                   RM

  8      117          Photocopy of e-mail chain             52

  9      118          Photocopy of e-mail chain             53

 10      119          Photocopy of e-mail chain             54

 11      120          No Exhibit 120                        55

 12      121          Photocopy of e-mail chain             55

 13      122          Photocopy of e-mail from              57
                      Ramie Morales to Lori
 14                   Sebransky, dated 8/19/2019,
                      with Clean United
 15                   Construction Release (Draft)

 16      123          No Exhibit 123                        58

 17      124          Photocopy of e-mail chain             58

 18      125          No Exhibit 125                        59

 19      126          Photocopy of e-mail from Lori         59
                      Sebransky to Ramie Morales,
 20                   dated 8/21/2019, with Clean
                      United Construction Release
 21                   (Draft) attached

 22      127          Photocopy of e-mail chain             60

 23      128          Photocopy of e-mail from              61
                      Ramie Morales to Lori
 24                   Sebransky, dated 8/26/2019,
                      with Executed Release
 25                   attached
```

Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                        Page  6
 1              INDEX TO EXHIBITS (Continued)

 2

 3   Number      Description                          Page

 4
     129        No Exhibit 129                        63
 5
     130        Photocopy of e-mail chain             63
 6

 7

 8          QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

 9                          Page    Line

10                           46       6

11                           46      21

12                           74      25

13                           77      25

14                           78       9

15                           78      18

16                           79      14

17                           79      22

18                           80       9

19                           80      15

20                           85      21

21                           86       4

22                           87      15

23

24

25
```

Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 16

1    you on this.  My mistake.

2         A.   I'm on it.

3         Q.   Oh.  There you are.  There you are.

4              So this is Mathis to you.  Following up on

5    our conversation from last week.  Please see attached

6    correspondence.

7              Do you see that?

8         A.   I do.

9         Q.   Okay.  And beginning on page 3, we have a

10   letter dated December 27, 2018, from Troutman Sanders.

11             Do you see that?

12        A.   I do.

13        Q.   Okay.  And that's a letter that you're

14   familiar with that was sent to Zurich?

15        A.   Yes.

16        Q.   All right.  Thank you.

17             And by the way, when I ask you these

18   questions -- and I know you know this -- I don't wish

19   to invade the attorney-client privilege.  So you're

20   never going to tell me about things you talked to your

21   client with.

22             So I'm going to show you what was previously

23   marked as 59.

24             MR. REEVES:  Scott, you got the Bates stamp?

25             MR. THOMAS:  Got it.

Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 17

```
 1              Thank you.
 2    BY MR. REEVES:
 3         Q.   Lori, this is an e-mail you sent.
 4         A.   It is.
 5         Q.   If you need to -- go ahead and read it.  I'm
 6    going to ask you a question about it.
 7         A.   Okay.
 8              Okay.
 9         Q.   Accurate e-mail?
10         A.   Yes.
11         Q.   Okay.  You reference here, second sentence.
12              Quote, I have spoken with LP, comma, which
13    admits it made a mistake.
14              I won't read the rest.
15              Do you see that?
16         A.   I do.
17         Q.   Accurate statement?
18         A.   Yes.
19         Q.   Who made -- who at LP said they made a
20    mistake?
21         A.   Rich Bullard.
22         Q.   How many conversations did you have with
23    Bullard?
24         A.   I've had several.  I can't give you an exact
25    number.  But at least three.
```

Lori Sebransky, Esq.                          Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 39

1    with him?

2         A.   I do recall having a conversation with

3    Ramie.

4         Q.   What was the nature --

5         A.   I recall one -- I remember one phone call.

6         Q.   Yeah.  And are you able to tell me when that

7    occurred relative to all this back and forth?

8         A.   I wrote an e-mail the -- the day that we

9    spoke that kind of memorialized the conversation

10   that -- but I don't remember off the top of my head

11   what the date of that was.

12        Q.   Okay.  So that's -- as we go through them --

13   or if you see it, then we'll be okay.

14        A.   All right.

15        Q.   Regardless, looking at 108 here.  E-mail you

16   sent following your return from your vacation.

17        A.   That's it.  Right.

18        Q.   All right.  So let's go -- 109.

19             All right.  So you.  Ramie.  July 22.

20             You see that?

21        A.   I do.

22        Q.   It says:

23             Thanks for speaking to me this afternoon.

24             Do you see that?

25        A.   I do.

Page 40

1        Q.    Okay.  Go ahead and read the substance of
2    the e-mail to yourself.  Tell me when you're done.
3    I'll have to move it.
4        A.    Okay.
5        Q.    So the balance of the e-mail.
6        A.    Okay.
7        Q.    You sent this e-mail.  Agreed?
8        A.    Agreed.
9        Q.    The information contained in this e-mail is
10   accurate, to your knowledge.  Agreed?
11       A.    Agreed.
12       Q.    All right.  This proposal that's kind of
13   bolded here -- this one and two -- do you see that?
14       A.    I do.
15       Q.    Who's the origin of that?  Is that you?  Is
16   that Morales?  Is that a collaboration?
17       A.    The first number -- number 1 -- that issue
18   was Ramie.  Number 2 was me.
19       Q.    Okay.  So, in a sense, you each came to it
20   with terms that you wanted?
21       A.    The -- Ramie had proposed the first term.
22   And this e-mail is saying, if you propose the first
23   term, then we need the second term.
24       Q.    Understood.
25       A.    Right.



Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 63

1    mark as 130.

2              (Exhibit 130 was marked for

3              identification.)

4    BY MR. REEVES:

5       Q.   E-mail from Odia to you and your colleague.

6    There's Simons.

7              You see that?

8       A.   I do.

9       Q.   Okay.  It's an e-mail.  Go ahead and read it

10   to yourself.  I'll flip the page when you're ready.

11      A.   Okay.  Oh, my gosh.

12      Q.   You don't have to -- let me stop.  You don't

13   have to read it all.

14             But do you recall receiving this e-mail?

15   Kind of a wish list from Attorney Odia.

16      A.   I do.

17      Q.   Okay.  And do you recall if this e-mail was

18   received by you shortly after you had a couple -- a

19   phone conversation?

20      A.   That, I don't remember.

21      Q.   The date here of the e-mail is September 16,

22   2019.

23             Do you have a recollection of when you first

24   became aware of the involvement of Attorney Odia and

25   Attorney Thomas?

Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 64

1          A.   I do not.

2          Q.   Do you suspect it's around this time frame,

3    in September 2019?

4          A.   Well, let me think about timing.  I think it

5    was in advance of that.  But I can't tell you -- I

6    can't pinpoint it.

7          Q.   We had seen before that the -- the release

8    was signed by your client on August 21, by Zurich on

9    August 23.  And then there was an e-mail by Morales

10   August 26 sending you a copy of the release.

11         Do you recall those exhibits?

12         A.   Yes.

13         Q.   And then payment presumably occurred -- or,

14   actually, I have a document.  It suggests it was sent

15   by overnight mail on August 30.

16         A.   Okay.

17         Q.   So -- and then this e-mail, Exhibit 130.

18   It's September 16.  So that's within two to three

19   weeks of all this activity.

20         Do you have that in mind?

21         A.   Well, I have the -- the dates in mind.  But

22   it doesn't help me pinpoint when, you know, Payne and

23   Fears was involved or this -- or when I would have

24   been providing them information.

25         It would have been, I think, after we



Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 65

1    reached our agreement with LP in settling the LP

2    litigation.

3        Q.   Okay.  So I'll share with you documents that

4    would suggest you were coordinating with them before

5    any agreement was reached.

6            But my question to you is:  Are you aware of

7    whether you were dealing with Payne and Fears at the

8    same time you were dealing with Morales vis-a-vis the

9    release.

10       A.   I don't believe that I was.  No.

11       Q.   So is it your belief that you're dealing

12   with Payne and Fears after you concluded the

13   settlement with Zurich?

14       A.   I think that's right.

15       Q.   Okay.  It would appear that's just a matter

16   of days or weeks.

17           Does that jive with your recollection?

18       A.   I -- I just don't remember that timing at

19   all.  I'm sorry.

20       Q.   No problem.

21           So let's go back to 130 real quick.  This is

22   a wish list.

23           And you see Item 4 here?

24       A.   Yes.

25       Q.   My sense is -- you've annotated it.



Lori Sebransky, Esq.                          Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 66

```
 1              My sense is this is the ask.  And then this
 2    is your response.
 3              Do I have that right?
 4        A.   I -- I think that's right.  I suspect the
 5    original of this would have my responses in -- in
 6    colored ink.
 7        Q.   Yeah.  Because we're dealing with black and
 8    white, we're not seeing that.
 9        A.   Correct.
10        Q.   But, in a sense, the ask is a copy of the
11    release.  And the response is:
12              I'm sending this separately.
13              You see that?
14        A.   Yes, I do.
15              And if that's the case, then this exchange
16    of information would have happened before we had an
17    agreement with -- to settle the LP litigation.
18        Q.   So, again, you've got this -- inquiries here
19    numbered 1 through 15.
20              Do you recall -- do you recall what led to
21    that, so to speak?  Do you recall a meeting?  A phone
22    call?
23              What is it that occurred before this list
24    was sent, if you recall at all?
25        A.   I'm just confused on my timing.  So I'm
```

Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 67

```
 1   having a hard time, you know, putting things in
 2   chronological order.
 3            We did have discussions with LP and
 4   CapSpecialty earlier.  And perhaps that is a result of
 5   those conversations where we're providing information
 6   so they could take a look at it before we settled the
 7   LP case.
 8            So I'm just not confident of the time frame.
 9   I'm sorry.
10       Q.   No.  Don't be sorry.
11            So, again, paper trail reflects that at
12   least -- I'll show it to you again.
13            It would appear that this wish list was sent
14   to you on September 16th.
15            Do you see that?
16       A.   I do see that.
17       Q.   Okay.  And you have no reason to doubt that
18   that's when that e-mail was sent.  Agreed?
19       A.   I don't doubt that.  No.
20       Q.   Okay.  So I'm going to show you a response
21   you sent.  80.  I think you have it.  I'll do screen
22   share.
23            So that's an e-mail from you.
24            You see that?
25       A.   I do.
```



Lori Sebransky, Esq.                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 68

1      Q.   Payne and Fears.

2           You see that?

3      A.   I do.

4      Q.   It says:  UCC Request number 4.

5           Do you see that?

6      A.   I do.

7      Q.   All right.  And then here's the executed

8  agreement.

9           Do you see that?

10     A.   I do.

11     Q.   Okay.  And so Exhibit 80 is an e-mail you

12  sent on September 18th.  Agreed?

13     A.   Correct.

14     Q.   Thank you.

15          I'm just going to go through my notes.  I

16  don't know that I have much more.  Almost there.

17          Let me show you what's marked as 70.

18  Assignment Agreement.

19          You see this?

20     A.   I do.

21     Q.   Did you participate in the crafting of this

22  document?

23     A.   I did.

24     Q.   Okay.  Any coercion associated with how this

25  document came together?

# Ex E, exhibit 59

# Ex E, exhibit 59

| From: | Lori Sebransky <las@mhfirm.law> |
|---|---|
| Sent: | Wednesday, January 9, 2019 5:03 PM |
| To: | Mathis, Jennifer; jkoonankeil@CapSpecialty.com |
| Cc: | Matt Ennis |
| Subject: | Re: United Construction - 8730 Military Rd. remediation claim |

Hello Jennifer and Jeff,

Now that Zurich has considered your coverage position and maintained its denial, responsibility for the claim rests with CapSpecialty, as LP's insurer. I have spoken with LP, which admits it made a mistake by failing to tender the claim to Zurich on time, and in our December 18, 2018 conference call you acknowledged the CapSpecialty policy provides coverage for LP. We see no basis for CapSpecialty to deny its contractual obligations.

Since CapSpecialty has been unwilling to acknowledge responsibility for the claim, United Construction has retained counsel to proceed against LP directly. LP will be hearing from counsel shortly, if it hasn't already. If CapSpecialty continues to believe Zurich's denial is wrong, then CapSpecialty should protect its insured by paying the claim and then seeking reimbursement from Zurich. Otherwise LP is exposed to a significant judgment, and CapSpecialty is exposed to significant extra-contractual liability.

Please let us know right away how CapSpecialty intends to proceed. The remediation and repair work is now scheduled to begin on January 21. We need to know before then that CapSpecialty will pay for that work.

Thank you,
Lori

Lori A. Sebransky
Attorney at Law
**McCaffery|Hosking LLP**
1777 Botelho Drive, Suite 360
Walnut Creek, CA 94596
Mobile: 415.786.6030

From: Christopher Ford <chris.ford@zurichna.com>
Sent: Tuesday, January 8, 2019 1:46 PM
To: Mathis, Jennifer; Lori Sebransky
Cc: jkoonankeil@CapSpecialty.com; Matt Ennis
Subject: RE: United Construction - 8730 Military Rd. remediation claim

Jennifer in follow up to your letter, please see attached correspondence.

1

Bullard
10/12/2022
**Exhibit 59**

CAP006710



**Chris Ford**
*Claims Specialist IV*
Steadfast Insurance Company
PO Box 968020
Schaumburg, IL 60196
Office: 805-520-3641
Fax: 805-520-3641
chris.ford@zurichna.com

zurichna.com

 

**From:** Mathis, Jennifer [mailto:Jennifer.Mathis@troutman.com]
**Sent:** Thursday, December 27, 2018 9:31 AM
**To:** Christopher Ford; Lori Sebransky
**Cc:** jkoonankeil@CapSpecialty.com; Huggins, Michael L.; Tim McCaffer y; Matt Ennis
**Subject:** [EXTERNAL] United Construction - 8730 Military Rd. remediation claim

Chris and Lori,

Following up on our conversation from last week, please see the attached correspondence.

Regards,

Jennifer

**Jennifer Mathis**
**troutman sanders**
Direct: 415.477.5706
jennifer.mathis@troutman.com

This e-mail message (and any attachments) from Troutman Sanders LLP may contain legally privileged and confidential information solely for the use of the intended recipient. If you received this message in error, please delete the message and notify the sender. Any unauthorized reading, distribution, copying, or other use of this message (and attachments) is strictly prohibited.

******************** PLEASE NOTE ********************
This message, along with any attachments, is for the designated recipient(s) only and may contain privileged, proprietary, or otherwise confidential information. If this message has reached you in error, kindly destroy it without review and notify the sender immediately. Any other use of such misdirected e-mail by you is prohibited. Where allowed by local law, electronic communications with Zurich and its affiliates, including e-mail and instant messaging (including content), may be scanned for the purposes of information security and assessment of internal compliance with company policy.

CAPC005711

# Ex E, exhibit 80

# Ex E, exhibit 80

**Mark Simons**

| | |
|---|---|
| **From:** | Lori Sebransky <las@mhfirm.law> |
| **Sent:** | Wednesday, September 18, 2019 9:48 AM |
| **To:** | sjo@paynefears.com; sst@paynefears.com |
| **Cc:** | Tim McCaffery; Mark Simons; Craig Willcut |
| **Subject:** | Fw: United Construction v. LP - Military Road - Request #4 |
| **Attachments:** | UCC- Request #4.pdf |



**RELEASE AGREEMENT**

This Release Agreement is entered into by Steadfast Insurance Company and United Construction Company.

**I.      DEFINITIONS**

For purposes of this Release Agreement, the following terms have the following meanings:

1.      "Steadfast" refers to Steadfast Insurance Company and to its officers, directors, shareholders, employees, agents, attorneys, affiliated companies, reinsurers, predecessors, successors, and assigns.

2.      "The Steadfast policy" refers to Steadfast professional liability policy No. EOC 0193620-00, effective April 20, 2016 – April 20, 2017, which is the subject of this action.

3.      "United Construction" refers to United Construction Company and to its officers, directors, shareholders, employees, agents, attorneys, affiliated companies, predecessors, successors, and assigns.

4.      "The properties" refers to the warehouse buildings located at 8020 and 8040 N. Virginia Street in Reno, Nevada.

5.      "This claim" refers to the claim against United Construction by the owner of the 8020 and 8040 N. Virginia Street properties (Logicenter 395 Owner, LLC) to remediate mold and repair the roof structure to prevent mold re-growth (Steadfast file No. 9260150559).

**II.     RECITALS**

A.      United Construction designed and built two warehouse buildings located at 8020 and 8040 N. Virginia Street in Reno, Nevada. Mold was discovered at the properties. During the term of the Steadfast policy, the owner of the properties made a claim against United Construction to remediate the mold and repair the roof structure to prevent mold re-growth.

B.      The Steadfast policy provides professional liability insurance to United Construction. The Steadfast policy limit is $5 million per claim and in the aggregate.

C.      United Construction made a timely claim under the Steadfast policy for mold remediation and associated encapsulation repairs to the roof structure to prevent the re-growth of mold.

D.      Steadfast accepted coverage for this claim under a reservation of rights subject to the policy's terms and conditions.

1

E.    United Construction paid to remediate the mold and effect the encapsulation repair at the properties. United seeks reimbursement of these sums under the Steadfast policy.

F.    United Construction also designed and built a warehouse located at 8730 Military Road in Reno, Nevada. Damages were discovered at this property. During the term of the Steadfast policy, the owner of the Military Road property made a claim against United Construction to remediate the damages.

G.    United Construction's insurance broker, LP Insurance Services, never reported the Military Road claim to Steadfast, as United had requested. Steadfast received notice of the Military Road claim from United Construction on or about July 11, 2017, after the Steadfast policy had expired (on April 20, 2017). On July 27, 2017, Steadfast denied coverage for the Military Road claim solely because the claim was not reported during its policy period (Steadfast file No. 9260156182). United Construction acknowledges that the Military Road claim was untimely and does not dispute that denial.

H.    Steadfast acknowledges it would have provided coverage for the Military Road claim subject to the policy's terms and conditions had it been timely reported before the Steadfast policy expired (April 20, 2017), or within 60 days of the policy's expiration (June 20, 2017).

I.    United Construction agrees the Military Road claim is not covered under the Steadfast policy because the claim was not timely reported as required by the Steadfast policy.

III.    PAYMENT, CONSIDERATION, AND RELEASE

To resolve this claim and any disputes under the Steadfast policy, Steadfast shall pay United Construction $1,922,413.40 within 10 days of the date this Release Agreement is executed. United Construction authorizes and directs payment of the claim be made by check or draft payable to "United Construction Company." The check or draft is to be delivered to United Construction Company, 5300 Mill St., Reno, NV 89502.

In consideration of this payment, and upon its receipt, United Construction shall release Steadfast, its predecessors, successors, parents, subsidiaries, agents, servants, employees, and attorneys, and each of them, of and from any and all liability, claims, demands, damages, actions, and causes of action that United Construction has, or claims to have, against Steadfast arising from the claim against United to remediate mold and repair the roofing to prevent mold re-growth at the 8020 and 8040 N. Virginia Street properties.

IV.    ENTIRE AGREEMENT

This Release Agreement contains the entire agreement between the parties as it relates to This Claim. The terms of this Release are contractual and not a mere recital. This Release Agreement is executed without reliance upon any representation by any person concerning the nature or extent of damages or legal liability therefor, and the undersigned has carefully read and understands the contents of this Release Agreement and has signed it of their own free will.

2

V.    WARRANTY

United Construction represents and warrants that it has not assigned to any other person or party all or any portion of any claim that it may now or in the future have against Steadfast arising out of this claim.

VI.    CONSTRUCTION OF AGREEMENT

This Agreement is the product of negotiation and preparation by and among the parties hereto and their respective attorneys. The parties therefore expressly acknowledge and agree that this Agreement shall not be deemed prepared or drafted by one party or another, or its attorneys, and will be construed accordingly.

VII.    GOVERNING LAW

This Agreement shall be interpreted in accordance with and governed in all respects by the laws of the State of California.

This Release Agreement shall run to and be binding upon the heirs, successors, executors, administrators and assigns of the parties.


DATED: 8/21/19                         United Construction Company


DATED: 8/23/19                         Steadfast Insurance Company


3

# Ex E, exhibit 109

# Ex E, exhibit 109

Sebransky
11/1/2022
**Exhibit 109**

| From: | Ramie Morales <rmorales@mfrlegal.com> |
|---|---|
| Sent time: | 07/24/2019 02:16:39 PM |
| To: | Lori Sebransky <las@mhfirm.law> |
| Cc: | Ramie Morales <rmorales@mfrlegal.com> |
| Subject: | RE: LP Brokers -- United Construction - CONFIDENTIAL SETTLEMENT/MEDIATION COMMUNICATION |

Lori,

Please forward the proposed agreement referenced below. The concept makes sense.

Ramiro Morales
*Law Offices of*
MORALES FIERRO & REEVES
2151 Salvio Street, Suite 280
Concord, CA 94520
(925) 288-1776/ (925) 288-1856 facsimile

****************PLEASE NOTE **************
This email message and any documents accompanying this transmittal may contain privileged and/or confidential information and is intended solely for the addressee(s) named above. If you are not the intended addressee/recipient, you are hereby notified that any use of, disclosure, copying, distribution or reliance on the contents of this email information is strictly prohibited and may result in legal action against you. Please reply to the sender advising of the error in transmission and immediately delete/destroy the message and any accompanying documents. Thank you.

**From:** Lori Sebransky [mailto:las@mhfirm.law]
**Sent:** Monday, July 22, 2019 4:35 PM
**To:** Ramie Morales
**Subject:** Re: LP Brokers -- United Construction - CONFIDENTIAL SETTLEMENT/MEDIATION COMMUNICATION

**Hello Ramie,**

Thanks for speaking with me this afternoon. As we discussed, United Construction is interested in resolving the pending claim on the 8020/8040 property to help absorb its out-of-pocket costs on the Military Road remediation. Given LP's insistence that Zurich covers the Military Road claim under the "related claim" provision (even though the claim was not reported within the Zurich policy period), you had proposed the 8020/8040 claim could be resolved if United Construction would agree the Military Road claim was not a "related claim" under the Zurich policy (since it was not tendered on time). By making that agreement, Zurich asks United to give up coverage for Military Road in the event a court ultimately decides it relates back.

United Construction would prefer to pursue LP for payment of the Military Road claim, instead of pursuing Zurich (as LP is pressing hard for United to do). To allow United Construction to seek relief from LP, without sacrificing all potential coverage in the event a court were to agree the Military Road claim relates back, United proposes the 8020/8040 claim be settled with these agreements: **(1) United agrees the Military Road claim is not a "related claim" under the Zurich policy, since the claim was not reported during the policy period; and (2) Zurich agrees it would have accepted coverage for the Military Road claim had it been timely reported, as it did for 8020/8040.**

This proposal benefits both Zurich and United - Zurich avoids a claim by United Construction that it wrongly denied coverage for Military Road based on the related claim provision, and Zurich's acknowledgment that it would have covered Military Road (consistent with its handling of 8020/8040) helps perfect United's professional negligence claim against LP.

This proposal is also consistent with the prior handling of the claims:

- Zurich accepted coverage for 8020 and 8040;
- Zurich denied Military Road only because it was reported too late [July 27, 2017 denial letter];
- United Construction did not contest the denial based on the late tender;    SSP000079
- Zurich considered Cap Specialty's "related claim" analysis [December 27, 2018 letter from

Troutman Sanders];

- Zurich rejected Cap Specialty's "related claim" analysis, reaffirming its July 27, 20217 denial based on the late tender [January 8, 2019 letter from Chris Ford to Troutman].

To speed things up we can modify the earlier proposed release agreement (circulated some time ago). While you discuss this proposal with Zurich I will dig up a copy and forward it to you with my initial revisions.  Thanks.


Lori A. Sebransky
Attorney at Law
**McCaffery|Hosking LLP**
1777 Botelho Drive, Suite 360
Walnut Creek, CA 94596
Mobile: 415.786.6030

---

**From:** Ramie Morales <rmorales@mfrlegal.com>
**Sent:** Sunday, July 21, 2019 5:52 PM
**To:** Lori Sebransky <las@mhfirm.law>
**Subject:** RE: LP Brokers -- United Construction

I am available tomorrow after 2:30

Ramiro Morales
*Law Offices of*
MORALES FIERRO & REEVES
2151 Salvio Street, Suite 280
Concord, CA 94520
(925) 288-1776/ (925) 288-1856 facsimile

*******************LEASE NOTE****************
This email message and any documents accompanying this transmittal may contain privileged and/or confidential information and is intended solely for the addressee(s) named above. If you are not the intended addressee/recipient, you are hereby notified that any use of, disclosure, copying, distribution or reliance on the contents of this email information is strictly prohibited and may result in legal action against you. Please reply to the sender advising of the error in transmission and immediately delete/destroy the message and any accompanying documents. Thank you.

**From:** Lori Sebransky [mailto:las@mhfirm.law]
**Sent:** Sunday, July 21, 2019 5:11 PM
**To:** Ramie Morales
**Subject:** Fw: LP Brokers -- United Construction

Hi Ramie,

I have returned from vacation and am following up on my Friday voicemail to you. Can you give me a call about an agreement to resolve the 8020/8040 N. Virginia Street claims? My number is 415.786.6030. United Construction would like to move forward with resolution, and I'd like to work with you on that quickly given cash flow issues.  I'll try to reach you Monday morning if you don't reach me first. Thanks much.


Lori A. Sebransky
Attorney at Law
**McCaffery|Hosking LLP**
1777 Botelho Drive, Suite 360
Walnut Creek, CA 94596
Mobile: 415.786.6030

---

**From:** Ramie Morales <rmorales@mfrlegal.com>
**Sent:** Monday, June 10, 2019 9:03 AM
**To:** Lori Sebransky
**Cc:** Christopher Ford; Ramie Morales

SSP000080

**Subject:** RE: LP Brokers -- United Construction

Lori,

Please communicate directly with Chris on the issue. I understand he is available to discuss.

Ramiro Morales
*Law Offices of*
MORALES FIERRO & REEVES
2151 Salvio Street, Suite 280
Concord, CA 94520
(925) 288-1776/ (925) 288-1856 facsimile

*******************PLEASE NOTE ***************
This email message and any documents accompanying this transmittal may contain privileged and/or confidential information and is intended solely for the addressee(s) named above. If you are not the intended addressee/recipient, you are hereby notified that any use of, disclosure, copying, distribution or reliance on the contents of this email information is strictly prohibited and may result in legal action against you. Please reply to the sender advising of the error in transmission and immediately delete/destroy the message and any accompanying documents. Thank you.

**From:** Lori Sebransky [mailto:las@mhfirm.law]
**Sent:** Friday, June 07, 2019 11:03 AM
**To:** Ramie Morales
**Subject:** Re: LP Brokers -- United Construction

Hi Ramie,

I appreciate your call, and will be speaking with the United Construction folks shortly.

I had asked Chris for an accounting of the claim adjustment for the 8020/8040 N. Virginia Street claim. Chris indicated it's about $1.9 million, which I appreciate, but do you have an objection to him providing a precise number, and an explanation of what was not included in the $1.9 million? To move forward with resolving the claim United will want to know the specific number that would be paid and what expenses were not included. I'm trying to get this lined up in advance so we can move as quickly as possible.

Thanks much.

Lori A. Sebransky
Attorney at Law
**McCaffery|Hosking LLP**
1777 Botelho Drive, Suite 360
Walnut Creek, CA 94596
Mobile: 415.786.6030

**From:** Ramie Morales <rmorales@mfrlegal.com>
**Sent:** Wednesday, June 5, 2019 8:35 AM
**To:** Lori Sebransky
**Cc:** Ramie Morales
**Subject:** LP Brokers -- United Construction

Lori,

Thanks for speaking with me yesterday. Below is my contact information.

Ramiro Morales
*Law Offices of*
MORALES FIERRO & REEVES
2151 Salvio Street, Suite 280
Concord, CA 94520
(925) 288-1776/ (925) 288-1856 facsimile

*******************LEASE NOTE ***************
This email message and any documents accompanying this transmittal may contain privileged and/or confidential information and is intended solely for the addressee(s) named above. If you are not the intended addressee/recipient, you are hereby notified that any use of, disclosure, copying, distribution or reliance on the contents of this email information is strictly prohibited and may result in legal action against you. Please reply to the sender advising of the error in transmission and immediately delete/destroy the message and any accompanying documents. Thank you.

# Ex E, exhibit 130

# Ex E, exhibit 130

**Mark Simons**

| From: | Lori Sebransky <las@mhfirm.law> |
| Sent: | Wednesday, September 18, 2019 9:01 AM |
| To: | Sarah J. Odia; Scott S. Thomas |
| Cc: | Tim McCaffery; Mark Simons; Craig Willcut |
| Subject: | Re: United Construction v. LP - 8730 Military Road |

Hi Sarah and Scott,

My responses to your requests are below in red. I wanted to get this to you before I get on a plane tomorrow morning. Just let me know of any follow-up questions. We can talk by phone if that's easier (it probably is). I return to the office 10/7, but Tim might be able to help you while I'm away, especially for any (non-insurance) questions related to the owner's claim against UCC.

Thanks,
Lori

Lori A. Sebransky
Attorney at Law
**McCaffery|Hosking LLP**
1777 Botelho Drive, Suite 360
Walnut Creek, CA 94596
Mobile: 415.786.6030

From: Sarah J. Odia <sjo@paynefears.com>
Sent: Monday, September 16, 2019 12:19 PM
To: Lori Sebransky <las@mhfirm.law>; Scott S. Thomas <sst@paynefears.com>
Cc: Tim McCaffery <tjm@mhfirm.law>; Mark Simons <Mark@mgsimonslaw.com>; Craig Willcut
<craigw@unitedconstruction.com>
Subject: RE: United Construction v. LP - 8730 Military Road

Lori,

Thank you very much for following up. Here are the additional documents and information we need:

1. Direct tender correspondence with RHP Mechanical; I am sending this separately, along with other correspondence (request #8).
2. Coverage position letter(s) from State National Insurance Co. for Military Rd. claim (I saw correspondence suggesting they had retained coverage counsel in March 2019, but no coverage position letter); We do not have

1



a position letter, but State National, through its coverage counsel, is involved and investigated the loss. State National's counsel for this claim is Cara Christian of Christian, Dichter & Sluga. They retained a consultant to look at the building when the remediation work began. This policy is a CGL policy with a mold exclusion. I'm sure they were looking for non-mold related damage.

3.  Did State National ever respond to your request for reconsideration of the Virginia Rd. claims? If so, could you please forward the response? State National (through Cara Christian) was investigating coverage for this claim, too. We do not have a position letter. We were talking to Cara about potential resolution when things were put on hold while the owner explored the potential sale of the buildings. Because of the mold exclusion, the basis for our claim under this policy was the possibility of damage to the OSB due to moisture intrusion (a non-mold issue).

4.  UCC/Zurich release for the Virginia Rd. claims; I am sending this separately.

5.  Any correspondence with AXIS/NARS following their 5/29/18 denial; None.

6.  Any additional correspondence with Tokio Marine regarding Military Rd. since their 1/23/19 supplemental ROR; I am sending this separately.

7.  Any additional correspondence with Tokio Marine on the Virginia Rd. claims since their 11/14/16 denial; I am sending this separately.

8.  Any coverage position letters or tender correspondence with RHP's carriers; I'm sending this in conjunction with request #1. We have heard from 2 of RHP's carriers: (1) Houston Casualty (professional liability), represented by counsel Laura Boezman-Farias; and (2) AXA XL (pollution), claims handler Donna Sugg (claim #3747814). We have not had a response from State National, RHP's GL carrier. By the way, on the N. Virginia Street buildings, UCC's Zurich-appointed defense counsel, Shawn Oliphant, was chasing RHP. I was chasing RHP on Military Rd.

9.  Who was the roofing subcontractor for the Military Road project? This was a design-build project. The only subcontractor with potential liability is RHP.

10. Documents in the file mention Roof Management Consultants, Strategic Roofing, and KTR (Prologis' "design consultant"). Can you let us know what role, if any these entities played in the construction of the Military Road building? I don't believe they played any role in the construction; I believe these entities are the owner's consultants. I will confirm that with United Construction.

11. A copy of the 4/21/17 Fowler report re: Military Rd.; Already sent.

12. Subcontract agreements between UCC and RHP Mechanical, the roofing subcontractor, and any other design professionals or contractors who may be implicated by the Military Rd. claim; Already sent. The only relevant subcontract agreement is the one between UCC and RHP.

13. Has an analysis been done by UCC, its experts, or anyone else regarding whether there are any other subcontractors or design professionals who may be potential targets for failing to design or install the roof and related components? If so, please forward us the results of that analysis; There is nothing in writing. But there are two potential targets: RHP and the roof manufacturer. The manufacturer for Military Rd. is JohnsManville.

14. Subcontract/design agreements between UCC and the owner of the Military Rd. property; I'm not sure I have this in my file - I'll check with United. United is not willing to involve the owner in any claims.

15. Any demands or correspondence between UCC and the owner regarding the Military Rd. claim, including the scope of the remediation, the cause of the mold/design issue, and/or UCC's liability for the same. The Fowler report (request #11) was procured by the owners. Other materials will be sent separately. Unlike a typical construction defect case, there was no formal demand that lays out the issues, scope of repair, etc. (This was a design-build project, so there was no issue about UCC's role.) Much of this communication was verbal. The key dispute was the type of repair needed to correct the problem. That dispute ultimately was resolved.

**Sarah J. Odia**
Partner

# PAYNE & FEARS

PAYNE & FEARS LLP • 6385 South Rainbow Boulevard, Suite 220, Las Vegas, NV 89118
Direct 702.851.0303 • Main 702.851.0300 • Fax 702.851.0315

2

# EXHIBIT F

# EXHIBIT F

Craig A. Willcut                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                        Page 1
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF NEVADA

 3

 4
     CAPITOL SPECIALTY INS. CORP.,      )
 5                                      )
                      Plaintiff,        )
 6                                      )
         vs.                            )        Case No.
 7                                      )  2:20-cv-01382-JCM-VCF
     STEADFAST INS. CO., et al.,        )
 8                                      )
                      Defendants.       )
 9   _____)
     and related crossclaims.           )
10   _____)

11

12

13

14

15          DEPOSITION OF CRAIG A. WILLCUT

16             [via web videoconference]

17

18          Taken on Thursday, October 20, 2022
               by a Certified Court Reporter
                    At 10:04 a.m.
19             Held in Las Vegas, Nevada

20

21

22

23

24      Reported by:  Ellen A. Goldstein, CCR 829

25         Job No. 51088, Firm Nos. 061F/116F
```

Craig A. Willcut                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 2

```
 1   A P P E A R A N C E S (via web videoconference):

 2
             For CAPITOL SPECIALTY INSURANCE CORPORATION:
 3
                     SARAH J. ODIA, ESQ.
 4                   PAYNE & FEARS
                     6385 South Rainbow Boulevard
 5                   Suite 220
                     Las Vegas, Nevada  89118
 6                   (702)382-3574
                     sjo@paynefears.com
 7
             For STEADFAST INSURANCE COMPANY:
 8
                     WILLIAM C. REEVES, ESQ.
 9                   MORALES FIERRO & REEVES
                     600 South Tonopah Drive
10                   Suite 300
                     Las Vegas, Nevada  89106
11                   (702)699-7822
                     wreeves@mfrlegal.com
12
             For RHP MECHANICAL:
13
                     JESSICA A. WEST, ESQ.
14                   TYSON & MENDES
                     2835 St. Rose Parkway
15                   Suite 140
                     Henderson, Nevada  89052
16                   (702)724-2648
                     jwest@tysonmendes.com
17
             For UNITED CONSTRUCTION COMPANY and CRAIG WILLCUT:
18
                     MARK G. SIMONS, ESQ.
19                   SIMONS HALL JOHNSTON
                     690 Sierra Rose Drive
20                   Reno, Nevada  89511
                     (775)785-0088
21                   msimons@shjnevada.com

22                   LORI A. SEBRANSKY, ESQ.
                     McCAFFERY HOSKINS
23                   1777 Botelho Drive
                     Suite 360
24                   Walnut Creek, California  94596
                     (510)610-7981
25                   las@mhfirm.law
```

Craig A. Willcut                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                            Page  3
  1                        I N D E X

  2

  3    WITNESS                                              PAGE

  4    CRAIG A. WILLCUT

  5         Examination by MR. REEVES                    6, 165
           Examination by MS. WEST                          126
  6        Examination by MS. ODIA                          141

  7
                           E X H I B I T S
  8

  9    NUMBER          DESCRIPTION                          PAGE

 10            (exhibits that were previously marked)

 11    Exhibit 4      8-12-16 email chain                    142
                      (SF 000830 to 000832)
 12
       Exhibit 6      7-14-16 letter from Jeremy              56
 13                   Woolf  (SF 000828)

 14    Exhibit 18     6-3-19 email from Lori                 155
                      Sebransky  (SSP 000066 to
 15                   000067)

 16    Exhibit 25     12-27-18 through 1-3-19 email          158
                      chain with attachment
 17                   (SF 001380 to 001390)

 18    Exhibit 30     4-18-16 Application for                 63
                      Contractor's Protective
 19                   Professional Indemnity and
                      Liability Insurance
 20                   (SSP 000417 to 000428)

 21    Exhibit 31     Diary of construction                   63
                      activity by dates
 22                   (CAP 003666 to 003669)

 23    Exhibit 35     7-14-16 email chain                     57
                      (CAP 002266 to 002267)
 24
       Exhibit 40     9-1-16 through 11-3-16 email           160
 25                   chain  (CAP 002271 to 002273)
```

Craig A. Willcut                                        Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                      Page 4
 1    I N D E X   (continued):

 2    NUMBER          DESCRIPTION                         PAGE

 3    Exhibit 42      2-15-17 letter from Jan               56
                      Kneisel  (CAP 003662 to
 4                    003664)

 5    Exhibit 50      7-27-17 letter from Chris             79
                      Ford  (SF 001399 to 001401)
 6
      Exhibit 55      12-17-18 email from Craig             80
 7                    Willcut  (CAP 005708)

 8    Exhibit 56      1-29-19 through 1-30-19 email        167
                      chain with attachment
 9                    (CAP 005712 to 005715,
                       SSP 000148 to 000150)
10
      Exhibit 57      8-21-19 Release Agreement             90
11                    (SSP 000148 to SSP 000150)

12    Exhibit 58      Undated letter from Craig            101
                      Willcut  (CAP 003987)
13
      Exhibit 59      12-27-18 through 1-9-19 email         97
14                    chain  (CAP 005710 to 005711)

15    Exhibit 60      1-11-19 letter from Mark             103
                      Simons  (Bates number
16                    illegible, SF 001374)

17    Exhibit 61      Complaint in "United               105
                      Construction Company v.
18                    L/P Insurance Services,
                      LLC"
19
      Exhibit 63      1-29-19 through 1-31-19             107
20                    email chain with attachment
                      (CAP 005737 to 005741)
21
      Exhibit 64      2-1-19 email from Matt Ennis        111
22                    with attachment  (CAP 005744
                      to 005746)
23
      Exhibit 69      4-27-20 Settlement Agreement        123
24                    and Mutual Release  (no Bates
                      stamps)
25
```

Craig A. Willcut                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                         Page 5
  1   NUMBER              DESCRIPTION                       PAGE

  2   Exhibit 70          Undated Assignment and             124
                          Cooperation Agreement
  3                       (CAP 003589 to 003593)

  4

  5

  6

  7

  8      QUESTIONS THE WITNESS WAS INSTRUCTED NOT TO ANSWER

  9                            PAGE      LINE

 10                             11        2

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Craig A. Willcut                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 50

1      Q     And are you generally aware that Brad did not

2   put Zurich on notice of Milan until substantial work had

3   been performed?

4      MS. ODIA:  Object to form, object to form.

5      THE WITNESS:  I am aware of that.

6   BY MR. REEVES:

7      Q     And did that surprise you or what was your --

8   what is your perspective relative to that dynamic?

9      A     I don't like the word "surprise" personally,

10  but I was unaware we did it; but at the time we thought

11  this was a Prologis -- we were under the understanding it

12  was a Prologis issue and that they were paying for this

13  remediation work.

14     Q     What's the basis of that understanding, that

15  latter point regarding payment?

16     A     Conversations between Prologis and Mike

17  Clements.

18     Q     That you weren't involved with; agreed?

19     A     Not with Prologis, correct.

20     Q     And so am I to understand that Clements

21  reported to you that Prologis was going to pay for it?

22     A     That is correct.

23     Q     And was the understanding or what was relayed

24  to you by Clements that Prologis was going to pay a

25  hundred percent?

Craig A. Willcut                          Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 60

1   Military; agreed?

2        A    I am aware.

3        Q    And out of that, your company sued LP; agreed?

4        A    My former company sued LP, yes.

5        Q    Apologies for that.  You're indulging me.

6        A    No problem.

7        Q    Understood.

8             And out of that came a settlement of, rough

9   numbers, 4 million and less than a hundred thousand.  Are

10  you aware of that settlement?

11       A    It sounds about correct.

12       Q    And I asked Mr. Breach, and my recollection is

13  I said, "What damages do you have?  You know, what were

14  you not compensated for vis-a-vis that settlement?"  And

15  I'm not going to characterize what he said.  I'll just

16  ask you straight up.

17            What sums is -- what damages does your company

18  have associated with Military for which it has not

19  already received compensation?

20       A    My recollection is that we received

21  compensation for all of our direct costs on the project.

22  We did not receive compensation for attorneys' fees,

23  expert fees -- maybe -- I think it was just attorneys'

24  fees.

25       Q    Prosecution fees to go after LP?

Craig A. Willcut                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 61

1       A    Attorneys' fees for the whole -- everything
2   that happened I guess.
3       Q    Can you quantify those for me at all?
4       A    No, not even -- no idea off the top of my head.
5       Q    So other than attorneys' fees, your company is
6   fully compensated?
7       A    I believe I recall that they were fully
8   compensated.
9       Q    And on Virginia, you received -- your company
10  received, your former company received, rough numbers,
11  1.9 million from Zurich; agreed?
12      A    Sounds familiar.
13      Q    Have you quantified what sums your company --
14  your former company -- is out of pocket that it did not
15  receive compensation for vis-a-vis Virginia?
16      A    I believe it was the same situation.  I believe
17  that they were reimbursed for all of their out of --
18  direct costs but not attorneys' fees.
19      Q    Okay.  And then Milan, my understanding is that
20  you received -- whatever you received from -- again I
21  apologize and you're indulging me -- your former company
22  received compensation from Prologis on the order of
23  roughly 50 percent; agreed?
24      A    Roughly 50 percent as I recall, yes.
25      Q    And then as I understand it, your company

Craig A. Willcut                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 67

1    12:32 p.m.)

2    BY MR. REEVES:

3        Q    So the Virginia comes in and is tendered to

4    Zurich.  Were you involved relative to the Virginia claim

5    coming in and the decision to put Zurich on notice?  What

6    was your involvement, if any, relative to that?

7        A    Yes.  I was involved as president of the

8    company in discussions with our attorneys at the time.

9        Q    And the decision to put Zurich on notice, walk

10   me through the mindset of that.

11       A    I couldn't tell you what my mindset was four,

12   five, six, seven years ago, whatever it was.

13       Q    Fair enough.

14            You seem to have a recollection in your mindset

15   on Milan that you strategically did not put Zurich on

16   notice because you thought that, as I understand it, that

17   Prologis was going to pay for the repairs.  Do you recall

18   that?

19       A    That's correct.

20       Q    And so, you know, can we say that in a sense --

21   well, you tell me.  The decision to put Zurich on notice

22   for Virginia, was that a product of you didn't have a

23   commitment from the owner to reimburse you at that point

24   in time?

25       A    No.  I believe it was because -- well, at the

Craig A. Willcut                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 68

1   time we wanted to make sure everybody got noticed on

2   time.  We weren't going to make that mistake again.

3       Q    Had you known a mistake occurred by the time

4   you put Zurich on notice vis-a-vis Virginia?

5       MS. ODIA:  Object to form.

6       THE WITNESS:  I believe we did.  I don't know for a

7   fact, but I believe we did.

8   BY MR. REEVES:

9       Q    And so as I understand, you know, using the

10  word "mistake," in a sense you're capturing I believe the

11  concept of making sure an insurance company is placed on

12  notice as early as possible.  Is that how we capture that

13  mistake?

14      A    That's how I would character that mistake, yes.

15  Regardless of who we thought was going to pay for it,

16  they should have been noticed.

17      Q    And so do you view the fact that Milan was not

18  earlier tendered -- is that a, quote, unquote, mistake

19  from your vantage point with the benefit of hindsight?

20      MS. ODIA:  Object to form.

21      THE WITNESS:  It was a mistake not to put them on

22  notice as soon as it was recognized, yes.

23  BY MR. REEVES:

24      Q    And then you get to Military and a mistake

25  occurred there; right?



Craig A. Willcut                                      Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 80

1      A    Brad would keep me in the loop.

2      Q    So, you know, you got a letter here, and I can

3   show you a letter from Arch taking a similar position or

4   declining to send coverage relative to Military.  So I'm

5   curious when it bubbled up in your mind that there is an

6   LP problem associated with Military.  Is it around the

7   time of receiving this letter or is it later?

8      MS. ODIA:  Object to form.

9      THE WITNESS:  I don't recall off the top of my head

10  exactly -- or not even exactly.  I don't have even a time

11  frame of when -- with regard to LP with failure to

12  timely notify or whatever, however you say that.

13  BY MR. REEVES:

14     Q    Okay.  Go to 55.

15     A    Okay, we're there.

16     Q    Email you sent?

17     A    Looks like it.

18     Q    Do you recall sending it?

19     A    Do I recall sending it?

20     Q    Yeah.

21     A    Do I recall exactly hitting the send button?

22  No.  No, I don't recall sending it, but obviously I did

23  send it.

24     Q    Fair enough.  And I don't mean to be -- you

25  know, there's a reason for my question, because this one

Craig A. Willcut                          Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 90

```
 1   BY MR. REEVES:
 2       Q    And a key part of that resolution is 4 million
 3   bucks was paid over to your company; agreed?
 4       MS. ODIA:  Object to form.
 5       THE WITNESS:  Yeah, they were reimbursed for
 6   approximately 4 million, yeah.
 7   BY MR. REEVES:
 8       Q    Did LP communicate to you that they were
 9   actively working with their insurer to settle the claim?
10       A    I recall a conversation that, yes, they -- and
11   that's when they couldn't communicate with us, when they
12   were working through them.
13       Q    And so if I understand correctly, by virtue of
14   this vetting process with other folks of your executive
15   team, the decision was made to continue with the
16   relationship with Bullard and LP; agreed?
17       A    That's correct.
18       Q    All right.  Let's go to 57.
19       A    Okay.
20       Q    Go to page 3.
21       A    Okay.
22       Q    Is that your signature?
23       A    It is.
24       Q    We talked before about the agreement or the
25   release with United -- excuse me, with Zurich.  So this
```

Craig A. Willcut                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 91

1   is a document that you signed voluntarily; agreed?

2       A    After consultation with my attorney -- or

3   United attorneys -- yes.

4       Q    When you gave me that qualification --

5       A    Nobody held a gun to my head.

6       Q    Understood.

7            You almost create the caveat that your lawyer

8   had a gun to your head when you say "after consultation."

9   I don't care who you consulted with.  At the end of the

10  day you signed it voluntarily; agreed?

11      A    Yes.

12      Q    Okay.  And you read it before you signed it;

13  agreed?

14      A    I read it, yes.

15      Q    Go to the second page, subpart I.

16      A    Okay.

17      Q    It says, quote, "United Construction agrees the

18  Military Road claim is not covered."  Do you see that?

19      A    I do.

20      Q    It's an accurate statement; agreed?

21      MS. ODIA:  Object to form.

22      MR. SIMONS:  Yeah.  For clarification, he'll agree

23  that the -- the entirety of that sentence.  To be clear,

24  the objection --

25      MR. REEVES:  I don't know what that is.  Should we

# Ex F, exhibit 55

# Ex F, exhibit 55

| | |
|---|---|
| From: | Craig Willcut |
| Sent: | Monday, December 17, 2018 10:35 AM |
| To: | Richard Bullard - L/P Insurance Services (rich.bullard@lpins.net); Matt Ennis |
| Cc: | Brad Breach |
| Subject: | 8730 Military Road |

Rich and Matt,

As you are both aware there is a claim for mold at the above referenced project. United submitted our claim to LP Insurance and LP Insurance failed to timely notify our carrier of said claim. Based on that our insurance carrier has rejected the claim. LP Insurance then submitted the claim to your E&O insurance carrier to provide coverage.

As of today, your carrier has still not accepted the claim and are now saying that this should still be covered under our original E&O coverage. If that is their opinion that is their right, however we can't wait for that maneuvering to take place. This has been a claim for a long time and now when its time to commit there is hesitation.

I am providing this email as a courtesy to advise you that it is United's opinion that LP Insurance is responsible for this lack of coverage and will proceed in whatever manner necessary to pay for the remediation and encapsulation work in order to fulfill our obligations to the owner. We are planning on commencing the work on January 2, 2019. We either need a commitment from your insurance carrier or by LP Insurance by this Friday, December 28, 2019 that this work is a covered expense or we will have no other option to proceed by whatever legal means necessary to ensure this work is paid for by LP Insurance.

I look forward to receiving a commitment from LP Insurance as prescribed above.

Craig Willcut | President
**United Construction Company**
O: 775.858.8090 | D: 775.398.1704 |M: 775.848.8090| craigw@unitedconstruction.com
Licenses: NV #0015417 AZ: #163263 CA: #553339 NM: #85070 OR #203095 UT: #95-311769-5501

Executive Administrator: Sarah Schmidt 775.398.1714

BUILD UNITED - *United with our customers, team and communities providing best-in-class construction services since 1978.*

EXHIBIT

Breach 55    3/8/22

CAP005708

# Ex F, exhibit 57

# Ex F, exhibit 57

## RELEASE AGREEMENT

This Release Agreement is entered into by Steadfast Insurance Company and United Construction Company.

## I.     DEFINITIONS

For purposes of this Release Agreement, the following terms have the following meanings:

1.     "Steadfast" refers to Steadfast Insurance Company and to its officers, directors, shareholders, employees, agents, attorneys, affiliated companies, reinsurers, predecessors, successors, and assigns.

2.     "The Steadfast policy" refers to Steadfast professional liability policy No. EOC 0193620-00, effective April 20, 2016 – April 20, 2017, which is the subject of this action.

3.     "United Construction" refers to United Construction Company and to its officers, directors, shareholders, employees, agents, attorneys, affiliated companies, predecessors, successors, and assigns.

4.     "The properties" refers to the warehouse buildings located at 8020 and 8040 N. Virginia Street in Reno, Nevada.

5.     "This claim" refers to the claim against United Construction by the owner of the 8020 and 8040 N. Virginia Street properties (Logicenter 395 Owner, LLC) to remediate mold and repair the roof structure to prevent mold re-growth (Steadfast file No. 9260150559).

## II.     RECITALS

A.     United Construction designed and built two warehouse buildings located at 8020 and 8040 N. Virginia Street in Reno, Nevada. Mold was discovered at the properties. During the term of the Steadfast policy, the owner of the properties made a claim against United Construction to remediate the mold and repair the roof structure to prevent mold re-growth.

B.     The Steadfast policy provides professional liability insurance to United Construction. The Steadfast policy limit is $5 million per claim and in the aggregate.

C.     United Construction made a timely claim under the Steadfast policy for mold remediation and associated encapsulation repairs to the roof structure to prevent the re-growth of mold.

D.     Steadfast accepted coverage for this claim under a reservation of rights subject to the policy's terms and conditions.

1

EXHIBIT

Breach 57   9|8|22

SSP000148

E.      United Construction paid to remediate the mold and effect the encapsulation repair at the properties. United seeks reimbursement of these sums under the Steadfast policy.

F.      United Construction also designed and built a warehouse located at 8730 Military Road in Reno, Nevada. Damages were discovered at this property. During the term of the Steadfast policy, the owner of the Military Road property made a claim against United Construction to remediate the damages.

G.      United Construction's insurance broker, LP Insurance Services, never reported the Military Road claim to Steadfast, as United had requested. Steadfast received notice of the Military Road claim from United Construction on or about July 11, 2017, after the Steadfast policy had expired (on April 20, 2017). On July 27, 2017, Steadfast denied coverage for the Military Road claim solely because the claim was not reported during its policy period (Steadfast file No. 9260156182). United Construction acknowledges that the Military Road claim was untimely and does not dispute that denial.

H.      Steadfast acknowledges it would have provided coverage for the Military Road claim subject to the policy's terms and conditions had it been timely reported before the Steadfast policy expired (April 20, 2017), or within 60 days of the policy's expiration (June 20, 2017).

I.      United Construction agrees the Military Road claim is not covered under the Steadfast policy because the claim was not timely reported as required by the Steadfast policy.

## III.     PAYMENT, CONSIDERATION, AND RELEASE

To resolve this claim and any disputes under the Steadfast policy, Steadfast shall pay United Construction $1,922,413.40 within 10 days of the date this Release Agreement is executed. United Construction authorizes and directs payment of the claim be made by check or draft payable to "United Construction Company." The check or draft is to be delivered to United Construction Company, 5300 Mill St., Reno, NV 89502.

In consideration of this payment, and upon its receipt, United Construction shall release Steadfast, its predecessors, successors, parents, subsidiaries, agents, servants, employees, and attorneys, and each of them, of and from any and all liability, claims, demands, damages, actions, and causes of action that United Construction has, or claims to have, against Steadfast arising from the claim against United to remediate mold and repair the roofing to prevent mold re- growth at the 8020 and 8040 N. Virginia Street properties.

## IV.     ENTIRE AGREEMENT

This Release Agreement contains the entire agreement between the parties as it relates to This Claim. The terms of this Release are contractual and not a mere recital. This Release Agreement is executed without reliance upon any representation by any person concerning the nature or extent of damages or legal liability therefor, and the undersigned has carefully read and understands the contents of this Release Agreement and has signed it of their own free will.

2

SSP000149

## V.    WARRANTY

United Construction represents and warrants that it has not assigned to any other person or party all or, any portion of any claim that it may now or in the future have against Steadfast arising out of this claim.

## VI.    CONSTRUCTION OF AGREEMENT

This Agreement is the product of negotiation and preparation by and among the parties hereto and their respective attorneys. The parties therefore expressly acknowledge and agree that this Agreement shall not be deemed prepared or drafted by one party or another, or its attorneys, and will be construed accordingly.

## VII.    GOVERNING LAW

This Agreement shall be interpreted in accordance with and governed in all respects by the laws of the State of California.

This Release Agreement shall run to and be binding upon the heirs, successors, executors, administrators and assigns of the parties.

DATED: 8/21/19              United Construction Company

DATED: 8/23/19              Steadfast Insurance Company

3

SSP000150

# EXHIBIT G

# EXHIBIT G

Danielle N. Hill                              Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 1

```
 1                  UNITED STATES DISTRICT COURT

 2                       DISTRICT OF NEVADA

 3

 4   CAPITOL SPECIALTY INS. CORP., ) Case No.:
                                   ) 2:20-cv-01382-JCM-VCF
 5              Plaintiff,         )
                                   )
 6   vs.                           )
                                   )
 7   STEADFAST INS. CO., et al.,   )
                                   )
 8              Defendants.        )
     _____)
 9                                 )
     AND RELATED CROSS-CLAIMS.     )
10   _____)

11

12

13

14

15            REMOTE VIDEOCONFERENCE DEPOSITION

16                           OF

17                    DANIELLE N. HILL

18   Taken on Wednesday, November 9, 2022, at 1:55 p.m. PST

19            Appearing via videoconference from
                        Reno, Nevada
20

21

22            By a Certified Court Reporter

23

24   Reported by:  Dawn Bratcher Gustin, CCR 253, RPR, CRR
                                   California CSR 7124
25   Job No. 51402, Firm Nos. 061F/116F
```

Danielle N. Hill                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 2

```
 1   APPEARANCES:
     (All participants appearing remotely)
 2
     For the Plaintiff and Deponent:
 3
             SCOTT S. THOMAS, ESQ.
 4           PAYNE & FEARS LLP
             6385 South Rainbow Boulevard
 5           Suite 220
             Las Vegas, Nevada 89118
 6           sst@paynefears.com

 7

 8   For the Defendant/Cross-Claimant Steadfast Insurance
     Company:
 9
             WILLIAM C. REEVES, ESQ.
10           MORALES FIERRO & REEVES
             600 South Tonopah Drive
11           Suite 300
             Las Vegas, Nevada 89106
12           wreeves@mfrlegal.com

13

14   For RHP Mechanical Systems:

15           JESSICA A. WEST, ESQ.
             TYSON & MENDES LLP
16           2835 St. Rose Parkway
             Suite 140
17           Henderson, Nevada 89052
             jwest@tysonmendes.com
18

19
     For LP Insurance and Deponent:
20   (Present with the witness)

21           PAUL J. ANDERSON, ESQ.
             MAUPIN, COX & LeGOY
22           4785 Caughlin Parkway
             Reno, Nevada 89509
23           panderson@mcllawfirm.com

24
                         * * * * * * * *
25
```

Danielle N. Hill                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 3

```
 1                    I N D E X

 2   WITNESS                                          PAGE

 3   DANIELLE N. HILL

 4        Examination by Mr. Reeves                      5

 5        Examination by Mr. Thomas                     83

 6

 7

 8                    E X H I B I T S

 9   EXHIBIT        DESCRIPTION                        PAGE

10        (Exhibits previously marked and not attached)

11   Exhibit 30    CONFIDENTIAL - Zurich applications    37
                   for insurance by United
12                 (SSP000417 to 428)

13   Exhibit 35    Email chain, top email dated         38
                   7/14/16 from Hill to Breach
14                 (CAP002266 to 2267)

15   Exhibit 43    Two emails from Hill to Breach        59
                   dated 7/13/17 (CAP001105)
16
     Exhibit 44    Email chain, top email dated         60
17                 7/13/17 from Hill to Breach
                   (CAP003988 to 3991)
18
     Exhibit 46    Email chain, top email dated         71
19                 7/21/17 from Hill to Bullard
                   (CAP001122 to 1123)
20
     Exhibit 50    7/27/17 letter from Ford to          74
21                 Breach cc Hill (SF001399 to 1401)

22

23

24

25
```

Danielle N. Hill                           Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 48

1  hypothetical.

2          THE WITNESS:  Based on the timeline provided by

3  the client.

4  BY MR. REEVES:

5      Q.   Timeline between completion and when the claim

6  comes in?

7      A.   Yes.

8      Q.   And you put each carrier -- pattern and

9  practice 2016, put each carrier on notice, because

10  damage could have occurred during that period?

11          MR. THOMAS:  Objection.  Incomplete and

12  improper hypothetical.

13          THE WITNESS:  Yes.

14  BY MR. REEVES:

15      Q.   Okay.  So what happened on Military?  You

16  didn't report it to Zurich; agreed?

17      A.   Agreed.

18          MR. THOMAS:  Objection.

19          I'm sorry.

20          Objection.  Assumes facts not in evidence.

21  BY MR. REEVES:

22      Q.   What happened?  Why didn't you?

23          MR. THOMAS:  Same objections.

24          THE WITNESS:  I based my submission on the

25  initial email that I received from Brad.



Danielle N. Hill                              Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 49

1   BY MR. REEVES:

2       Q.    And what is it that led you not to put Zurich

3   on notice?

4       A.    I didn't see it as a design claim.  It looked

5   like a pollution claim.

6       Q.    Got it.

7             And so you concluded that you didn't need to

8   put PL on notice; agreed?

9       A.    Agreed.

10      Q.    And you made that conclusion based on the email

11  you received from Brad Breach?

12      A.    Yes.

13      Q.    And did you consult with Bullard regarding

14  that?

15      A.    No.

16      Q.    Did you consult with Bullard's team regarding

17  that?

18      A.    No.

19      Q.    Did you communicate to Bullard who you did

20  place on notice?

21      A.    A few months later, yes.

22      Q.    Not contemporaneous with the time that you put

23  the carriers on notice.

24      A.    Correct.

25      Q.    Did you advise Breach who you put on notice?

Danielle N. Hill                          Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 60

1  as 44.

2          (Previously marked Exhibit 44 was

3          identified for the record.)

4  BY MR. REEVES:

5      Q.  It's multiple pages.  We'll just start at the

6  top.  You see July 13, 2017?

7      A.  Yes.

8      Q.  Okay.  So real quick, I saw -- you know, we

9  just looked at a prior email.  Your pattern and practice

10 is to put the carriers on notice.  You use those ACORD

11 loss notices; agreed?

12     A.  Yes.

13     Q.  And so you filled those out for the carrier,

14 sent them off.

15          Do you recall monitoring the responses you

16 received from the carriers?

17     A.  No, I don't recall.

18     Q.  Is it typical -- when you send off a -- in the

19 2017 time frame, when you place a carrier of a

20 third-party claim where your client's in a defensive

21 position vis-a-vis the ACORD form, do you typically get

22 an acknowledgment from the carrier relative to receipt

23 of that form?

24     A.  Sometimes.

25     Q.  And my sense is -- and the one I was about to

Danielle N. Hill                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 65

1      A.    Pretty much, yes.

2      Q.    So what was your involvement on Military on a

3   going-forward basis?  Was there none other than maybe

4   you got -- people asked you questions maybe what

5   happened?

6      A.    Once Matt took the file over?

7      Q.    Yes.

8      A.    No one really came to me at that point.  I just

9   monitored the file.  Again, if it was a reservation of

10   rights or a coverage letter came in, I simply forwarded

11   that to Matt and Rich.

12      Q.    Okay.  Did you act unilaterally on Military

13   once Matt took it over?

14      A.    Not really, no.

15      Q.    Sounds like you're -- in effect, you're

16   providing them information as it comes in, but you're

17   not doing anything without direction -- directions;

18   agreed?

19      A.    Correct.

20      Q.    Okay.  So, again, we're here on 44.  Let's go

21   to the bottom.  Brad to Ford.

22            Do you know who Ford is?

23      A.    The Zurich adjuster.

24      Q.    Okay.  Did you ever deal with Ford?

25      A.    Yes.



Danielle N. Hill                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 66

1      Q.   Have you dealt with him unrelated to the claims

2  we're talking about?

3      A.   I don't recall.

4      Q.   Okay.  What I'm getting at is do you recall

5  dealing with him previously?

6      A.   I don't recall.

7      Q.   Do you have an opinion of Ford?  Did he -- do

8  you know, was a good guy, bad guy, difficult?  Anything

9  along those lines?

10     A.   I don't have any opinion of him.

11     Q.   Have you dealt with him since these claims?

12     A.   No.

13     Q.   So July 11, Brad Ford inquiring about Military.

14          Do you see that?

15     A.   Yes.

16          MR. ANDERSON:  What exhibit number is this?

17          MR. REEVES:  44.

18          MR. ANDERSON:  Thanks.

19  BY MR. REEVES:

20     Q.   Ford.  Do you know who this Batjer guy is?

21     A.   No.

22     Q.   Have you ever seen that name before?

23     A.   No.

24     Q.   Ford saying:

25          "Forwarding to you as I don't have a claim for



Danielle N. Hill                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 67

1           this."

2           Do you see that?

3      A.   Yes.

4      Q.   Batjer is with Steadfast.  I use Zurich.  You

5  know Zurich is Steadfast; right?

6      A.   Yes.

7      Q.   Okay.  Go ahead and read this note to yourself.

8           Tell me when you're done, please.

9      A.   I'm good.

10     Q.   Okay.  So the gist of this email is Zurich has

11 no notice of the Military claim; agreed?

12     A.   Yes.

13     Q.   Okay.  And that jibes with your testimony

14 because you didn't put Zurich on notice of the claim by

15 July 12; agreed?

16     A.   Yes.

17     Q.   Okay.  So here's Brad.  Now he's sending to

18 you.  It says:

19           "I have only received acknowledgment from

20           Philadelphia."

21           Do you see that?

22     A.   Yes.

23     Q.   Okay.  And Philadelphia I could -- parent

24 company there, Tokio Marine; agreed?

25     A.   Yes.

Danielle N. Hill                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 71

1  might have reached out and obtained this information.

2        Do you recall that?

3     A.   I don't recall, but I'm assuming, yes.

4     Q.   Okay.  All right.  I'll show you what was

5  marked as 46.

6        (Previously marked Exhibit 46 was

7        identified for the record.)

8  BY MR. REEVES:

9     Q.   Look at the bottom first.  There's that Batjer

10 guy.  Ford.  You read this already.

11       Ford to Batjer.  There's Ford saying:

12       "...still received nothing in this matter."

13       You see this July 17?

14    A.   Yes.

15    Q.   Okay.  And you're not on there.

16       So it looks like Bullard forwarded it to you on

17 the 18th.  Sent it by his iPhone.

18       Do you see that?

19    A.   Yes.

20    Q.   Do you recall having a conversation with him,

21 or did he just send this out of the blue?

22    A.   I don't remember having a conversation, no.

23    Q.   Okay.  I'm just pointing out there's no content

24 to his email.  He's just forwarding along.

25       Do you see that?



Danielle N. Hill                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 72

 1      A.    Yes.

 2      Q.    Then here you are responding.

 3            Do you see that?

 4      A.    Yes.

 5      Q.    And do you recall an intervening conversation

 6   with Bullard, or did you divine why he was forwarding it

 7   to you?  How did it come to be that you are responding

 8   in this manner?

 9      A.    I don't recall having a conversation.  I just

10   recall sending the email.

11      Q.    Okay.  So you wrote this email; right?

12      A.    Yes.

13      Q.    Okay.  And it's accurate; right?

14      A.    Yes.

15      Q.    And then Hill, that's you, Bullard, July 20.

16   You say:

17            "As a follow-up to my voicemail message..."

18            Do you see that?

19      A.    Yes.

20      Q.    So implicit is you left Bullard a voicemail

21   message; agreed?

22      A.    Looks like it.

23      Q.    Do you recall what you said in that voicemail

24   message?

25      A.    No.

Danielle N. Hill                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 73

1    Q.    Okay.  So it appears, to me, that you made

2  contact with Philly and Zurich and you're providing

3  Bullard with information relative to those

4  conversations; agreed?

5    A.    Yes.

6    Q.    Okay.  And then you say:

7          "Rich, I just spoke to Brad..."

8          Do you see that?

9    A.    Yes.

10    Q.    Okay.  And then this is July 21.

11          Do you see that?

12    A.    Yes.

13    Q.    Okay.  So looks like you're talking with

14  Bullard; you're talking with Breach; agreed?

15    A.    Yes.

16    Q.    Okay.  So do you recall those conversations?

17    A.    No.

18    Q.    Did you ever communicate to Breach that the

19  notice to Zurich was untimely?

20    A.    No.

21    Q.    Why not?

22    A.    I -- I don't know.

23    Q.    Have you ever communicated with anybody at

24  United regarding your handling of the tenders?

25    A.    What do you mean?  Did I submit their claims on

# Ex G, exhibit 44

# Ex G, exhibit 44

8730 Military Road, Reno, NV
From:   Danielle Hill
Received:   7/13/2017 2:53:06 PM
To:     'Brad Breach';
( )
Attachments: image001.jpg; image002.jpg; image003.jpg; image004.jpg
image005.jpg

Brad-

The York Adjuster is: Davie Smith dave.smith@yorkrsg.com Claim Number: 6466891.

He should be contacting you to discuss the claim.

Thank You!

**Danielle Hill**
Claims Consultant
**LP Insurance Services Inc.**
300 East 2nd Street, Suite 1300 Reno, NV 89501
Direct (775) 996-6033/Fax (775) 996-6093
*danielle.hill@lpins.net/lpins.net*

 LPIS Logo

CONFIDENTIALITY NOTICE· This email contains confidential and privileged material for the sole use of the intended recipient(s). If the reader of this e-mail is not the intended recipient or his/her authorized agent, the reader is hereby notified that any use, disclosure, dissemination, distribution, or copying of this e-mail, including attachments, is strictly prohibited. If you have received this e-mail in error, please IMMEDIATELY (1) Forward the email and all file attachments to your.email@lpins.net AND (2) permanently delete the message and any file attachments. Questions may be directed to LP Insurance Services, Inc. (775) 996-6000.

**From:** Danielle Hill
**Sent:** Thursday, July 13, 2017 9:11 AM
**To:** 'Brad Breach'
**Subject:** RE: 8730 Military Road, Reno, NV

I also submitted the claim to York. I will e-mail the Claims Manager on this one & will follow back up with you shortly.

Thank You!

**Danielle Hill**
Claims Consultant
**LP Insurance Services Inc.**
300 East 2nd Street, Suite 1300 Reno, NV 89501
Direct (775) 996-6033/Fax (775) 996-6093
*danielle.hill@lpins.net/lpins.net*

LPIS Logo



**EXHIBIT**

Breach 44    9/8/22

CAP003988

CONFIDENTIALITY NOTICE: This email contains confidential and privileged material for the sole use of the intended recipient(s). If the reader of this e-mail is not the intended recipient or his/her authorized agent, the reader is hereby notified that any use, disclosure, dissemination, distribution, or copying of this e-mail, including attachments, is strictly prohibited. If you have received this e-mail in error, please IMMEDIATELY (1) Forward the email and all file attachments to your.email@lpins.net AND (2) permanently delete the message and any file attachments. Questions may be directed to LP Insurance Services, Inc. (775) 996-6000.

}

---

**From:** Brad Breach [mailto:Brad@unitedconstruction.com]
**Sent:** Wednesday, July 12, 2017 4:49 PM
**To:** Danielle Hill
**Subject:** FW: 8730 Military Road, Reno, NV

I have only received acknowledgement from Philadelphia for the claim listed above. What other carriers were notified of the claim??

Brandon F. Breach | Vice President / CFO
**United Construction Company**
O: 775.858.8090 | D: 775.398.1708 | brad@unitedconstruction.com
Licenses: NV #0015417 AZ: #163263 CA: #553339 NM: #85070 OR: #203096 UT: #95-311769-5501

**BUILD UNITED** - *United with our customers, team and communities providing best-in-class construction services since 1978.*

**From:** Daryl Batjer [mailto:daryl.batjer@zurichna.com]
**Sent:** Wednesday, July 12, 2017 5:59 AM
**To:** Brad Breach <Brad@unitedconstruction.com>
**Cc:** Christopher Ford <chris.ford@zurichna.com>
**Subject:** FW: 8730 Military Road, Reno, NV

Mr. Breach:

Please note Chris is out on vacation until Friday, but forwarded me your below message.  Unfortunately, I cannot locate a claim number in our system for this claim.  Please kindly forward this email on to your agent and/or provide me with your agent's contact information so I can reach out directly to him or her.  I'll partner with your agent to ensure we have the tender docs and that a claim number has been established and assigned to the proper Claims Specialist.  I will also investigate if your agent has the current reporting address.

I look forward to hearing back from you so I can do everything on my end to expedite you receiving the claim number and contact information for your Claims Professional.

Thank you for bringing this to Chris' attention and my apologies you had not previously heard a response back in regards to this tender.

Best,

 Zurich_Sign
ature_logo

**Daryl Batjer**
*Team Manager Latent & Environmental Claims*
Steadfast Insurance Company
PO Box 66965
Chicago, IL 60666-0965

**Office:** 214-866-1156

zurichna.com

r   n: Christopher Ford
s   .t: Tuesday, July 11, 2017 5:59 PM
**To:** Daryl Batjer
**Subject:** Fwd: 8730 Military Road, Reno, NV

Forwarding to you as I do not have a claim for this. I can't access ez access to check.

| Zurich_Sign ature_logo | **Chris Ford** |
|---|---|
| | *Claims Specialist IV Latent & Environmental* |
| | *Claims* |
| | Zurich North America |
| | PO Box 66965 |
| | Chicago, IL 60666-0965 |
| | **Office:** 805-520-3641 |
| | **Fax:** 805-520-3647 |

chris.ford@zurichna.com

zurichna.com

r   n forwarded message:

**From:** Brad Breach <Brad@unitedconstruction.com>
**Date:** July 11, 2017 at 12:14:16 PM EDT
**To:** 'Christopher Ford' <chris.ford@zurichna.com>
**Subject:** 8730 Military Road, Reno, NV

Can you tell me if you or Zurich have received a claim for 8730 Military Road? Our agent submitted the claim some time ago but we have received no follow up from Zurich.

Brandon F. Breach | Vice President / CFO
**United Construction Company**
O: 775.858.8090 | D: 775.398.1708 | brad@unitedconstruction.com
Licenses: NV #0015417 AZ: #163263 CA: #553339 NM: #85070 OR: #203096 UT: #95-311769-5501

BUILD UNITED - *United with our customers, team and communities providing best-in-class construction services since 1978.*

This email was scanned by Bitdefender

***************** PLEASE NOTE ******************
This message, along with any attachments, is for the designated recipient(s) only and may contain privileged, proprietary, or otherwise confidential information. If this message has reached you in error, kindly destroy it without review and notify the sender i   .ediately. Any other use of such misdirected e-mail by you is prohibited. Where allowed by local law, electronic communications with Zurich and its affiliates, including e-mail and instant messaging (including content), may be scanned for the purposes of information security and assessment of internal compliance with company policy.
***************** PLEASE NOTE ******************

CAP003990

This message, along with any attachments, is for the designated recipient(s) only and may contain privileged, proprietary, or otherwise confidential information. If this message has reached you in error, kindly destroy it without review and notify the sender immediately. Any other use of such misdirected e-mail by you is prohibited. Where allowed by local law, electronic communications with Zurich and its affiliates, including e-mail and instant messaging (including content), may be scanned for the purposes of information security and assessment of internal compliance with company policy.

This email was scanned by Bitdefender

# Ex G, exhibit 46

# Ex G, exhibit 46

**8730 Military Road, Reno, NV**
From: Danielle Hill
Received: 7/21/2017 9:18:38 AM
To:    Rich Bullard;

Attachments:

Rich-

     I just spoke to Brad & have submitted this matter to Zurich. Brad mentioned that this is similar to the other two claims: 8020 & 8040. We will be e-mailing me some dates today as we may need to put additional carriers on notice.

     Thanks- D

**From: Danielle Hill**
**Sent:** Thursday, July 20, 2017 11:45 AM
**To:** Rich Bullard
**Subject:** RE: 8730 Military Road, Reno, NV

Rich-

     As a follow up to my voicemail message, I just spoke with PHLY & Zurich.

     PHLY stated that Brad sent her a report back in June. Mold was found on the roof base. The moisture levels are going down. Brad stated that they were reviewing their options & would follow back up with the Adjuster. The Adjuster will be sending out her coverage letter shortly.

     Zurich: To date, I have not submitted this matter to Zurich/E&O, but need to do so. I spoke to the Zurich Adjuster, Chris } & we discussed the update that I got from the PHLY Adjuster. Chris suggested that we reach out to Brad to discuss this matter & review potential issues. He also suggested that I get Brad's approval to submit this to Zurich before tendering it. I would like to speak with you about this & some other things that were mentioned during the call.

     Thanks- D

**From: Danielle Hill**
**Sent:** Tuesday, July 18, 2017 8:49 AM
**To:** Rich Bullard
**Subject:** RE: 8730 Military Road, Reno, NV

Rich-

     I only put the GL (York) & Pollution (PHLY) on notice of this matter given the description that Brad provided.

     Please advise the appropriate carriers that we have now found microbial growth on the building located at 8730 Military Road, Reno, NV. This building started design in August of 2015 and started Construction in October 2015. Construction was completed in July 2016.

     I just got off the phone with the Zurich Adjuster to discuss this. He has requested that I get an update from York & PHLY before we decide if a tender to the E&O carrier is necessary.

     Thanks- D

**: Rich Bullard**
**Sent:** Tuesday, July 18, 2017 3:57 AM
**To:** Danielle Hill
**Subject:** Fwd: 8730 Military Road, Reno, NV



EXHIBIT

Broach 45    9/8/22

CAP001122

Sent from my iPhone

Begin forwarded message:

**From:** Christopher Ford <chris.ford@zurichna.com>
**Date:** July 17, 2017 at 2:30:41 PM PDT
**To:** Daryl Batjer <daryl.batjer@zurichna.com>, "Brad@unitedconstruction.com" <Brad@unitedconstruction.com>
**Cc:** "Bullard, Richard (rich.bullard@lpins.net)" <rich.bullard@lpins.net>
**Subject:** RE: 8730 Military Road, Reno, NV

Brad I have still received nothing on this matter.

 **Chris Ford**
*Claims Specialist IV Latent & Environmental Claims*
Zurich North America
PO Box 66965
Chicago, IL 60666-0965

Office: 805-520-3641
Fax: 805-520-3647

chris.ford@zurichna.com

zurichna.com



**From:** Daryl Batjer
**Sent:** Wednesday, July 12, 2017 5:59 AM
**To:** Brad@unitedconstruction.com
**Cc:** Christopher Ford
**Subject:** FW: 8730 Military Road, Reno, NV

Mr. Breach:

Please note Chris is out on vacation until Friday, but forwarded me your below message. Unfortunately, I cannot locate a claim number in our system for this claim. Please kindly forward this email on to your agent and/or provide me with your agent's contact information so I can reach out directly to him or her. I'll partner with your agent to ensure we have the tender docs and that a claim number has been established and assigned to the proper Claims Specialist. I will also investigate if your agent has the current reporting address.

I look forward to hearing back from you so I can do everything on my end to expedite you receiving the claim number and contact information for your Claims Professional.

Thank you for bringing this to Chris' attention and my apologies you had not previously heard a response back in regards to this tender.

Best,

 **Daryl Batjer**
*Team Manager Latent & Environmental Claims*
Steadfast Insurance Company
PO Box 66965
Chicago, IL 60666-0965

CAP001123

# EXHIBIT H

# EXHIBIT H

Page 1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4

5    CAPITOL SPECIALTY INS. CORP.,

6            Plaintiff,

7            vs.                        No. 2:20-cv-01382-JCM-VCF

8    STEADFAST INS. CO., et al.,

9            Defendants.
     _____/
10
     and related crossclaims.
11   _____/

12

13

14

15          WEB-BASED DEPOSITION OF MIKE CLEMENTS

16              Taken on November 1, 2022

17                  At 10:02 a.m.

18          Remotely in Las Vegas, Nevada

19

20

21

22

23

24   Reported by:  Linda Horton Sprague, CCR 466

25   Job No. 51306.A, Firm Nos. 061F/116F

Mike Clements                               Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

```
                                                          Page  2
 1    APPEARANCES:

 2

 3    For the Plaintiff:

 4             Scott S. Thomas, Esq.
               Payne & Fears
 5             6385 South Rainbow Boulevard
               Suite 220
 6             Las Vegas, Nevada 89118
               (702) 851-0300
 7             sst@paynefears.com

 8

 9    For Steadfast Insurance Company:

10             William C. Reeves, Esq.
               Morales Fierro & Reeves
11             600 South Tonopah Drive
               Suite 300
12             Las Vegas, Nevada 89106
               (702) 699-7822
13             wreeves@mfrlegal.com

14

15
      For RHP Mechanical Systems:
16
               Jessica A. West, Esq.
17             Tyson & Mendes
               2835 St. Rose Parkway
18             Suite 140
               Henderson, Nevada 89052
19             (725) 410-7684
               jwest@tysonmendes.com
20

21

22

23

24

25
```

```
                                                          Page  3
 1    APPEARANCES:   (Continued)

 2

 3    For United Construction Company:

 4              Mark G. Simons, Esq.
              Simons, Hall, Johnston, PC
 5              690 Sierra Rose Drive
              Reno, Nevada 89511
 6              (775) 785-0088
              msimons@shjnevada.com
 7

 8
      Also Present:
 9
              Lori Sebransky, Esq.
10

11                   INDEX OF EXAMINATION

12

13    MIKE CLEMENTS

14                                              Page

15    EXAMINATION

16    By Mr. Reeves                               5

17    By Ms. West                              112

18    By Mr. Thomas                            129

19

20                   INDEX TO EXHIBITS

21

22    Number      Description                   Page

23     95         Photocopy of letter from       58
                  Patrick Breen to Craig
24                Willcut, dated September 19,
                  2016
25
```

Mike Clements                                  Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 11

1    you need.  He was provided with Exhibit 31.

2             MR. REEVES:  Yeah.  Okay.

3             So, Mark, he has access to a binder there?

4             MR. SIMONS:  Yes, he does.

5             MR. REEVES:  Okay.  Thank you.

6    BY MR. REEVES:

7        Q.   So when he -- Counsel just indicated you

8    reviewed Exhibit 31.

9             That's a narrative you prepared.  Agreed?

10       A.   Yes.

11       Q.   Okay.  And you prepared it -- my sense --

12   in, you know, 2016 time frame.  Agreed?

13       A.   Yes.

14       Q.   It was your intention to be accurate

15   relative to what's reflected in Exhibit 31.  Agreed?

16       A.   Yes.

17       Q.   And, you know, having reviewed it recently,

18   did you see anything that was inaccurate relative to

19   31?

20       A.   No.

21       Q.   Why did you prepare 31?  Is that a pattern

22   and practice of a -- kind of a narrative of chronology

23   you prepare?  Or was there something else going on?

24       A.   I was instructed to by my boss to keep track

25   so we remember what happened when -- until the job

Mike Clements                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 17

1          A.   I don't recall.

2          Q.   Got it.

3               So I'm in the projects.  Now I'm into the

4     second layer; right?

5               Do you understand what I'm saying?

6               So we're now second layer file structure.

7               What is it?

8          A.   There's current projects.  Preconstruction.

9     I don't recall any others exactly.

10         Q.   What about completed?

11         A.   I don't -- I don't know.  I don't recall if

12    there's a completed folder in there.

13         Q.   All right.  So you go into current.  Is

14    that, then, a -- that's now the third layer.

15              Now do we have project names?

16         A.   No.

17              They're separated by departments or

18    different states.

19         Q.   Okay.  So when -- at the end of the day,

20    Exhibit 31 -- my sense is you saved it, ultimately,

21    from your local to your -- to the server under a

22    particular file associated with Milan.  Agreed?

23         A.   Agreed.

24         Q.   And getting to that file -- the end file, is

25    it, quote, unquote, Milan?  Or are there -- is there

Mike Clements                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 30

```
1              MR. REEVES:  Thank you.

2              (Court reporter clarification.)

3              (A discussion was held off the record.)

4    BY MR. REEVES:

5        Q.   All right.  So that April 5 date in

6    Exhibit 31 -- the narrative suggests that's the first

7    date that mold was discovered in Milan.  Agreed?

8              MR. THOMAS:  Objection.  Best estimate.

9    Mr. Thomas speaking.

10   BY MR. REEVES:

11       Q.   So Mr. Clements, as I told you before, I

12   need you to answer regardless of the objection unless

13   he tells you not to answer.  Understood?

14       A.   Yes.

15       Q.   Okay.  So you have my question in mind?

16       A.   Yes.

17            That -- that is the first date that we

18   discovered mold.

19       Q.   Got it.

20            And so the narrative, you know, provides a

21   time line of events and things like that.

22            The -- ultimately, United agreed to perform

23   some work out there vis-a-vis remediating the mold.

24   Agreed?

25       A.   Agreed.
```

Mike Clements                                    Capitol Specialty Ins. Corp. v. Steadfast Ins. Co.

Page 60

1   letter -- as I understand it, your impression was

2   proceed with the work.  Agreed?

3       A.    Correct.

4       Q.    So your conversations with Marko led you to

5   believe that Prologis was going to bear the cost of

6   the remediation.  Agreed?

7       A.    Yes.

8       Q.    At some point in time, did your

9   understanding change?

10      A.    No.

11      Q.    Are you aware of Prologis taking the

12  position that they would not bear the entirety of the

13  cost associated with remediation of Milan?

14      A.    No.

15      Q.    All right.  Were you -- you know, I asked

16  you before about insurance applications.  Your

17  testimony there was you weren't involved.

18          What about insurance claims?  Did they ever

19  involve you on insurance claims?

20      A.    No.

21      Q.    Do you know -- were you involved relative to

22  the decision by United to place my client on notice of

23  Milan?

24      A.    No.

25      Q.    Are you -- let's lay a little foundation.

# Ex H, exhibit 31

# Ex H, exhibit 31

**4/5/16**

UCC started to remove roof insulation in preparation to install roof supports for added RTU's for Chewy.com TI at the main office area, Southwest corner of building.  UCC office was notified that mold was present between roof insulation and roof OSB.  I requested the field personnel not to disturb the mold.  The field was asked to remove the insulation at all roof top unit locations to determine if mold was present at all new RTU locations.  Tom Wise Consulting was contacted to visit the jobsite, test the mold and to provide any helpful information as to the cause of the mold growth and severity.  Tom indicated that 4/7/16 is the earliest he could schedule a site visit.  Craig Willcut was informed of the findings and indicated to wait until Tom Wise provides the requested information to enable a clear understanding and knowledge of severity and cause, prior to advising the building owner.  Mike Brunkow was also notified of the issue found as well.  Mike Brunkow was the project manager of the building project.  RHP arrived onsite to mobilize with material for Chewy.com TI.  RHP noticed the exhaust fans were not operational.  After researching the reason the fans were not operational, RHP found the power turned off.  RHP serviced the exhaust fans and found the belts were cracked.  According to RHP, new belts with appearance of cracking is a sign of belts not in use for an extended period of time.  RHP replaced the belts and turned power on to the exhaust fans.  UCC field was instructed to assure fans were operational while onsite.

**4/6/16**

UCC field reported mold at other areas of new RTU's.  The field was instructed to not perform any disturbance of mold areas until the test results are known of the severity.  UCC re-directed manpower.

**4/7/16**

UCC furnished a scissor lift for Tom Wise Consulting.  Tom gathered samples of the mold that was found.  Tom delivered to the testing agency.

**4/8/16**

Tom Wise verbally reported the mold type was not harmful to breathe unless disturbed.  In addition, the mold type is a rapid acting towards OSB/wood.  Tom indicated the mold was found early, which is helpful.  UCC field began to perform work at the Southeast corner near the battery charging area for the exhaust fan roof support.  Mold again was present.  UCC field again, was directed not to disturb the mold.  UCC advised Tom Wise and he was not surprised.  UCC decided to schedule Tom Wise Consulting to visit the site visit on 4/9/16 to test the humidity levels at the roof level, scissor lift level, 3' AFF level and the exterior humidity at various, random spots in the building.  Tom Wise requested UCC to be onsite as well to operate the scissor lift.  UCC provided Tom Wise Consulting floor and roof plans for documentation.

**4/9/16**

Tom Wise Consulting and UCC started onsite at noon.  Choosing random areas of the building to test humidity levels.  UCC provided a scissor lift with an operator to help facilitate Tom Wise Consulting.



**EXHIBIT**

Erisoch 31     3/8/22

CAP003666

**4/11/16**

UCC called Tom Wise Consulting to coordinate a meeting to discuss what was found and suggested options. UCC scheduled a meeting with Craig Willcut, Mike Brunkow and Mike Clements to review the findings and meet with Tom Wise on Tuesday April 12, 2016.

**4/12/16**

Craig Willcut and Mike Brunkow could not attend the meeting. Therefore, I met with Tom Wise and I invited RHP to join the meeting as well. Tom Wise did not have a written report/status to provide however, provided the conditions verbally. Eleven (11) "spots" were tested. of the eleven (11) spots, ten (10) spots mold was resent, seven (7) spots has significant growth, three (3) spots has minor growth and one (1) spot had no growth. Tom measured the humidity levels and found the inside of the building to be 45.8%, outside the building was 30.9%. Above the insulation, below the OSB, humidity level ranged from 60% to 71.2% at the eleven (11) spots surveyed. I asked Tom to provide a minimum preliminary report to share with all of those involved. Tom indicated he is not a professional to determine the root cause of high humidity levels nor suggest the existing HVAC system installed is not sufficient nor a correction action to decrease the humidity. The only recommendation Tom provided was to get rid of the cause of increased humidity levels. According to RHP, Doug DeAngeli finding the exhaust fans without power, indicated the exhaust fans were turned off for quite some time. Potentially, since the building was complete in July 2015. Therefore, the building was not having air exchanges as code requires. RHP's opinion is if the exhaust fans were operational, there would be proper air exchanges to remove stagnant air from the building. In addition, since the building was new, the concrete floor and walls could be still curing and releasing humidity in the building. During the winter months, the Cambridge units were providing freeze protection with outside air, through the Cambridge unit heating up the air and distributing into the warehouse space.

I explained to Tom that UCC has a project to build and needed to continue before more lost time has gone by. Tom suggested to have a trained professional remove any mold at locations of OSB would need to be removed and sanitized to not create a health hazard. I asked Tom if the mold would dry out and stop growing; if the encapsulate could be applied. Tom indicated that would be acceptable as long as the mold and OSB were at an acceptable water content.

**4/13/16**

I contacted Advance Installation to visit the job site and provide costs for mold remediation at needed disturbed areas. Tom Davis agreed to provide a proposal. I spoke to Tom Marko and advised him of our findings and our opinion. In addition, we spoke about the remediation that needed to be done, ASAP. Tom suggested to run the costs in the Chewy.com to expedite the work.

**4/17/16**

I received a proposal from Advance Installations. After checking with Andy Jones, UCC Superintendent on site at Chewy.com project the scope was complete. UCC coordinated with Tom Wise as to the operational procedure to remediate the mold. Tom Wise indicated an air scrubber/HEPA NAM should e

utilized and containment would be a suggested means of method for remediation. UCC provided a PO to Advance Installation to perform the work and scheduled the remediation for 4/18/16 & 4/19/16.

**4/18/16**

Advanced Installation was onsite starting the remediation scope of work.

**4/19/16**

Advance Installation completed the scope of work.

**4/20/19**

I spoke to Tom Marko and he indicated that the local Prologis support team would be handling this issue as they had more experience dealing with such issues. I explained to Tom that UCC's opinion is that if the exhaust fans were operational the entire duration from July 2015 until now, we believe there would not be a humidity issue therefore, no mold would have been growing. UCC requested Tom Wise Consulting to visit the site again to find humidity levels and readings to determine the levels were decreasing.

**4/25/16**

Tom Wise Consulting visited the site to take humidity levels.

**4/29/16**

UCC received an initial report of the findings from Tom Wise Consulting.   See initial report from Wise Consulting in job file for results.

**5/7/16**

UCC received a final report of the findings from Tom Wise Consulting. See final report from Wise Consulting in job file for results.

**5/9/16**

I received a call from Tom Marko, Tom indicated that someone should be starting the remediation process soon as not to impact Chewy.com project. I suggested to Tom to send UCC a letter to indicate UCC to start the work. Tom indicated he would send UCC something in an email and would also call Craig Willcut to coordinate, as well. I was out of the office on PTO.

**5/10/16**

I received a call from Tom Marko which he requested a conference call to discuss the next steps. I coordinated with Craig Willcut and Mike Brunkow to determine a time for the call. CW indicated he would not be able to attend. MB and I participated in a call with Tom Marko and Mathias Hughes. Prologis indicated they wanted UCC to perform the work, ASAP. Prologis directed UCC to inspect each joint of insulation and inspect for mold. If mold existed, leave the insulation hanging down to allow for it to dry out. The importance was above the TI spaces and freezer area. In addition, when the OSB was dry, clean/sanitize the mold/dry/re-install the insulation. If mold did not exist, secure the insulation as it

was. UCC agreed to start the inspecting for mold, ASAP. I offered one other option from Tom Wise; dry out the OSB therefore the mold could not grow and apply the encapsulate over OSB and mold to contain the spores. Tom indicated Prologis would not accept not removing mold. UCC indicated to Tom Marko, once the responsible party was identified, the cost would be reimbursed. Prologis let us know their consultant was going to be onsite this afternoon. In addition, Prologis let known it was their general practice to turn off the exhaust fans to conserve energy in unoccupied warehouses.

**5/12/16**

I sent an email to Tom Marko; see email in job file. I attached the initial and final report UCC has received to date. UCC to retain an insulator to start the work based on Tom Wise procedure to maintain safety on the jobsite.

**5/16/16**

UCC scheduled a meeting with AlCal Insulation, Tom Wise to coordinate the process to investigate for mold above insulation. See meeting minutes dated 5/16/16. It was determined AlCal was to be onsite Tuesday 5/17/16 to start. UCC/AlCal to have a contract based on T&M and an agreed upon hourly rate. UCC to receive hourly rates for mold abatement.

**5/17/16**

AlCal onsite starting to remove/let insulation hang down.

**5/19/16**

UCC received an hourly rate for mold abatement from Advance Installation. I sent the proposal to Tom Wise for his approval of the procedure listed on the proposal. Tom Wise indicated it was good and wanted to confirm one item with Advance. Tom Wise indicated he would speak to Tom Davis to clarify.

**5/23/16**

Advance Installation started onsite.

CAP003669

# EXHIBIT I

# EXHIBIT I

F I L E D
Electronically
CV19-00164
2019-01-18 01:46:47 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7076281 : yvilona

1    **$1425**
Mark G. Simons, Esq. (SBN 5132)
2    SIMONS HALL JOHNSTON PC
6490 S. McCarran Blvd., #F-46
3    Reno, Nevada 89509
Telephone:    (775) 785-0088
4    Facsimile:    (775) 785-0087
Email:  msimons@shjnevada.com
5    *Attorneys for Plaintiff*
6

7
**IN THE SECOND JUDICIAL DISTRICT FOR THE STATE OF NEVADA**
8
**IN AND FOR THE COUNTY OF WASHOE**
9

10
UNITED CONSTRUCTION COMPANY,          **CASE NO:**  CV19-00164
11    a Nevada corporation,
**DEPT. NO:**  7
12
            Plaintiffs,
13
**COMPLAINT**
14    L/P Insurance Services, LLC,            **EXEMPT FROM ARBITRATION**
a Nevada limited liability company,      **(NAP 3(A); 5(A): in excess of**
15    and DOES 1-10,                          **$50,000)**
16
            Defendants.
17
18    _____/
19
**COMPLAINT**
20
    Plaintiff complains of Defendants and for causes of action as follows:
21
**PARTIES**
22
23    1.    Plaintiff United Construction Company is a Nevada corporation ("United").

24    2.    Defendant L/P Insurance Services, LLC, is a Nevada limited liability
25    company ("LP") doing business in Washoe County, Nevada.
26
27    3.    United does not know the true names and capacities of defendants sued
herein as DOES 1 through 10, inclusive, and therefore sues these defendants by
28

SIMONS HALL
JOHNSTON PC
6490 S. McCarran
Blvd., #F-46
Reno, NV 89509
(775) 785-0088

fictitious names. United is informed and believes, and thereon alleges, that each of these fictitiously named defendants is responsible in some actionable manner for the damages herein alleged. United requests leave of Court to amend its Complaint to name the defendants specifically when their identities become known.

## GENERAL ALLEGATIONS

**A.    THE POLICY.**

4.    United is a construction company.

5.    United engaged LP, a licensed insurance broker, to provide United with all appropriate and necessary insurance applicable to United's business operations.

6.    As a matter of routine, United referred all questions regarding its insurance claims to LP and LP handled all United's insurance needs, including tendering any claims to the appropriate insurers.

7.    In or about April 2016, LP procured Contractor's Protective Professional Indemnity coverage for United covering the time period April 20, 2016, to April 20, 2017, policy number EOC 0193620-00 (the "Policy").

8.    The Policy was issued to United by Steadfast Insurance Company commonly referred to as Zurich ("Zurich").

9.    The Policy's limit was $5,000,000 per claim and in the aggregate.

10.    The Policy was a claims-made and reported policy.

11.    Under the Policy, in order for insurance coverage to apply for any claim, the claim must have been made and reported during the policy period unless an extended reporting period applied to the claim.

12.    The Policy allowed up to an additional sixty (60) days after the expiration of the Policy as and for an extended reporting period.

SIMONS HALL
JOHNSTON PC
6490 S. McCarran
Blvd., #F-46
Reno, NV 89509
(775) 785-0088

2

**B.    THE MILITARY ROAD CLAIM.**

13.    On July 2016, during the Policy period, United completed construction of a large commercial building located at 8730 Military Road, Reno, Nevada (the "Military Road Property").

14.    On or about April 17, 2017, during the Policy period, the owner of the Military Road Property made a claim against United for mold and moisture damage (the "Military Road Claim").

15.    The Military Road Claim was a covered claim of the Policy and, pursuant to the terms of the Policy, the Policy's insurance protections applied and the Military Road Claim would have been paid.

16.    On April 17, 2017, during the Policy period, United notified LP of the Military Road Claim and asked that LP tender the claim to its carriers.

17.    On April 18, 2017, during the Policy period, LP responded to United and advised United it would immediately submit the Military Road Claim to the "appropriate [insurance] carriers" on United's behalf.

18.    LP did not submit the Military Road Claim to Zurich.

19.    On April 20, 2017, the Policy issued by Zurich expired.

20.    United did not renew the Policy with Zurich.

21.    On June 20, 2017, the sixty (60) day extended reporting period under the Policy issued by Zurich expired.

22.    On July 11, 2017, United contacted Zurich to obtain a status update on the Military Road Claim given that LP had previously informed United it was submitting to Zurich on its behalf.  United's correspondence states, in part:  "Our agent submitted the claim some time ago but we have received no follow up from Zurich."  Zurich

SIMONS HALL
OHNSTON PC
490 S. McCarran
Blvd., #F-46
Reno. NV 89509
(775) 785-0088

3

subsequently confirmed that this communication by United was its first notification of the Military Road Claim.

23.    On July 12, 2017, Zurich advised United that it did not have a claim number in its system and offered to work with United's agent LP "to ensure we have the tender docs and that a claim number has been established and assigned to the proper Claims Specialist."

24.    On July 13, 2017, United contacted LP to find out which carriers were notified of the Military Road Claim and LP's response acknowledges that LP failed to notify Zurich of the Military Road Claim.

25.    On July 17, 2017, Zurich notified United that it still had "received nothing on this matter."

**C.    ZURICH'S DENIAL OF COVERAGE.**

26.    On July 27, 2017, Zurich issued its letter to United denying coverage under the Policy for the Military Road Claim ("Coverage Denial Letter").

27.    In Zurich's Coverage Denial Letter, Zurich notifies United that it did not timely receive notice of the Military Road Claim within the Policy period or within the extended reporting period.

**D.    LP'S ADMISSIONS OF LIABILITY.**

28.    LP has repeatedly admitted and acknowledged to United that it failed in its duties and responsibilities to timely notify Zurich of the Military Road Claim during the Policy period and/or the extended reporting period.

**D.    UNITED'S DUTY TO REMEDIATE AND REPAIR.**

29.    United estimates that the cost of remediation and/or repair of the Military Road Property to resolve the Military Road Claim is between $3,200,000 to $4,000,000.

SIMONS HALL
JOHNSTON PC
6490 S. McCarran
Blvd., #F-46
Reno, NV 89509
(775) 785-0088

4

30.     United has notified LP, that on or about January 21, 2019, United will commence the remediation and/or repairs to the Military Road Property to resolve the Military Road Claim, and that United expects LP to pay for this work given LP's failure to timely report this claim to Zurich.

## FIRST CAUSE OF ACTION
### (Negligence)

31.     United realleges and incorporates all preceding paragraphs as though fully set forth herein.

32.     LP owed United a duty of care to perform those activities and responsibilities entrusted to it including, among other things, the duty to promptly and timely notify Zurich of the Military Road Claim.

33.     In addition, LP's relationship with United established a special relationship between the two that imposed upon LP a duty to United to exercise a reasonable degree of care in notifying Zurich of the Military Road Claim reported to it by United.

34.     At all times LP knew, understood and intended United to rely upon it to notify Zurich of the Military Road Claim.

35.     LP has breached its duties owed to United by, among other things:  (1) failing to promptly notify Zurich of the Military Road Claim upon receipt of notification of the claim by United; (2) failing to notify Zurich of the Military Road Claim before April 20, 2017, when the policy expired; (3) failing to notify Zurich of the Military Road Claim before June 20, 2017, during the extended reporting period; (4) failing to follow-up and ascertain that Zurich had received notice of the Military Road Claim, thereby ensuring coverage of the claim by Zurich; (5) failing to follow-up and ascertain whether Zurich had opened a claim for the Military Road Claim; (6) failing to advise United that LP had not notified Zurich of the Military Road Claim so that United could undertake appropriate action to ensure Zurich was timely apprised of the Military Road Claim; (7) failing to inform United that the Policy period expired on April 20, 2017, and that if

RMONS HALL
OHNSTON PC
1490 S. McCarran
3lvd., #F-46
Reno, NV 89509
775) 785-0088

5

1  Zurich did not receive notice of the Military Road Claim by that date the claim would be

2  excluded from coverage; and (8) failing to inform United that the Policy extended

3  reporting period expired on June 20, 2017, and that if Zurich did not receive notice of

4  the Military Road Claim by that date the claim would be excluded from coverage.

5       36.     United has sustained damages as a result of LP's failure and neglect in

6  the approximate amount of $3,200,000 to $4,000,000.

7       WHEREFORE, United prays for the following relief against LP:

8       1.      For damages in excess of $15,000;

9       2.      For an award of its attorneys' fees and costs; and

10      3.      For such other relief as this Court deems just and proper.

11      AFFIRMATION:  The undersigned hereby affirms that the preceding document

12  does not contain the Social Security number of any person.

13      DATED this _18th_ day of January, 2019.

14

15                          SIMONS HALL JOHNSTON PC
                            6490 S. McCarran Blvd. #F-46
16                          Reno, NV 89509

17

18                          Mark G. Simons
                            _Attorneys for United Construction Company_
19

20

21

22

23

24

25

26

27

SIMONS HALL
JOHNSTON PC
6490 S. McCarran
Blvd., #F-46
Reno, NV 89509
775) 785-0088

28

6

# EXHIBIT J

# EXHIBIT J

F I L E D
Electronically
CV19-00164
2019-02-25 04:23:06 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7134689 : csulezic

**CODE: 1130**
LIPSON NEILSON P.C.
JOSEPH P. GARIN, ESQ.
Nevada Bar No. 6653
LISA J. ZASTROW, ESQ.
Nevada Bar No. 9727
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 - Telephone
(702) 382-1512 - Facsimile
jgarin@lipsonneilson.com
lzastrow@lipsonneilson.com

*Attorneys for Defendant*
*LP Insurance Services, LLC*

## IN THE SECOND JUDICIAL DISTRICT FOR THE STATE OF NEVADA

## IN AND FOR THE COUNTY OF WASHOE

| | |
|---|---|
| UNITED CONSTRUCTION COMPANY, a Nevada corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>L/P Insurance Services, LLC, a Nevada limited liability company, and DOES 1-10,<br><br>Defendants. | CASE NO.:   CV19-00164<br><br>DEPT. NO.:   7<br><br><br>**ANSWER TO COMPLAINT**<br><br>**-AND-**<br><br>**THIRD PARTY COMPLAINT** |
| LP INSURANCE SERVICES, LLC, a Nevada limited liability company;<br><br>Third-Party Plaintiff,<br><br>vs.<br><br>ZURICH NORTH AMERICA, an Illinois corporation; STEADFAST INSURANCE COMPANY, a Delaware corporation; ARCH SPECIALTY INSURANCE COMPANY, a Missouri corporation, and DOES 1-10 and ROES 1-10.<br><br>Third-Party Defendants. | |

*Lipson Neilson P.C.*
*9900 Covington Cross Drive, Suite 120*
*Las Vegas, Nevada 89144*
*(702) 382-1500 FAX: (702) 382-1512*

1    COMES NOW, Defendant LP INSURANCE SERVICES, LLC (hereafter referred to as

2  "Answering Defendant by and through its counsel of record, Joseph P. Garin of, LIPSON

3  NEILSON P.C., and hereby responds to Plaintiff's Complaint as follows:

4    1.  Answering Paragraph 1 and 2 of Plaintiff's Complaint, Answering Defendant admits the

5  allegations contained in said paragraph.

6    2.  Answering Paragraph 3 of Plaintiff's Complaint, Answering Defendant is without

7  knowledge or information sufficient to form a belief as to the truth of the allegations contained in

8  said paragraph and therefore denies the allegations contained therein.

9    3.  Answering Paragraph 4 of Plaintiff's Complaint, Answering Defendant is without

10  knowledge or information sufficient to form a belief as to the truth of the allegations contained in

11  said paragraph and therefore denies the allegations contained therein.

12    4.  Answering Paragraph 5, 18 and 28 of Plaintiff's Complaint, Answering Defendant denies

13  the allegations contained in said paragraph.

14    5.  Answering Paragraph 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 22, 23, 24, 25,

15  26, 27 29 and 30 of Plaintiff's Complaint, Answering Defendant is without knowledge or

16  information sufficient to form a belief as to the truth of the allegations contained in said

17  paragraph and therefore denies the allegations contained therein.

## FIRST CAUSE OF ACTION

### (Negligence)

6.  As to paragraph 31 of Plaintiff's Complaint, Answering Defendant incorporates its

responses to paragraphs 1 through 30 as if fully set forth herein.

7.  Answering Paragraph 32, 33, 34, 35 and 36 of Plaintiff's Complaint, Answering

Defendant denies the allegations contained in said paragraph.

## AFFIRMATIVE DEFENSES

1.  Plaintiff fails to state a claim against Defendant LP Insurance Services upon which relief

may be granted.

2. Plaintiff's claims are barred or reduced, in whole or in part, on the grounds of comparative fault, proportionate responsibility, contributory negligence, and comparative negligence, based on the Plaintiff's own acts and omissions, and based upon the acts, omissions, negligence, intentional misconduct, fraud, or fault of third persons whose conduct is imputed to the Plaintiff, and Plaintiff's recovery, if any, should be barred or reduced in a manner consistent with applicable law.

3. Plaintiff's claims are barred by the applicable statutes of limitation and on the grounds of laches.

4. Plaintiff's claims are barred on the grounds that LP Insurance Services has at all times acted in a commercially reasonable manner, and has exercised reasonable care, diligence, and good faith.

5. Plaintiff's claim for equitable relief is barred for each of the reasons reflected in the other affirmative defenses asserted in this answer, and on the grounds that Plaintiff's allegations do not meet the standards for awarding the equitable relief they seek.

6. Plaintiffs' claimed damages are the result of the acts or omissions of third persons for whom the Defendant is not responsible.

7. Plaintiff's claims are barred, in whole or in part, based on the terms and conditions of contracts and documents governing the rights and obligations of the parties and other third persons associated with the persons and conduct referenced in the Complaint, and as a result of Defendant's compliance with applicable state and federal statutory and regulatory provisions governing the conduct, acts, and purported omissions challenged in this action.

8. Plaintiff's damages and losses allegedly sustained, if any, were the direct and proximate result of intervening and superseding acts or omissions of third persons, whether named or unnamed, and not as a result of any acts or omissions by Defendant or the acts or omissions of any persons or entities whose conduct is attributable to Defendant.

Page 3 of 14

Lipson Neilson P.C.
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 FAX: (702) 382-1512

9. Plaintiff's claims are barred, in whole or in part, by the economic loss doctrine or equivalent theories.

10. Plaintiff's claims are barred under the doctrine of unclean hands.

11. Plaintiff's damages, if any, must be apportioned and allocated among all responsible policies and other parties.

12. Plaintiff's claim for damages is barred, in whole or in part, by their failure to mitigate damages.

13. Plaintiff's claim for equitable relief is barred by the fact that there are adequate remedies available at law.

14. Plaintiff's claims are barred by the doctrines of waiver and release.

## PRAYER

WHEREFORE, Answering Defendant LP Insurance Services, LLC requests Plaintiff take nothing by way of its Complaint; that said Complaint be dismissed, with prejudice; that these Answering Defendant be awarded costs and attorneys' fees incurred in defending this action; and that Answering Defendant be awarded such other and further relief as this Court deems just.

/./././

/./././

/./././

/./././

/./././

/./././

/./././

/./././

/./././

/./././

Lipson Neilson P.C.
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 FAX: (702) 382-1512

**THIRD PARTY COMPLAINT AGAINST
ZURICH NORTH AMERICA; STEADFAST INSURANCE COMPANY and ARCH
SPECIALTY INSURANCE COMPANY**

Defendants/Third Party Plaintiff L/P INSURANCE SERVICES, LLC, by and through

its counsel of record, the Law Office of Lipson Neilson P.C., hereby alleges against Third-Party

Defendants ZURICH NORTH AMERICAN, STEADFAST INSURANCE COMPANY, and

ARCH SPECIALTY INSURANCE as follows:

**PARTIES**

1.  L/P INSURANCE SERVICES, LLC ("LP") is a limited liability company organized and

existing under the laws of the State of Nevada and authorized to do business in Washoe County,

Nevada.

2.  UNITED CONSTRUCTION COMPANY ("UCC") is a corporation organized and

existing under the laws of the State of Nevada and authorized to do business in Washoe County,

Nevada.

3.  ZURICH NORTH AMERICA ("Zurich") is a corporation organized and existing under

the laws of the State of Illinois with its principal place of business at 1299 Zurich Way,

Schamburg, IL 60196.

4.  Zurich conducts business in Washoe County, Nevada and therefore jurisdiction and

venue are proper herein.

5.  STEADFAST INSURANCE COMPANY ("Steadfast") is a corporation organized and

existing under the laws of the State of Delaware with offices located at 1400 American Lane,

Schaumburg, IL 60196.

6.  Steadfast is an affiliated company with Zurich and both conduct business in Washoe

County, Nevada and therefore jurisdiction and venue are proper herein.

7.  Steadfast and Zurich are collectively referred to herein as "Zurich".

Lipson Neilson P.C.
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 FAX: (702) 382-1512

8.   ARCH SPECIALTY INSURANCE COMPANY ("Arch") is a corporation organized and existing under the laws of the State of Missouri with offices located at One Liberty Plaza, New York, NY 10006.

9.   Arch conducts business in Washoe County, Nevada and therefore jurisdiction and venue are proper herein.

10. The true names of DOES 1-10 and ROES 1-10, inclusive, whether individuals, corporations, governmental entities or otherwise, are unknown to LP, who therefore sues said parties by such fictitious names.  LP is informed and believes and thereon alleges that the parties designated herein as DOES 1-10 and ROES 1-10, at all times relevant herein, were either residents of Nevada and/or were conducting business in Clark County, Nevada, and are legally responsible for the events and happenings described in the Complaint, which proximately caused damages to LP as alleged herein.  LP will ask leave of Court to amend this Complaint to insert the true names and capacities of the DOES 1-10 and ROES 1-10, and state appropriate charging allegations when that information has been ascertained.

## GENERAL ALLEGATIONS

11. UCC is a licensed commercial general contractor doing business in Washoe County, Nevada.

12. UCC contracts large scale, multi-million-dollar construction projects.

13. LP is an insurance and risk management services company.

14. UCC hired LP to provide United with insurance applicable to United's business operations.  The LP duties and obligations are stated in a Service Agreement.

15. Logistic Center contracted with UCC for UCC to provided design build services at four locations in Reno, Nevada.

/././/

Lipson Neilson P.C.
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 FAX: (702) 382-1512

16. Specifically, UCC was contracted to design and build four warehouses at each of the following locations; 385 Milan Ave., 8020 North Virginia Road, 8040 North Virginia Road and 8730 Military Road.

17. On or about April 5, 2016 a UCC employee discovered mold at the Milan Ave. warehouse location during removal of roof insulation.

18. On August 5, 2016 that UCC tendered its claim to Zurich; Claim No. 9260150560.

19. That day, on August 5, 2016, UCC requested that LP tender three claims to UCC's "General Liability, Pollution Liability and Professional Liability carriers" regarding "possible Design-Build Claim which caused condensation and building damage" at the Milan Ave., 8020 North Virginia Road and 8040 North Virginia Road locations.

20. LP complied with UCC's request.

21. By letter dated November 16, 2016 Zurich denied coverage for the Milan Ave. claim for alleged failure to obtain prior approval before incurring expenses, among other reasons.

22. Zurich accepted the tender for the 8020 North Virginia Road and 8040 North Virginia Road properties.

23. The Zurich Policy in issue is Policy No. EOC 0193620-00 ("Zurich Policy").

24. Upon information and belief, Zurich was provided all claim related material including expert reports and the general contracts between UCC and Logistic Center.

25. Zurich was on notice that the Milan Road, 8020 Virginia Road, 8040 Virginia Road and Military Road properties were all related construction projects with the same design build scope, for the same owner.

26. On or about April 17, 2017, during the Policy period, the owner of the Military Road Property made a claim against UCC for mold and moisture damage (the "Military Road Claim").

27. The Military Road Claim is a covered claim of the Zurich Policy and, pursuant to the

Page 7 of 14

1    terms of the Zurich Policy, the Policy's insurance protections applied and the Military Road

2    Claim should have been accepted by Zurich.

3    28. On April 17, 2017, during the Policy period, United notified LP of the Military Road

4    Claim and asked that LP tender the claim to its carriers by asking that LP tender "microbial

5    growth on the building located at 8730 Military Road."

6

7    29. Based on UCC's request, LP tendered the claims to State National (York) Insurance

8    Company for general liability, and to Philadelphia Insurance Company, which is noted as

9    "Pollution" coverage.

10   30. On April 18, 2017, during the Zurich Policy period, LP responded to United and advised

11   United it would immediately submit the Military Road Claim to the "appropriate [insurance]

12   carriers" on United's behalf.

13   31. LP did not send a separate request regarding the Military Road Claim to Zurich.

14

15   32. UCC did not send a separate request for coverage to Zurich; however, again, Zurich was

16   on notice of the related claims.

17   33. On April 20, 2017, the Zurich Policy expired.

18   34. UCC did not renew the Policy with Zurich.

19   35. On June 20, 2017, the sixty (60) day extended reporting period under the Policy issued by

20   Zurich expired.

21   36. On July 11, 2017, United contacted Zurich to obtain a status update on the Military Road

22

23   Claim.

24   37. Zurich subsequently asserted that this communication by UCC was its first notification

25   of the Military Road Claim.

26

27   38. On July 12, 2017, Zurich advised UCC that it did not have a claim number in its system

28   and offered to work with United's agent LP "to ensure we have the tender docs and that a claim

Lipson Neilson P.C.
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 FAX: (702) 382-1512

number has been established and assigned to the proper Claims Specialist."

39. On July 17, 2017, Zurich notified UCC that it still had "received nothing on this matter."

40. On July 27, 2017, Zurich issued its letter to United denying coverage under the Policy for the Military Road Claim ("Coverage Denial Letter").

41. In Zurich's Coverage Denial Letter, Zurich notified UCC that it did not timely receive notice of the Military Road Claim within the Policy period or within the extended reporting period.

42. The related claims provision in the Zurich Policy does not provide any reporting deadline for subsequent related Claims that are reported after the Policy period and relate back to a claim that was made and reported during the Policy period.

43. The Zurich Policy does not require that later-made Related Claims be reported within the Zurich Policy Period or the extended reporting period.

44. Pursuant to the related claims provision in the Zurich Policy, two or more Claims "arising out of the same, interrelated, associated, repeated, or continuous negligent act, error or omission or a series of related negligent acts, errors or omissions "Related Claims" shall be treated as a single Claim and shall be subject to the same Limit of Liability and only one Self Insured Retention for each applicable Coverage Part if multiple coverage parts are involved.

45. The Military Road Claim is a related claim to one or more of the prior claims that UCC tendered under the Zurich Policy regarding the properties at Milan Ave. and North Virginia Road. Therefore, the Military Road Claim was timely reported under the Zurich Policy pursuant to the related claims provision, which does not set forth any reporting deadline for subsequent related claims.

46. Pursuant to the Zurich Policy, two or more Claims "arising out of the same, interrelated, associated, repeated, or continuous negligent act, error or omission or a series of related negligent acts, errors or omissions "Related Claims" shall be treated as a single Claim.

Page 9 of 14

Lipson Neilson P.C.
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 FAX: (702) 382-1512

47. The Zurich Policy also contains a notice of circumstance provision, which states that to the extent the Insured provides Zurich written notice, before the Policy Period expires, of an actual or alleged negligent act, error or omission "which may be expected to give rise to" a Claim under the policy, any Claim for which coverage is provided by the Policy that may be made against the Insured shall be deemed to have been made on the date on which notice of circumstance was given.

48. Zurich was provided with written notice during the Zurich Policy period of the prior claims regarding the properties at Milan Ave. and North Virginia Road. Per the Zurich Policy's notice of circumstance provision, Zurich therefore had sufficient notice of an actual or alleged negligent act, error or omission "which may be expected to give rise to" the Military Road Claim. Therefore, the Military Road Claim should be deemed to have been made on the earliest date during the Zurich Policy period on which Zurich was provided notice of such circumstance.

49. Because UCC was entitled to coverage under the Zurich Policy for the Military Road Claim, Zurich's denial of coverage for that claim was negligent and constituted a breach of the duty to defend and a breach of the covenant of good faith and fair dealing.

50. After Zurich wrongfully denied coverage for the Military Road Claim, UCC continued to pursue its claim, through LP, against its subsequent carrier, Arch.

51. Arch issued a Contractors Professional Liability Pollution Liability and Protective Indemnity Policy, Policy No PDCPP0021200 ("Arch Policy").

52. On November 10, 2017, Arch denied coverage for the claim alleging that the Military Road Claim relates back to claims made before the inception of the Arch Policy.

53. Arch's declination letter indicated that because the Military Road Claim is a Related Claim, Zurich/Steadfast should be responsible for coverage under the claim.

54. To the extent the Military Road Claim does not constitute a Related Claim under the Arch Policy, UCC is entitled to coverage from Arch.

Page 10 of 14

55. On or about January 18, 2019 UCC filed suit against LP asserting that LP failed to tender the Military Road claim to UCC's carrier's in a timely manner ("UCC Complaint").

56. The UCC Complaint asserts a single cause of action against LP for negligence.   LP asserts its proper affirmative defenses and asserts that Zurich's denial of coverage was negligent and constituted a breach of the duty to defend and a breach of the covenant of good faith and fair dealing, or was otherwise not proper, under the Zurich Policy, and thus any coverage owed to UCC, is owed by Zurich, not LP.

57. To the extent the Military Road Claim is found to not constitute a Related Claim under the Arch Policy, any coverage owed to LP, not owed by Zurich, is owed by Arch pursuant to the Arch Policy.

### FIRST CAUSE OF ACTION
### (Contribution as to All Defendants)

58. LP realleges and incorporates all preceding paragraphs as though fully set forth herein.

59. LP refers to the UCC Complaint, in its entirety, and fully incorporates it by reference herein.

60. If LP is held liable to UCC for the claim made in the UCC Complaint, it is solely due to the conduct of the Third-Party Defendants, each of them, as herein alleged.

61. Therefore, the Third-Party Defendants are liable, the exact amount of which is unknown at this time, for any damages to UCC as alleged in the UCC Complaint, in contribution, as a matter of law.

62. Additionally, LP is required to have counsel and incur attorney fees and costs to defend the UCC Complaint, and prosecute this Third-Party Complaint, and therefore, Third-Party Defendants are responsibility for all LP's legal fees and costs, as provided for at law.

### SECOND CAUSE OF ACTION
### (Indemnification as to All Defendants)

63. LP realleges and incorporates all preceding paragraphs as though fully set forth herein.

Lipson Neilson P.C.
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 FAX: (702) 382-1512

64. LP refers to the UCC Complaint, in its entirety, and fully incorporates it by reference herein.

65. If LP is held liable to UCC for the claim made in the UCC Complaint, it is solely due to the conduct of the Third-Party Defendants, each of them, as herein alleged.

66. Therefore, LP is entitled to be indemnified by the Third-Party Defendants should LP be determined liable, the exact amount of which is unknown at this time, for any damages to UCC as alleged in the UCC Complaint, as a matter of law.

67. Additionally, LP is required to have counsel and incur attorney fees and costs to defend the UCC Complaint, and prosecute this Third-Party Complaint, and therefore, Third-Party Defendants are responsibility for all LP's legal fees and costs, as provided for at law.

### THIRD CAUSE OF ACTION
**(Declaratory Relief as to All Defendants)**

68. LP realleges and incorporates all preceding paragraphs as though fully set forth herein

69. LP refers to the UCC Complaint, in its entirety, and fully incorporates it by reference herein.

70. An actual controversy has arisen between LP and the Third-Party Defendants, each of them, with respect to the rights, obligations and duties of the parties.

71. The controversy is ripe for adjudication and LP seeks a determination that the Military Road Claim is a Related Claim, as defined under the Zurich Policy, and therefore is a covered claim, denied negligently, in breach of the duty to defend, and in bad faith.

72. Additionally, to the extent the Military Road Claim is not a Related Claim under the Arch Policy, UCC is entitled to coverage from Arch.

73. LP is required to have counsel and incur attorney fees and costs to defend the UCC Complaint, and prosecute this Third-Party Complaint, and therefore, Third-Party Defendants are responsibility for all LP's legal fees and costs, as provided for at law.

Lipson Neilson P.C.
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 FAX: (702) 382-1512

WHEREFORE, Third-Party Plaintiffs pray for judgment as follows:

1.  For judgment as requested herein, in favor of Third-Party Plaintiff LP INSURANCE SERVICES, LLC;

2.      For any and all legal and/or equitable relief as the Court deems just and proper, including, but not limited to legal fees and costs;

3.      For any such relief as the Court may deem just and proper.

**AFFIRMATION**
**Pursuant to NRS 239B.030**

The undersigned hereby affirms that the proceeding document does not contain the social security number of any person

DATED this 25th day of February, 2019.

LIPSON NEILSON P.C.

By: _____*Lisa J. Zastrow*_____
JOSEPH P. GARIN, ESQ. (NV Bar No. 6653)
LISA J. ZASTROW, ESQ. (NV Bar No. 9727)
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144

*Attorneys for Defendant*
*LP Insurance Services, LLC*

Lipson Neilson P.C.
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 FAX: (702) 382-1512

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lipson Neilson P.C.
9900 Covington Cross Drive, Suite 120
Las Vegas, Nevada 89144
(702) 382-1500  FAX: (702) 382-1512

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of February, 2019 service of the foregoing ANSWER TO COMPLAINT AND THIRD-PARTY COMPLAINT was made pursuant to NRCP 5(b) and electronically transmitted to the Clerk's Office using the Court's E-Flex system for filing and transmittal to the following parties:

Mark G. Simons, Esq.
SIMONS HALL JOHNSTON PC
6490 S. McCarran Blvd., #F-46
Reno, NV 89509
Tel: (775) 785-0088
Fax: (775) 785-0087

*Attorneys for Plaintiff United Construction Company*

*Nancy Rozan*
An employee of LIPSON NEILSON P.C.

# EXHIBIT K

# EXHIBIT K

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release ("Agreement") is entered into as of the date it has been fully executed by the Parties, who are Capitol Specialty Insurance Corporation ("CapSpecialty"), L/P Insurance Services, LLC ("L/P"), and United Construction Company ("United"). CapSpecialty, L/P, and United are collectively referred to herein as the "Parties" and each individually as a "Party."

## RECITALS

These recitals are included solely for the purpose of providing background and context for this Agreement and do not constitute admissions by any Party or a waiver by any Party of rights not otherwise extinguished by the releases contained herein.

A.      CapSpecialty issued Insurance Agents and Brokers Professional Liability Policy, No. IA20151100-03, to L/P for the September 1, 2017 to September 1, 2018 Policy Period (the "CapSpecialty Policy"). (CapSpecialty Policy Declarations, Items 1 & 2.)

B.      The CapSpecialty Policy has a $5 million per **Claim** Limit of Liability and a $5 million Aggregate Limit of Liability, subject to a $25,000 per **Claim** Deductible. (CapSpecialty Policy Declarations, Items 4 & 5 as amended by Endorsement No. 2.)  **Claim Expenses** do not reduce the CapSpecialty Policy's Limits of Liability. (CapSpecialty Policy, § I.A.3.)

C.      L/P is a licensed insurance broker that provided insurance brokerage services to United.

D.      United has alleged that L/P failed to timely report a claim on United's behalf to United's insurer Steadfast Insurance Company ("Zurich") in connection with property damage allegedly discovered at a warehouse property for which United provided design-build services, located at 8730 Military Road, Reno, Nevada (the "Military Road Property"). United had previously tendered to Zurich claims for property damages resulting from alleged flaws at warehouse properties located at 8020 N. Virginia Street, Reno, Nevada, and 8040 N. Virginia Street, Reno, Nevada (collectively, the "Virginia Street Properties") and 385 Milan Drive, Sparks, Nevada (the "Milan Drive Property"). Certain or all of these properties were owned by Logisticenter 395 Owner LLC ("Logisticenter").

E.      On or about April 17, 2017, Logisticenter made a claim against United for property damage to the Military Road Property arising out of the same design-build features that allegedly caused the same type of damage to the Milan Drive Property and the Virginia Road Properties (the "Military Road Claim").

F.      When the Military Road Claim was reported to Zurich, Zurich denied coverage for it on the basis that it was not timely reported.

G.      United alleges that it has incurred and will continue to incur significant damages repairing the Military Road Property as a result of Zurich's denial of coverage, and that L/P's alleged failure to timely report the Military Road Property claim caused damage to United.

CAP006027

H.     Zurich has continued to maintain its coverage denial, including in correspondence to CapSpecialty responding to CapSpecialty's correspondence to Zurich pointing out the flaws in Zurich's coverage position.

I.     On January 18, 2019, United filed a lawsuit against L/P in the Second Judicial District Court, Washoe County, Nevada, No. CV19-00164, alleging professional negligence based on L/P's purported failure to provide timely notice of the Military Road Property claim to Zurich. ("L/P Litigation").

J.     On January 25, 2019, CapSpecialty agreed by letter to defend and indemnify L/P in connection with the L/P Litigation, subject to a full and complete reservation of rights.

K.     Following numerous settlement discussions and a mediation session, United, L/P, and CapSpecialty agreed to settle their disputes involving the Military Road Property claim and the L/P Litigation for a total payment amount of $4,097,000, such payments to be made as outlined below, with CapSpecialty paying $3.6 million and L/P agreeing to pay the remainder, subject to United assigning all of its claims against Zurich and any other insurers or potentially responsible parties in connection with the Milan Drive, Virginia Street, and Military Road Properties.

## AGREEMENT

**NOW, THEREFORE**, based on the foregoing recitals, and in consideration of the mutual covenants and agreements reflected herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

## **Payments**

1.     L/P and CapSpecialty jointly will pay, according to the terms and contribution amounts below, a total amount of $4,097,000 to United to resolve any and all claims that United has made or may make against L/P in connection with the Military Road Property.

2.     CapSpecialty shall make payment in the amount of $1,967,295.45 to United, no later than fifteen (15) days after the last of the following conditions occurs: (1) execution of this Agreement by the Parties; (2) CapSpecialty's receipt of a completed W-9 from United, along with all appropriate payment information; and (3) receipt of a fully-executed copy of the Assignment and Cooperation Agreement, a copy of which is attached hereto as Exhibit A. CapSpecialty's $1,967,295.45 payment will be credited against the CapSpecialty Policy's Limit of Liability for all **Claims** and will erode that Limit of Liability by $1,967,295.45.

3.     In addition to CapSpecialty's payment of $1,967,295.45 to United, CapSpecialty will reimburse United (or directly pay United's vendors, as directed by United) for $1,632,704.55 in additional amounts incurred in connection with the remediation of the Military Road Property, according to reasonable proof provided by United or its vendors that such amounts have been incurred or billed to United, including, but not limited to, invoices typically provided in the course of such work. CapSpecialty will pay such reimbursements to United (or to the appropriate vendor) no later than thirty (30) days after CapSpecialty receives acceptable proof of the reimbursable amounts. CapSpecialty's total settlement contribution shall not exceed

CAP006028

$3.6 million, all inclusive. All amounts that CapSpecialty pays to United in connection with this settlement will be credited against the CapSpecialty Policy's Limit of Liability for all **Claims** and will erode that Limit of Liability by those amounts.

4.     L/P shall make payment in the amount of $497,000.00 to United no later than fifteen (15) days after United satisfies the conditions set forth in paragraph 2, above, as well as the following conditions, including (1) execution of this Agreement by the Parties; (2) L/P's receipt of a completed W-9 from United; and (3) receipt of a fully executed copy of the Assignment and Cooperation Agreement, attached as Exhibit "A," as well as receipt of a fully executed copy of the Release and Recovery Agreement (the "RRA") between CapSpecialty and L/P. It is the intent of the Parties that CapSpecialty pay the first $3,600,000.00 to United despite L/P's willingness to advance $497,000.00 following performance by United of the conditions set forth in paragraphs 2 and 3 above. Therefore, upon final payment to United, CapSpecialty agrees to reimburse L/P the difference, if any, between the amount CapSpecialty pays pursuant to the terms of this Agreement and the sum of $3,600,000.00, up to a total of $497,000.00.

## Assignment

5.     In exchange for the payments by CapSpecialty and L/P to United as set forth in Paragraphs 1 through 4 above, and for other valuable consideration, United will agree to the terms and conditions set forth in the Assignment and Cooperation Agreement attached hereto as Exhibit A.

## Recovery Agreement

6.     CapSpecialty and L/P have entered into the above-referenced RRA, which sets forth the rights of each Party to priority in receipt of funds recovered by counsel employed by CapSpecialty. The terms of the RRA control priority of receipt of funds and all other matters regarding recovery between CapSpecialty and L/P, except as set forth in paragraph 4 above.

## Release

7.     Except for any rights created by this Agreement, upon payment by CapSpecialty and L/P to United as set forth in Paragraphs 1 through 4 above, United, on its own behalf and on behalf of its past, present and future parents, agents, members, affiliates, subsidiaries, successors, equity holders, officers, directors, employees, representatives, and attorneys hereby unconditionally releases and forever discharges L/P and its past, present and future principals, parents, agents, members, affiliates, subsidiaries, successors, equity holders, officers, directors, employees, representatives, insurers (including but not limited to CapSpecialty), reinsurers and attorneys from any and all claims, actual or potential claims, causes of action, suits, claims for sums of money, contracts, controversies, agreements, costs, attorneys' fees, expenses, damages, judgments and demands whatsoever in law or equity, known or unknown, now existing or hereafter arising, which United had, has or may have in the future against L/P in connection with United's claim or claims concerning (i) the remediation of the Military Road Property, (ii) the L/P Litigation, (iii) any claims for coverage under any insurance policy with regard to, arising out of, or in any way related to the remediation of the Military Road Property or the L/P Litigation; and (iv) any claims by or against any creditors in connection with the remediation of

CAP006029

the Military Road Property or the L/P Litigation. This release also includes any loans taken and/or interest paid and/or incurred by United in connection with such matters, or any amounts United paid to any other person or entity arising out of such matters or the facts and circumstances underlying or alleged in such matters, including all attorneys' fees and costs incurred by United in connection with these matters. This release also includes United's agreement to dismiss the L/P Litigation, and United will take the immediate and necessary steps to effect such dismissal. United's dismissal of the L/P Litigation shall constitute a dismissal without prejudice until the full settlement amount of $4,097,000 has been paid, upon which time the dismissal shall constitute a dismissal with prejudice of the L/P Litigation, regardless of whether a dismissal with prejudice and order is submitted to, and entered by, the Court. Nothing in this release shall be deemed to be a release of the rights United is assigning to CapSpecialty pursuant to the Assignment and Cooperation Agreement or any subrogation rights that CapSpecialty may have against any person or entity not a party to this Agreement.

8.      Except for any rights created by this Agreement, L/P on its own behalf and on behalf of their past, present and future parents, agents, members, affiliates, subsidiaries, successors, equity holders, officers, directors, employees, representatives, attorneys and insurers (except for CapSpecialty, as noted in paragraph 9 below) hereby unconditionally releases and forever discharges United, and its past, present and future principals, parents, agents, members, affiliates, subsidiaries, successors, equity holders, officers, directors, employees, representatives, and attorneys from any and all claims, actual or potential claims, causes of action, suits, claims for sums of money, contracts, controversies, agreements, costs, attorneys' fees, expenses, damages, judgments and demands whatsoever in law or equity, known or unknown, now existing or hereafter arising, in connection with United's claim or claims concerning (i) the remediation of the Military Road Property, (ii) the L/P Litigation, (iii) any claims for coverage under any insurance policy with regard to, arising out of, or in any way related to the remediation of the Military Road Property or the L/P Litigation; and (iv) any claims by or against any creditors in connection with the remediation of the Military Road Property or the L/P Litigation. In addition, L/P agrees to indemnify, defend and hold United harmless from any claims, demands or causes of action arising out of the Assignment and Cooperation Agreement. Nothing in this release shall be deemed to be a release of the rights United is assigning to CapSpecialty pursuant to the Assignment and Cooperation Agreement or any subrogation rights that CapSpecialty may have against any person or entity not a party to this Agreement.

9.      Except as otherwise provided by this Agreement, any rights and obligations between United and CapSpecialty are fully set forth in the Assignment and Cooperation Agreement, attached as Exhibit "A."

10.     To the extent the Parties each may have claims against the other of which they are unaware and unsuspecting that arise from the circumstances surrounding the matters released herein, it is the intention of the Parties in entering into this Agreement that it will deprive each party of such claims and prevent them from asserting them now or in the future. To this end, the Parties waive all rights and benefits conferred upon them by the statutes or common law of any jurisdiction that has the same or similar effect as the provision set forth below:

A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if

CAP006030

known by him or her, would have materially affected his or her settlement with the debtor or released party.

**Confidentiality**

11.    The Parties agree that they will keep confidential and not disclose the terms or amounts of this Agreement, any drafts of this Agreement, or any communications describing the terms of this Agreement, except to the extent such disclosure is consented to by all Parties, is required by a court or government agency order, or is required by law; provided, however, that nothing in this Agreement will prohibit the Parties from disclosing any such information in confidence to their directors, officers, partners, members, legal counsel, accountants, reinsurers, bonding companies (which does not include Zurich), or auditors.

**Representations & Warranties**

12.    The Parties represent and warrant that there have not been any, and agree that there will not be any, assignments or other transfers of any interest in any claim which either Party releases and discharges pursuant to this Agreement, except as set forth in the Assignment and Cooperation Agreement attached as Exhibit A.

**Entire Agreement**

13.    This is an integrated Agreement.  It sets forth the entire agreement between the Parties with regard to the subject matter of this Agreement and supersedes all prior agreements and understandings of the Parties.  The Parties have entered into this Agreement voluntarily and not in reliance upon any representation, warranty, consideration, or inducement not recited herein.  This Agreement shall not be altered, amended, modified, or otherwise changed in any respect whatsoever except by a duly executed writing by all Parties.

**No Admissions of Liability or Coverage**

14.    All obligations called for by this Agreement are not to be construed as an admission of liability, an admission of coverage or lack of coverage under the CapSpecialty Policy, or an admission of the validity or enforceability of any matters that are released pursuant to this Agreement.  The Parties also acknowledge and agree that this Agreement will not be taken or used, nor will this Agreement be admissible in evidence, in any action, cause of action or proceeding, except in an action to enforce the terms of this Agreement.

**Construction of Agreement**

15.    The Parties agree that this Agreement shall be binding upon, and shall inure to the benefit of, each Party and its respective related persons and entities, as well as any other corporation, partnership or entity into which any Party to this Agreement or any related persons and entities may merge, consolidate or reorganize.

16.    This Agreement will not be construed against the Party preparing it, but will be construed as if both Parties had prepared it, and it will not be construed against CapSpecialty merely because CapSpecialty is an insurance company.

CAP006031

## Severability

17.    If any provision of this Agreement is held to be illegal, invalid or otherwise unenforceable under any present or future laws, such provision(s) shall be fully severable and shall in no way affect the validity or enforceability of this Agreement or any other provision of this Agreement. All that is required to make this Agreement a legally binding and enforceable agreement is the Party's authorized representative's signatures.

18.    If any fact now believed to be true is found hereafter to be other than, or different from, that which is now believed, each Party expressly assumes the risk of such difference in fact and agrees that this Agreement shall and will remain effective notwithstanding any such difference in fact. In furtherance of the Parties' intention that this Agreement shall be effective as a full and final accord, satisfaction and release of each and every matter specifically referred to in this Agreement, each Party acknowledges that it expressly waives and relinquishes, to the fullest extent permitted by law, the provisions, rights and benefits of any principle of common or statutory law of the United States or any other state or country, which narrowly construes releases purporting by their terms to release unknown or underestimated or overestimated claims and/or liabilities in whole or in part, or restricts or prohibits the releasing of such claims and/or liabilities.

## Choice of Law

19.    This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada.

## Advice of Counsel

20.    This Agreement is made and executed by each of the Parties hereto with the advice of counsel, and no Party has been coerced or induced to enter into this Agreement by any improper action by the other Party.

## Recitals

21.    The recitals to this Agreement are hereby incorporated by reference into this Agreement as if fully set forth herein.

## Headings & Captions

22.    The headings and captions used in this Agreement are for convenience only, are not a part of this Agreement, and shall not alter or determine any rights or obligations under this Agreement

## Execution in Counterparts

23.    To facilitate execution, this Agreement may be executed in one or more counterparts, each of which shall be deemed an original and when taken together with the other signed counterparts, shall constitute one Agreement which shall be binding upon and effective as

CAP006032

to all Parties.  Signatures transmitted by facsimile or by electronic mail shall be fully and legally binding on the Parties.

**Authorized Signatures**

    24.    Each of the undersigned individuals executing this Agreement on behalf of his or her respective party represents and warrants that he or she is authorized to enter into and execute this Agreement on behalf of such party, that the appropriate corporate resolutions or other consents have been passed and/or obtained, and that this Agreement will be binding on the party on whose behalf it is executed.  Each of the Parties herein represent, warrant and stipulate that it, through its authorized representative, has read and is/are fully aware of the contents of this Agreement and its legal effect, has full capacity and authority to execute and deliver this Agreement, to perform or cause to be performed, all respective obligations and duties hereunder, to consummate the transactions contemplated hereby, without the necessity of any further act, or consent of any other party, and that the appropriate corporate resolutions or other consents have been passed and/or obtained.  This Agreement constitutes valid and binding obligations on all of the Parties, enforceable in accordance with its terms.

    **IN WITNESS WHEREOF**, each of the undersigned Parties has caused this Agreement to be duly executed on its behalf as of the dates indicated below.


UNITED CONSTRUCTION COMPANY

By: Michael J. Whittaker

Signature: _____

Title: President & CEO

Date: 4/27/20

L/P INSURANCE SERVICES, LLC

By: _____

Signature: _____

Title: _____

Date: _____

CAP006033

to all Parties. Signatures transmitted by facsimile or by electronic mail shall be fully and legally binding on the Parties.

<u>Authorized Signatures</u>

24.    Each of the undersigned individuals executing this Agreement on behalf of his or her respective party represents and warrants that he or she is authorized to enter into and execute this Agreement on behalf of such party, that the appropriate corporate resolutions or other consents have been passed and/or obtained, and that this Agreement will be binding on the party on whose behalf it is executed. Each of the Parties herein represent, warrant and stipulate that it, through its authorized representative, has read and is/are fully aware of the contents of this Agreement and its legal effect, has full capacity and authority to execute and deliver this Agreement, to perform or cause to be performed, all respective obligations and duties hereunder, to consummate the transactions contemplated hereby, without the necessity of any further act, or consent of any other party, and that the appropriate corporate resolutions or other consents have been passed and/or obtained. This Agreement constitutes valid and binding obligations on all of the Parties, enforceable in accordance with its terms.

**IN WITNESS WHEREOF**, each of the undersigned Parties has caused this Agreement to be duly executed on its behalf as of the dates indicated below.


UNITED CONSTRUCTION COMPANY

By: _____

Signature: _____

Title: _____

Date: _____

L/P INSURANCE SERVICES, LLC

By: *Nicholas D E Rossi* _____

Signature: _____

Title: *President* _____

Date: *4/21/20* _____

CAP006034

CAPITOL SPECIALTY INSURANCE CORPORATION

By: _____William Roy_____

Signature: _____

Title: ___Head of Professional Liability Claims___

Date: ___5/5/2020_____

CAP006035

# EXHIBIT L

# EXHIBIT L

## ASSIGNMENT AND COOPERATION AGREEMENT

This ASSIGNMENT AND COOPERATION AGREEMENT ("Assignment") is made effective as of the last date it is signed below, by and between Capitol Specialty Insurance Corporation ("CapSpecialty"), and United Construction Company ("United").

## RECITALS

These recitals are included solely for the purpose of providing background and context for this Agreement and do not constitute admissions by any Party or a waiver by any Party of rights not otherwise extinguished by the releases contained herein.

A.    CapSpecialty issued an Insurance Agents and Brokers Professional Liability Policy, policy number IA20151100-03, to L/P Insurance Services, Inc. ("L/P"), effective from September 1, 2017, through September 1, 2018 ("CapSpecialty Policy").

B.    L/P is a licensed insurance broker that provided insurance brokerage services to United pursuant to the terms of a service agreement.

C.    Steadfast Insurance Company ("Zurich") issued a Professional Liability Insurance Policy, policy number EOC 0193620-00, to United, effective from April 20, 2016, through April 20, 2017 ("Zurich Policy").

D.    Logisticenter 395 Owner, LLC contracted with United for United to provide design-build services for two warehouses at 8020 N. Virginia St., Reno, Nevada, and 8040 N. Virginia St., Reno, Nevada (collectively, "Virginia Street Properties"). Logisticenter 395 Owner, LLC II contracted with United for United to provide design-build services for a warehouse at 8730 Military Road, Reno, Nevada ("Military Road Property"). KTR NV II, LLC contracted with United for United to provide design-build services for a warehouse at 385 Milan Drive, Sparks, Nevada ("Milan Property").

E.    On or around April 5, 2016, United discovered property damage at the Milan Property related to an allegedly defective roof design that was also implemented at the Military Road Property and the Virginia Street Properties.

F.    United alleges that it has incurred significant damages repairing the Milan Property, Military Road Property, and Virginia Street Properties in order to remediate property damage and correct the design-build issues that caused property damage at those properties. United continues to incur such damages at the Military Road Property.

G.    On or around August 5, 2016 L/P tendered a claim to Zurich on United's behalf under the Zurich Policy for property damage to the Milan Property related to the allegedly defective roof design. Zurich denied the claim on November 16, 2016 asserting that United had incurred remediation expenses without Zurich's prior approval.

CAP003589

H.     On September 19, 2016, L/P tendered two additional claims on United's behalf to Zurich for property damage to the Virginia Street Properties related to the allegedly defective roof design. Zurich consolidated the claims into one claim and issued a reservation of rights letter to United related to the Virigina Street Properties in October 2016.

I.     On or around April 17, 2017, the owner made a claim against United for property damage to the Military Road Property arising out of the same design-build features that caused the same kind of damage to the Milan Property and the Virginia Street Properties ("Military Road Claim").

J.     When the Military Road Claim was reported to Zurich, Zurich denied coverage for it on the basis that it was not timely reported.

K.     On January 18, 2019, United filed a lawsuit against L/P in the Second Judicial District Court, Washoe County, Nevada, Case No.: CV19-00164 for professional negligence alleging that L/P failed to give timely notice of the Military Road Claim to Zurich ("L/P Litigation").

L.     L/P tendered the L/P Litigation to CapSpecialty under the CapSpecialty Policy. On January 25, 2019, CapSpecialty agreed to defend and indemnify L/P in the L/P Litigation subject to a reservation of rights.

M.     Following a January 21, 2020 mediation, L/P and United settled the L/P Litigation for $4,097,000 ("United Settlement"). CapSpecialty has agreed to contribute $3.6 million in total toward the settlement pursuant to the terms of the CapSpecialty Policy, and L/P has agreed to contribute the remaining funds.

N.     The $4,097,000 being paid to United in this settlement reimburses United for the costs United has incurred and will incur to remediate the roof at the Military Road Property to resolve the property owner's claim and demand.

O.     As part of the United Settlement, United agrees to assign its rights, benefits, proceeds, and causes of action against Responsible Entities, as defined below, related to claims made against United and damages incurred by United arising out of alleged property damage at the Milan Property, the Military Road Property, and the Virginia Street Properties.

## AGREEMENT

NOW, THEREFORE, in consideration of the covenants set forth below, and for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     **Assignment**. United hereby assigns, conveys, and transfers to CapSpecialty any and all rights, benefits, proceeds, claims, and causes of action, whether contractual, legal, equitable, or otherwise, United has or may have against any and all insurers, contractors, subcontractors, suppliers, design professionals, consultants, or other non-owner entities ("Responsible Entities") arising out of any claims or demands made against United and/or damages

CAP003590

incurred by United related to its repair and/or correction of the construction defects, design issues, and/or resulting property damage at the Milan Property, the Military Road Property, and the Virginia Street Properties, including United's consequential damages ("Assigned Claims"). The Assigned Claims include, but are not limited to, United's rights, benefits, proceeds, claims, and causes of action against Zurich    or any company affiliated with Zurich; AXIS Insurance Company; North American Risk Services; Arch Specialty Insurance Company; AIG Excess Insurance Company; Lexington Insurance Company; Greenwich Insurance Company; CNA Insurance Company; Tokio Marine Specialty Insurance Company ("Tokio Marine"); Philadelphia Insurance Company ("Philadelphia"); State National Insurance Company; National Union Fire Insurance Company; Travelers Property and Casualty Insurance Company; Ray Heating Products, Inc. dba RHP Mechanical Systems ("RHP"); Houston Casualty Company; and any entity related to or affiliated with the Responsible Entities.

United does not assign, convey, or transfer to CapSpecialty any rights, benefits, proceeds, claims, and causes of action, whether contractual, legal, equitable, or otherwise, United has or may have against the owners of the Milan Property, the Military Road Property, or the Virginia Street Properties. CapSpecialty agrees it will not sue or otherwise pursue recovery against the owners of these properties.

CapSpecialty shall be entitled to all monies recovered from the Responsible Entities related to the Assigned Claims, subject to the terms of the Release and Recovery Agreement between CapSpecialty and L/P.

2.      **Cooperation**. United agrees to fully cooperate with CapSpecialty in its efforts to pursue the Assigned Claims against the Responsible Entities. United's duty to cooperate with CapSpecialty, includes, but is not limited to:

- Providing any information CapSpecialty requests, subject to the attorney-client and work product privileges;

- Within thirty (30) days after this Assignment is executed by United, providing CapSpecialty with complete copies of United's files related to its tender (or tenders made on behalf of United) of the Assigned Claims to the Responsible Entities, including, but not limited to all correpondence, all expert reports, investigative reports, internal reports, contracts, insurance policies, proof of damages, and any other documentation supporting or relating to the Assigned Claim;

- Within thirty (30) days after this Assignment is executed by United, providing CapSpecialty with complete copies of all of United's files related to the allegedly defective roof design that is the subject of the Assigned Claims, including but not limited to correspondence, contracts, plans, draft plans, investigative reports, internal reports, and demands;

- Making its employees, officers, or others affilated with United who have knowledge of either the design issues that are the subject of the Assigned Claims, or other facts related to the Assigned Claims, reasonably available for depositions, interviews, or to provide written statements or declarations, as requested by CapSpecialty;

Page **3** of **5**

CAP003591

United does not have to provide CapSpecialty with documents, information, or material that is subject to the attorney-client or work product privileges.

United warrants and represents that the contractual claims assigned herein are in full force and effect and are fully assignable, with the exception of United's claims against Zurich related to the Virginia Street Properties, to the extent that those claims may have been released by United. United hereby assumes and agrees to perform all remaining and executory obligations, if any, under any contracts that are the subject of the Assigned Claims. United further represents that United has full rights and authority to transfer the claims subject to this assignment and that such claims are free of lien or encumbrance.

3.     **Severability**. To the extent that any provision of this Assignment shall be found to be illegal or unenforceable for any reason, such provision shall be modified or deleted in such a manner as to make this Assignment, as so modified, legal and enforceable under applicable laws.

4.     **Miscellanous**. United and CapSpecialty agree and understand that the language of this Assignment will not be presumptively construed against either party.

5.     **Capacity**. Each party has the right and authority to enter into this Assignment and there is no agreement or obligation of any kind which would prevent it from performing its duties, responsibilities or obligations to the other party under this Assignment.

6.     **Waiver**. No waiver of any breach of any provision of this Assignment shall be deemed to be a waiver of any preceding or succeeding breach of the same provision or any other provision.

7.     **Applicable Law**. This Assignment shall be governed by and construed in accordance with the laws of the State of Nevada.

8.     **Construction**. The language of this Assignment shall be construed as a whole, according to its fair meaning, not strictly for or against Assignor and Assignee and with no regard to the identity or status of any person or persons who drafted this Agreement.

9.     **Attorneys' Fees**. In the event of any litigation, claim or other legal proceeding relating to a breach or the interpretation of this Assignment, the prevailing party shall be entitled to recover its reasonable attorneys' fees and court costs.

10.     **Jurisdiction**. Any litigation or legal action between the parties concerning this Assignment shall take place in the U.S. District Court for the District of Nevada. The parties hereby consent to the jurisdiction of such court or courts and agree to appear in any such action upon written notice thereof.

11.     **Counterparts**. This Assignment may be executed in counterparts, each of which shall be an original and all of which when taken together shall be deemed to constitute one and the same instrument.

CAP003592

**IN WITNESS WHEREOF**, CapSpecialty and United, by their duly authorized representatives, affix their signatures below.

DATED:                  CAPITOL SPECIALTY INSURANCE CORPORATION

By: _____

Its: _____
                      Head of Professional Liability Claims


DATED:                  UNITED CONSTRUCTION COMPANY

By: _____

Its: _PRESIDENT & COO_____

**END OF SIGNATURES**

4834 0901 9578.1

CAP003593

# EXHIBIT M

# EXHIBIT M

1  Scott S. Thomas
   Nevada Bar No. 7937
2  sst@paynefears.com
   Sarah J. Odia
3  Nevada Bar No. 11053
   sjo@paynefears.com
4  PAYNE & FEARS LLP
   6385 S. Rainbow Blvd., Suite 220
5  Las Vegas, Nevada 89118
   Telephone: (702) 851-0300
6  Facsimile: (702) 851-0315
   *Attorneys for Plaintiff*
7  *Capitol Specialty Insurance Corporation*

8

9              **UNITED STATES DISTRICT COURT**

10                  **DISTRICT OF NEVADA**

11  CAPITOL SPECIALTY INSURANCE              Case No.: 2:20-cv-1382-JCM-VCF
    CORPORATION, a Wisconsin corporation,
12  as assignee of UNITED CONSTRUCTION
    COMPANY,
13
                                             **PLAINTIFF CAPITOL SPECIALTY**
14              Plaintiff,                    **INSURANCE CORPORATION'S**
                                             **THIRTEENTH SUPPLEMENTAL**
15        v.                                 **DISCLOSURE OF DOCUMENTS AND**
                                             **WITNESSES**
16  STEADFAST INSURANCE COMPANY, a
    Delaware corporation;  RHP MECHANICAL
17  SYSTEMS, a Nevada corporation; and AXIS
    SURPLUS INSURANCE COMPANY, an
18  Illinois corporation,

19  Defendants.

20  AND RELATED CROSSCLAIM

21

22        Pursuant to Fed. R. Civ. P. 26(a)(1), Plaintiff/Counter Defendant Capitol Specialty

23  Insurance Corporation ("CapSpecialty") hereby makes the following supplemental disclosures.

24  **Supplements are in bold.**

25                      **I. WITNESSES**

26        Pursuant to Fed. R. Civ. P. 26(a)(1), the following individuals likely have discoverable

27  information regarding the allegations set forth within CapSpecialty's Second Amended Complaint,

28  Defendant Arch Specialty's Counterclaim, and defenses raised in the parties' answers, which

PAYNE & FEARS LLP
ATTORNEYS AT LAW
6385 S. RAINBOW BLVD, SUITE 220
LAS VEGAS, NEVADA 89118
(702) 851-0300

| 29. | Emails between Troutman Pepper and United Construction | CAP005629 – 5698 |
| 30. | United Construction Company's Supplemental Production of Documents in Response to Subpoena to Non-Party for Production of Documents | CAP005699-005736 |
| 31. | Emails between LP, Steadfast and United regarding the Virginia Street Release | CAP005737-005757 |
| 32. | Invoices for Attorneys' Fees and Costs | CAP005758-006026 |
| 33. | Settlement Agreement and Mutual Release | CAP006027-006035 |
| 34. | Tom Wise Fungal Screen Inspection – 8730 Military Rd. | CAP006036-006044 |
| 35. | Tom Wise - Green Sheet | CAP006045 |
| **36.** | **Documents referenced by EMP Consultants' Mike Wintheiser during 11/4/22 Deposition** | **CAP006046 - 006052** |

## III. COMPUTATION OF DAMAGES

CapSpecialty is claiming the following damages, which are supported by their disclosed documents:

General Damages:                              $5,056,950.68 + ongoing TOTAL

Military Road Repair Costs:                   $4,097,000.00

Milan Ave. Unreimbursed Repair Costs:    $   450,000.00

Attorneys' Fees & Costs:                       $   509,950.68 + ongoing

Pre-Judgment Interest:                         TBD

Punitive Damages:                              TBD

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

### IV. INSURANCE DISCLOSURE

2        CapSpecialty is not presently aware of any insurance agreement which must be identified

3   pursuant to Fed. R. Civ. P. 26(a)(1)(iv).

4   DATED:  November 4, 2022                PAYNE & FEARS LLP

5

6                                    By:   /s/ Sarah J. Odia

7                                          Scott S. Thomas, Nevada Bar No. 7937
                                           Sarah J. Odia, Nevada Bar No. 11053
8                                          6385 S. Rainbow Blvd., Suite 220
                                           Las Vegas, Nevada 89118
9                                          Telephone: (702) 851-0300
                                           *Attorneys for Plaintiff/Counter Defendant
10                                         Capitol Specialty Insurance Corporation*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PAYNE & FEARS LLP**
ATTORNEYS AT LAW
6385 S. RAINBOW BLVD, SUITE 220
LAS VEGAS, NEVADA 89118
(702) 851-0300

1

## <u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on November 4, 2022, copies of the foregoing **PLAINTIFF**

3   **CAPITOL SPECIALTY INSURANCE CORPORATION'S THIRTEENTH**

4   **SUPPLEMENTAL DISCLOSURE OF DOCUMENTS AND WITNESSES** was served via

5   email (disclosure and exhibits) and U.S. Mail (disclosure only) addressed as follows:

6   Thomas E. McGrath, Esq.                Ramiro Morales, Esq.
    Jessica West, Esq.                     Morales Fierro & Reeves
7   Tyson & Mendes                         2151 Salvio Street, Ste. 280
    170 S. Green Valley Pkwy., Ste. 300    Concord CA 94520
8   Henderson, NV 89012                    RMorales@mfrlegal.com
    tmcgrath@tysonmendes.com               Attorneys for Defendant
9   jwest@tysonmendes.com                  Steadfast Insurance Company
    Attorneys for Defendant
10  RHP Mechanical Systems

11  Mike Melendez, Esq.
    Teri Mae Rutledge, Esq.
12  Cozen O'Connor
    101 Montgomery Street, Ste. 1400
13  San Francisco, CA 94104
    mmelendez@cozen.com
14  trutledge@cozen.com
    Attorneys for AXIS Surplus

15

16

17                                          _/s/ Jennifer Stephens_
                                            Jennifer Stephens, an Employee of
18                                          PAYNE & FEARS LLP

19  4885-6796-9341.1

20

21

22

23

24

25

26

27

28

# EXHIBIT N

# EXHIBIT N

1  Scott S. Thomas
   Nevada Bar No. 7937
2  sst@paynefears.com
   Sarah J. Odia
3  Nevada Bar No. 11053
   sjo@paynefears.com
4  PAYNE & FEARS LLP
   6385 S. Rainbow Blvd., Suite 220
5  Las Vegas, Nevada 89118
   Telephone: (702) 851-0300
6  Facsimile: (702) 851-0315
   *Attorneys for Plaintiff/Counter Defendant*
7  *Capitol Specialty Insurance Corporation*

8

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CAPITOL SPECIALTY INSURANCE CORPORATION, a Wisconsin corporation, as assignee of UNITED CONSTRUCTION COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>STEADFAST INSURANCE COMPANY, a Delaware corporation; ARCH SPECIALTY INSURANCE COMPANY, a Missouri Corporation; and RHP MECHANICAL SYSTEMS, a Nevada corporation,<br><br>    Defendants. | Case No.: 2:20-cv-1382-JAD-VCF<br><br>**PLAINTIFF/COUNTER DEFENDANT CAPITOL SPECIALTY INSURANCE CORPORATION'S RESPONSE TO FIRST SET OF INTERROGATORIES BY STEADFAST INSURANCE COMPANY** |
| ARCH SPECIALTY INSURANCE COMPANY, a Missouri Corporation,<br><br>    Counterclaimant,<br><br>    v.<br><br>CAPITOL SPECIALTY INSURANCE CORPORATION, a Wisconsin corporation, as assignee of UNITED CONSTRUCTION COMPANY,<br><br>    Counter Defendant. | |

*(left margin, vertical text)* PAYNE & FEARS LLP — ATTORNEYS AT LAW — 6385 S. RAINBOW BLVD., SUITE 220 — LAS VEGAS, NEVADA 89118 — (702) 851-0300

Case No. 2:20-cv-1382-JAD-VCF

PLAINTIFF/COUNTER DEFENDANT CAPITOL SPECIALTY INSURANCE CORPORATION'S RESPONSE TO FIRST SET OF INTERROGATORIES BY STEADFAST INSURANCE COMPANY

PAYNE & FEARS LLP
ATTORNEYS AT LAW
6385 S. RAINBOW BLVD., SUITE 220
LAS VEGAS, NEVADA 89118
(702) 851-0300

**INTERROGATORY NO. 11:**

State the total amount that United Construction Company incurred to remediate the roof at the MILAN PROPERTY to resolve the MILAN CLAIM.

**RESPONSE TO INTERROGATORY NO. 11:**

Objection: This Interrogatory is vague and ambiguous as to the term "remediate the roof."

Without waiving the foregoing general and specific objections, CapSpecialty responds as follows: Upon information and belief, $1,273,908.44.

**INTERROGATORY NO. 12:**

State the total amount it cost to remediate the roof at the MILAN PROPERTY in the MILAN CLAIM.

**RESPONSE TO INTERROGATORY NO. 12:**

Objection: This Interrogatory is vague and ambiguous as to the term "remediate the roof."

Without waiving the foregoing general and specific objections, CapSpecialty responds as follows: Upon information and belief, $1,273,908.44.

**INTERROGATORY NO. 13:**

Identify each and every PERSON who paid for the cost to remediate the roof at the MILAN PROPERTY in the MILAN CLAIM.

**RESPONSE TO INTERROGATORY NO. 13:**

Objection: This Interrogatory is vague and ambiguous in its request that CapSpecialty identify each PERSON who "paid for the cost to remediate the roof." It is also vague and ambiguous as to the term "remediate the roof."

Without waiving the foregoing specific and general objections, CapSpecialty responds as follows: Upon information and belief, United Construction Company incurred the costs to remediate the MILAN PROPERTY related to the MILAN CLAIM, under the belief that the owner of the MILAN PROPERTY was going to pay United Construction Company for such remediation costs. It was not until July 2016 that United Construction Company was first put on notice that the owner of the MILAN PROPERTY was asserting the MILAN CLAIM against United Construction Company, and the owner refused to reimburse United for the remediation costs. Upon information

Case No. 2:20-cv-1382-JAD-VCF

1    DATED: June 21, 2021                    PAYNE & FEARS LLP

2

3                                            By:        /s/ Sarah J. Odia

4                                                  Scott S. Thomas, Nevada Bar No. 7937
                                                   Sarah J. Odia, Nevada Bar No. 11053
5                                                  6385 S. Rainbow Blvd., Suite 220
                                                   Las Vegas, Nevada 89118
6                                                  Telephone: (702) 851-0300

7                                                  Attorneys for Plaintiff/Counter Defendant
                                                   Capitol Specialty Insurance Corporation
8

9

10

11

PAYNE & FEARS LLP
ATTORNEYS AT LAW
6385 S. RAINBOW BLVD., SUITE 220
LAS VEGAS, NEVADA 89118
(702) 851-0300

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF/COUNTER DEFENDANT CAPITOL SPECIALTY INSURANCE CORPORATION'S RESPONSE TO
FIRST SET OF INTERROGATORIES BY STEADFAST INSURANCE COMPANY

<div style="text-align:center">

**VERIFICATION**

</div>

I, William Roy, am the Head of Professional Liability Claims for Plaintiff/Counter

Defendant Capitol Specialty Insurance Corporation ("CapSpecialty") and am authorized to make

this verification for and on behalf of CapSpecialty. I have read the foregoing **PLAINTIFF/**

**COUNTER DEFENDANT CAPITOL SPECIALTY INSURANCE CORPORATION'S**

**RESPONSE TO FIRST SET OF INTERROGATORIES BY STEADFAST INSURANCE**

**COMPANY** and am informed and believe that the matters stated therein in response to

Interrogatory numbers 1 through 20 are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Dated this <u>18th</u> day of June, 2021.

_____

William Roy

<div style="position:absolute; left:0; top:40%; writing-mode:vertical">

PAYNE & FEARS LLP
ATTORNEYS AT LAW
6385 S. RAINBOW BLVD., SUITE 220
LAS VEGAS, NEVADA 89118
(702) 851-0300

</div>

PLAINTIFF/COUNTER DEFENDANT CAPITOL SPECIALTY INSURANCE CORPORATION'S RESPONSE TO
FIRST SET OF INTERROGATORIES BY STEADFAST INSURANCE COMPANY

PAYNE & FEARS LLP
ATTORNEYS AT LAW
6385 S. RAINBOW BLVD., SUITE 220
LAS VEGAS, NEVADA 89118
(702) 851-0300

1  **CERTIFICATE OF SERVICE**

2  I hereby certify that on June 21, 2021, copies of the foregoing **PLAINTIFF/COUNTER**

3  **DEFENDANT CAPITOL SPECIALTY INSURANCE CORPORATION'S RESPONSE TO**

4  **FIRST SET OF INTERROGATORIES BY STEADFAST INSURANCE COMPANY** were

5  served via U.S. mail and email addressed as follows:

6

7  Ramiro Morales, Esq.
Morales Fierro & Reeves

8  600 S. Tonopah Drive, Ste. 300
Las Vegas, NV 89106

9  RMorales@mfrlegal.com
Attorneys for Defendant
Steadfast Insurance Company

10

11  Kevin R. Stolworthy, Esq.
Michelle D. Alarie, Esq.

12  Armstrong Teasdale LLP
3770 Howard Hughes Pkwy., Ste. 200

13  Las Vegas, NV 89169
KStolworthy@atllp.com

14  MAlarie@atllp.com
Attorneys for Defendant/Counterclaimant

15  Arch Specialty Insurance Company

16  Jeffrey Ballin, Esq.
Tyson & Mendes

17  170 S. Green Valley Pkwy., Ste. 300
Henderson, NV 89012

18  JBallin@TysonMendes.com
Attorney for Defendant

19  RHP Mechanical Systems

20  _/s/ Erica Bennett_____
Erica Bennett

21  An Employee of PAYNE & FEARS LLP

22

23

24

25

26

27

28

-21-                          Case No. 2:20-cv-1382-JAD-VCF

PLAINTIFF/COUNTER DEFENDANT CAPITOL SPECIALTY INSURANCE CORPORATION'S RESPONSE TO
FIRST SET OF INTERROGATORIES BY STEADFAST INSURANCE COMPANY